# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI, Individually and
On Behalf of All Others Similarly Situated,

                          Plaintiff,

      v.

GOLDMAN SACHS GROUP, INC.,
GOLDMAN SACHS MORTGAGE
COMPANY, GS MORTGAGE SECURITIES
CORP., GOLDMAN, SACHS & CO., INC.,
MCGRAW-HILL COMPANIES, INC.,
MOODY'S INVESTORS SERVICE, INC.,
FITCH INC., DANIEL L. SPARKS, MARK
WEISS, JONATHAN S. SOBEL, GSAA
HOME EQUITY TRUST 2006-2, GSAA
HOME EQUITY TRUST 2006-3, and
GSAMP TRUST 2006-S2.

                     Defendants.

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATION OF §§ 11, 12(a)(2) AND 15
OF THE SECURITIES ACT OF 1933

DEMAND FOR JURY TRIAL



# TABLE OF CONTENTS

Page

I.  SUMMARY OF THE ACTION ..................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................5

III.  THE PARTIES......................................................................................................5

    A.  Plaintiff .......................................................................................................5

    B.  Defendants ...................................................................................................6

IV.  FACTUAL BACKGROUND ................................................................................9

    A.  The Development Of The Secondary Mortgage Market And Subprime Mortgages ..........................................................9

    B.  The Mechanics Of Structuring Mortgage Pass-Through Certificates .........................................................................12

    C.  Assessing The Quality Of A Mortgage Pass-Through Certificate Investment .............................................................13

    D.  The Role Of The Ratings Agencies In Structuring And Rating Certificates.........................................................................15

V.  CERTIFICATES OFFERED BY DEFENDANTS ................................................16

VI.  DEFENDANTS MISREPRESENTED THE NATURE OF THE LOANS UNDERLYING THE CERTIFICATES....................................................18

    A.  Representations Regarding Loan Origination Underwriting ..............................................................................19

    B.  Representations Regarding Appraisals .................................................20

    C.  Representations Regarding Credit Enhancement................................22

    D.  Defendants' Representations Failed To Disclose The True Risk Of Investing In The Certificates ....................................23

        1.  The Deterioration Of Underwriting Standards.............................................................................23

        2.  The Investment-Grade Ratings Misrepresented The True Risk Of The Certificates ........................................................................25

VII.  MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ...........................................................................26

VIII.  CLASS ACTION ALLEGATIONS .................................................................38

FIRST CAUSE OF ACTION  For Violation of Section 11 of the
        Securities Act (Against The Individual Defendants, Issuing
        Defendants and Underwriter Defendants) ........................................................................40

SECOND CAUSE OF ACTION  For Violation of Section 12(a)(2)
        of the Securities Act (Against the Issuing Defendants and
        Underwriter Defendants) ................................................................................................42

THIRD CAUSE OF ACTION  For Violation of Section 15 of the
        Securities Act (Against Goldman Sachs, GSMC, and
        GS&Co.) ........................................................................................................................44

RELIEF REQUESTED...............................................................................................................44

I.    <u>SUMMARY OF THE ACTION</u>

1.    Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff") brings this securities class action on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Goldman Sachs Issuing Trusts (defined, *infra*) pursuant or traceable to GS Mortgage Securities Corp.'s ("GSMSC") August 17, 2005 Registration Statement (amending original) and accompanying prospectus and prospectus supplements.  By this action, Mississippi PERS seeks redress pursuant to the Securities Act of 1933 (the "Securities Act") against defendants Goldman Sachs Group Inc. ("Goldman Sachs"), Goldman Sachs Mortgage Company ("GSMC"), GSMSC, Goldman, Sachs & Co., Inc. ("GS&Co."), McGraw-Hill Companies, Inc. ("McGraw-Hill"), Moody's Investors Service, Inc. ("Moody's"), Fitch, Inc. ("Fitch"), Daniel L. Sparks, Mark Weiss, Jonathan S. Sobel, and the Issuing Trusts.[1]

2.    This action arises from defendants' sale of mortgage pass-through certificates using false and misleading offering documents.  Mortgage pass-through certificates are securities entitling the holder to income payments from pools of loans and mortgage-backed securities ("MBS").  Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, rating agencies played an important role in the sale of such securities to investors.  Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives.  Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as investment-grade securities.  As alleged below, however, defendants misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the certificates.

---

[1]  The Issuing Trusts are set forth in ¶25, *infra*.

3.      On August 17, 2005, GSMSC filed with the Securities and Exchange Commission ("SEC") on Form S-3 a Registration Statement under the Securities Act, as subsequently amended on March 29, 2006 (the "Registration Statement"), with which GSMSC indicated its intention to sell more than 40 billion mortgage pass-through certificates ("Certificates") through a yet-to-be-determined number of Issuing Trusts.   The Certificates would be issued pursuant to the Registration Statement and accompanying prospectus, also filed with the SEC (the "Prospectus"), generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates.  The Certificates were then sold to investors by the Underwriter Defendants, as defined herein, pursuant to a series of prospectus supplements, which were also filed with the SEC and incorporated by reference into the Registration Statement ("Prospectus Supplements").   Each Prospectus Supplement included a detailed description of that Issuing Trust and its respective Certificates.  The Registration Statement, Prospectus and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

4.      As set forth below, the Offering Documents contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly liable for those misstatements under the Securities Act.

5.      Goldman Sachs is a Wall Street investment bank that, through its various subsidiaries, provides a range of investment banking, securities, and investment management services to corporations, financial institutions, governments, and high-net-worth individuals worldwide.  GSMC, a limited partner of Goldman Sachs, acquires residential mortgage loans in the secondary market.  Many of the mortgage loans originated or purchased by GSMC were pooled together and transferred to GSMSC, and then ultimately deposited into qualifying special purpose entities – the Issuing Trusts.  These pools of loans were then securitized into mortgage-backed securities and sold by the Issuing Trusts and Underwriter Defendants to investors in the form of the Certificates.  The Certificates were packaged in "tranches" by

different levels of risk and reward. The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the Issuing Trusts. As the original borrowers on each of the loans pay their mortgages, distributions are made to investors in accordance with the terms of the Certificates. If borrowers fail to pay back their mortgages, default, or are foreclosed, the losses flow to investors based on the seniority of their Certificates.

