**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI, Individually and On
Behalf of All Others Similarly Situated,

                          Plaintiff,

                                            CIVIL ACTION NO. 09-CV-1110 (HB)

               -against-

GOLDMAN SACHS GROUP, INC., *et al.*,

                          Defendants.
----------------------------------------------------------X


**THE RATING AGENCY DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED**
**CLASS ACTION COMPLAINT**

Joshua M. Rubins
James J. Coster
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200

*Attorneys for Defendant Moody's Investors*
*Service, Inc.*


Martin Flumenbaum
Roberta Ann Kaplan
Andrew J. Ehrlich
Tobias J. Stern
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendant Fitch, Inc.*

Floyd Abrams
S. Penny Windle
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendant The McGraw-Hill*
*Companies, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

ARGUMENT ...............................................................................................................2

I.    PLAINTIFF'S § 11 CLAIMS SHOULD BE DISMISSED ................................. 2

    A.   Plaintiff's Claims Against the RAs Are Precluded by Express SEC Rule ........................ 3

    B.   Plaintiff Has No Claim for "Underwriter" Liability Against the RAs............................. 4

        1.   The Consent Requirements of § 11(a)(4) Preclude Plaintiff's Claims ........................ 5

        2.   The RAs Are Not "Underwriters" of the Securities They Rated ................................. 8

II.   THE ASSERTED RATINGS-RELATED "OMISSIONS" ARE NOT ACTIONABLE..... 12

    A.   No Actionable "Misstatements" or "Omissions" Are Alleged ........................................ 12

    B.   The Offering Documents Bespoke Caution.................................................................. 14

CONCLUSION.............................................................................................................15

# TABLE OF AUTHORITIES

Page

**Cases**

*Ackerberg* v. *Johnson*, 892 F.2d 1328 (8th Cir. 1989) ........................................   8

*In re Adelphia Communications Corp. Securities and Derivative Litigation*,
    2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)...............................................   10, 11n

*Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009)..............................................................   9

*In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y.
    2004) ..........................................................................................................   14n

*In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F.
    Supp. 2d 742 (S.D. Tex. 2005) ..............................................................   4

*In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189
    (S.D.N.Y. 2003) ...................................................................................   5n

*Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)......................   15

*Harden* v. *Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392 (7th Cir. 1995) .....   11n

*Herman & MacLean* v. *Huddleston*, 459 U.S. 375 (1983) .................................   2, 5

*Ingenito* v. *Bermac Corp*, 441 F. Supp. 525 (S.D.N.Y. 1977)............................   8

*Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y.
    2008) ........................................................................................................   14

*Luce* v. *Edelstein*, 802 F.2d 49 (2d Cir. 1986).....................................................   15

*McFarland v. Memorex Corp.*, 493 F. Supp. 631 (N.D. Cal. 1980)....................   *passim*

*In re Merrill Lynch & Co. Research Reports Securities Litigation*, 272 F.
    Supp. 2d 243 (S.D.N.Y. 2003)............................................................   13

*Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007).............................   15

*In re Morgan Stanley Technology Fund Securities Litigation*, 2009 WL
    256005 (S.D.N.Y. Feb. 2, 2009).........................................................   13

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ...................   15

*Pinter* v. *Dahl*, 486 U.S. 622 (1988)....................................................................   11

| | Page |
|---|---|
| *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................................... | 9 |
| *In re Refco, Inc. Securities Litigation*, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ...................................................................... | 5-8, 10, 11n |
| *Resnik* v. *Swartz*, 303 F.3d 147 (2d Cir. 2002) ..................................... | 13 |
| *Roth ex rel. Beacon Power Corp.* v. *Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008) ................................................................................... | 3n |
| *SEC* v. *Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002)........................... | 8 |
| *Starr ex rel. Estate of Sampson* v. *Georgeson Shareholder, Inc.*, 412 F.3d 103 (2d Cir. 2005)........................................................................... | 13 |
| *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) .......................................................................... | 11n |
| *Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095 (W.D.N.Y. 1978) ................................................................................... | 5n-6n |
| *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438 (1976)............................ | 13 |
| *United States* v. *Evans*, 375 F.2d 730 (9th Cir. 1967) ......................... | 3n |
| *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991) ........................... | 12 |

**Administrative Decisions**

| | |
|---|---|
| *In re Lorsin, Inc.*, SEC Release No. 250, 82 S.E.C. Docket 3044 (May 11, 2004).............................................................................. | 8 |

**Congressional Reports**

| | |
|---|---|
| H.R. Rep. No. 73-85 (1933)............................................................... | 8n |

**Regulations**

SEC Regulations

| | |
|---|---|
| Rule 436(g), 17 C.F.R § 230.436(g) (2009) .................................... | 1n, 3-4, 9 |

**Rules**

Fed. R. Civ. P.

