**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PUBLIC EMPLOYEES' RETIREMENT :
SYSTEM OF MISSISSIPPI, Individually and :
On Behalf of All Others Similarly Situated, :
                               :
           Plaintiff, :
                               :
        v. :    No. 09-CV-1110 (HB)
                               :    **(Dispositive Motion)**

GOLDMAN SACHS GROUP, INC., :
GOLDMAN SACHS MORTGAGE :
COMPANY, GS MORTGAGE SECURITIES :
CORP., GOLDMAN, SACHS & CO., INC., :
MCGRAW-HILL COMPANIES, INC., :
MOODY'S INVESTORS SERVICE, INC., :
FITCH INC., DANIEL L. SPARKS, MARK :
WEISS, JONATHAN S. SOBEL, GSAA :
HOME EQUITY TRUST 2006-2, GSAA :
HOME EQUITY TRUST 2006-3 and :
GSAMP TRUST 2006-S2, :
                               :
          Defendants. :
                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE GOLDMAN SACHS DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Richard H. Klapper
Michael T. Tomaino, Jr.
Patrice A. Rouse
Harsh N. Trivedi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs Group, Inc., Goldman, Sachs & Co., Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Jonathan S. Sobel, Daniel L. Sparks and Mark Weiss*

August 10, 2009

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................... 1

ALLEGATIONS OF THE AMENDED COMPLAINT ................................................................ 3

    A.    The Parties and Claims ............................................................................................ 3

    B.    The Certificates Plaintiff Purchased ....................................................................... 4

    C.    Alleged Misrepresentations in the Offering Documents ......................................... 6

STANDARD ON THIS MOTION ............................................................................................... 7

ARGUMENT ............................................................................................................................... 7

    I.    PLAINTIFF LACKS STANDING TO SUE ........................................................... 7

        A.    Plaintiff Lacks Standing to Assert Section 11 Claims as to Securities
            Offered by GSAA Home Equity Trusts 2006-2 and 2006-3 ....................... 8

        B.    Plaintiff Lacks Standing to Assert Section 12(a)(2) Claims Even as
            to the GSAMP 2006-S2 Certificates that It Purchased ............................. 10

    II.    PLAINTIFF DOES NOT PLEAD ANY COGNIZABLE ECONOMIC LOSS ... 11

    III.    THE AMENDED COMPLAINT DOES NOT PLEAD ANY ACTIONABLE
        MISREPRESENTATIONS ................................................................................... 13

        A.    The Offering Documents Disclosed All Information Plaintiff Alleges
            Was Required ............................................................................................ 14

            1.    The Offering Documents Disclosed the Originators' Lending
                Practices ........................................................................................ 14

            2.    The Offering Documents Disclosed the Involvement of
                Independent Mortgage Brokers and Appraisers ............................ 15

            3.    The Offering Documents Disclosed the Calculation of
                Loan-to-Value Ratios .................................................................... 16

            4.    The Offering Documents Disclosed the Calculation of
                Debt-to-Income Ratios .................................................................. 16

            5.    The Offering Documents Disclosed the Credit Enhancement
                Features ........................................................................................ 17

6.      The Offering Documents Disclosed the Certificates' Ratings ...... 18

B.      Plaintiff Does Not Adequately Allege Materiality or Violation of
Any Duty to Disclose ................................................................................. 19

IV.     PLAINTIFF'S CLAIMS ARE TIME-BARRED .................................................. 21

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashcroft* v. *Iqbal*,
No. 07-1015, 2009 WL 1361536 (U.S. May 18, 2009) ........................................... 7

*Basic, Inc.* v. *Levinson*,
485 U.S. 224 (1988) ........................................................................................ 13

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) ........................................................................... 7, 17, 18

*Conopco, Inc.* v. *Roll Int'l*,
231 F.3d 82 (2d Cir. 2000) ................................................................................ 7

*DeBenedictis* v. *Merrill Lynch & Co.*,
492 F.3d 209 (3d Cir. 2007) ........................................................................... 24

*DeMaria* v. *Andersen*,
318 F.3d 170 (2d Cir. 2003) ........................................................................... 13

*Dodds* v. *Cigna Sec., Inc.*,
12 F.3d 346 (2d Cir. 1993) ............................................................................. 21

*Donovan* v. *Am. Skandia Life Assurance Corp.*,
No. 02-CV-9859, 2003 WL 21757260 (S.D.N.Y. July 31, 2003) ......................... 15

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ........................................................................... 20

*Finkel* v. *Putnam Convertible Opportunities & Income Trust*,
No. 96-CV-4810, 1997 WL 60847 (S.D.N.Y. Feb. 11, 1997) ............................. 14

*First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 2002) ............................................................................. 11

*Fishbury, Ltd.* v. *Connectics Corp.*,
No. 06-CV-11496, 2006 WL 3711566 (S.D.N.Y. Dec. 14, 2006).......................... 8

*Garber* v. *Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008) .......................................................... 20, 21

*Gustafson* v. *Alloyd Co.*,
513 U.S. 561 (1995) ........................................................................................ 10

*GVA Market Neutral Master, Ltd.* v. *Veras Capital Partners Offshore Fund, Ltd.*,
 580 F. Supp. 2d 321 (S.D.N.Y. 2008) ............................................................ 24

*Hoffman* v.*UBS AG*,
 591 F. Supp. 2d 522 (S.D.N.Y. 2008) ............................................................. 8

*Ingrassia* v. *County of Sullivan*,
 262 F. Supp. 2d 116, 119 (S.D.N.Y. 2003) ............................................... 4, 23

*In re Alstom SA Sec. Litig.*,
 406 F. Supp. 2d 402 (S.D.N.Y. 2005) ....................................................... 21, 22

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
 381 F. Supp. 192 (S.D.N.Y 2004) .............................................................. 7, 12

*In re Broderbund/Learning Co. Sec. Litig.*,
 294 F.3d 1201 (9th Cir. 2002) ...................................................................... 12

*In re First Union Corp. Sec. Litig.*,
 128 F. Supp. 2d 871 (W.D.N.C. 2001) .......................................................... 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 352 F. Supp. 2d 429 (S.D.N.Y. 2005) ........................................................... 19

*In re Initial Pub. Offering Sec. Litig.*,
 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................................................... 11, 12

*In re Livent, Inc. Noteholders Sec. Litig.*,
 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................... 10

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ............................................................. 7

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................... 10

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
 Nos. 02-CV-6153, 02-CV-8579, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ........................ 20

*In re N2K Inc. Sec. Litig.*,
 82 F. Supp. 2d 204 (S.D.N.Y. 1999) ............................................................. 20

*In re Openwave Sys. Sec. Litig.*,
 528 F. Supp. 2d 236 (S.D.N.Y. 2007) ........................................................... 22

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
 441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................................. 8

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000) ...................................................................... 10

*Korweck* v. *Hunt*,
    646 F. Supp. 953 (S.D.N.Y. 1986) ........................................................................ 24