6.     Thus, the investment quality of the Certificates was and is necessarily linked to the quality of the mortgage loan pools held by each Issuing Trust. The Offering Documents included several representations regarding: (i) the underwriting standards used by the loan originators; (ii) the standards and guidelines used by GSMC when evaluating and acquiring the loans; (iii) the appraisal standards used to value the properties collateralizing the loans, and the corresponding loan-to-value ratios of the loans; (iv) the credit enhancement supporting the loan securitization process; and (v) the pre-established ratings assigned to each tranche of Certificates issued pursuant to the Offering Documents.

7.     This action relates to Certificates that separate Issuing Trusts (as set forth in ¶25, herein) issued and that Plaintiff and other Class members purchased. While all of the Certificates were offered pursuant to the Registration Statement and Prospectus, each Issuing Trust issued its own Prospectus Supplement offering Certificates related only to its unique loan pool. Plaintiff Mississippi PERS purchased Series 2006-S2 Mortgage Pass-Through Certificates pursuant to the Prospectus Supplement filed by defendant GSAMP Trust 2006-S2. In accordance with the Prospectuses, each of the Prospectus Supplements is identical, or nearly identical, in substance.

8.     The Certificates issued by each Issuing Trust were divided into several classes, or "tranches," which had different priorities of seniority, payment, exposure to risk and default, and interest payments. Defendants Moody's, a division of Moody's Corp., McGraw-Hill, through its division, Standard & Poor's ("S&P"), and Fitch, through its division Fitch Ratings Ltd. ("Fitch Ratings"), directly and indirectly participated in, and took steps necessary for the

distribution of the Certificates.    In addition, Moody's, S&P and Fitch Ratings directly participated in the selection of the underlying mortgages to be securitized and issued by each Issuing Trust.    Moreover, as a condition to the issuance of the Certificates, Moody's, S&P and Fitch Ratings rated the investment quality of the Certificates with pre-determined ratings. These ratings, which were expressly included in each of the Prospectus Supplements, determined, in part, the price at which these Certificates were offered to Plaintiff and the Class. Moody's and S&P assigned investment-grade ratings on most of the tranches of the offered Certificates.

9.    The highest investment rating used by Moody's is "Aaa."    The highest rating used by S&P and Fitch is "AAA."    These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.    Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.    These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade, or "junk bond."

10.    As alleged more fully below, the Offering Documents misstated and omitted material information regarding the quality of the loans underlying the Certificates and the process by which GSMC acquired those loans.    Specifically, the Offering Documents failed to disclose, *inter alia*, that the loan originators had systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards and that GSMC ignored its loan purchasing guidelines.    Likewise, the underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties.

11.    As a result of the materially false and misleading statements in the Offering Documents, Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality."    Consequently, certain Certificate tranches represented to be investment-grade instruments were later revealed to be below investment-grade instruments, or "junk bonds."    The downgrades in the ratings caused the value of the Certificates to collapse.    The Certificates continue to lose value as

delinquencies, defaults and foreclosures related to the mortgages underlying the Certificates continue to increase. As a result, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

13.    Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District. In addition, several of the parties are located in this District.

14.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## III.    THE PARTIES

### A.    Plaintiff

15.    Plaintiff Public Employees' Retirement System of Mississippi is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi. Established by the Mississippi Legislature in 1952, Mississippi PERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees. Mississippi PERS acquired Certificates pursuant and/or traceable to the Offering Documents. Mississippi PERS purchased 6,000,000 Series 2006-S2 Mortgage Pass-Through Certificates issued by the GSAMP Trust 2006-S2, at a price of $99.99 (per lot of 100), as reflected in the Certification attached hereto as Exhibit 1.

B.    <u>Defendants</u>

16.    Defendant Goldman Sachs Group, Inc. is a Delaware Corporation with its principal executive office located at 85 Broad Street, New York, New York 10004.  As an investment bank, Goldman Sachs is an underwriter of a wide range of securities and other financial instruments, including mortgage related securities.  Goldman Sachs, through GSMC, created and controls GSMSC, a limited purpose, wholly-owned subsidiary designed to facilitate the issuance and sale of the Certificates.  Goldman Sachs acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, Goldman Sachs participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

17.    Defendant Goldman Sachs Mortgage Company is a New York limited partnership, with its principal place of business located at 85 Broad Street, New York, New York 10004.  GSMC's general partner is Goldman Sachs Real Estate Funding Corp. (an entity itself controlled by Goldman Sachs) and its limited partner is Goldman Sachs.  GSMC is the parent of GSMSC, and an affiliate of GS&Co.  GSMC purchases closed, independently funded, first- and subordinate-lien residential mortgage loans for its own investment, securitization or resale. GSMC served as the "Sponsor"/"Seller" in the securitization of certain of the Issuing Trusts; and, in coordination with GS&Co., worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

18.    Defendant GS Mortgage Securities Corp. is a Delaware corporation and a limited purpose, wholly-owned subsidiary of GSMC, with its principal place of business located at 85 Broad Street, New York, New York 10004.  GSMSC is an affiliate of GS&Co.  GSMSC served in the role as "Depositor" in the securitization of the Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77b(a)(4).

19.    Defendant Goldman, Sachs & Co., Inc. is a Delaware corporation with its principal place of business located at 85 Broad Street, New York, New York 10004.  GS&Co. is an affiliate of GSMC and GSMSC.  GS&Co. acted as an "Underwriter" of the Certificates

6

within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, GS&Co. participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

20.    Defendant McGraw-Hill Companies is a Delaware corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in California. Standard & Poor's, a division of McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors. S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). S&P participated in the drafting and dissemination the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, S&P worked with GSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

21.    Defendant Moody's Investors Service, Inc. is a division of Moody's Corp., a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007, with a regional Moody's office located at One Front Street, Suite 1900, San Francisco, California. Moody's provides credit ratings, research and risk analysis to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Moody's worked with GSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

22.    Defendant Fitch, Inc. is a Nationally Recognized Statistical Rating Organization with dual headquarters in New York, New York, and London, England, and its principal place of operations at One State Street Plaza, New York, New York 10004. Fitch, through Fitch Ratings, is a leading global rating agency committed to providing the world's credit markets

with independent, timely and prospective credit opinions. Fitch Ratings participated in the drafting and dissemination the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Fitch Ratings worked with GSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

23.    Defendant McGraw-Hill, inclusive of S&P, defendant Moody's, and defendant Fitch, inclusive of Fitch Ratings, are collectively referred to herein as the "Rating Agency Underwriters."