8.......................................................................................................... 1
12(b)(6) ........................................................................................... 1

**SEC Releases**

SEC Release No. 33-6336, 46 F.R. 42024 (Aug. 18, 1981) ............................ 3-4
SEC Release No. 33-6383, 1982 WL 90370 (Mar. 3, 1982) .......................... 3-4
SEC Release No. 33-7086, 1994 WL 469347 (Aug. 31, 1994)...................... 4n, 13, 14
SEC Release No. 33-8400, 69 F.R. 15594 (Mar. 25, 2004) ........................... 4n

**Statutes**

Securities Act of 1933

§ 2(a)(11), 15 U.S.C. § 77b(a)(11) (2006) ...................................................... 8
§ 7, 15 U.S.C. § 77g(a) (2006) ...................................................................... 6n
§ 11, 15 U.S.C. § 77k (2006) ........................................................................ *passim*

**Treatises**

Thomas Lee Hazen, *Law of Securities Regulation* (4th ed. 2002)........................ 8

**Other Authorities**

Daniel M. Covitz, *et al*, *Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate* (Dec. 2003)..................................................................... 13n

*NASD Manual* (CCH) (1994)............................................................................. 11n

Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, Securities and Exchange Commission (Jan. 2003)..................................................................................... 13n

The McGraw-Hill Companies, Inc.,[1] Moody's Investors Service, Inc. ("Moody's") and Fitch Inc. ("Fitch," and collectively, the "RAs") respectfully submit this brief in support of their motion to dismiss the Amended Complaint ("AC") pursuant to Fed. R. Civ. P. 8 and 12(b)(6).[2]

## PRELIMINARY STATEMENT

Section 11 of the Securities Act of 1933 (the "1933 Act") provides plaintiffs a potential cause of action if false or misleading information is contained in a registration statement. But the categories of persons that may be sued under § 11 are carefully limited and defined to include only those persons that had a direct role in the registered offering. In the long history of the 1933 Act, that group has never included a nationally recognized statistical rating organization ("NRSRO"), *i.e.*, rating agencies recognized by the federal government. Plaintiff's claims here against the RAs seek an unprecedented and impermissible expansion of the well-settled bounds of the 1933 Act.

Specifically, Lead Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff") asserts claims under § 11 against S&P, Moody's and Fitch, three NRSROs that issued credit ratings on the mortgage pass-through certificates (the "Certificates") at issue.[3] Plaintiff does so notwithstanding that the rating opinions of NRSROs are explicitly exempt by SEC regulation from liability under § 11. Plaintiff seeks to elude this explicit bar with a sleight of hand: It simply relabels the RAs' alleged conduct as "underwriting." That the RAs underwrote nothing appears to be of no moment. Nor does the legal reality that, at the very most, the RAs' alleged conduct could provide a basis for "expert" liability under § 11 if, as required by the statute, the RAs had been named, and consented to be named, in the registration statement as having prepared or certified

---

[1] Because the allegations in the AC regarding McGraw-Hill concern its business unit, Standard & Poor's Rating Services, we refer to this defendant herein as "S&P."

[2] This case presents issues similar to those raised in another matter pending before this Court, entitled *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, No. 08-CV-5093. The positions of Plaintiffs in these cases on certain issues, however, differ in some respects, *e.g.,* in *New Jersey Carpenters*, Plaintiffs disavow that they are suing the RAs on the basis of their ratings given the exemption from liability afforded to an NRSRO's ratings under SEC Rule 436(g). *See* Section I.A., *supra*.

[3] Credit ratings "address[] the likelihood of the receipt by a certificateholder" of the distributions owed to it. "A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time[.]" *See, e.g.*, GSAMP Trust, Series 2006-S2 Prospectus Supplement ("GSAMP ProSupp") at S-101 attached as Exhibit 4 to the Declaration of Floyd Abrams (the "Abrams Decl.").

any portion of it.  But the RAs, indisputably, are not so named and did not consent to be named.

Plaintiff's "underwriter" claims against the RAs are all the more puzzling since there has never been any doubt as to the identity of the actual underwriter of the securities at issue here. The Offering Documents[4] could not be clearer in stating that Defendant Goldman, Sachs & Co. ("GS&Co.") was the "underwriter" of each of the offerings at issue here.  *See, e.g.,* GSAMP Pro-Supp. (listing "Goldman, Sachs & Co., Inc." as "Underwriter").  Under the 1933 Act, the role of an "underwriter" has long been confined to those persons that have a role in the distribution process between the issuer and the investor.  The RAs are not — and could not be — alleged to have played such a role.  In short, there is no basis for a § 11 claim against the RAs here.

In addition to Plaintiff's failure to meet the threshold requirements for § 11 liability, Plaintiff's claims are time-barred.  The RAs join in the brief filed by the Goldman Sachs Defendants on this point.  Moreover, the alleged "misstatements" asserted by Plaintiff relating to the RAs and their ratings cannot as a matter of law serve as the basis for a 1933 Act claim both because they are not material misstatements or actionable omissions and because these inherently forward-looking statements were accompanied by meaningful cautionary language.[5]

## ARGUMENT

## I.     PLAINTIFF'S § 11 CLAIMS SHOULD BE DISMISSED

Section 11 "allows purchasers of a registered security to sue certain *enumerated* parties in a registered offering when false or misleading information is included in a registration statement. [It] was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a *direct role* in a registered offering."  *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 381-82 (1983) (emphasis added).  The only parties

---

[4]  In the AC, Plaintiff purports to represent a class of purchasers of Certificates traceable to an "August 17, 2005 Registration Statement."  (AC ¶ 1).  The specific offerings listed, however, relate to a November 5, 2004 Registration Statement.  Correction of this error would nonetheless be futile for the reasons set forth herein.  In this brief, we refer to the relevant Registration Statement, Prospectus and Prospectus Supplements as the "Offering Documents."