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ........................................................................................ 14

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) .............................................................. passim

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004) .................................................................................... 3

*Simon* v. *Eastern Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) .................................................................................................. 8

STATUTES AND RULES

Section 11 of the Securities Act of 1933
    15 U.S.C. § 77k ................................................................................................. 9, 11

Section 12(a)(2) of the Securities Act of 1933
    15 U.S.C. § 77*l*(a)(2) ............................................................................................ 11

Section 13 of the Securities Act of 1933
    15 U.S.C. § 77m .................................................................................................... 21

Securities Act Rule 12b-2
    17 C.F.R. § 240.12b-2 ............................................................................................. 3

Securities Act Rule 512
    17 C.F.R. § 229.512 ................................................................................................. 9

Securities Act Rule 1111
    17 C.F.R. § 229.1111 ............................................................................................. 21

Securities Act Rule 436
    17 C.F.R. § 230.436 ............................................................................................... 19

Fed. R. Civ. P. 12(b)(1) ................................................................................... 1, 7, 12

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1, 7

**OTHER AUTHORITIES**

*Asset-Backed Securities*,
Securities Act Release No. 8518, Exchange Act Release No. 50, 905,
    70 Fed. Reg. 1506 (Jan. 7, 2005) ............................................................. 10, 12, 20

The Goldman Sachs Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the June 22, 2009 Amended Complaint ("Am. Compl.") in this action pursuant to Fed. R. Civ. P. 12(b)(1), for lack of standing, and 12(b)(6), for failure to state a claim and as barred by the statute of limitations.

## PRELIMINARY STATEMENT

This case is one of dozens of similar putative class actions that have been brought against issuers and underwriters of mortgage-backed securities in the wake of the unforeseen and unprecedented implosion of the housing and mortgage markets.  With the benefit of perfect hindsight as to these extraordinary events, the plaintiff here, Public Employees' Retirement System of Mississippi ("Plaintiff"), purports to bring claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"), belatedly challenging the sufficiency of disclosures relating to three offerings of mortgage pass-through certificates issued by three different trusts.  The Amended Complaint should be dismissed for numerous reasons.

As a threshold matter, Plaintiff claims to have purchased certificates issued by *only one* of those trusts — GSAMP Trust 2006-S2 ("GSAMP 2006-S2").  As numerous courts have held, Plaintiff lacks standing to assert claims with respect to securities it did not buy.  Those claims should be dismissed on that basis alone.  Moreover, Plaintiff lacks standing under Section 12(a)(2) even as to the GSAMP 2006-S2 certificates that it allegedly purchased, because Plaintiff does not allege that it purchased those certificates *from* any of the Goldman Sachs Defendants and *in* the initial public offering, as required in order to bring a Section 12(a)(2) claim.

Further, Plaintiff fails to plead a cognizable economic loss, an essential element of its Sections 11 and 12(a)(2) claims.  As clearly disclosed in the relevant offering documents, the trust

---

[1]     The Goldman Sachs Defendants are The Goldman Sachs Group, Inc. ("GS Group"), Goldman, Sachs & Co. ("Goldman Sachs"), Goldman Sachs Mortgage Company ("GSMC"), GS Mortgage Securities Corp. ("GS Mortgage"), Daniel L. Sparks, Mark Weiss and Jonathan S. Sobel.

certificates entitle holders to pass-through principal and interest payments from pools of non-
traditional, second-lien mortgage loans originated under programs that required limited or no
documentation of the borrowers' income, assets or employment.  Yet Plaintiff does not allege that
there has been a single missed or late payment, let alone a default, on any of these certificates.
Indeed, Plaintiff nowhere alleges that certificateholders have failed to receive all pass-through
payments due as described in the offering documents, and those payments are all that investors
bargained for (in contrast to equity securities whose holders seek market appreciation).

   More fundamentally, the Amended Complaint identifies no actionable misstatement
or omission.  Plaintiff asserts that the offering documents understated the risk of borrower default
— and correlatively diminished pass-through payments — by failing to describe accurately the
originators' underwriting guidelines for the inherently risky subprime loans held by the trusts and
the methods employed by the third-party rating agencies that rated the certificates.  The Amended
Complaint, however, does not provide *any* factual information about the *actual* loans held by the
trusts, which were made by third-party lenders (or "originators") unaffiliated with Goldman Sachs.
Instead, Plaintiff simply borrows generalized allegations from other mortgage-backed securities
lawsuits, which in turn collected snippets from various public reports that have criticized mortgage
originators and rating agencies, including many that had no involvement whatsoever in the loans
underlying Plaintiff's certificates.  Plaintiff then postulates in wholly conclusory terms that these
practices must have been employed here.  Plaintiff pleads no facts to support these suppositions, and
completely ignores that the offering documents provided abundant detail about the actual
underlying loans, including that they involved higher risk because they were not underwritten to the
same standards as traditional mortgage loans.  Moreover, even if the originators of the loans
deviated in undisclosed ways from their underwriting guidelines in connection with the loans
underlying the certificates in question here, SEC Regulation AB required the disclosure only of

*known* deviations from the originator's underwriting guidelines, and the Amended Complaint does not allege that Defendants had knowledge of any such deviations.  Indeed, Plaintiff *expressly disclaims* any such allegation, no doubt to avoid the heightened pleading strictures of Rule 9(b) and the Private Securities Litigation Reform Act.

Finally, the applicable statute of limitations bars Plaintiff's claims because the Amended Complaint's allegations, as well as a sea of additional media reports and other publicly available information (all of which the Court may properly consider on this motion), make clear that Plaintiff had inquiry notice of its purported claims for more than one year before it filed this action.[2]

## ALLEGATIONS OF THE AMENDED COMPLAINT

### A.      The Parties and Claims

Plaintiff — a Mississippi-based government pension fund — purports to represent a putative class of investors who purchased mortgage pass-through certificates issued by three separate trusts in three different securities offerings.  (Am. Compl. ¶¶ 1, 33, 127.)  Plaintiff, however, claims to have purchased certificates issued by *only one* of those trusts — GSAMP 2006-S2.  (*Id.* ¶ 14.)  Plaintiff nevertheless challenges all three offerings and purports to assert claims under (i) Section 11 of the 1933 Act against all Defendants (*id.* ¶¶ 130-44), (ii) Section 12(a)(2) of the 1933 Act against GS Group and Goldman Sachs, as alleged underwriters of the offerings (*id.* ¶¶ 145-52), and (iii) Section 15 of the 1933 Act against GS Group, Goldman Sachs, GSMC and the three individual defendants (who are current or former officers of GS Mortgage) as

---

[2]      Plaintiff's claim for "control person" liability under Section 15 fails because Plaintiff has not adequately pleaded an underlying Section 11 or 12(a)(2) violation, and because Plaintiff does not adequately plead facts supporting an inference that GS Group, Goldman Sachs, GSMC or the individual defendants "controlled" any of the alleged primary violators.  *See Rombach* v. *Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).  To establish a Section 15 claim, plaintiff must allege an underlying primary violation, *id.*, and "the power to direct or cause the direction of the management and policies of" the alleged primary violator.  17 C.F.R. § 240.12b-2.