24.    Defendants GS&Co., Goldman Sachs, and the Rating Agency Underwriters are collectively referred to herein as the "Underwriter Defendants."

25.    Defendants, the Issuing Trusts, were created and structured by GSMSC to issue billions of dollars worth of Certificates pursuant to the Registration Statements and Prospectuses. For each offering by the Issuing Trusts, GSMSC served as the "Depositor," GS&Co. served as a designated "Underwriter," and GSMC served as the "Sponsor"/"Seller." The following chart identifies: (1) each Issuing Trust; (2) the respective Prospectus Supplement issue date pursuant to which the Certificates were issued and sold; and (3) the stated value of the Certificates issued:

| Issuing Trust | Prospectus Issue Date | Principal Amount |
|---|---|---|
| GSAA Home Equity Trust 2006-2 | February 6, 2006 | $960,739,200 |
| GSAA Home Equity Trust 2006-3 | February 24, 2006 | $997,484,200 |
| GSAMP Trust 2006-S2 | March 30, 2006 | $698,422,000 |

26.    Defendants GSMSC, Goldman Sachs and the Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

27.    Defendant Daniel L. Sparks ("Sparks") was, at relevant times, the Chief Executive Officer ("CEO") and a Director of GSMSC. Defendant Sparks signed the

Registration Statement. While serving as CEO and Director of GSMSC, defendant Park was concurrently the Managing Director, Head of the Mortgage Department of defendant Goldman Sachs.

28.    Defendant Mark Weiss ("Weiss") was, at relevant times, the Vice President and the principal financial officer and principal accounting officer of GSMSC. Defendant Weiss signed the Registration Statement. While serving as Vice President of GSMSC, defendant Weiss was concurrently a Managing Director, Commercial and Residential Mortgage Originations and Securitizations of defendant Goldman Sachs.

29.    Defendant Jonathan S. Sobel ("Sobel") was, at relevant times, a Director of GSMSC. Defendant Sobel signed the Registration Statement. While serving as a Director of GSMSC, defendant Sobel was concurrently the Head of MBS Trading and then the Global Head of Risk Management for the Investment Management Division of defendant Goldman Sachs.

IV.    FACTUAL BACKGROUND

A.    The Development Of The Secondary Mortgage Market And Subprime Mortgages

30.    Traditionally, consumers wishing to finance the purchase of a house (or other property) were able to obtain a 30-year or 15-year fixed rate mortgage or a conventional adjustable rate mortgage ("ARM") through a mortgage lender that would profit by servicing the loans and collecting interest payments over the life of the mortgages. As such, the lender (or loan originator) had an interest in making sure that borrowers were able to repay their loans; or that loans were at least adequately collateralized in the case of default.

31.    To increase available funds for borrowers, the U.S. government chartered Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The GSEs were empowered to buy mortgages (*i.e.,* the rights to repayment of the loans) from loan originators, thus developing a secondary market for mortgages. Once bought, the loans were pooled together, securitized and sold to investors as "mortgage backed securities," or

"MBS." The money that a loan originator earned from the loan sales was then used to finance new mortgages, thereby increasing the lender's revenues.

32.    Investors who purchased MBS would (typically) receive monthly payments over the lifetime of the underlying loans, in accordance with the borrowers' payments of principal and interest. To protect MBS investors, the GSEs only purchased loans that met approved underwriting standards. In addition, the prices of the MBS were discounted to account for an assumed rate of default or non-payment of a certain percentage of loans.

33.    From 1995 to 2005, the housing market experienced a dramatic rise in home ownership. According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge as 12 million more Americans became homeowners between 1994 and 2004. The increased demand also resulted in a growth in new home construction. In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold, compared with an average of 609,000 per year from 1990 to 1995.

34.    Investment banks such as Goldman Sachs and other entities became active in and profited from the lucrative secondary market for mortgage loans. Unlike GSEs, investment banks were not constrained by the same strict conditions and restrictions when purchasing loans from loan originators. As the secondary market for loans originated with less stringent underwriting standards expanded, loan originators were increasingly able to lend to borrowers with higher credit-risk profiles without absorbing all of the increased risk. In exchange for the increased risk of default and/or delinquencies, the loan originators provided the loans at higher interest rates – *i.e.*, subprime loans – with higher potential rates of return, due to the higher interest percentage charged to the borrowers and thus the higher rate of return to investors in the secondary market.

35.    In recent years, several factors led to greater demand for subprime and alternative loan mortgages in the secondary market. Perhaps the most significant factor was the introduction of new pricing models, the Gaussian copula models developed by David X. Li,

10

which allowed for rapid pricing of exotic finance structures that relied upon pooled mortgages and MBS. The increased demand in the secondary market, along with persistent low interest rates and low inflation (perhaps caused by the increased demand in the secondary market), facilitated consumer borrowing.

36. Concurrently, as loan originators increased the amount of loans sold rather than held and serviced, they became less vigilant in guarding against the risk of defaults and delinquencies because they were able to quickly transfer the risk to purchasers in the secondary market. Loan fees and sales revenue became the lender's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation. In addition, it is now known that loan originators abandoned their stated underwriting and appraisal standards, and other methods of risk assessment, in order to increase loan origination quantities.

37. According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005. The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that would previously have been denied." This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan"). According to a report by rating agency S&P, Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

38. The end result was a mortgage paradigm shift where loan originators allowed consumers to borrow more money than they could afford to repay. As consumers were able to borrow more, they were able to spend more. Accordingly, housing prices kept rising. In that environment, consumers who were unable to repay their loans could simply borrow more

11

money (against increased equity) or sell their house at a perpetually increasing price to other consumers – who likely borrowed more than they could afford to repay, as well. Thus, in the sky-rocketing housing market, the effects of the loan originators' over-aggressive lending practices were not immediately realized.

39.    Eventually, however, the aggressive lending practices overburdened the housing market. Housing prices peaked, loan volume leveled-off and loan defaults and delinquencies started to rise. Without underlying repayment revenues and adequate collateral value to support MBS, the credit market began deteriorating and investors in mortgaged-backed instruments, directly or through derivative instruments such as asset-backed or mortgage pass-through certificates, experienced tremendous losses.