[5]  The RAs also join in the brief filed by the Goldman Sachs Defendants, which seeks dismissal for the additional reasons that: 1) Plaintiff lacks standing; 2) Plaintiff has not plead a cognizable economic loss; and 3) Plaintiff has not alleged any actionable omission or misrepresentation.

that can be held liable are listed in the statute and are the following:

> (1) every person who signed the registration statement; (2) every person who was a director .
> . . or partner in the issuer. . .; (3) every person who, with his consent, is named in the regis-
> tration statement as being or about to become a director . . . (4) every accountant, engineer,
> or appraiser, or any person whose profession gives authority to a statement made by him,
> who has with his consent been named as having prepared or certified any part of the regis-
> tration statement, or as having prepared or certified any report or valuation which is used in
> connection with the registration statement, with respect to the statement in such registration
> statement, report, or valuation, which purports to have been prepared or certified by him;
> [and] (5) every underwriter with respect to such security.  15 U.S.C. §77k(a).

Plaintiff's claims must be dismissed both because they are barred by SEC rule and because the

RAs simply do not fall within the remaining categories of persons subject to § 11 liability.

## A.    Plaintiff's Claims Against the RAs Are Precluded by Express SEC Rule

Plaintiff's claims are, at their core, a challenge to the appropriateness of the ratings the

RAs issued on the Certificates.  *See, e.g.,* AC ¶ 113.  Yet, whatever legal rights Plaintiff might

have to challenge those ratings, a claim under § 11 is not among them.  Indeed, by SEC rule, credit

ratings of an NRSRO are absolutely immune from liability under § 11 of the 1933 Act.  Specifi-

cally, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1), provides that:

> the security rating assigned to a class of debt securities[6] . . . by a [NRSRO] . . . shall not
> be considered a part of the registration statement prepared or certified by a person
> within the meaning of sections 7 and 11 of the Act.

The purpose of the rule is unambiguous.  It is to "exclude any [NRSRO] whose security

rating is disclosed in a registration statement from civil liability under Section 11."[7]  SEC Release

No. 33-6336, 46 F.R. 42024, 42024, 42027 (Aug. 18, 1981) (the "Proposal Release").  *See also*

SEC Release 33-6383, 1982 WL 90370, at *23 (Mar. 3, 1982) ("The Commission continues to

---

[6]  The Certificates here are "debt securities."  The Certificates have a definite obligor (the issuing trust); a definite
obligee (the Certificateholder); a definitely ascertainable obligation (the principal amount specified by the Certificate
plus a specified interest rate); and a time of maturity (*e.g.*, the last distribution date for the Series 2006-S2 Certificates
is January 2036).  *See* GSAMP ProSupp at A-2, S-8, S-95.  These factors confirm the "debt" nature of the securities at
issue here.  *See United States* v. *Evans*, 375 F.2d 730, 731 (9th Cir. 1967) (holding that interest was "debt" where it
had "all the characteristics of a debt-obligation," *i.e.*, "a definite obligor," "a definite obligee," "a definitely ascertain-
able obligation," "and a time of maturity").  The Offering Documents also expressly state that the Certificates will be
taxed as "debt" and that the ratings themselves speak only to the debt nature of the Certificates, *i.e.*, "the likelihood of
the receipt by a certificateholder of distributions on the mortgage loans."  GSAMP ProSupp. at S-101.

[7]  Courts defer to the SEC's interpretation of its own rules provided "the interpretation is not plainly erroneous or in-
consistent with the law."  *Roth ex rel. Beacon Power Corp.* v. *Perseus, L.L.C.*, 522 F.3d 242, 247 (2d Cir. 2008).

believe that . . . it is appropriate to exempt NRSROs from [§ 11] liability if their ratings are included in . . . registration statements."). Rule 436(g) thus provides a "statutory exemption" "for Section 11 claims against credit rating agencies" designated as NRSROs. *In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 511 F. Supp. 2d 742, 817 & n.77 (S.D. Tex. 2005).[8]

This exemption was adopted in full recognition of the concerns raised by some commentators that NRSROs might not give "due attention" to their ratings unless they were subject to potential liability, and with full appreciation of the "significance" of ratings for, *inter alia*, institutions statutorily barred from investing in securities below a certain rating. Proposal Release, 46 F.R. at 42026-27 & n.16. The exemption thus reflects a deliberate public policy determination — because of the value of ratings to investors, the SEC encourages their inclusion in registration statements, but has also recognizes that, but for the exemption, no NRSRO would consent to such inclusion. The exemption also makes sense given the nature of credit ratings. As set forth in the Offering Documents, ratings are opinions about the "likelihood of the receipt by a certificateholder" of distributions owed to them. *See, e.g.*, GSAMP ProSupp at S-100. That is, they are opinions about the likelihood of future events. If circumstances turn out differently than anticipated and rating opinions change, that does not mean that the initial ratings were "false" when issued or, more to the point, that NRSROs should face strict liability under § 11.