"control persons" (*id*. ¶¶ 153-55).

Defendant GSMC was the sponsor of all three offerings, but originated none of the underlying mortgage loans.  Instead, GSMC purchased the loans at arm's length from third-party originators, and then pooled and conveyed those loans to the depositor, GS Mortgage.  (*Id*. ¶¶ 5, 16, 29-30.)  GS Mortgage then conveyed the loan pool to the trusts.  (*Id*. ¶¶ 17, 29-30.)  In exchange for the loan pool, the trust transferred certificates to GS Mortgage.  (*Id*. ¶¶ 29-31.)  GS Mortgage then sold these certificates to investors through the underwriter, Goldman Sachs.  (*Id*. ¶¶ 18, 31.)  Despite Plaintiff's conclusory allegation that GS Group was also an "underwriter" and "participated in the drafting and dissemination" of the offering documents (*id*. ¶ 15), the offering documents make clear that GS Group (the publicly-held parent company of the Goldman Sachs organization and not a registered broker-dealer or the underwriter) played no such role in the offerings.  (*See* Rouse Decl., Exs. A, B and C (identifying no role for GS Group).)[3]

## B.      The Certificates Plaintiff Purchased

Plaintiff alleges that it purchased GSAMP 2006-S2 certificates; it does not allege that it purchased certificates from the other two challenged offerings (GSAA Home Equity Trust 2006-2 and 2006-3).  (Am. Compl. ¶ 14.)  The materials pursuant to which Plaintiff's GSAMP 2006-S2 certificates were offered and issued consist of (i) a registration statement filed with the

---

[3]      Cites to "Rouse Decl." are to the accompanying Declaration of Patrice A. Rouse.  The Rouse Declaration attaches (in excerpted form, where noted, to eliminate unnecessary volume) the offering documents with respect to the certificates that Plaintiff purchased, as well as other documents referred to in the Amended Complaint and various publicly available materials concerning the subprime mortgage industry.  It is well established that in ruling on a motion to dismiss, the Court may consider the allegations of the complaint as well as "documents attached to the [c]omplaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit."  *See Ingrassia* v. *County of Sullivan*, 262 F. Supp. 2d 116, 119 (S.D.N.Y. 2003).

SEC on November 5, 2004 (which was subsequently amended on December 24, 2004),[4] (ii) a base prospectus dated November 17, 2005, (iii) a prospectus supplement dated March 28, 2006, and (iv) a free writing prospectus (providing *individual* loan-level data) filed contemporaneously with the respective prospectus supplement.  (*See* Am. Compl. ¶¶ 1, 33, 42-43; Rouse Decl., Ex. A.)  The offering documents disclosed that the certificates are backed by alternative, second-lien mortgage loans owned by the issuing trust.  (*See* Am. Compl. ¶¶ 4, 28, 32, 43, 126; Rouse Decl., Ex. A at S-1, S-29 – S-36.)  As borrowers make their monthly mortgage payments, the trust "passes through" a portion of these payments to certificateholders based on the class of their certificates.  (*See*, *e.g.*, Am. Compl. ¶¶ 4, 28, 32, 34; Rouse Decl., Ex. A at S-7.)  Plaintiff does not allege that certificateholders have failed to receive all payments to which they are entitled.

As Plaintiff acknowledges, the offering documents contained abundant "detailed" descriptions about the certificates and the loans held by the trusts.  (Am. Compl. ¶ 43.)  For example, the disclosures for GSAMP 2006-S2 informed investors that New Century Mortgage Corporation ("New Century") had originated *all* of the underlying loans using a variety of lending programs, including programs that did not require borrowers to provide evidence of their income, assets or employment, and that loans made pursuant to these alternative programs posed a greater risk of default than traditional mortgage loans extended in accordance with more conservative standards.  (*See*, *e.g.*, Am. Compl. ¶¶ 47, 50; Rouse Decl., Ex. A at S-14, S-32 – S-36.)  The offering documents for GSAA Home Equity Trusts 2006-2 and 2006-3 similarly disclosed the

---

[4]     Plaintiff purports to represent a class of purchasers of Certificates offered pursuant to an August 17, 2005 Registration Statement.  (*See* Am. Compl. ¶ 1.)  The specific offerings listed, however, were made pursuant to a November 5, 2004 Registration Statement.

lending programs and associated risks for the originators of the loans held by those trusts.[5]  It could not have been clearer that all three trusts held subprime second-lien loans that would be particularly impacted by a downturn in the housing market or the economy in general.  (*See*, *e.g.*, Rouse Decl., Ex. A at S-13 – S-16.)  The offering documents for GSAMP 2006-S2 disclosed not only that "exceptions to the New Century Underwriting Guidelines are made where compensating factors exist," but also that "**[i]t is expected that a substantial portion of the mortgage loans will represent these exceptions**."  (*See* Rouse Decl., Ex. A at S-32 (emphasis added).)  Indeed, Plaintiff itself quotes this language in the Amended Complaint.  (*See* Am. Compl. ¶ 50.)

**C.    Alleged Misrepresentations in the Offering Documents**

Despite these detailed disclosures, Plaintiff asserts that the offering documents failed to provide adequate information about the underwriting guidelines of certain mortgage loan originators, the risks associated with the certificates and the methodologies used by the rating agencies.  (*See*, *e.g.*, Am. Compl. ¶¶ 7, 8, 45.)  Not only do the offering documents themselves refute these general allegations, but the Amended Complaint also does not provide a single fact about the *actual* loans underlying the specific certificates at issue in this case, the *actual* underwriting practices used for those loans, or the *actual* ratings methodologies employed for those certificates.  Instead, Plaintiff's allegations are directed at the subprime mortgage and securitization markets as a whole, and are derived from little more than the widespread public attention that those industries have been receiving for at least two years amid the ongoing economic crisis.  And even then, the Amended Complaint does not allege that the loans at issue performed any differently than similarly situated loans in the context of a nationwide housing crash of unprecedented proportion.

---

[5]      Relevant excerpts from the GSAA Home Equity Trust 2006-2 and 2006-3 prospectus supplements are attached to the Rouse Declaration as Exhibits B and C, respectively.

## STANDARD ON THIS MOTION

When a plaintiff lacks standing to bring a particular claim, the court should dismiss that claim under Fed. R. Civ. P. 12(b)(1) because a defect in standing deprives the court of subject matter jurisdiction. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004).

A complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007). The possibility that a plaintiff might prove *some* facts in support of its claim is insufficient to survive a motion to dismiss. *Id*. at 570. "[A] formulaic recitation of the elements of a cause of action will not do." *Ashcroft* v. *Iqbal*, No. 07-1015, 2009 WL 1361536, at *12 (U.S. May 18, 2009) (quotation marks omitted). Plaintiff must establish the elements of each claim through factual allegations sufficient "to raise a right to relief above the speculative level" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

Further, where "it is clear from the face of the complaint, and matters of which the court may take judicial notice," that the plaintiff's claims are time-barred, dismissal under Rule 12(b)(6) is proper. *Conopco, Inc*. v. *Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) (courts routinely dismiss securities fraud claims on statute of limitations grounds where facts triggering inquiry notice are apparent from the complaint, the documents cited therein and public documents).

## ARGUMENT

### I.   PLAINTIFF LACKS STANDING TO SUE

To establish a claim under Section 11 or 12(a)(2) of the 1933 Act, a plaintiff must have standing. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig*., 381 F. Supp. at 245. "The burden to establish standing rests on the party asserting its existence." *Id.* Accordingly, at the

pleading stage, the plaintiff must "clearly . . . allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *Id*.

    **A.**    **Plaintiff Lacks Standing to Assert Section 11 Claims as to <u>Securities Offered by GSAA Home Equity Trusts 2006-2 and 2006-3</u>**

        Although the Amended Complaint purports to challenge three separate offerings by three trusts (Am. Compl. ¶¶ 1, 33), Plaintiff claims to have purchased certificates issued by only *one* of these trusts — GSAMP 2006-S2.  (Am. Compl. ¶ 14.)  Thus, Plaintiff lacks standing to assert a Section 11 claim with respect to the certificates that it did not purchase.

        Section 11 embodies a congressionally mandated trade-off in which would-be plaintiffs, in order to have standing to sue under Section 11 (which does not require proof of fraudulent intent), must have purchased the specific securities on which they base their claim.  *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("[w]ith regard to the [68] funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims").  In addition, to assert a Section 11 claim on behalf of a class, at least one named plaintiff must have purchased securities traceable to the challenged offering.  *See Simon* v. *Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976); *Fishbury, Ltd.* v. *Connectics Corp.*, No. 06-CV-11496, 2006 WL 3711566, at *13 (S.D.N.Y. Dec. 14, 2006) (same).

        Where, as here, no named plaintiff purchased securities issued in certain of the challenged offerings, the Section 11 claims based on those offerings must be dismissed for lack of standing.  *See Simon*, 426 U.S. at 40 n.20 ("[T]he fact that a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (internal quotation marks omitted)); *Hoffman* v. *UBS AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) ("Plaintiffs in

this case cannot meet the injury requirement for claims relating to funds in which they have not purchased shares because they cannot claim to be personally injured by the violations relating to those funds.").

Moreover, Plaintiff cannot establish Section 11 standing with respect to certificates that it did not purchase by arguing that all the challenged offerings were made pursuant to the same shelf registration statement.  (*See* Am. Compl. ¶¶ 1, 42-43.)  A plaintiff's purchase of certificates issued pursuant to a prospectus supplement that incorporated a shelf registration statement does *not* confer standing with respect to certificates issued under *other* prospectus supplements.  An issuer of securities under a shelf registration is required to file supplements that add updated information about the offered securities.  *See* 17 C.F.R. § 229.512(a)(1).  SEC regulations provide that "for the purpose of determining any liability under the [1933 Act], each . . . post-effective amendment [to a shelf registration statement, such as a prospectus supplement] shall be deemed to be *a new registration statement* relating to the securities offered therein."  17 C.F.R. § 229.512(a)(2) (emphasis added); *see also* 17 C.F.R. § 229.512(a)(1).  Therefore, each of the three offerings is subject to a separate "registration statement" consisting of the original shelf registration statement and prospectus, as well as the applicable prospectus supplement — which is replete with additional disclosures specific to the portfolios involved.

Accordingly, Plaintiff has standing at most to assert a Section 11 claim relating to its GSAMP 2006-S2 certificates, and its Section 11 claims relating to the other two offerings challenged in the Amended Complaint should be dismissed.[6]

---

[6]    Plaintiff's Section 11 claims against GS Group and GSMC should be dismissed in all events because GS Group and GSMC are not proper Section 11 defendants.  Section 11 permits purchasers to sue only the issuer of the securities, individuals who sign the registration statement, directors or principal officers of the issuer, underwriters and experts who helped prepare the registration statement.  15 U.S.C. §§ 77k(a)(1)-(5).  A plaintiff cannot bring a "sponsor" (here, GSMC) within Section 11's

(*continued on next page*)

**B.    Plaintiff Lacks Standing to Assert Section 12(a)(2) Claims
Even as to the GSAMP 2006-S2 Certificates that It Purchased**

Plaintiff asserts its Section 12(a)(2) claims against GS Group and Goldman Sachs. (*See* Am. Compl. ¶¶ 23, 146.)  A plaintiff may maintain a Section 12(a)(2) claim only with respect to securities that it purchased (i) *from* the defendant being sued and (ii) *in* the public offering (*i.e.*, not in the secondary market).  Here, Plaintiff lacks standing under Section 12(a)(2) because it does not allege that it purchased any certificates — including the GSAMP 2006-S2 certificates — *from* GS Group or Goldman Sachs, or *in* the public offering.

Since the Supreme Court's decision in *Gustafson* v. *Alloyd Co*., 513 U.S. 561 (1995), courts have consistently held that Section 12(a)(2) applies only to direct purchases *from* sellers *in* public offerings.  Here, Plaintiff merely alleges that it purchased GSAMP 2006-S2 certificates "pursuant and/or traceable to the offering documents."  (Am. Compl. ¶ 14.)  Plaintiff does *not* allege that it bought its certificates from GS Group or Goldman Sachs, and does *not* allege that it bought any certificates directly in the public offerings, as opposed to the secondary market.  Thus, the Court should dismiss Plaintiff's Section 12(a)(2) claim in its entirety.[7]

---

ambit by pleading that the sponsor "directly and indirectly participated in the distribution of the Certificates and . . . in drafting and disseminating the Offering Documents for the Certificates."  (Am. Compl. ¶ 136.)  *See Asset-Backed Securities*, 70 Fed. Reg. 1506, 1534 (Jan. 7, 2005) (defining "sponsor" as a separate party in asset-backed transactions involving intermediate transfer of assets).  Plaintiff also lacks a basis to bring Sections 11 and 12(a)(2) claims against GS Group because its claims against GS Group are premised entirely on its conclusory allegation that GS Group was an "underwriter."  (Am. Compl. ¶¶ 15, 135, 147, 148.)  This is plainly incorrect.  All three prospectus supplements clearly state that the only underwriter for the transactions was Goldman Sachs.  (Rouse Decl., Exs. A, B and C at S-1.)

[7]     *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) ("Under Section 12(a)(2), only a defendant from whom the plaintiff purchased securities may be liable." (internal quotation marks omitted)); *In re Livent, Inc. Noteholders Sec. Litig*., 151 F. Supp. 2d 371, 435 (S.D.N.Y. 2001) (same); *In re Ultrafem Inc. Sec. Litig*., 91 F. Supp. 2d 678, 693-94 (S.D.N.Y. 2000) ("Purchasers in . . . secondary market offerings do not have standing to bring actions under Section 12[(a)](2).").