B.    The Mechanics Of Structuring Mortgage Pass-Through Certificates

40.    Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS. Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

41.    First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," which either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

42.    The issuing trust then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Although technically different instruments, tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward. Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of

seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA." Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

43. By working with the underwriters, the depositor, and the rating agencies, the issuing trust is able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering. Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriter. The underwriter offers the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



44. Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans. Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans. Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

C.     Assessing The Quality Of A Mortgage Pass-Through Certificate Investment

45. The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans

pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, as set forth in the offering prospectus, certificate owners would suffer more than expected losses as income necessary to service the certificates would necessarily diminish.

46.    Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property.  In the event of a foreclosure, an accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and thus the amount of money that issuing trust would receive and be able to pass through to certificate holders.

47.    An accurate appraisal is also critical to calculating loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates.  The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property.  For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%.  If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

48.    From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan.  First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default.  Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

49.    Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates.  Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the offered certificates.

50.     The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors.   In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

51.     Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches.  In other words, overcollateralization serves as a cushion, so that in the case of default on certain loans, the remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

52.     A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust.  Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans.

53.     If the assumed underwriting standards and appraisals are inaccurate, or the loan purchasing guidelines used to acquire those loans are disregarded, the stated credit enhancement parameters will be inaccurate, and investors will not receive the level of protection as set forth in the respective registration statement and prospectus(es).

D.     The Role Of The Ratings Agencies In Structuring And Rating Certificates

54.     Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk associated with a particular investment instrument.   Historically, an overwhelming majority of the rating agencies' revenues were generated by fees from subscribers who received their research and ratings.   In the structured finance arena (*i.e.*, mortgage pass-through certificates and other MBS), however, rating agencies often played an active role in structuring the very instruments that they rated – and they received lucrative fees for their services.

55.     The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold only "investment-grade" bonds and securitized interests. Indeed, many MBS – including mortgage pass-through certificates – were geared towards, and promoted to, institutional investors. Here, in fact, each of the Prospectus Supplements stated, "The offered certificates may be inappropriate for individual investors."

## V.    CERTIFICATES OFFERED BY DEFENDANTS

56.     In theory, the loan securitization process entails a series of "arm's-length" transactions where the certificates are valued, appropriately priced and sold to investors. The depositor pays a fair price to the sponsor/seller based on the represented quality of the pool of loans. The depositor then verifies the quality of the loans and transfers them to the issuing trust. The depositor then works with the underwriters to assess the likely cash-flows from the loan repayments and, based on those calculations, sets the parameters and expected yield of each certificate tranche that the underwriter will offer to investors.

57.     Goldman Sachs, through its controlled entity GSMC, established GSMSC for the sole purpose of issuing the Certificates. GSMSC filed with the SEC the Registration Statement and Prospectus, identifying itself as the "Depositor" of a to-be-determined series of Certificate offerings, pursuant to forthcoming Prospectus Supplements.

58.     The Prospectus and Prospectus Supplements provided information to investors about the Certificates in more detail in progression. First, the Prospectus provided general information regarding the Certificate offerings. Then, the respective Prospectus Supplements provided the specific terms of the particular Certificate series offering.

59.     The Prospectus provided that GSMSC would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would consist of assets from one of the following categories: (i) mortgaged loans or participations in mortgage loans secured by one- to four-family residential properties; (ii) mortgage loans or participations in mortgage loans secured by multifamily residential

16

properties; (iii) loans or participations in loans secured by security interests on shares in cooperative housing corporations; (iv) conditional sales contracts and installment sales or loan agreements or participations in such contracts or agreements secured by manufacturing housing; (v) closed-end and revolving credit line mortgage loans or participations in revolving credit line mortgage loans (or certain revolving credit line mortgage loan balances); and (vi) mortgage pass-through securities issued or guaranteed by Government National Mortgage Association, the Fannie Mae, Freddie Mac or other government agencies or government sponsored agencies or privately issued mortgage-backed securities.

60.     Subsequent to filing the Prospectus, GSMSC caused to be filed Prospectus Supplements for each of the Issuing Trusts.  For example, on March 28, 2006, GSMSC filed with the SEC a Prospectus Supplement offering Series 2006-S2 Mortgage Pass-Through Certificates on behalf of the GSAMP Trust 2006-S2.

61.     In the Prospectuses and each of the respective Prospectus Supplements, GSMSC was identified as the Depositor for the Issuing Trusts' Certificate offerings.  While GSMSC served as the Depositor for each of the Issuing Trusts, it was directed and controlled by GSMC and/or Goldman Sachs.

62.     The Registration Statement, and each of the respective Prospectus Supplements, identified GSMC as the "Sponsor" of the loans acquired by the Depositor, GSMSC.  While GSMC served as the Sponsor for each of the Issuing Trusts, it was directed and controlled by Goldman Sachs.

63.     According to the Registration Statement and Prospectus Supplements, the Depositor acquired a pool of loans from the Sponsor GSMC, who purchased the loans or otherwise acquired them through its conduit program.  A majority of the mortgage loans underlying the Certificates were purchased by GSMC from NC Capital Corporation ("NC Capital"), an affiliate of New Century Mortgage Corporation ("New Century").  A pool of loans was then sold to the Depositor and passed-through to the Issuing Trusts.

64.    GSMSC, the Depositor, then worked with the Underwriter Defendants and GSMC to structure the securitization transactions and price the Certificates.  Per the Offering Documents, GS&Co. was the designated "Underwriter."  In addition, by way of their actual participation and conduct in structuring the transactions, Goldman Sachs and the Rating Agency Underwriters directly and indirectly participated in the distribution process.  Specifically, the Rating Agency Underwriters participated in structuring the transactions and, as a condition to the issuance of the Certificates, provided investment-grade ratings as detailed in each of the Prospectus Supplements.

65.    As stated in the Prospectus and the Prospectus Supplements, GS&Co., as the designated Underwriter, purchased the Certificates and offered them to investors, including Plaintiff and other Class members.  The proceeds from those sales were then transferred to GSMSC (the Depositor), net of underwriting fees.

VI.    DEFENDANTS MISREPRESENTED THE NATURE
       OF THE LOANS UNDERLYING THE CERTIFICATES

66.    The Offering Documents contained material statements regarding, *inter alia*, (i) the underwriting process and standards by which the loans held by the respective Issuing Trusts were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by GSMC when evaluating and acquiring the loans; (iii) representations concerning the value of the underlying real-estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors.