In proposing Rule 436(g), the SEC emphasized that NRSROs would remain subject to liability under the antifraud provisions of the securities laws. Proposal Release, 46 F.R. at 42028 & n.32. But, liability under § 11 on the basis of an NRSRO's ratings is barred. Because Plaintiff's claims here, at their core, seek to hold the RAs liable for their ratings, they should be dismissed.

### B.   Plaintiff Has No Claim for "Underwriter" Liability Against the RAs

Rule 436(g), however, is not the only ground that requires dismissal. Indeed, Plaintiff's

---

[8] In 1994, in recognition of the "development of a vast market for mortgage and asset backed securities," the SEC "determined to reconsider its policy of voluntary ratings disclosure" in registration statements and solicited market comments on, *inter alia*, "the continued appropriateness of its policy of exempting NRSROs from providing consents." SEC Release No. 33-7086, 1994 WL 469347, at *3, *8 (Aug. 31, 1994) (the "1994 SEC Release"). The SEC ultimately determined not to change its position regarding the disclosure of ratings. SEC Release No. 33-8400, 69 F.R. 15594, 15606 & n.127 (Mar. 25, 2004).

§ 11 claims must also be dismissed for the independent reason that there are simply no factual allegations here to provide a basis for finding that the RAs fall within any of the five categories of persons subject to § 11 liability.  Plaintiff seeks to impose liability under § 11(a)(5), asserting that, through their alleged actions, the RAs "each acted as an underwriter in the sale of Certificates." (AC ¶ 135).  As detailed below, this is nothing more than a naked and improper attempt to erase the consent requirements of § 11(a)(4), which, as shown below, Plaintiff cannot meet.  (§ I.B.1). In any event, even if neither the exemption nor the consent requirements existed, the activities the RAs allegedly performed simply do not as a matter of law constitute "underwriting."  (§ I.B.2).

### 1.      The Consent Requirements of § 11(a)(4) Preclude Plaintiff's Claims

Plaintiff asserts that the RAs may be held liable under § 11 because they "each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates."  (AC ¶ 135).  Even accepting these allegations as true, it is well-established that "certain individuals who play a part in preparing the registration statement generally cannot be reached by a Section 11 action."  *Herman & MacLean*, 459 U.S. at 386 n.22.  In certain circumstances, an "accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him" may be subject to § 11 *but only to the extent* that "expert" has been named to investors, and has consented to being named, as someone who certified or prepared a portion of the registration statement.  15 U.S.C. §77k(a)(4).

The types of activities the RAs allegedly performed here, *i.e.,* providing opinions and drafting documents, are activities that courts evaluate under the "expert" provision of § 11(a)(4). *See, e.g., In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *3, n.5 (S.D.N.Y. Aug. 14, 2008) (Lynch, J.) ("*Refco II*") (noting that § 11 claims against "attorneys who draft the documents on which the public rely" are generally brought, and evaluated, under § 11(a)(4)).[9]  Thus, to state a

---

[9]  *See also McFarland* v. *Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980) (evaluating § 11(a)(4) claim against defendant alleged to have participated in the "preparation and review" of the registration statement); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208-11 (S.D.N.Y. 2003) (Lynch, J.) (evaluating § 11(a)(4) claim against defendant alleged to have reviewed financial and other information and issued fairness opinions included in registration statement); *Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095, at *8 (W.D.N.Y. 1978) (evaluat-

Footnote continued on next page.

claim, Plaintiff was required to allege that the RAs were named, and consented to be named, as endorsing the registration statements.  Yet, as the Offering Documents make clear, the RAs were not named and did not consent to be named, and Plaintiff does not allege otherwise.[10]

Notwithstanding Plaintiff's assertion that it is suing the RAs as "underwriter[s]" under § 11(a)(5) (AC ¶ 135), this absence of naming and consent is dispositive of Plaintiff's § 11 claims. *See Refco II*, at *3-*5.  In *Refco II*, Judge Lynch evaluated a similar claim asserting "underwriter" liability under § 11(a)(5) where, as here, it was clear that the defendants did not fall within the first four categories of § 11.  Although the defendants in *Refco II* had not been named to investors as having prepared or certified the registration statement at issue, plaintiffs argued that the defendants had been involved in drafting and editing the registration statement and thus could still be held liable as an underwriter under § 11(a)(5).  In dismissing the § 11 claims, Judge Lynch observed that "Plaintiffs do not cite any case in which a court has held that a party that participated in the drafting of a registration statement, but who was not identified to the public as endorsing the truth of representations contained therein, has been held liable under § 11 as an underwriter."  *Id*. at *3.  In fact, Judge Lynch reasoned, "courts have generally refused to extend § 11 liability to those professionals most directly involved in the drafting of registration statements: lawyers."  *Id*.  The *Refco II* plaintiffs attempted to distinguish the myriad cases holding that lawyers are not subject to § 11 liability, arguing that these cases were decided under the § 11(a)(4) "expert" provision — not the § 11(a)(5) "underwriter" provision.  Judge Lynch rejected this distinction, noting "[i]t would seem even stranger to classify attorneys who draft the documents on which the public rely as 'underwriters' — a term generally understood to refer to those who undertake actively to sell the securities — than to consider them 'profession[als] . . . named as having prepared . . . any part of the registration statement.'"  *Id*. at *3 n.5.  These cases make clear that historically both "plaintiffs

---

Footnote continued from previous page.

ing § 11(a)(4) claim brought against lawyer that "'passed on all legal matters relative to the [offering documents]'").