## II.      PLAINTIFF DOES NOT PLEAD ANY COGNIZABLE ECONOMIC LOSS

The Amended Complaint should also be dismissed because Plaintiff does not plead that it (or the putative class) has suffered any cognizable economic loss, an essential element of its claims for damages under Sections 11 and 12(a)(2) of the 1933 Act. *See* 15 U.S.C. §§ 77k(e), 77l(a)(2); *see also In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) ("If a plaintiff has no conceivable damages under Section 11[(e)], [it] cannot state a claim upon which relief can be granted and [its] claims must be dismissed."). Given the pass-through structure of the certificates, it is obvious that investors have received precisely what they bargained for and suffered no such loss.

*First,* Plaintiff concedes that it (and other investors) purchased certificates based on the "absolute cash flow and timing of payments" from the certificates. (Am. Compl. ¶ 9; *see also id.* ¶¶ 4, 34.) Plaintiff does *not* allege that there has been even a *single* late or missed payment, let alone any default, on any of the certificates. Nor has Plaintiff pleaded a single fact that suggests that the "market value" or "price" of the certificates has declined. Instead, Plaintiff asserts that its certificates are "exposed to increased risk with respect to [the] absolute flow and timing of payments." (*Id.* ¶ 9.) Such allegations are pure speculation. *See First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[Plaintiff] does not allege actual injury by simply claiming that it incurred additional risk of loss . . . . [W]e reject [its] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined."). Indeed, the reason Plaintiff cannot allege a loss is because it has received all the payments that it bargained for when it bought its certificates.

*Second*, to the extent that Plaintiff bases its alleged "loss" on the theory that a ratings decline is equivalent to a drop in the price of a stock, it not only fails to allege any facts about the

- 11 -

supposed ratings downgrades, but also completely ignores the fundamental difference between

mortgage-backed securities and equity investments (such as stock).  As explained by the SEC,

investors in asset-backed securities ("ABS") differ from investors in corporate securities in that

"ABS investors are generally interested in the characteristics and quality of the underlying assets,

the standards for their servicing, the timing and receipt of cash flows from those assets and the

structure for distribution of those cash flows." *Asset-Backed Securities*, Securities Act Release No.

8518, Exchange Act Release No. 50, 905, 70 Fed. Reg. 1506, 1508, 1510-11 (Jan. 7, 2005).  In the

case of stocks, investors hope that the shares they buy will appreciate over time, and that they will

profit upon resale from the difference between their original purchase price and the appreciated

price.  *See id.* at 1508-11.  By contrast, mortgage-backed securities are contractual rights to a

portion of principal and interest payments from underlying loan pools, whose value is derived from

the future cash flows generated by the loan pools.  *See id.* at 1508, 1510-11; *In re First Union Corp.*

*Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed

securities such as those at issue here essentially is an exercise in estimating future cash flows.").

Investors in mortgage-backed securities consequently can suffer "damages" only

when they do not receive "pass-through" cash flow payments to which they are entitled.  Plaintiff

has not alleged any such failure.  In similar situations, courts have routinely dismissed Sections 11

and 12(a)(2) claims for failure to plead an economic loss; this Court should do so here.[8]  *See In re*

*Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d at 299 ("If a plaintiff has no conceivable damages

under Section 11[(e)], [it] cannot state a claim upon which relief can be granted and [its] Section 11

claims must be dismissed."); *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05

---

[8]        Plaintiff's failure to plead the required element of economic loss also warrants dismissal under
Fed. R. Civ. P. 12(b)(1) for lack of constitutional or statutory standing.  *See In re AOL Time Warner,*
*Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d at 245-46.

(9th Cir. 2002) (same).

### III.   THE AMENDED COMPLAINT DOES NOT PLEAD ANY ACTIONABLE MISREPRESENTATIONS

Sections 11 and 12(a)(2) require that a plaintiff allege that (i) the offering documents contained a material misrepresentation and (ii) the defendants had a duty to disclose the allegedly misrepresented information.  *See Basic, Inc.* v. *Levinson*, 485 U.S. 224, 232 (1988); *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).  In evaluating whether an alleged misrepresentation was material, the offering documents must be read as a whole, focusing not "on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]."  *DeMaria* v. *Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  Whether a duty to disclose existed depends "largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder."  *Panther Partners, Inc.*, 538 F. Supp. 2d at 668.

Here, the offering documents contain detailed disclosures that accurately spelled out the information that Plaintiff claims was misrepresented, including the loan originators' underwriting guidelines, the fact that exceptions to those guidelines were permitted, and that a "substantial portion of the mortgage loans" were expected to represent such exceptions.  (*See* Rouse Decl., Ex. A at S-32, S-36; Am. Compl. ¶ 50.)  Moreover, even if Plaintiff had otherwise identified an inaccurate disclosure of the loan originators' *general* practices or subprime mortgage loans or borrowers *generally*, the Amended Complaint would still fail to state a claim because it does not allege facts establishing that any of the purported misrepresentations were material or in violation of a duty to disclose.  Indeed, there are no allegations whatsoever about any of the *actual* loans held by the trusts issuing *these* certificates, and hence no allegations that any of the supposedly

misrepresented underwriting practices affected any (no less a material number) of the loans held by the three trusts.  Nor does the Amended Complaint allege that Defendants knew of the unaffiliated originators' supposed deviations from the standards disclosed in the offering documents.

### A.      The Offering Documents Disclosed All Information Plaintiff Alleges Was Required

The supposed misrepresentations and omissions underlying Plaintiff's claims are belied by the detailed disclosures in the offering documents, which demonstrate that investors were provided with all material information about the certificates.  *See Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5, 9 (2d Cir. 1996) (dismissing claims based on alleged failure to disclose risk of investing in mortgage-backed securities because "prospectuses warn[ed] investors of exactly the risk plaintiffs claim was not disclosed"); *Finkel* v. *Putnam Convertible Opportunities & Income Trust*, No. 96-CV-4810, 1997 WL 60847, at *2 (S.D.N.Y. Feb. 11, 1997) (same), *aff'd*, 162 F.3d 1147 (2d Cir. 1998).

### 1.      The Offering Documents Disclosed the Originators' Lending Practices

Plaintiff alleges that the offering documents failed to disclose that originators could issue loans pursuant to alternative lending programs that reduced or eliminated documentation and verification requirements.  (Am. Compl. ¶¶ 4, 7, 8, 45, 46, 48-93.)  The Amended Complaint itself concedes, however, that the offering documents disclosed precisely this information.  (*Id.* ¶ 50.) For example, the GSAMP 2006-S2 prospectus supplement disclosed that "the [underlying] mortgage loans [were] originated in accordance with New Century Underwriting Guidelines" (Rouse Decl., Ex. A at S-32), which included "full documentation, limited documentation and stated income documentation residential loan programs" (*id.* at S-33).  It also disclosed that "[o]n a case-by-case basis, exceptions to the [guidelines were] made . . . [and] it [was] expected that a substantial portion of the mortgage loans [would] represent these exceptions."  (*Id.* at S-32.)