67.    Each Prospectus Supplement included tables with data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties.

A.    Representations Regarding Loan Origination Underwriting

68.    Although the percentages vary among the Issuing Trusts, the Prospectus Supplements stated that GSMC acquired the mortgage loans underlying the Certificates from various loan originators.  As represented in the Prospectus Supplements, the acquired mortgage loans underlying the Certificates "were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" in this Prospectus Supplement.[2]

69.    As represented in the Offering Documents, the mortgage loans were acquired from originators or loan sellers that represented and warranted that all mortgage loans originated and/or sold by it were underwritten in accordance with standards consistent with those used by mortgage lenders or manufactured home lenders during the period of origination and/or as specified in the Prospectus Supplements.

70.    As represented in the Offering Documents, the originator applied the underwriting standards in the respective Prospectus Supplements to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral.  GSMC, in connection with the acquisition of the mortgage loans, performed quality control by re-underwriting several mortgage loans based upon appropriate criteria depending to some extent on its prior experience with the originator and prior experience with particular types of loans and geographical regions.

71.    As explained in the Prospectus Supplements, GSMC purchases mortgage loans from pre-approved counterparties on a periodic basis.  For example, with regard to certain of the Issuing Trusts, GSMC bid on three pools of mortgage loans from NC Capital in September, October and December 2005, respectively, and purchased a sub-set of each such pool after conducting due diligence on the mortgage loan portfolio offered.  Substantially all of the unpaid mortgage loans that GSMC purchased from NC Capital in September, October and December 2005 were securitized and included in certain of the Issuing Trusts.

---

[2]  The Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

72.    Prior to acquiring any mortgage loans, GSMC represented that it conducted a review of the related mortgage loan seller.  GSMC's review process consists of reviewing select financial information from credit and risk assessment and underwriting guideline review, senior level management discussion and background checks.  The scope of the loan due diligence will depend on the credit quality of the mortgage loans.

73.    As noted, the Prospectus Supplements indicated that certain of the loans underlying the Certificates were issued pursuant to reduced or alternative documentation programs offering varying types of loan products, such as balloon payment or alternative rate mortgage loans.  A statistical breakdown of the loans categorized by documentation level is included in the Prospectus Supplement for each Issuing Trust.

B.    Representations Regarding Appraisals

74.    As represented in the Prospectus Supplements, the securitization transactions were designed around the assumption that the related mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

75.    Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  As required by Fannie Mae and Freddie Mac, and as represented by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.

76.    With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*     \*     \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.     the reporting of a predetermined result (*e.g.*, opinion of value);

2.     a direction in assignment results that favor the cause of the client;

3.     the amount of a value opinion;

4.     the attainment of a stipulated result; or

5.     the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

77.    In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators required an appraisal report that included market data analysis based on recent sales of comparable homes in the area. If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk, field review or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

78.    As represented in the Offering Documents, the "Loan-to-Value Ratio" or "LTV Ratio" of a mortgage loan at any time is the fraction, expressed as a percentage, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value of the related mortgaged property. The collateral value of a mortgage property, other than with respect to housing contracts and certain mortgage loans the proceeds of which are used to refinance an existing loan, is the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of such loan and (b) the sales price for such property.

79.    The Prospectus Supplements also provided information regarding the weighted average combined original LTV Ratio of the loans underlying the Certificates. The Combined

LTV Ratio is provided in each Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical location. Moreover, each Prospectus Supplement made representations regarding the Combined LTV Ratio. For example, the GSAMP Trust 2006-S2 Prospectus Supplement stated that "[t]he weighted average original combined loan-to-value ratio of the mortgage loans is approximately 99.84% and approximately 99.93% of the mortgage loans have original combined loan to value ratios exceeding 80.00%."

        C.     Representations Regarding Credit Enhancement

80.     Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements. Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued. The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests, a yield maintenance agreement, overcollateralization and excess interest. Each form of credit enhancement is necessarily dependent on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

81.     Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization. For example, the GSAMP Trust 2006-S2 Prospectus Supplement stated that the overcollateralization amount with respect to the Series 2006-S2 Certificates was 2.40% of the aggregated outstanding principal balance of the mortgage loans on the cut-off date ($741,424,703), or approximately $17,794,192.

82.     In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust). Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the

aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

83.    The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering.  As stated in the Prospectus Supplements, the ratings assigned to mortgage pass-through certificates "address the likelihood of the receipt by certifcateholders of distributions on mortgage loans.  The ratings take into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the Certificates." GSAMP Trust 2006-S2 Prospectus Supplement.[3]

84.    Here, the Rating Agency Underwriters worked directly with the Underwriter GS&Co., Depositor GSMSC and Sponsor GSMC to structure the Certificate transactions to achieve certain ratings.  In fact, it was a condition of the issuance of the Certificates that each tranche in the series receive the respective ratings as set forth in the Prospectus Supplements.

D.    Defendants' Representations Failed To Disclose
The True Risk Of Investing In The Certificates

1.    The Deterioration Of Underwriting Standards

85.    From 1995 to 2005, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners between 1994 and 2004. Likewise, in recent years, the subprime market has grown dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to Inside Mortgage Finance, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5 percent of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

86.    As detailed above, Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including

---

[3]  As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

mortgage pass-through certificates. This aggressive push created a boom for the mortgage lending industry. By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the housing market. At the center of the escalation was Wall Street's partnership with subprime lenders. This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

87.    As is now evident, far too much of the lending during that time was neither responsible nor prudent. According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis. A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios." In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original). As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

88.    Indeed, several of Goldman Sachs's primary loan suppliers, including New Century and Countrywide Home Loans, Inc. ("Countrywide"), are among the originators that helped cause the mortgage crisis because they completely abandoned their underwriting standards in order to increase loan origination volume. In fact, Countrywide is now under investigation of its lending practices and the subject of enforcement action by several government regulators, including the Illinois Attorney General, the California Attorney General, the Connecticut Attorney General, the Federal Bureau of Investigation ("FBI") and Department

of Justice, and regulators in the states of Washington, West Virginia, North Carolina, Indiana and Florida, among others.

89.     The government has launched numerous investigations into the subprime mortgage lending industry.  In May 2008, the FBI and the criminal division of the Internal Revenue Service formed a task force to examine mortgages that were made with little or no proof of the earnings or assets of borrowers.  The task force includes federal prosecutors in New York, Los Angeles, Philadelphia, Dallas and Atlanta.  The task force is focusing on the role of mortgage lenders and brokers in low- or no-documentation loans, and is also examining how the loans were bundled into securities.