[10]  In fact, § 7 of the 1933 Act requires that where an entity is named as an expert, its *consent* "shall be filed with the registration statement."  15 U.S.C. § 77g(a).  No consent by the RAs was ever filed and Plaintiff does not claim it was.

attempting to extend § 11 liability to lawyers and courts rejecting those efforts have looked primarily to the subsection (4) category . . . rather than to the subsection (5) category" — this, he explained, "speaks volumes" against the plaintiffs' argument that applying the "underwriter" prong would be "a straightforward application of broad and literal language" of § 11(a)(5).  *Id.*

In short, unless it independently meets the definition of an "underwriter" (which, as demonstrated below, is not the case here), a party's alleged role in preparing the registered offering cannot provide a basis for § 11 liability if it has not been named to investors as having prepared or certified the registration statement.  Indeed, whatever actions a plaintiff may assert the unnamed "expert" performed are simply "irrelevant" to § 11 liability.  In *McFarland* v. *Memorex Corp.*, the court dismissed § 11 claims against an accountant, where the accountant had not been named, and had not consented to be named, as having prepared the allegedly misleading financial data in the registration statement.  493 F. Supp. at 643.  Plaintiffs argued that even though the accountant had not been named as an expert in connection with the allegedly misleading materials, it had prepared and reviewed materials that were used in connection with the registered offering and thus, should still be liable under § 11.  The court rejected plaintiffs' argument, stating:  "This argument is flawed because section 11(a)(4) limits liability.  Because the accountants are not 'named as' having prepared the allegedly misleading portions of the registration statement, their participation in the preparation of the misleading figures is irrelevant to section 11."  *Id.*

Here, where the RAs were not named, and did not consent to be named, as endorsing the representations in the Offering Documents, Plaintiff has no claim under § 11.  By urging the Court to hold the RAs liable as "underwriters," Plaintiff seeks to erase § 11's consent requirements.  As reflected in *Refco II* and *McFarland*, however, the law does not countenance that attempt.[11]

---

[11]  If successful, Plaintiff's attempt to ignore the limitations on liability contained in § 11(a)(4) would lead to senseless results.  An NRSRO, whose ratings are exempted from liability, would: (a) nonetheless be subjected to potential liability for every other word in the registration statement made by other parties; and (b) be subjected to greater potential liability than that of lawyers, accountants, and other professionals who regularly play a significant role in securities offerings.  That is because an "expert" under § 11(a)(4) is subject to liability only with respect to misstatements, if any, made in the portion of the registration statement that it prepared or certified.  15 U.S.C. §77k(a)(4).  The expert is not subject to liability for all statements made in the offering documents as an "underwriter" would be.

### 2.    The RAs Are Not "Underwriters" of the Securities They Rated

In any event, the activities allegedly performed by the RAs do not make them "underwriters."  Rather, an underwriter is an entity that "participates in the transmission process between the issuer and the public."  *Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977) (Lasker, J.).  Congress defined the term "to encompass 'all persons who might operate as conduits for securities being placed into the hands of the investing public.'"  *In re Lorsin, Inc.*, SEC Release No. 250, 82 S.E.C. Docket 3044 (May 11, 2004) (quoting 1 Thomas Lee Hazen, *The Law of Securities Regulation* 431 (4th ed. 2002)); *SEC* v. *Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002) (Stein, J.) (same); *Ackerberg* v. *Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989) (An "'underwriter' is generally defined in close connection with the definition and meaning of 'distribution.'").[12]

Specifically, the 1933 Act provides as follows:

> The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. . . . 15 U.S.C. §77b(a)(11).

Plaintiff does not allege (nor could it) that the RAs meet the first clause of the definition.  Rather, Plaintiff bases its unprecedented "underwriter" claims on a tortured reading of the second clause.

Like the rest of the definition, however, the "participation" necessary to qualify one as an underwriter must relate to the actual distribution of the security.  *Refco II*, at *4 ("[T]he breadth of the definition of 'underwriter' is intended to sweep up all — but only — those who play a role in the distribution of the securities."); *McFarland*, 493 F. Supp. at 644 ("It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security.  There is no allegation here, however, that [the alleged underwriters] purchased any . . . securities with a view

---

[12]  The 1933 Act's legislative history confirms this:  "The term [underwriter] is defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also . . . the person who purchases an issue outright with the idea of then selling that issue to the public.  The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, in the distribution of a large issue.  The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter.  The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein."  H.R. Rep. No. 73-85, 13, 1933 WL 983 (1933).

to distribution or that they offered or sold any security[.]").

Even if the RAs performed the actions alleged here, Plaintiff offers no basis — and there is none — to support any assertion that the RAs had a role in the "distribution process."  The AC does not (and could not) allege that the RAs acted as conduits between the issuer and investors.  The AC does not (and could not) allege that the RAs purchased securities with a view to their distribution.  And the AC does not (and could not) allege that the RAs offered or sold any securities to Plaintiff or had any contact whatsoever with it.[13]  The RAs' only "contact" with the public was through the publication of their ratings, but that, of course, cannot trigger § 11 liability.