- 14 -

Indeed, approximately 56.71% of the loans were issued pursuant to alterative lending programs. (*Id.* at A-2.)  These and similar disclosures thus explained that originators (like New Century) could, and did, deviate from their standard underwriting guidelines.[9]  The offering documents for GSAA Home Equity Trusts 2006-2 and 2006-3 contain substantially similar disclosures.  (*See* Rouse Decl. Exs. B at S-50 and C at S-48).

### 2.   The Offering Documents Disclosed the Involvement of Independent Mortgage Brokers and Appraisers

Plaintiff alleges that the offering documents did not disclose sufficiently that originators' appraisal procedures may have yielded inaccurate property values.  (Am. Compl. ¶¶ 7, 8, 45, 94-103.)  As Plaintiff acknowledges, however, the offering documents fully disclosed that third parties conducted the appraisals:  "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers."  (Am. Compl. ¶ 95; Rouse Decl., Ex. A at S-32; *see also* Ex. B at S-51, Ex. C at S-48-49.)  A reasonable investor would have understood this to indicate precisely the information that Plaintiff complains was misrepresented — namely, that neither the Goldman Sachs Defendants nor any originator (like New Century) controlled the appraisal process and that third-party appraisal services might deviate from standard guidelines (which deviation the offering documents explicitly cautioned).  *See Donovan* v. *Am. Skandia Life Assurance Corp.*, No. 02-CV-9859, 2003 WL 21757260, at *2 (S.D.N.Y. July 31, 2003) ("Liability does not arise from the failure to disclose that which should be obvious to the average investor." (citation omitted)).

---

[9]      The offering documents also cautioned investors that New Century's relaxed underwriting standards could affect the certificates' risk and yield:  "Less Stringent Underwriting Standards and the Resultant Potential for Delinquencies on the Mortgage Loans Could Lead to Losses on Your Certificates."  (Rouse Decl., Ex. A at S-14; *see also* Ex. B at S-20, Ex. C at S-20.)

### 3.   The Offering Documents Disclosed the Calculation of Loan-to-Value Ratios

Plaintiff alleges that the offering documents did not disclose that originators could deviate from their standard loan-to-value guidelines.  (Am. Compl. ¶¶ 7, 46, 48, 51, 57, 73, 78, 85, 89, 94-103.)  These allegations are duplicative of, and derived entirely from, Plaintiff's flawed appraisal allegations, because the offering documents made clear that one component of the "loan-to-value" ratio was the "appraised value."  (*See*, *e.g.*, Rouse Decl., Ex. A at S-32, Ex. B at S-43, Ex. C at S-43.)  To construct its loan-to-value theory, Plaintiff starts with its unsupported assertion that appraisals were "inflated" (*see*, *e.g.*, Am. Compl. ¶¶ 7, 103), adds another layer of speculation by referring generally to "misleading" sales prices due to pressure and coercion (*see*, *e.g.*, *id.* ¶ 100), and then extrapolates that a ratio of appraisal value to sales price must have misrepresented a borrower's equity (*see*, *e.g.*, *id.* ¶ 103).  There is nothing new in these allegations; they involve multiple layers of speculation and are as flawed as the underlying appraisal allegations.

Moreover, Plaintiff's theory is based on the erroneous premise that an "inflated" appraisal necessarily *causes* a misstated loan-to-value ratio.  (*Id.* ¶¶ 94-103.)  The offering documents, however, plainly defined "loan-to-value" as the ratio between the principal balance of the mortgage loan and the *lesser* of (i) the selling price of the property *or* (ii) its appraised value at the time of sale.  (Rouse Decl., Ex. A at S-32 – S-33, Ex. B at S-43, Ex. C at S-43.)  An "inflated" appraisal thus would not necessarily alter the loan-to-value ratio for a mortgage loan, much less cause it to overstate a borrower's equity.  Plaintiff's boot-strapped loan-to-value ratio claim is therefore deficient.

### 4.   The Offering Documents Disclosed the Calculation of Debt-to-Income Ratios

Plaintiff alleges that the offering documents did not disclose that originators could deviate from their standard debt-to-income guidelines.  (*See*, *e.g.*, Am. Compl. ¶ 7.)  Contrary to

Plaintiff's allegations, however, the offering documents expressly disclosed that originators (like New Century) could deviate from their guidelines concerning borrowers' debt-to-income ratios. (*See*, *e.g.*, Rouse Decl., Ex. A at S-36 ("On a case-by-case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception . . . ."), Ex. B at S-50, Ex. C at S-48.) The offering documents also disclosed that originators were not required to verify the "income" component of the "debt-to-income" ratio.  (*See*, *e.g.*, Rouse Decl., Ex. A at S-33 ("an applicant may be qualified based upon monthly income as stated"), Ex. B at S-51, Ex. C at S-52.)  Thus, the offering documents disclosed precisely what Plaintiff alleges was omitted.

>    **5.**      **The Offering Documents Disclosed the Credit Enhancement Features**

Plaintiff alleges that the offering documents misrepresented the level of credit enhancement protecting certain classes of certificateholders from losses on their certificates should borrowers default on the underlying loans.  (Am. Compl. ¶¶ 45, 104-09.)  Here again, instead of providing factual allegations that make this theory plausible, *see Twombly*, 550 U.S. at 555, Plaintiff resorts to speculation, alleging that because "many of the loan originators did not follow their underwriting and property appraisal standards," the level of credit enhancement must have been inadequate.  (*Id*. ¶ 109.)  The only basis for this assertion, however, is Plaintiff's underwriting and appraisal claims, which are themselves inadequate.  (*See id.* ¶ 40 ("If the presumed underwriting standards and appraisals are inaccurate, the stated credit enhancement parameters will be inaccurate").)  Furthermore, Plaintiff ignores several prominent warnings in the prospectus supplement that "THE CREDIT ENHANCEMENT FEATURES MAY BE INADEQUATE TO PROVIDE PROTECTION FOR THE OFFERED CERTIFICATES."  (Rouse Decl., Ex. A at S-20, Ex. B at S-24, Ex. C at S-24; *see also* Ex. A at S-21, S-22.)  These and similar disclosures made it abundantly clear that the overcollateralization amount could fluctuate, and that while the initial

amount was "approximately 2.40%," that amount was not guaranteed for any distribution date

(Rouse Decl., Ex. A at S-68) — precisely what Plaintiff alleges was misrepresented or omitted.[10]

### 6.   The Offering Documents Disclosed the Certificates' Ratings

The Amended Complaint likewise falls short based on the alleged failure to disclose

that the ratings assigned to the certificates (i) could be inaccurate, (ii) were based on supposedly

"outdated" models and (iii) could be compromised by a purported conflict of interest between the

rating agencies and the issuers.[11]   (Am. Compl. ¶¶ 7, 45, 110-24.)   *First*, Plaintiff's allegation is

premised on the assertion that the rating agencies' models used inaccurate loan data, including

allegedly inflated property values.   (*See id.* ¶ 113.)   Plaintiff, however, never alleges that *any* of the

*actual* loans held in the trusts were made in violation of any originator's underwriting guidelines.