2.     The Investment-Grade Ratings
Misrepresented The True Risk Of The Certificates

90.     As detailed above, the Rating Agency Underwriters directly participated in structuring the securitization transactions underlying the Certificates and, as a condition to the issuing of the Certificates to the public, provided pre-determined ratings for the Certificates. These pre-determined credit ratings were, for virtually all tranches of the offered Certificates, investment-grade.  Moody's and S&P maintained investment-grade ratings on the Certificates until, at least, August 26, 2008.

91.     The ratings provided by the Rating Agency Underwriters were unjustifiably high and did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  The President's Working Group on Financial Markets, Policy Statement Financial Market Developments (March, 2008), confirms that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as asset-backed pass-through certificates.

92.     Internal rating agency emails discovered and released by U.S. Congressional investigators reveal that some Rating Agency Underwriter employees suspected before the credit markets deteriorated that the Rating Agency Underwriters used lax standards for rating

MBS. For example, one email between colleagues at S&P stated, "Rating agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters." As J.P. Morgan CEO Jamie Dimon observed, "There was a large failure of common sense. Very complex securities should not have been rated as if they were easy to value bonds."

93.    Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

## VII.    MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

94.    The Registration Statement for the Issuing Trusts contained an illustrative form of the prospectus for use in the offering of the Certificates. The Registration Statement was prepared by the Issuing Defendants and Underwriter Defendants, and signed by the Individual Defendants. Along with the Registration Statement, the Prospectus was filed providing details of the Certificate offerings. The Prospectus was prepared by the Issuing Defendants and the Underwriting Defendants. Subsequently, Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and making certain representations about the loan origination process and the quality of the loans. The Prospectus Supplements were prepared by the Issuer Defendants and the Underwriter Defendants. The Rating Agency Underwriters directly participated in the structuring of the mortgage pools and, as a condition of the issuance of the Certificates, provided the investment-grade ratings predetermined in the Prospectus Supplements. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements. The Prospectus was referenced and incorporated into the Registration Statement.

95.    The Registration Statement and the Prospectus stated the "Underwriting Guidelines" concerning the loans underlying each of the Certificates offered pursuant to the Registration Statements.   Specifically, each of the Prospectus Supplements state that "The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement."   Each of the Prospectus Supplements identified loan originators of the loans in the mortgage pools underlying the Certificates for that particular Issuing Trust and provided representations regarding the underwriting standards utilized by the identified loan originators.

96.    The GSAMP Trust 2006-S2 Prospectus Supplement listed New Century Mortgage Corporation as a loan originator accounting for the loans in the mortgage pool underlying the Issuing Trust, and stated that:

> The New Century Underwriting Guidelines are primarily intended to repay the related mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.  All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.  While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. . . .
>
> The mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines.  On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist.  It is expected that a substantial portion of the mortgage loans will represent these exceptions.
>
> Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company….  Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable

27

condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century.

\* \* \*

The mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.

97. The GSAA Home Equity Trust 2006-3 Prospectus Supplement listed Countrywide Home Loans, Inc. as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

As part of its evaluation of potential borrowers, Countrywide generally requires a description of income. If required by its underwriting guidelines, Countrywide obtains employment verification providing current and historical income information and/or telephonic employment confirmation. . . .

Countrywide's underwriting standards are applied by or on behalf of Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and

the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits. . . .

Countrywide may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations:  The Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

\*  \*  \*

In addition to Countrywide's standard underwriting guidelines (the "STANDARD UNDERWRITING GUIDELINES"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide uses underwriting guidelines featuring expanded criteria (the "EXPANDED UNDERWRITING GUIDELINES"). . .

Countrywide's Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 75% for mortgage loans with original principal balances up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000….

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide's Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 80% for mortgage loans with original principal balances up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans

with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

98.     The GSAA Home Equity Trust 2006-3 Prospectus Supplement listed GreenPoint Mortgage Funding, Inc. ("GreenPoint") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> GreenPoint has originated residential mortgage loans of substantially the same type as the Mortgage Loans since October of 1999. . . .
>
> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present. The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. . . .
>
> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. Each mortgage loan has a required amount of reserves, with the minimum being two months of principal, interest, taxes and insurance for full documentation loans. Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for additional risk. . . .
>
> GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of

program are generally limited to borrowers with credit histories that demonstrate an ability to repay indebtedness in a timely fashion. . . .

\*   \*   \*

In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing.  All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in good condition and verify that construction, if new, has been substantially completed.

99.    The GSAA Home Equity Trust 2006-3 Prospectus Supplement listed First National Bank of Nevada ("FNBN") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide).  To the extent the programs reflect underwriting guidelines different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans there under may reflect relatively higher delinquency rates and/or credit losses.  In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated by a prospective borrower.

In addition to its originations, FNBN also acquires mortgage loans from approved correspondent lenders under a program pursuant to which the correspondent agrees to originate the mortgage loans in accordance with the underwriting guidelines of FNBN…. FNBN generally conducts a quality control review of a sample of these mortgage loans within 45 [days] after the origination or purchase of such mortgage loan.  The number of loans reviewed in the quality control process varies based on a variety of factors,

including FNBN's prior experience with correspondent lender and the results of the quality control review process itself.

FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral…. Generally, scheduled payments on a mortgage during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

100. The GSAA Home Equity Trust 2006-3 Prospectus Supplement listed National City Mortgage Co. ("National City Mortgage") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

The originator's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present. Generally, each mortgagor will have been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor. The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history, and personal information, and will have furnished the lender with authorization to obtain a credit history which summarizes the mortgagor's credit history. . . .

Mortgage loans with principal balances exceeding $1,000,000 ("super jumbos") are allowed if the loan is secured by the

borrower's primary residence or second home. The loan-to-value ratio for super jumbos generally may not exceed 75%. For cash out refinance loans, the maximum loan-to-value ratio generally is 90% and the maximum "cash out" amount permitted is based in part on the original loan-to-value of the related mortgage loan and FICO score. Typically, the maximum cash-out permitted is the greater of $200,000 or 50% of the new loan amount for LTVs above 50%. Less than fully documented loans generally have loan-to-value and/or loan amount limits.

\* \* \*

Under the full/alternative documentation, the prospective borrower's employment, income and assets are verified through written and telephonic communications, covering a 2-year period for employment/income and a 2-month period for assets. Eligible loans may have been processed through Loan Prospector or Desktop Underwriter…

Under stated income documentation, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.