Putting aside the ratings, as one must per Rule 436(g), Plaintiff's conclusory allegations do little more than parrot the statutory definition of an "underwriter."  *See, e.g.*, AC ¶ 135 (alleging that the RAs "directly and indirectly participated in the distribution of the Certificates").  As the Supreme Court reiterated just recently, such allegations are insufficient to state a claim.  *See Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (Lynch, J.) ("*Refco I*") is also instructive on this point.  In *Refco*, Plaintiffs had asserted that defendants who allegedly "participated" in a public offering could be liable as "underwriters" under § 11.   Judge Lynch, noting that the term "underwriter" is not "a term of unlimited applicability that includes anyone associated with a given transaction," dismissed the claims.  *Id*.  The court found that plaintiffs' "conclusory allegation" "include[d] no detail whatsoever" and failed to set forth any "specific allegations as to the extent of [the alleged] participation or what actual actions the defendants took."  *Id*.  The court continued:  "[T]he single sentence alleging that [the defendants] participated in the public

---

[13] Similarly, the AC does not (and could not) allege that the RAs had a financial stake in the success of the offerings.  This factor also counsels against any "underwriter" characterization.  *See McFarland*, 493 F. Supp. at 645 ("The Court must consider whether the warrantholders 'participated' in the underwriting from [a] risk-bearing perspective . . . .  Because the warrantholders took no similar risk and received no corresponding reward, it would be anomalous to include them within the definition of underwriter along with those who engaged in the selling effort.").

offering presents a legal conclusion, not a factual allegation"; it is "simply a reproduction of the statutory requirement of 'direct or indirect participation.'" *Id.* at 630-31. *See also In re Adelphia Communications Corp. Securities and Derivative Litigation*, 2007 WL 2615928, at *8 (S.D.N.Y. Sept. 10, 2007) (McKenna, J.) (a "bare pleading" that banks "extended loans," "'induced and structured numerous public offerings'" through affiliates and had "'direct or indirect participation in the distribution'" did not "turn lenders into underwriters").

Plaintiff's allegation that the RAs participated in the drafting of the Offering Documents (AC ¶ 135) fares no better. Such a role, even if true, does not relate to the *distribution* of securities. Judge Lynch's decision in *Refco II* is again telling. On an amended complaint, the *Refco* plaintiffs added allegations that the defendants had "played a substantial role in drafting and editing the Bond Registration Statement on the basis of which the registered bonds were sold to the public." *Refco II*, 2008 WL 3843343, at *2. In dismissing the § 11 claims yet again, Judge Lynch rejected "Plaintiffs' effort to redeem their complaint by identifying actions taken by defendants *behind the scenes* . . . ." *Id.* at *4 (emphasis added). Judge Lynch cautioned that the definition of the term "underwriter" "must be read in relation to the underwriting function that the definition is intended to capture" — a definition which "primarily references[ those who 'purchase[ ] from an issuer with a view to . . . the distribution of any security.'" *Id.* The alleged "participation" must relate to the specific undertaking of "purchasing securities from an issuer with a view to their resale — that is, the underwriting of a securities offering as commonly understood." *Id.; see also McFarland*, 493 F. Supp. at 645 ("[T]his Court will not strain the definition of a statutory term in order to classify [defendants] as underwriters" even where they had "structured the transaction . . . to avoid the risks of an underwriter.").

Here, even taking Plaintiff's allegations as true, they involve nothing more than alleged "behind the scenes" (to use Judge Lynch's phrase) actions unrelated to the distribution of securities. Accordingly, Plaintiff's theory appears to be that the RAs may be liable as underwriters because their alleged actions here were somehow necessary steps in the creation and therefore the eventual distribution of the securities. If accepted, such a theory would – contrary to Judge Lynch's holding in *Refco* – render the term "underwriter" one of "unlimited applicability" extend-

-10-

ing it to all lawyers, accountants and other third parties who often play important roles in regis-tered offerings and yet generally do not play a role in the distribution and thus, are not considered "underwriters." But, the 1933 Act has never been interpreted in this manner. In fact, with one ex-ception not relevant here, *every* case the RAs are aware of which an entity was held to be an "un-derwriter," the entity had in fact purchased, sold or distributed securities.[14]

With no basis in current law for its claim, it is evident that what Plaintiff is really asking the Court to do here is not to apply the well-settled terms of the 1933 Act to the facts of this case, but rather to amend retroactively the 1933 Act to broaden the categories of persons subject to § 11. But, as the Supreme Court held in *Pinter*, interpreting another provision of the 1933 Act:

> 'The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.' . . . The broad remedial goals of the Securities Act are insufficient justification for inter-preting a specific provision 'more broadly than its language and the statutory scheme reasonably permit. *Pinter* v. *Dahl*, 486 U.S. 622, 653 (1988).[15]

Throughout the long history of the 1933 Act, the key in determining whether a defendant is an "underwriter" is whether the defendant had a role in *distributing* the securities. Plaintiff does not provide the Court with any basis, factual or legal, to conclude that the RAs had a role in the actual distribution of securities. Plaintiff's § 11 claims must be dismissed on this ground as well.