*Second*, the offering documents accurately disclosed the ratings and warned that those ratings could

change.   (Rouse Decl., Ex. A at S-28 ("THE RATINGS ON YOUR CERTIFICATES COULD BE

REDUCED OR WITHDRAWN"), S-101 ("A security rating is not a recommendation . . . and may

be subject to revision or withdrawal at any time . . . ."), Ex. B at S-37, Ex. C at S-36.)   That the

rating agencies later downgraded their initial ratings does not mean that the ratings were false when

made.   *See Panther Partners, Inc.*, 538 F. Supp. 2d at 669 (allegations implying "that what only

became clear due to subsequent events was somehow known [to defendants] far earlier" is

speculative, hindsight pleading that fails to satisfy the *Twombly* standard).   *Third*, the certificates'

ratings cannot in all events give rise to liability under the 1933 Act because the ratings are not

---

[10]     Plaintiff also fails to allege that (i) it suffered any loss for which the applicable credit enhancement would have provided protection (Am. Compl. ¶¶ 107-09), or (ii) the initial overcollateralization stated in the prospectus supplement ("2.40%") decreased at all, let alone by a material percentage (*id.* ¶ 109).

[11]     The Goldman Sachs Defendants incorporate by reference the arguments concerning ratings set forth in the motion to dismiss filed by the rating agency defendants.

considered part of the offering documents.  *See* 17 C.F.R. § 230.436(g)(1).  Plaintiff's ratings

disclosure claims should therefore be dismissed.

      **B.**     **Plaintiff Does Not Adequately Allege**
<br>                 **<u>Materiality or Violation of Any Duty to Disclose</u>**

        Sections 11 and 12(a)(2) require a plaintiff to allege that (i) the offering documents

contained a *material* misrepresentation and (ii) the defendants were under a *duty to disclose* the

allegedly misrepresented information.  *Panther Partners, Inc*., 538 F. Supp. 2d at 668.  Even if

Plaintiff had adequately alleged that the offering documents contained misrepresentations about

subprime mortgage loans generally, or about originators' general underwriting practices, the

Amended Complaint would still fail to allege that any such misrepresentations were material here,

or that Defendants violated any duty to disclose, because no allegations tie these alleged industry-

wide practices to any of the specific loans or certificates at issue here (much less establish a material

impact on them).

        *First*, despite having access to publicly filed documents listing the characteristics of

*all* the loans conveyed to the trusts, Plaintiff fails to allege that any of these particular loans

(i) violated any originators' underwriting guidelines, (ii) had an inaccurate property appraisal,

"loan-to-value" ratio or "debt-to-income" ratio, or (iii) contributed to inadequate credit enhancement

or inaccurate ratings for the certificates.[12]  Further, even assuming that some "improper" loans were

included in the loan pools, Plaintiff does not allege that the purported errors reached material levels

---

[12]      Plaintiff cites information purporting to show delinquency rates for the underlying loans as of
May 2009.  (Am. Compl. ¶ 126.)  These delinquency rates, more than three years *after* the certificates
were initially offered, have no bearing on the accuracy of disclosures made in 2005 and 2006.  *See In re
Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) ("[T]o state a claim
under § 11, a plaintiff must allege that the registration statement . . . contained an untrue statement of a
material fact or omitted to state a material fact required to be stated therein . . . .  The truth of a
statement made in the prospectus is adjudged by the facts as they existed when the registration statement
became effective." (internal quotation marks and citation omitted)).

— either in light of the huge number of mortgage loans held by the trusts (*e.g.*, approximately 12,460 loans in the GSAMP 2006-S2 trust) or in comparison to how similarly situated loans performed in the housing meltdown.  Without allegations to establish materiality, Plaintiff cannot state a claim.  *See ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009) (dismissing Section 11 claim for lack of materiality). Plaintiff's parroting of conclusory allegations found in public sources and reliance on unidentified hearsay about general market practices concerning other unrelated offerings, without supporting factual allegations, does not state a claim.  *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing 1933 Act claims as "too conclusory, as they offer no possibility at all of assessing materiality").

   *Second*, under the SEC regulations applicable to mortgage-backed securities, the Goldman Sachs Defendants had a duty to disclose only *known* exceptions to an originator's underwriting guidelines and the manner in which the loans were selected.  *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000) ("The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's [offering documents]."), *aff'd*, 202 F.3d 81 (2d Cir. 2000); *In re Morgan Stanley Tech. Fund Sec. Litig.*, Nos. 02-CV-6153, 02-CV-8579, 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009) ("[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material."); *Panther Partners, Inc.*, 538 F. Supp. 2d at 668 ("Whether a duty to disclose exists [under Section 11] depends largely on the itemized disclosures required by the securities laws . . . .").

   Specifically, Section 1111 of Regulation AB — which "comprehensively" "provid[es] tailored disclosure requirements and guidance for [1933 Act] filings involving asset-backed securities," *Asset-Backed Securities*, 70 Fed. Reg. at 1581 — addresses the "[i]nformation [r]egarding [p]ool [a]sset [t]ypes and [s]election [c]riteria" Defendants were required to disclose:

> A description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, *to the extent known*, any changes in such criteria and the extent to which such policies and criteria are or could be overridden.

17 C.F.R. § 229.1111(a)(3) (emphasis added).

Far from alleging that the Goldman Sachs Defendants had *any* knowledge that any originator was deviating from its underwriting guidelines, Plaintiff affirmatively insists that they had *no* such knowledge and did *not* recklessly disregard any such deviations.  (*See*, *e.g.*, Am. Compl. ¶ 48 ("Plaintiff does not allege that any of the Defendants named herein knew of, or recklessly disregarded, the failure of the originators to comply with their underwriting guidelines.").)  Where (as here) an SEC regulation requires that defendants disclose only *known* information, plaintiffs must allege that defendants *knew* about the purportedly misrepresented or omitted information to state a claim for a disclosure violation.  *See Garber*, 537 F. Supp. 2d at 613 (dismissing Section 11 claim where regulation required knowledge of "known trends" and plaintiff failed to make such allegations).  Because Plaintiff has not only failed to do so, but has done exactly the opposite, its claims should be dismissed.