101. The GSAA Home Equity Trust 2006-2 Prospectus Supplement listed Argent Mortgage Company, L.L.C., formerly Ameriquest Mortgage Company ("Argent"), as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

Each mortgage loan originated by Argent was originated generally in accordance with guidelines (the "Underwriting Guidelines") established by Argent with one of the following income documentation types: "Full Documentation." "Limited Documentation," or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability; and (2) the value and adequacy of the mortgaged property as collateral. On a case-by-case basis, Argent may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines. . . .

During the underwriting process, Argent reviews and verifies the loan applicant's sources of income (except under the Stated

Income and Limited Documentation types, under which programs, such information may not be independently verified), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires either (A) (i) an appraisal of the mortgaged property which conforms with to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of Argent or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property or (B) an insured automated valuation model. The Underwriting Guidelines permit loans with combined LTV ratios at origination of up to 100%, subject to certain Risk Category limitations. . . .

Properties that are secure mortgage loans have a valuation obtained by either: (1) an appraisal performed by a qualified and licensed appraiser who is a staff appraiser or an independent appraiser who is in good standing with Argent's in-house appraisal department; or (2) subject to Argent's Underwriting Guidelines, an insured automated valuation model.

\* \* \*

Under the Underwriting Guidelines, various Risk Categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan ("Risk Categories"). These Risk Categories establish the maximum permitted LTV ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher risk credit mortgage loans are graded in Risk Categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Underwriting Guidelines establish lower maximum LTV ratios and lower maximum loan amounts for loans graded in Risk Categories.

102.    The above statements, as set forth in ¶¶95-101, were materially false and misleading when made because they failed to disclose that (i) loan originators systematically ignored abandoned their stated and traditional underwriting standards during the period of

origination; (ii) the underwriting standards actually utilized did not properly evaluate the borrower's credit standing and ability to repay the loan, as represented; (iii) exceptions were made to the underwriting standards despite the absence of true compensating factors; and (iv) the appraisals were not conducted in accordance with the loan originators' stated underwriting standards.

103.    The GSAA Home Equity Trust 2006-3 Prospectus Supplement stated that the loans underlying the Certificates of the Issuing Trusts were originated or acquired from third parties by GSMC through the "GSMC Conduit Program," and stated:

> Substantially all of the mortgage loans acquired by GSMC through its conduit program were acquired generally in accordance with the underwriting criteria described in this section.  In certain instances, compensating factors demonstrated to the mortgage loan originator by a prospective borrower may warrant GSMC to make certain exceptions to these guidelines.  In such instances GSMC would purchase a mortgage loan that did not completely conform to the guidelines set out below.

> *    *    *

> Generally, each borrower applying for a mortgage loan must complete a credit application.  The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information. . . .

> Based on the data referenced above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property….

> Generally, the "full" documentation program requires information with respect to the borrower's income and assets (i.e., standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories)… Generally, under "full" documentation programs at least two years of income documentation is provided.  Assets and employment history must also be verified by the originating lender.

\* \* \*

> An appraisal is generally conducted on each mortgaged property by the originating lender.  The appraisal must be conducted in accordance with established appraisal procedure guidelines acceptable to the originator in order to determine the adequacy of the mortgaged property as security for repayment of the related mortgage loan.  All appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Foundation….

104.    The above statements were materially false and misleading when made because they failed to disclose that GSMC and the other third party loan originators: (i) systematically ignored or abandoned their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to GSMC's Conduit Program acquisition underwriting standards; and (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan origination quantity and the resulting fees obtained.

105.    The Registration Statement and Prospectus included the Weighted Average Original Combined LTV Ratio, as well as tabular data reflecting the Weighted Average Original Combined LTV Ratios per a range of categorized loans.  For example, the GSAMP Trust Series 2006-S2 Prospectus Supplement indicated that 12,199 loans (out of 12,460 total loans) were within the Loan-to-Value Ratio range of 95.01% to 100%.  The total weighted average Loan-to-Value ratio was represented as 97.96%.  No loan was represented to have a Loan-to-Value Ratio of greater than 100%.

106.    The above statements, including the tabular statistics in each Prospectus Supplement regarding the purported Loan-to-Value Ratios of the underlying mortgages, were materially false and misleading when made because they failed to disclose that the Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures and in accordance with USPAP, as stated in the Prospectus Supplements.  In addition, the statements were materially false and misleading

when made because the actual Loan-to-Value Ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established independent appraisal procedures and in accordance with USPAP, per the appraisal guidelines set forth in the Prospectus Supplements.

107.    The Prospectuses represented that the securitization of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. Each Prospectus Supplement stated a particular amount by which the aggregate stated principal balance of the mortgage loans was greater than the aggregate class principal of the Certificates at the time of the offering.    For example, the GSAMP Trust Series 2006-S2 Prospectus Supplement stated, "As of the closing date the amount of initial overcollateralization is equal to approximately 2.40%."

108.    The Prospectus and Prospectus Supplements represented that each Issuing Trust was structured with "credit enhancement provided for the benefit of the holders of the certificates," including the use of excess interest to cover losses on the mortgage loans and as distribution of principal to build or maintain overcollateralization.

109.    The above statements were materially false and misleading when made because they failed to disclose that because GSMC and the loan originators systematically ignored or abandoned their underwriting standards, and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates.    As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

110.    The Registration Statement and Prospectus stated that "in order to be issued, the Offered Certificates must be assigned" certain pre-determined ratings from the Rating Agency Underwriters, as set forth in the Prospectus Supplements.    As stated:

A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the mortgage loans. The rating takes into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the certificates.

111.    Each Prospectus Supplement listed the initial Ratings of the Certificates being offered by the Issuing Trust. In each, the Certificates were rated as investment-grade, in accordance with the pre-established rating systems utilized by the Rating Agency Underwriters. For example, the GSAMP Trust Series 200-S2 Prospectus Supplement included the following chart identifying each Series 2006-S2 Certificate rating:

| Class | Fitch | Moody's | S&P |
|-------|-------|---------|-----|
| A-1A | AAA | Aaa | AAA |
| A-1B | AAA | Aaa | AAA |
| A-2 | AAA | Aaa | AAA |
| A-3 | AAA | Aaa | AAA |
| M-1 | AA | Aa2 | AA |
| M-2 | AA- | Aa3 | AA- |
| M-3 | A | A2 | A |
| M-4 | A- | A3 | A- |
| M-5 | BBB+ | Baa1 | BBB+ |
| M-6 | BBB | Baa2 | BBB |
| M-7 | BBB- | Baa3 | NR |

112.    The above statements, as set forth in ¶¶110 and 111, were false and misleading when made because they (i) failed to disclose that the ratings assigned to the Certificates did not reflect the true likelihood of the receipt of all payments on the loans; (ii) misrepresented that the ratings considered the actual credit quality of the loans; (iii) misrepresented that the ratings considered the extent to which the payment stream on the loans was adequate to make the payments required by the Certificates; and (iv) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Underwriters' pre-established rating guidelines.