---

[14] The one exception is *Harden* v. *Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995), a case that "dealt with an entirely different animal," *i.e.* the "Qualified Independent Underwriter" ("QIU"). *Adelphia*, 2007 WL 2615928, at *8. A QIU is an entity that, *inter alia*, is legally required (as an "underwriter" would be) to conduct due diligence on a transaction, that affirmatively agrees "to undertake the legal responsibilities and liabilities of an underwriter under the [1933 Act], specifically including those [set forth in § 11]," and that must be listed in the "underwriting section of the registration statement," along with the statement that the QIU "is assuming the responsibilities of acting as a [QIU] . . . ." *NASD Manual* (CCH) ¶¶ 1882-84, Sch. E, §§ 2(o)(7), 3(c)(1), 4(b) (1994). Thus, nothing in *Harden* changes the fact that it is those entities "identified to the public as endorsing the truth of representations contained [in the registra-tion statement]" that are the subject of § 11. *Refco II*, at *3.

[15] Not only would a request to rewrite the 1933 Act be inappropriate as a jurisprudential matter, but it could also lead to the imposition of billions of dollars in strict liability on entities that had no meaningful way to anticipate such po-tential exposure -- and thus no meaningful opportunity to protect themselves or take steps to minimize that exposure. Leaving aside the fundamental injustice of such a result, the resulting uncertainty would lead to dramatic ineffi-ciencies and costs (both in time and money) in the offering process. Indeed, courts have rejected attempts to expand a cause of action where it would also necessarily expand the well-recognized limits on liability that are relied upon by market participants. *See, e.g., Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 772 (2008) (refusing to extend §10(b) to "aiders and abettors" and holding that "[t]he practical consequences of [such] an expansion . . . . provide[d] a further reason to reject [plaintiff's liability theory]" as it "would expose a new class of defendants" to the risks of "extensive discovery" and the potential "extort[ion] of settlements" which may force these new defendants to contract to "protect against these threats, raising the costs of doing business").

## II.    THE ASSERTED RATINGS-RELATED "OMISSIONS" ARE NOT ACTIONABLE

Plaintiff identifies the allegedly misleading portions of the Offering Documents on pages 13-43 of the AC.  While the vast majority of these "misleading" statements relate to mortgage underwriting guidelines and property appraisal standards, — areas with which the RAs indisputably had nothing to do — Plaintiff also asserts two purported reasons for why the "ratings" in the Prospectus Supplements "misstated the quality of the Certificates" (AC, p.39).  First, Plaintiff asserts that the ratings were "unjustifiably high . . . as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default."  (AC ¶¶ 113-120).[16]  Second, Plaintiff asserts that the "Registration Statements" were misleading in stating that "it was a condition to the issuance of any class of Offered Securities that they shall have been rated not lower than investment grade" (AC ¶ 121) because the RAs' compensation was not disclosed (AC, p.42).  None of these alleged "misstatements" are actionable as a matter of law.

### A.    No Actionable "Misstatements" or "Omissions" Are Alleged

Plaintiff's claims of ratings-related "misstatements" and/or "omissions," at their core, attack the RAs' ratings and as such, are barred by Rule 436(g).  *See* Section I.A.  Moreover, it is well-established that a defendant cannot be held liable for the expression of its opinion unless it is adequately plead that the speaker did not subjectively hold the opinion expressed.  *See Virginia Bankshares, Inc*. v. *Sandberg*, 501 U.S. 1083, 1095 (1991).  Here, Plaintiff's hindsight attacks on the RAs' ratings do not come close to pleading that the RAs did not subjectively believe their rating opinions when issued.  In fact, Plaintiff confirms in the AC that its claims "are not based on any knowing or reckless misconduct on the part of any Defendant."  (AC ¶ 3).

Moreover, certain facts underlying Plaintiff's "omissions" claims were known to the market.  Specifically, the fact that the RAs are engaged and paid by the issuers of the securities they rate is well-known and is disclosed by the RAs in their public announcements of their ratings.[17]

---

[16]   Plaintiff also characterizes this as an omission, asserting that the Offering Documents omitted the "true fact" that the ratings "were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information."  (AC ¶ 8).

[17]   *See, e.g*., New Issue: GSAMP Trust 2006-S2, S&P RatingsDirect (Jun. 9, 2006) ("Ratings Services receives compensation for its ratings.  Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities."), attached as Abrams Decl. Ex. 1;  *Moody's Global Credit Research: Rating*

Footnote continued on next page.

Further, the potential conflicts of interest inherent in the RAs' "issuer-pays" business model has long been the subject of public comment, including detailed comment by regulators.[18]  Plaintiff's claims require a showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976).  Public information is part of the "total mix" of information available, and thus a failure to disclose again publicly-known information cannot be the basis for a securities claim.  *See Starr ex rel. Estate of Sampson* v. *Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) ("The 'total mix' of information includes all information 'reasonably available . . .'").

Plaintiff's asserted "omissions" also fail to state a claim because "it is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material." *In re Morgan Stanley Technology Fund Sec. Litig.*, 2009 WL 256005, at *7, *12 (S.D.N.Y. Feb. 2, 2009) (Jones, J.); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) (Pollack, J.).  "Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Here, Plaintiff does not and cannot point to any rule, regulation or other legal duty that required the disclosure of the allegedly omitted information regarding the RAs' rating models or their compensation.  In fact, in the 1994 SEC Release, discussed in n.8 *supra*, the SEC considered – and ultimately rejected – proposals to require disclosure "on the method of compensating the rating organization," "the extent of the rating organization

---

Footnote continued from previous page.