## IV.   PLAINTIFF'S CLAIMS ARE TIME-BARRED

Section 13 of the 1933 Act requires that claims based on Sections 11 and 12(a)(2) of the Act must be filed within "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Thus, the one-year period begins to run when a plaintiff has either actual notice or "inquiry notice" of the alleged misrepresentations.  *See Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 349 (2d Cir. 1993).  A plaintiff does not need "notice of the entire wrongdoing" to trigger its duty to investigate whether it has possible Sections 11 and 12(a)(2) claims.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005).  Instead, a plaintiff is on inquiry notice when "the exercise

- 21 -

of reasonable diligence[] would have led to actual knowledge." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007).  "Information that may be held to constitute inquiry notice includes any financial, legal, or other data, such as public disclosures in the media . . . that provide a plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there may have been misleading statements or material omissions involved in the sale of the securities at issue," as well as private lawsuits. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 421. "When the facts from which knowledge may be imputed are clear from the pleadings and the papers and filings integral to the complaint, the question of inquiry notice may be properly resolved on a motion to dismiss." *Id*.

Plaintiff filed this action on February 6, 2009.  All of Plaintiff's claims are barred because Plaintiff was on inquiry notice (at a minimum) of the alleged misrepresentations challenged here well before February 6, 2008, as a result of the massive implosion of the housing and mortgage markets that started in mid-2007.

*First*, in light of the market tsunami over the prior several months, the three major rating agencies collectively placed all classes of the GSAMP 2006-S2 certificates on "negative watch" and downgraded all of their ratings by December 2007.  For example, (i) Fitch, Inc. ("Fitch") placed all the classes of certificates on "negative watch" by August 16, 2007, and downgraded all but the most senior certificates by September 7, 2007; (ii) Moody's Investors Service ("Moody's") placed all but the most senior certificates on "negative watch" by June 15, 2007, and downgraded these classes by December 4, 2007; and (iii) Standard & Poor's ("S&P") placed all the offered classes of certificates on "negative watch" by November 16, 2007, and

downgraded all their ratings by December 20, 2007.  (*See* Rouse Decl., Ex. D.)[13]  Accordingly, Plaintiff's allegation that it could not have known that its certificates were underperforming "[u]ntil February 21, 2008 at the earliest" is plainly incorrect.  (Am. Compl. ¶¶ 10, 125.)

*Second*, news sources provided great detail about the suspect lending practices of New Century and the corresponding risk of investing in securities backed by loans originated by New Century.  By the spring of 2007, New Century had "become a symbol of excess in lending to subprime borrowers," and its collapse culminated in a highly publicized **bankruptcy filing in April 2007** "as defaults surged and accounting misdeeds surfaced."  (Rouse Decl., Ex. G (Mar. 12, 2007 WALL STREET JOURNAL article).)  Additionally, many news sources discussed problems with New Century's lending practices, such as the fact that "New Century rarely demanded reviews of the appraisals on which loans are based."  (*Id.*)  These sources also provided a timeline of New Century's demise, discussed that a shareholder derivative suit based on New Century's lending practices was filed in February 2007 and reported that the Ohio Attorney General and Department of Commerce investigated and entered into a preliminary injunction against New Century, arising in part out of New Century's predatory lending practices.[14]

As summarized in Appendix 1 hereto, other public information available prior to February 6, 2009 (some of which Plaintiff cites) further disclosed the issues on which Plaintiff bases its Amended Complaint.  For example, Plaintiff cites the May 2007 Senate testimony of Alan

---

[13]     Similar ratings downgrades occurred for certificates issued by GSAA Home Equity Trusts 2006-2 and 2006-3 during this period.  (*See* Rouse Decl., Ex. E and F.)

[14]     *See* Press Release, Office of the Attorney General, State of Ohio, Marc Dann, *All Eyes on New Century; Attorney General Marc Dann Has Oversight of Foreclosures to Weed Out Predatory Lending Violations* (Mar. 28, 2007).  (Rouse Decl., Ex. H.)  The Goldman Sachs Defendants attach as Appendix 1 a chronology of publicly available information regarding the subprime industry, disclosing the very problems about which Plaintiff complains.  The Court may consider this information to determine whether Plaintiff was on inquiry notice of its possible claims without converting this motion to dismiss into a motion for summary judgment.  *See Ingrassia*, 262 F. Supp. 2d at 119.

Hummel (Chairman of the Appraisal Institute), in which he noted the lack of appraisers'

independence and that there was a "terrible conflict of interest" where appraisers "experience

systemic problems of coercion" and are "ordered to doctor their reports."  (Am. Compl. ¶ 101.)

Appendix 1 also summarizes information published before February 6, 2008, explaining that:

- **There were problems with subprime underwriting guidelines.**  The public record was saturated with news articles, statements from government officials and various lawsuits, concerning industry-wide poor lending practices of mortgage originators.  These articles detailed the loosening of underwriting standards and increasing instances of lending fraud.
- **Government officials were concerned about subprime loan origination practices.**  Congress held numerous hearings on the mortgage crisis, and major figures, such as Senators Dodd and Schumer, then-Secretary of the Treasury Paulson, Federal Reserve Chairman Bernanke, and FDIC Chairman Sheila Bair, made multiple public statements on how loose underwriting practices contributed to the subprime crisis.
- **Regulators were investigating subprime mortgage lenders.**  Several states issued public statements announcing that they were investigating and securing injunctions against subprime originators because of their underwriting practices.
- **Subprime mortgage lenders were closing because their alternative loan programs had resulted in significant defaults.**  Many subprime originators, including New Century, declared bankruptcy or closed all or substantial parts of their businesses because of buy-back obligations associated with nonperforming loans they had originated and sold.
- **Problems with appraisals were well known.**  It was widely reported that appraisers were being pressured and coerced by originators to inflate property values.
- **Problems with the rating agencies were well reported.**  Many news sources reported on the conflicts of interest that rating agencies had when evaluating securitizations and that they were revising their old ratings models.  This information led to the September 2007 Congressional hearings on the role of the rating agencies in the current subprime crisis.

This abundant information clearly constituted notice of the very "problems" about which Plaintiff

now complains.  Because Plaintiff filed its action more than one year after this information put it on

inquiry notice of its potential claims, its Sections 11 and 12(a)(2) claims are barred and should be

dismissed.[15]

---

[15]    *See DeBenedictis* v. *Merrill Lynch & Co.*, 492 F.3d 209, 217-18 (3d Cir. 2007) (articles on industry practices triggered notice); *GVA Market Neutral Master, Ltd.* v. *Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008) (government investigations gave rise to actual notice); *Korweck* v. *Hunt*, 646 F. Supp. 953, 958 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 874 (2d Cir.

(*continued on next page*)

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Amended Complaint should be dismissed in its entirety, with prejudice.

Dated:  August 10, 2009

Respectfully submitted,

/s/ Richard H. Klapper
Richard H. Klapper
Michael T. Tomaino, Jr.
Patrice A. Rouse
Harsh N. Trivedi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants The Goldman
Sachs Group, Inc., Goldman, Sachs &
Co., Goldman Sachs Mortgage
Company, GS Mortgage Securities
Corp., Jonathan S. Sobel, Daniel L.
Sparks and Mark Weiss*

---

1987) (individual lawsuits, Congressional hearings and media coverage triggered notice).