VIII.   CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Goldman Sachs Issuing Trusts (as set forth in ¶25) pursuant or traceable to GS

Mortgage Securities Corp.'s August 17, 2005 Registration Statement and accompanying Prospectus and Prospectus Supplements.

114.    This action is properly maintainable as a class action for the following reasons:

a)    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b)    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)    A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

115.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a)   Whether defendants violated the Securities Act;

b)   Whether statements made by defendants to the investing public in the Registration Statement, Prospectus and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c)   The extent and proper measure of the damages sustained by the members of the Class.

<u>FIRST CAUSE OF ACTION</u>

<u>For Violation of Section 11 of the Securities Act</u>
(Against The Individual Defendants, Issuing Defendants and Underwriter Defendants)

116.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

117.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants.  This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

118.    The Registration Statement for the Certificate offerings was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

119.    The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

120.    The Individual Defendants each signed the Registration Statement.

121.    The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.  The Underwriter Defendants were underwriters for the respective Issuing Trusts.

122.    The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

123.    The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

124.    Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

125.    The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectus, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

126.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

127.    Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statement.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

128.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

129.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

130.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

<u>SECOND CAUSE OF ACTION</u>

<u>For Violation of Section 12(a)(2) of the Securities Act</u>
(Against the Issuing Defendants and Underwriter Defendants)

131.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

132.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

133.    The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectus for their own financial gain.  The Prospectus contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

134.    The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus, as set forth herein.

135.    Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectus.

136.    By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant and/or traceable to the Prospectus.

137.    Plaintiff and the Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.  These plaintiffs hereby tender their Certificates, or proceeds from the sale thereof, to defendants named in this Cause of Action in exchange for the value of the consideration paid for such Certificates, plus interest.  In the alternative, these plaintiffs seek recovery of damages in an amount to be proven at trial.

138.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectus and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could

not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION

For Violation of Section 15 of the Securities Act
(Against Goldman Sachs, GSMC, and GS&Co.)

139.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

140.    This Cause of Action is brought against defendants Goldman Sachs, GSMC, and GS&Co. as controlling persons, pursuant to Section 15 of the Securities Act.  Each of Goldman Sachs, GSMC, and GS&Co., by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act.  Each of Goldman Sachs, GSMC, and GS&Co. had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the Securities Act, as described herein.

141.    Goldman Sachs's, GSMC's, and GS&Co.'s control, ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

142.    By virtue of the wrongful conduct alleged herein, Goldman Sachs, GSMC, and GS&Co. are liable to Plaintiff and other Class members for their sustained damages.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

(b)    Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other relief as the Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 6, 2009

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP


CHAD JOHNSON

CHAD JOHNSON (CJ3395)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
chad@blbglaw.com
            -and-
DAVID R. STICKNEY
TIMOTHY A. DeLANGE
BRETT M. MIDDLETON
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
brettm@blbglaw.com

POND, GADOW & TYLER
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees'
Retirement System of Mississippi and Proposed
Lead Counsel for the Class*

45

# EXHIBIT 1

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George W. Neville, Esq., on behalf of the Public Employees' Retirement System of Mississippi ("Mississippi PERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2.      Mississippi PERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      Mississippi PERS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Mississippi PERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.      Mississippi PERS' transactions in the Goldman Sachs pass-through securities that are the subject of this action are set forth in the chart attached hereto.

5.      Mississippi PERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *In re Coca-Cola Enterprises Inc. Securities Litigation*, Case No. 06-cv-275 (N.D. Ga.)
> *In re Sears Holdings Corporation Securities Litigation*, Case No. 06-cv-4053 (S.D.N.Y.)
> *In re Semtech Corp. Securities Litigation*, Case No. 07-cv-7114 (C.D. Cal.)
> *In re Ambac Financial Group, Inc. Securities Litigation*, Case No. 08-cv-411 (S.D.N.Y)
> *In re Schering-Plough Corporation/Enhance Securities Litigation*, Case No. 08-cv-397 (D.N.J.)
> *In re Maxim Integrated Products Inc. Securities Litigation*, Case No. 08-cv-832 (N.D. Cal.)

6.      Mississippi PERS has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *Public Employees' Retirement System of Mississippi v. Morgan Stanley et al.*,
> Case No. 08-cv-1469 (C.D. Cal.)

7.      Mississippi PERS is serving as a lead plaintiff and representative party on behalf of a class in *In re Merck & Co. Inc. Securities, Derivative & "ERISA" Litigation*, MDL No. 1658 (SRC); 05-cv-01151 (D.N.J.), 05-cv-2367 (D.N.J.). Mississippi PERS intervened in the action and was appointed to serve as a lead plaintiff and representative party in the action in 2007.

8.    Mississippi PERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re Par Pharmaceutical Companies, Inc. Securities Litigation,* Case No. 06-cv-3226 (D.N.J.)
*In re Dell, Inc. Securities Litigation,* Case No. 06-cv-726 (W.D. Tex.)
*Freudenberg v. E\*Trade Financial Corporation, et al.,* Case No. 07-cv-8538 (S.D.N.Y.)
*Lipetz et al. v. Wachovia Corporation et al.,* Case No. 08-cv-6171 (S.D.N.Y.)

9.    Mississippi PERS will not accept any payment for serving as a representative party on behalf of the Class beyond Mississippi PERS' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of February, 2009.

George W. Neville
Special Assistant Attorney General
*Legal Counsel to the Public Employees' Retirement System of Mississippi*

**Mississippi PERS**

**Transactions in GSAMP Trust 2006-S2**

| CUSIP # | Transaction | Date | Units | Par Value |
|---------|-------------|------|-------|-----------|
| 362334JF2 | Purchase | 3/24/2006 | 6,000,000 | $99.9980 |
| 362334JF2 | Sale | 10/7/2008 | (6,000,000) | $16.1560 |