*Action, "Moody's Rates GSAA Home Equity Trust 2006-2 Subprime Mortgage Deal"* (Feb. 20, 2006) (disclosing that "most issuers of debt securities" rated by Moody's "have, prior to assignment of any rating, agreed to pay" fees for appraisal and rating services), Decl. of Joshua M. Rubins Ex. A; Fitch, Inc. Terms of Use (in effect Mar. 30, 2006) ("Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities."), Decl. of Tobias J. Stern Ex. B; *see also* Fitch Rates GSAMP Trust $723.6MM Mortgage Pass-Thru Certificates, Series 2006-S2 (referring investors to the Terms of Use), Stern Decl. Ex. A.

[18] *See, e.g.,* SEC Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, at 40 (Jan. 2003) ("Potential conflicts of interest have existed in the credit rating business for many years. . ."); Daniel M. Covitz, *et al*, *Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate*, at 1 (Dec. 2003) (referring to "well-known conflicts of interest").

involvement in the structuring of the security" and "whether issuers should be required to disclose activities that could be viewed as 'ratings shopping.'"  SEC Release No. 33-7086, 1994 WL 469347, at *9-*10.  The alleged omission of this information thus cannot be actionable.

Finally, even if Plaintiff could show a "duty to disclose," Plaintiff fails to provide facts sufficient to show that the alleged flaws in the RAs ratings models or methodologies were known to the RAs at the time of the offerings.[19]  Even at the pleading stage, a "cognizable claim" "requires plaintiffs to, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering."  *Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (McMahon, J.).  Here, Plaintiff summarily claims that the RAs "have admitted that the methodology used to rate mortgage-backed securities between 2005 and 2007 was based on outdated and unreliable modeling . . . ." (AC ¶ 118).  Beyond the fact that Plaintiff alleges no details at all in support of this purported "admission," Plaintiff's hindsight attack on the RAs' ratings models relies solely on events occurring in 2008.[20]  Plaintiff simply does not and cannot allege that any material adverse information about the RAs' rating models or assumptions was known to them at the time the ratings were issued in 2006 and 2007.

## B.   The Offering Documents Bespoke Caution

Plaintiff's claims of alleged ratings-related misstatements also fail for another reason: the RAs' forward-looking ratings were included in the Offering Documents along with cautionary language warning investors about the purpose and limitation of ratings and the risk that the protections or "cushion" built into the transactions could be insufficient to insulate investors from losses in the event of stress.  The Offering Documents thus "bespoke caution" about the ratings.

---

[19] While the RAs dispute Plaintiff's characterization of their ratings models and methodologies, to the extent that Plaintiff is asserting that the Offering Documents should have expressly characterized these assumptions or models as "outdated" (AC ¶¶ 113, 118), Plaintiff has also failed to state a claim because such a characterization is not an actionable omission.  "[T]he federal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.).

[20] Plaintiff's allegations (AC ¶¶ 118-120) in fact rest, in large part, on a single former S&P employee that testified that his "opinion" in 2008 was that a rating model available in 2004 "would have had an earlier warning about the performance of many of the new products."  The testimony also makes clear that the employee left S&P in April 2005 and thus, contrary to Plaintiff's contention, has not — and cannot — speak to S&P's ratings models and methodologies employed "between 2005 and 2007."  *See* http://oversight.house.gov/documents/20081022102804.pdf.

Materiality is an essential element of a § 11 claim.  *See* 15 U.S.C. § 77k(a).  "The touchstone of [this] inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor[.]"  *See, e.g., Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  The offering documents thus must be read as a whole, with the alleged misstatements considered in context.  *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).  Under this doctrine, courts in this district have regularly dismissed § 11 claims where the relevant offering documents acknowledge the pertinent risk and set forth warnings specifically addressing the nature of that risk.  *See, e.g., Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 583-84 (S.D.N.Y. 2007) (Marrero, J.).

Here, the Offering Documents contained meaningful cautionary language regarding the nature and limitations of ratings.  (Relevant portions are attached as Exhibits 2-4 to the Abrams Declaration submitted herewith.)  These statements render Plaintiff's alleged "misstatements" regarding the ratings immaterial.  *See Halperin*, 295 F.3d at 360; *Luce* v. *Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).  For this reason as well, Plaintiff's § 11 claims should be dismissed.

## <u>CONCLUSION</u>

The claims asserted against the RAs should be dismissed in their entirety.

Dated: August 10, 2009

Respectfully submitted,

  /s/ Joshua M. Rubins

Joshua M. Rubins
James J. Coster
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169
*Attorneys for Moody's Investors Service, Inc.*

  /s/ Floyd Abrams

Floyd Abrams
S. Penny Windle
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
*Attorneys for The McGraw-Hill Companies, Inc.*

  /s/ Martin Flumenbaum

Martin Flumenbaum
Roberta Ann Kaplan
Andrew J. Ehrlich
Tobias J. Stern
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
*Attorneys for Fitch, Inc.*