

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI, Individually and
On Behalf of All Others Similarly Situated,

                Plaintiff,

  v.

GOLDMAN SACHS GROUP, INC.,
GOLDMAN SACHS MORTGAGE
COMPANY, GS MORTGAGE SECURITIES
CORP., GOLDMAN, SACHS & CO., INC.,
MCGRAW-HILL COMPANIES, INC.,
MOODY'S INVESTORS SERVICE, INC.,
FITCH INC., DANIEL L. SPARKS, MARK
WEISS, JONATHAN S. SOBEL, GSAA
HOME EQUITY TRUST 2006-2, GSAA
HOME EQUITY TRUST 2006-3, and
GSAMP TRUST 2006-S2.

                Defendants.

Civil Action No. 09-cv-1110-HB


SECOND AMENDED CLASS ACTION
COMPLAINT FOR VIOLATION OF
§§ 11, 12(a)(2) AND 15 OF THE
SECURITIES ACT OF 1933

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

Page

I. SUMMARY OF THE ACTION ........................................................................................1

II. JURISDICTION AND VENUE ......................................................................................4

III. THE PARTIES................................................................................................................4

    A. Plaintiff .............................................................................................................4

    B. Defendants ........................................................................................................5

IV. FACTUAL BACKGROUND ..........................................................................................9

    A. The Mechanics Of Structuring Mortgage Pass-Through Certificates ........................................................................................9

    B. Assessing The Quality Of Mortgage Pass-Through Certificates ......................................................................................11

V. THE GOLDMAN SACHS OFFERINGS.........................................................................13

VI. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING UNDERWRITING STANDARDS.........................................17

    A. New Century Mortgage Corporation ...................................................................20

    B. Argent Mortgage Company, LLC.........................................................................23

    C. Goldman Sachs Mortgage Conduit Program .........................................................26

    D. Countrywide Home Loans, Inc............................................................................28

    E. First National Bank of Nevada ...........................................................................35

    F. National City Mortgage Co.................................................................................37

    G. GreenPoint Mortgage Funding, Inc. ...................................................................39

    H. The Offering Documents Contained Misleading Risk Factors ..........................................................................................42

VII. THE OFFERING DOCUMENTS MISSTATED THE TRUE LTV RATIOS ASSOCIATED WITH THE UNDERLYING MORTGAGES ......................................................................43

VIII. THE OFFERING DOCUMENTS MISREPRESENTED THE OVERCOLLATERALIZATION OF THE ISSUING TRUSTS.................................................................................................48

IX.    THE RATINGS SET FORTH IN THE OFFERING DOCUMENTS MISSTATED THE QUALITY OF THE CERTIFICATES ................................................................................................51

X.    THE PERFORMANCE AND VALUE OF THE CERTIFICATES ............................................................................................58

XI.    CLASS ACTION ALLEGATIONS ...............................................................58

XII.    PLAINTIFF HAS STANDING TO PURSUE THE CLAIMS ALLEGED .........................................................................................60

FIRST CAUSE OF ACTION  For Violation Of Section 11 Of The Securities Act (Against The Depositor, the Individual Defendants, GS&Co. and the Rating Agency Defendants) ...............................................60

SECOND CAUSE OF ACTION  For Violation Of Section 12(a)(2) Of The Securities Act (Against the Depositor and GS&Co.) ...........................................................................................................64

THIRD CAUSE OF ACTION  For Violation Of Section 15 Of The Securities Act (Against Goldman Sachs, the Sponsor, the Individual Defendants and the Rating Agency Defendants) .............................................66

RELIEF REQUESTED ..................................................................................................68

JURY DEMAND ..........................................................................................................68

Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff"), alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief are based on the investigation of its undersigned counsel, and such investigation continues. Many of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

I.     SUMMARY OF THE ACTION

1.     Mississippi PERS brings this securities class action on behalf of itself and all persons or entities who purchased or otherwise acquired mortgage pass-through certificates ("Certificates") pursuant or traceable to GS Mortgage Securities Corp.'s (the "Depositor") August 17, 2005 Registration Statement, as amended ("Registration Statement"), and accompanying prospectus and prospectus supplements.[1]

2.     Plaintiff asserts claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Accordingly, this action involves solely strict liability and negligence claims brought pursuant to the Securities Act. This Complaint does not allege fraud on the part of any Defendant.

3.     This action arises from the sale of over $2.6 billion in mortgage pass-through certificates pursuant to the Registration Statement. Mortgage pass-through certificates are securities entitling the holder to income payments from pools of mortgage loans and/or

_____

[1] The Registration Statement, Prospectus and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

1

mortgage-backed securities ("MBS").  Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  The Certificates were supported by pools of mortgage loans that Goldman Sachs Mortgage Company (the "Sponsor") purchased. The Sponsor purchased the mortgage loans from various mortgage originators, including, among others, Countrywide Home Loans, Inc. ("Countrywide"), New Century Mortgage Corporation ("New Century"), Argent Mortgage Company, L.L.C. ("Argent") and the Goldman Sachs Mortgage Conduit Program ("GS Conduit Program").

      4.     Rating agencies played an important and necessary role in the distribution of the securities to investors.  Defendants Moody's, a division of Moody's Corp., McGraw-Hill Companies, through its division, Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") participated in structuring the Certificates (as explained below) and provided ratings for the Certificates.  These ratings, which were expressly included in each of the Prospectus Supplements, determined, in part, the price at which these Certificates were offered to Plaintiff and the Class.  Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA." Fitch's highest rating is "AAA."  These ratings signify the highest investment-grade, are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  Any instrument rated lower than BBB is considered below investment-grade.  Based on the rating agencies' purported analysis of the loan pools, the vast majority of the Certificates – 85% – received "triple-A" ratings, categorizing them as the highest quality of investment-grade securities.   As alleged below, however, Defendants

misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the Certificates.

5.     The Offering Documents contained untrue statements of material fact, omitted to state material facts required to be stated therein, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the debt-to-income ratios permitted on the loans; and (5) the ratings of the Certificates.

6.     The true facts which were omitted from the Offering Documents were:

- The loan originators, including Countrywide, New Century, Argent and the GS Conduit Program, had not followed their stated underwriting standards when issuing loans to borrowers;
- The underlying mortgages were based on appraisals that overstated the value of the underlying properties;
- The Certificates were not protected with the represented levels of credit enhancement and overcollateralization; and
- The ratings stated in the Prospectus Supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

7.     As a result of these untrue statements and omissions in the Offering Documents, Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality," and were not equivalent to other investments with the same credit ratings.   Contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments.  The credit rating agencies have now downgraded nearly all of the Certificates.  Many of the Certificates represented to be investment-grade instruments in the

Offering Documents have been downgraded to below investment-grade instruments.   The
Certificates, therefore, are no longer marketable near the prices paid by Plaintiff and the Class.

II.   JURISDICTION AND VENUE

8.   The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and
15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.   This Court has jurisdiction over
the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v
and 28 U.S.C. § 1331.

9.   Venue is proper in this District pursuant to Section 22 of the Securities Act and
28 U.S.C. § 1391(b) and (c).   Many of the acts and conduct complained of herein occurred in
substantial part in this District, including the dissemination of the materially false and
misleading statements complained of herein.   In addition, Defendants conduct business in this
District.

10.   In connection with the acts and conduct alleged herein, Defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including the mails and
telephonic communications.

III.   THE PARTIES

A.   Plaintiff

11.   Plaintiff, the Public Employees' Retirement System of Mississippi, is a
governmental defined benefit pension plan qualified under Section 401(a) of the Internal
Revenue Code, and is the retirement system for nearly all non-federal public employees in the
State of Mississippi.   Established by the Mississippi Legislature in 1952, Mississippi PERS
provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and
former public employees.   Mississippi PERS acquired Certificates pursuant to the Offering

Documents.  Mississippi PERS purchased Series 2006-S2 Mortgage Pass-Through Certificates issued by the GSAMP Trust 2006-S2 directly from Goldman Sachs & Co., Inc., as reflected in its certification, filed February 6, 2009.  On May 6, 2009, the Court appointed Mississippi PERS as Lead Plaintiff.

      B.    <u>Defendants</u>

      12.    Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware Corporation with its principal executive office located at 85 Broad Street, New York, New York 10004.  Goldman Sachs is a Wall Street investment bank that, through its various subsidiaries, provides a range of investment banking, securities, and investment management services to corporations, financial institutions, governments, and high-net-worth individuals worldwide. Goldman Sachs is an underwriter of a wide range of securities and other financial instruments, including mortgage related securities.  Goldman Sachs, through the Sponsor, created the Depositor, a limited purpose, wholly-owned subsidiary designed to facilitate the issuance and sale of the Certificates.  Goldman Sachs had the ability, directly and indirectly, and exercised such ability to control the Depositor.

      13.    Defendant Goldman Sachs Mortgage Company (the "Sponsor") is a New York limited partnership, with its principal place of business located at 85 Broad Street, New York, New York 10004.  The Sponsor's general partner is Goldman Sachs Real Estate Funding Corp. (an entity itself controlled by Goldman Sachs) and its limited partner is Goldman Sachs.  The Sponsor is the parent of the Depositor, and an affiliate of GS&Co (as defined below).  The Sponsor purchases closed, independently funded, first- and subordinate-lien residential mortgage loans for its own investment, securitization or resale. Goldman Sachs Mortgage Company served as the "Sponsor"/"Seller" in the securitization of the Issuing Trusts.  The

5

Sponsor initiated the securitization of the loans by transferring the mortgage loans to the Depositor. In coordination with GS&Co., the Sponsor worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

14.    Defendant GS Mortgage Securities Corp. (the "Depositor") is a Delaware corporation and a wholly-owned subsidiary of the Sponsor, with its principal place of business located at 85 Broad Street, New York, New York 10004. The Depositor is an affiliate of GS&Co. GS Mortgage Securities Corp. served in the role as "Depositor" in the securitization of the Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77b(a)(4).

15.    Defendant Goldman, Sachs & Co., Inc. ("GS&Co.") is a Delaware corporation with its principal place of business located at 85 Broad Street, New York, New York 10004. GS&Co. is an affiliate of the Sponsor and the Depositor. GS&Co. acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, GS&Co. participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

16.    Defendant McGraw-Hill Companies is a Delaware corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020. Standard & Poor's, a division of McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors. S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). The Complaint does not allege that S&P acted as an expert within the meaning of the Securities Act, 15, U.S.C. § 77k(a)(4). S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition,

6

S&P provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

17.     Defendant Moody's Investors Service, Inc. is a division of Moody's Corp., a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007.   Moody's provides credit ratings, research and risk analysis to investors.   Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   The Complaint does not allege that S&P acted as an expert within the meaning of the Securities Act, 15, U.S.C. § 77k(a)(4).   Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.   In addition, Moody's provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

18.     Defendant Fitch, Inc. is a Nationally Recognized Statistical Rating Organization with dual headquarters in New York, New York, and London, England, and its principal place of operations at One State Street Plaza, New York, New York 10004.   Fitch, through Fitch Ratings, provides credit ratings, research and risk analysis to investors.   Fitch acted as an "underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   The Complaint does not allege that S&P acted as an expert within the meaning of the Securities Act, 15, U.S.C. § 77k(a)(4).   Fitch Ratings participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.   In addition, Fitch Ratings provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

19.    Defendant McGraw-Hill, inclusive of S&P, defendant Moody's, and defendant Fitch, inclusive of Fitch Ratings, are collectively referred to herein as the "Rating Agency Defendants."

20.    Defendant Daniel L. Sparks ("Sparks") was, at relevant times, the Chief Executive Officer ("CEO") and a Director of the Depositor.  Defendant Sparks signed the Registration Statement.  While serving as CEO and Director of the Depositor, defendant Park was concurrently the Managing Director, Head of the Mortgage Department of defendant Goldman Sachs.

21.    Defendant Mark Weiss ("Weiss") was, at relevant times, the Vice President and the principal financial officer and principal accounting officer of the Depositor.  Defendant Weiss signed the Registration Statement.  While serving as Vice President of the Depositor, defendant Weiss was concurrently a Managing Director, Commercial and Residential Mortgage Originations and Securitizations of defendant Goldman Sachs.

22.    Defendant Jonathan S. Sobel ("Sobel") was, at relevant times, a Director of GSMSC.  Defendant Sobel signed the Registration Statement.  While serving as a Director of the Depositor, defendant Sobel was concurrently the Head of MBS Trading and then the Global Head of Risk Management for the Investment Management Division of defendant Goldman Sachs.

23.    Defendants Sparks, Weiss and Sobel are collectively referred to herein as the "Individual Defendants."

IV.     FACTUAL BACKGROUND

A.      The Mechanics Of Structuring Mortgage Pass-Through Certificates

24.     Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS. Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

25.     First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

26.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward. Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA." Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

27.     By working together, the underwriters, the depositor, and the rating agencies are able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-

9

determined rating at the time of offering. Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters. The underwriters offer the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



28.    Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans. Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans. Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

29.    GS&Co. served as an underwriter for each of the Issuing Trusts. The following chart identifies: (1) each Issuing Trust; (2) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold; (3) the stated value of the Certificates issued; and (4) the Rating Agency Defendants:

| Issuing Trust | Prospectus Date | Principal Amount | Rating Agencies |
|---|---|---|---|
| GSAA 2006-2 Trust | February 6, 2006 | $960,739,200 | S&P, Moody's |
| GSAA 2006-3 Trust | February 24, 2006 | $997,484,200 | S&P, Moody's |
| GSAMP 2006-S2 Trust | March 30, 2006 | $698,422,000 | Fitch, S&P, Moody's |

B.    <u>Assessing The Quality Of Mortgage Pass-Through Certificates</u>

30.    The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the MBS suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, certificate owners would suffer loss because the cash flow from the certificates would necessarily diminish.

31.    Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. An accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and, thus, the amount of money available to pass through to certificate holders.

32.    An accurate appraisal is also critical to calculating the loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

33.    From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property

11

have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

34.     Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates. Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the certificates.

35.     The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors.

36.     Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches. In other words, overcollateralization serves as a cushion, so that in the case of default on certain loans, the remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

37.     A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust. Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans. If the assumed underwriting standards and appraisals are inaccurate, the stated credit enhancement parameters will be inaccurate, and investors will not

receive the level of protection set forth in the respective registration statement and prospectus(es).

38.     Traditionally, rating agencies published ratings that were supposed to reflect an unbiased assessment of risk associated with a particular investment instrument. Such ratings enable investors to compare and determine equivalent investments and credit worthiness. A "AAA" rating, for example, is a credit risk of almost zero. The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds, and public pension funds, to hold only "investment grade" bonds and securitized interests. Indeed, the Registration Statement states that "[w]e anticipate that the securities will be sold primarily to institutional investors."

V.     THE GOLDMAN SACHS OFFERINGS

39.     On August 17, 2005, Defendants filed with the Securities and Exchange Commission ("SEC") on Form S-3 a Registration Statement under the Securities Act, as subsequently amended on March 29, 2006 (the "Registration Statement") (file number of 333-127620) with which Defendants indicated their intention to sell more than 40 billion mortgage pass-through Certificates. The Certificates would be issued pursuant to the Registration Statement and accompanying prospectus, also filed with the SEC (the "Prospectus"), generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates. The Registration Statement was prepared by the Depositor, GS&Co. and the Rating Agency Defendants, and signed by the Individual Defendants.

40.     On February 2, 2006, Defendants filed with the SEC the GSAA Home Equity Trust 2006-2 ("GSAA 2006-2 Trust") prospectus supplement with the SEC, with which Defendants indicated their intention to sell approximately $960 million in asset-backed

Certificates.  On February 22, 2006, Defendants filed with the SEC the GSAA Home Equity Trust 2006-3 ("GSAA 2006-3 Trust") prospectus supplement with the SEC, with which Defendants indicated their intention to sell approximately $997 million in asset-backed Certificates.  On March 28, 2006, Defendants filed with the SEC the GSAMP Trust 2006-S2 ("GSAMP 2006-S2 Trust") prospectus supplement with the SEC, with which Defendants indicated their intention to sell approximately $698 million in mortgage pass-through Certificates.

41.    Each Prospectus Supplement stated that all filings related to the Trust at issue would be available at the SEC's website, www.sec.gov, and "will be made under the name of GS Mortgage Securities Corp. and under the Securities and Exchange Commission file number 333-127620." File number 333-127620 corresponds to the August 2005 Registration Statement.

42.    Subsequently, the Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and containing representations about the loan origination process and the quality of the loans.  The respective Prospectus Supplements provided the specific terms of the particular Certificate series offering. Each Prospectus Supplement included tables with data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties.

43.    The Depositor, GS&Co., and the Rating Agency Defendants prepared the Prospectus Supplements.    GS&Co. sold the Certificates pursuant to the Prospectus Supplements, including directly to Mississippi PERS and other members of the Class.  The

Registration Statement incorporated by reference the subsequently filed Prospectus Supplements.

44.     As a condition of the issuance of the Certificates, the Rating Agency Defendants provided pre-determined investment-grade ratings.  For example, the Registration Statement stated:

> It is a condition of the issuance of the notes that the Class A Notes be rated 'AAA' by [_____] and 'AAA' by [_____], that the Class M-1 Notes be rated at least 'AA' by [_____] and at least 'AA' by [_____], that the Class M-2 Notes be rated at least 'A' by [_____] and at least 'A' by [_____] and that the Class M-3 Notes be rated at least 'BBB' by [_____].

Additionally, the sample prospectus included with the Registration Statement stated:

> It is a condition to the issuance of the securities of each series offered by this prospectus and by the related prospectus supplement that the nationally recognized statistical rating agency or agencies specified in the prospectus supplement shall have rated the securities in one of the four highest rating categories.

45.     The Rating Agencies' role in offering the Certificates departed substantially from the role they traditionally played in financial markets.  Rather than rating the Certificates after the structure of the tranches is determined, the Rating Agencies engaged with the Sponsor, the Depositor and GS&Co. to provide the required ratings.

46.     The Rating Agencies purportedly evaluated a number of characteristics of each mortgage pool underlying the Certificates.  They were supposed to consider factors such as expected default rates and amount of losses, pool characteristics, and credit enhancement features, such as the structure of the tranches or guarantees from insurance companies against losses from default or prepayment.  By assuming this unique and necessary role, the Rating Agencies had direct and indirect participation in the Certificates' distribution to investors.

47.     In addition to participating in a necessary role in the Certificates' distribution, the Prospectus Supplements make clear that the Rating Agencies played other important and vital roles regarding the structuring and administration of the Certificates.  These roles allowed them to exercise substantial control over many parties to the securitization transaction, the Defendants herein, including the Depositor.

48.     For example, the Prospectuses explicitly stated that "[t]he trustee may at any time resign as trustee by giving written notice of resignation to the depositor, the servicer *and each Rating Agency* not less than 60 days before the date specified in such notice, when such resignation is to take effect, and acceptance by a successor trustee meeting the trustee eligibility requirements."

49.     The Rating Agencies also had the ability to exercise, and did exercise, significant control over whether the Pooling and Servicing Agreements could be amended.  The Prospectus Supplements stated that each Pooling and Servicing Agreement could be amended by the Depositor, the Master Servicer and the Trustee without the consent of the Certificateholders for a number of reasons including, but not limited to (i) curing any ambiguity or mistake; (ii) correcting any defective provision or supplementing any provision in the Agreement that may be inconsistent with any other provision; or (iii) adding to the duties of the Depositor, the servicer or the trustee.  Such amendments could only be made provided such amendments did not adversely affect in any material respect the interest of any Certificateholder, as evidenced by (i) an opinion of counsel confirming that the amendment will not adversely affect in any material respect the interests of any holder of the certificates; or (ii) *a letter from each rating agency confirming that such amendment will not cause the reduction, qualification or withdrawal of the then-current ratings of the certificates*.

50.     The Rating Agencies also had the ability to exercise, and did exercise, significant control over the Master Servicer's rights and obligations.  For example, the Master Servicer had a right to assign its rights and delegate its duties, but only with the prior written consent of the Depositor and upon delivery to the Trustee and the Depositor of *a letter from each rating agency* to the effect that "such action shall not result in a downgrade, qualification or withdrawal of the ratings assigned to any of the certificates…"

51.     The Rating Agencies also had the ability to exercise, and did exercise, significant control over the interest rate swap agreements entered into by the Supplemental Interest Trust. The Prospectus Supplements required the Supplemental Interest Trust to enter into certain interest rate swaps with qualified counterparties.  These counterparties had to be rated in one of the top two categories by two of the three Rating Agencies, and had to satisfy a number of additional preconditions.  In the event the counterparty failed to satisfy one of the preconditions, it had to be replaced, but not without satisfaction of what was known as the "Rating Agency Condition":

> 'Rating Agency Condition' means, with respect to any action to which a Rating Agency Condition applies, that *each rating agency shall have been given ten days …prior notice* of that action and that each of the rating agencies shall have notified the Trustee, the Master Servicer, the Depositor and the trust in writing *that such action will not result in a reduction, qualification or withdrawal of the then current rating of the certificates that it maintains.*

## VI.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING UNDERWRITING STANDARDS

52.     The Offering Documents emphasized the underwriting standards used to originate the underlying mortgage loans.  Indeed, each Prospectus Supplement set forth the underwriting standards for the originators of the underlying loans in that Issuing Trust. Contrary to these representations, many of these originators did not originate loans in

17

accordance with their stated underwriting standards. Rather, as set forth below, these originators extended loans that did not comply with their underwriting standards in order to increase loan volume regardless of the borrower's ability to meet its obligations. The Depositor acquired these mortgage loans, deposited them into the Issuing Trusts and sold the securitized Certificates to Plaintiff and the Class.

53. Although the percentages vary among the Issuing Trusts, the Prospectus Supplements stated that the Sponsor acquired the mortgage loans underlying the Certificates from various loan originators. Specifically, the Prospectus Supplement for the GSAA 2006-2 Trust stated that all of the mortgage loans were acquired from Ameriquest Mortgage Company ("Ameriquest"). Included in the loans Ameriquest sold to the Sponsor were certain mortgage loans originated or acquired by Argent Mortgage Company, L.L.C. ("Argent"). GSAMP Trust 2006-S2 stated that New Century Mortgage Corporation ("New Century") originated *all* of the mortgage loans. The Prospectus Supplement for the GSAA 2006-3 Trust stated that approximately 29.86% of the mortgage loans were acquired from Countrywide, 17.75% from First National Bank of Nevada, 12.18% from National City Mortgage Co., 9.94% from GreenPoint Mortgage Funding, Inc., and 30.27% from various other mortgage loan sellers under the GS Conduit Program.

54. The representations regarding the underwriting guidelines utilized by the identified loan originators were untrue and omitted material facts. Indeed, as detailed below, many of the identified loan originators did not follow their stated underwriting guidelines. Plaintiff alleges that the Defendants named herein are strictly and negligently liable for the untrue statements and omissions in the Offering Documents.

55.    By way of background, the traditional mortgage model involved a bank originating a loan to the borrower/homeowner and retaining the credit (default) risk.  As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

56.    With the advent and proliferation of securitizations, the traditional model gave way to the "originate to distribute" model, in which banks essentially sell the mortgages and transfer credit risk to investors through mortgage-backed securities.  Securitization meant that those originating mortgages were no longer required to hold them to maturity.  By selling the mortgages to investors, the originators obtained funds, enabling them to issue more loans and generate transaction fees.   This increased the originators' focus on processing mortgage transactions rather than ensuring their credit quality.

57.    Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan.  As loan origination quantities increased, loan originators failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.

58.    Wall Street banks, including Goldman Sachs, entered into the high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  As is now evident, far too much of the lending during that time was neither responsible, prudent, nor in accordance with stated underwriting practices.

59.    The Registration Statement, which was explicitly incorporated into each Prospectus Supplement, consisted of, *inter alia*, "a basic prospectus and three forms of

19

prospectus supplement relating to the offer and sale of Securities of the Registrant." The Registration Statement stated that:

> All mortgage loans [_____] originates or acquires are generally underwritten by [_____] according to its credit, appraisal and underwriting standards. [_____], or its agents, apply such underwriting standards to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with applicable federal and state laws and regulations. [_____] permits exceptions to the underwriting standards where compensating factors are present.

65.   The Registration Statement also stated that:

> The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement. See 'The Underwriting Guidelines' below.

60.   As summarized below, these statements were materially untrue and contained material omissions. Rather than adhere to their stated underwriting guidelines, the originators who contributed mortgage loans to the pools at issue largely disregarded their underwriting guidelines.

A.   New Century Mortgage Corporation

61.   The Prospectus Supplement for the GSAMP Trust 2006-S2 Issuing Trust stated that New Century originated *all* of the underlying mortgage loans. New Century is a wholly owned operating subsidiary of New Century Financial Corporation. The Prospectus Supplement misrepresented and omitted material facts regarding the underwriting practices of New Century.

62.   The GSAMP Trust 2006-S2 Prospectus Supplement stated that:

> The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. . . .

The mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines.  On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist.  It is expected that a substantial portion of the mortgage loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company....Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century.

\* \* \*

The mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs.  Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.

63.     While the Offering Documents represented that New Century's underwriting of mortgages was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. New Century's underwriting guidelines were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages. New Century disregarded its underwriting guidelines to increase volume.

64.     On February 29, 2008, Michael J. Missal, Bankruptcy Court Examiner for New Century, issued a detailed report of the various deficiencies at New Century, including lenient and non-compliant mortgage origination guidelines. The Examiner's report detailed "serious loan quality issues at [New Century] beginning as early as 2004"; numerous "red flags" relating to loan quality; and the failure of New Century's senior management and board of directors to devote sufficient attention to improving loan quality until it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."

65.     The Court-appointed bankruptcy examiner conducted 110 interviews of 85 witnesses and a review of millions of pages of documents from the Company, its outside auditors, and others. In the 550-page Final Report, the Examiner concluded:

- The Company had a "brazen obsession" with increasing loan originations, and focused exclusively on packaging loans that could be sold or securitized in the secondary market, ignoring the increasing likelihood that the Company would be forced to repurchase billions of dollars of loans that would inevitably default.

- New Century engaged in loan origination practices that violated the Company's own guidelines.

- "New Century failed to have an effective system of internal controls."

- The Audit Committee of New Century's Board of Directors failed in its "vital corporate gate-keeper" functions.

22

66.     Indeed, the Bankruptcy Examiner explicitly distinguished the improper conduct at New Century from other subprime mortgage lenders: "The Examiner recognizes that the subprime mortgage market collapsed with great speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions.   Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."

B.      Argent Mortgage Company, LLC

67.     The GSAA 2006-2 Trust Prospectus Supplement listed Argent, formerly Ameriquest Mortgage Company, as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust.   The Prospectus Supplement misrepresented and omitted material facts regarding the underwriting practices of Argent.

68.     The Prospectus Supplement for the GSAA 2006-2 Trust stated that:

> Each mortgage loan originated by Argent was originated generally in accordance with guidelines (the "Underwriting Guidelines") established by Argent with one of the following income documentation types: "Full Documentation," "Limited Documentation," or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability; and (2) the value and adequacy of the mortgaged property as collateral. On a case-by-case basis, Argent may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines. . . .
>
> During the underwriting process, Argent reviews and verifies the loan applicant's sources of income (except under the Stated Income and Limited Documentation types, under which programs, such information may not be independently verified), calculates the amount of income from all such sources indicated on the loan

application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires either (A) (i) an appraisal of the mortgaged property which conforms with to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of Argent or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property or (B) an insured automated valuation model. The Underwriting Guidelines permit loans with combined LTV ratios at origination of up to 100%, subject to certain Risk Category limitations. . . .

Properties that are secure mortgage loans have a valuation obtained by either: (1) an appraisal performed by a qualified and licensed appraiser who is a staff appraiser or an independent appraiser who is in good standing with Argent's in-house appraisal department; or (2) subject to Argent's Underwriting Guidelines, an insured automated valuation model.

\*   \*   \*

Under the Underwriting Guidelines, various Risk Categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan ("Risk Categories"). These Risk Categories establish the maximum permitted LTV ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher risk credit mortgage loans are graded in Risk Categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Underwriting Guidelines establish lower maximum LTV ratios and lower maximum loan amounts for loans graded in Risk Categories.

69.    While the Offering Documents represented that Argent's underwriting of mortgages was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. Argent's

24

underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages. Argent systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

70.      According to a December 7, 2008, article in the *Miami Herald*, employees of Argent, including a vice president named Orson Benn, actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring . . . mortgage brokers in the art of fraud." Employees "taught [brokers] how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved. According to Mr. Benn himself, "the accuracy of loan applications was not a priority." The *Miami Herald* examined the applications for 129 loans funded by Argent and "found at least 103 that contained false and misleading information" and "red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." As noted by the article, "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references . . . ." Argent's lack of verification was so poor that a "borrower [who] claimed to work a job that didn't exist . . . got enough money to buy four houses." Another borrower "claimed to work for a company that didn't exist – and got a $170,000 loan."

71.      Moreover, according to a May 11, 2008 *Cleveland Plain Dealer* article, Jacqulyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, noted that "some Argent employees played fast and loose with the rules" and stated "I personally saw some stuff I didn't agree with." Ms.

25

Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them."

C.  Goldman Sachs Mortgage Conduit Program

72.  The GSAA 2006-3 Trust Prospectus Supplement stated that the Sponsor acquired approximately 30.27% of the underlying mortgage loans from various other loan originators under the Goldman Sachs Mortgage Conduit Program ("GS Conduit Program"). The Prospectus Supplement misrepresented and omitted material facts regarding the GS Conduit Program.

73.  The Prospectus Supplement for the GSAA Trust 2006-3 stated that:

> Substantially all of the mortgage loans acquired by GSMC through its conduit program were acquired generally in accordance with the underwriting criteria described in this section. In certain instances, compensating factors demonstrated to the mortgage loan originator by a prospective borrower may warrant GSMC to make certain exceptions to these guidelines. In such instances GSMC would purchase a mortgage loan that did not completely conform to the guidelines set out below.
>
> \*   \*   \*
>
> Generally, each borrower applying for a mortgage loan must complete a credit application. The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information. . . .
>
> Based on the data referenced above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property....
>
> Generally, the "full" documentation program requires information with respect to the borrower's income and assets (i.e., standard

> Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories)... Generally, under "full" documentation programs at least two years of income documentation is provided. Assets and employment history must also be verified by the originating lender.
>
> \*   \*   \*
>
> An appraisal is generally conducted on each mortgaged property by the originating lender. The appraisal must be conducted in accordance with established appraisal procedure guidelines acceptable to the originator in order to determine the adequacy of the mortgaged property as security for repayment of the related mortgage loan. All appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Foundation....

74.    While the Offering Documents represented that substantially all of the underlying mortgages acquired through the GS Conduit Program were underwritten to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. In truth, the GS Conduit Program failed to implement controls to prevent it from acquiring defective loans.

75.    Goldman Sachs omitted facts from their offering documents (such as information regarding underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood and ability of borrowers to repay the mortgage loans). Such omissions are the subject of a recently-settled investigation by Martha Coakley, the Attorney General of Massachusetts ("Massachusetts AG").

76.    On May 7, 2009, Goldman Sachs, on behalf of itself and its affiliates, the Sponsor and the Depositor, entered into a settlement agreement with the Massachusetts AG in order "[t]o resolve any potential claims stemming from the Attorney General's investigation . . ." Under the terms of the agreement, "Goldman [Sachs] has agreed to provide loan

27

restructuring valued at approximately $50  million to Massachusetts subprime borrowers . . . [and] make a $10 million payment to the Commonwealth . . ."[2]

77.     The investigation examined whether banks, including Goldman Sachs, engaged in the following practices:

- Facilitated the origination of "unfair" loans under Massachusetts law;
- Failed to ascertain whether loans purchased from originators complied with the originator's stated underwriting guidelines;
- Failed to take sufficient steps to avoid placing problem loans in securitization pools;
- Been aware of allegedly unfair or problem loans;
- Failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and
- Failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

D.      Countrywide Home Loans, Inc.

78.     The GSAA 2006-3 Trust Prospectus Supplement listed Countrywide Home Loans, Inc. as a loan originator accounting for 29.86% of the loans in the mortgage pool underlying that Issuing Trust.  The Prospectus Supplement misrepresented and omitted material facts regarding the underwriting practices of Countrywide.

79.     The Prospectus Supplement for the GSAA 2006-3 Trust stated that:

As part of its evaluation of potential borrowers, Countrywide generally requires a description of income.  If required by its underwriting guidelines, Countrywide obtains employment verification providing current and historical income information and/or telephonic employment confirmation. . . .

---

[2] The Goldman Sachs settlement agreement is available at http://www.mass.gov/Cago/docs/press/2009_05_07_goldman_settlement.pdf.

28

Countrywide's underwriting standards are applied by or on behalf of Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits. . . .

Countrywide may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations:  The Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

\* \* \*

In addition to Countrywide's standard underwriting guidelines (the "STANDARD UNDERWRITING GUIDELINES"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide uses underwriting guidelines featuring expanded criteria (the "EXPANDED UNDERWRITING GUIDELINES"). . .

Countrywide's Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 75% for mortgage loans with original principal balances up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000. . . .

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide's Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 80% for mortgage loans with original principal balances up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

80.     While the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. Countrywide's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages. Countrywide's loan originators systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

81.     On June 4, 2009, the SEC filed a complaint against Angelo Mozilo, David Sambol and Eric Sieracki, Countrywide's three most senior executives from 2005 through 2007. The SEC's complaint alleges that Messrs. Mozilo, Sambol and Sieracki misled investors by failing to disclose:

- The increasingly lenient underwriting guidelines used by Countrywide in originating loans;
- Countryside's pursuit of a "matching strategy" in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

- The high percentage of loans Countrywide originated were outside its own already widened underwriting due to loans made as exceptions to guidelines;

- Countrywide's definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

- The high percentage of Countrywide's subprime originations that had a loan to value ratio of 100%, for example, 62% in the second quarter; and

- Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

82.     Attorneys General from various states initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed using for originating residential loans.  For example, the Illinois Attorney General began an investigation into Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled *The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994 (the "Illinois AG Complaint").

83.     According to the Illinois AG Complaint, Countrywide employees who the Illinois AG interviewed stated that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.  With respect to stated income loans, Countrywide employees explained to the Illinois AG that, while the company had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.  To supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its

31

employees to utilize a website, www.salary.com, to determine the reasonableness of a potential borrower's stated income. Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan. The Illinois AG contends that the foregoing "reasonableness" test contravened proper underwriting practices.

84.     The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income. For example, according to the Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

85.     The California Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846 (the "California AG Complaint"). Similar to the Illinois AG Complaint, the California AG Complaint alleged that Countrywide departed from its stated underwriting standards. For example, the California AG Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans. The absence of readily obtainable asset verifications was also reported in an April 6, 2008 article in *The New York Times*. The article noted that even though Countrywide had the right to verify stated income on

an application through the IRS (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

86.    According to the California AG Complaint, Countrywide used a system called CLUES, or Countrywide Loan Underwriting Expert System, to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines. CLUES reports indicating a loan was not within Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

87.    Moreover, the California AG Complaint contained statements from Countrywide employees that they utilized www.salary.com purportedly to confirm a borrower's stated income. According to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, knew by how much they could overstate a borrower's income. A former California loan officer for Countrywide further explained that its loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make," after which the borrower would state that he or she made X amount of income.

88.    Likewise, the Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Financial Corporation, et al.*, No. CV08-40390945, alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

89.    Many of the allegations in the Illinois, California and Connecticut complaints were confirmed by investigations in other states such as Washington, West Virginia, Indiana

and Florida. Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by 11 states, including California and Illinois, for an estimated $8.4 billion.

90.     Countrywide's underwriting standards are also the subject of an investigation by the Federal Bureau of Investigation ("FBI"), which *The Wall Street Journal* first reported on March 8, 2008, in an article entitled "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud." According to the article, the FBI investigation is focused on "whether company officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings."

91.     On March 11, 2008, *The Wall Street Journal* published another article further detailing the FBI's investigation of Countrywide's lending practices. According to the sources interviewed by *The Wall Street Journal*, federal investigators found that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company . . . packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried."

92.     On August 24, 2009, MBIA Insurance Corp. ("MBIA") filed as amended complaint against Countrywide in New York state court in the case entitled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825. The MBIA amended complaint alleges that Countrywide fraudulently induced it to provide insurance for certain investment certificates. MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide. After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines

34

Countrywide represented it would follow."   MBIA discovered that many of the loan applications (i) "lack[ed] key documentation, such as a verification of borrower assets or income; (ii) include[d] an invalid or incomplete appraisal; (iii) demonstrate[d] fraud by the borrower on the face of the application; or (iv) reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."   Significantly, "MBIA's re-underwriting review . . . revealed that almost 91% of defaulted or delinquent loans in these 15 Countrywide Securitizations show material discrepancies."

93.     Moreover, in a February 23, 2008 article entitled "Mortgage Chief Picked by BofA Sparks Worries – Countrywide Executive Spearheaded Pursuit of Subprime Business," *The Wall Street Journal* reported that Countrywide's stated underwriting standards were not followed and warnings from Countrywide's risk-control managers were not heeded.

E.     First National Bank of Nevada

94.     The GSAA 2006-3 Trust Prospectus Supplement listed First National Bank of Nevada ("FNBN") as a loan originator accounting for 17.75% of the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide). To the extent the programs reflect underwriting guidelines different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans there under may reflect relatively higher delinquency rates and/or credit losses.   In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated by a prospective borrower.

35

In addition to its originations, FNBN also acquires mortgage loans from approved correspondent lenders under a program pursuant to which the correspondent agrees to originate the mortgage loans in accordance with the underwriting guidelines of FNBN…. FNBN generally conducts a quality control review of a sample of these mortgage loans within 45 [days] after the origination or purchase of such mortgage loan. The number of loans reviewed in the quality control process varies based on a variety of factors, including FNBN's prior experience with correspondent lender and the results of the quality control review process itself.

FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral…. Generally, scheduled payments on a mortgage during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

95.     While the Offering Documents represented that FNBN's underwriting was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. FNBN's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages. FNBN systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

96.     According to a press release dated July 25, 2008, the Office of the Comptroller of the Currency ("OCC") closed FNBN on that same day, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver.  The OCC acted after finding that FNBN was undercapitalized and had experienced substantial dissipation of assets and earnings due to "unsafe and unsound" lending practices.

F.      National City Mortgage Co.

97.     The GSAA 2006-3 Trust Prospectus Supplement listed National City Mortgage Co. ("National City") as a loan originator accounting for 12.81% of the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> The originator's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards are permitted where compensating factors are present. Generally, each mortgagor will have been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor.  The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history, and personal information, and will have furnished the lender with authorization to obtain a credit history which summarizes the mortgagor's credit history. . . .
>
> Mortgage loans with principal balances exceeding $1,000,000 ("super jumbos") are allowed if the loan is secured by the borrower's primary residence or second home.  The loan-to-value ratio for super jumbos generally may not exceed 75%.  For cash out refinance loans, the maximum loan-to-value ratio generally is 90% and the maximum "cash out" amount permitted is based in part on the original loan-to-value of the related mortgage loan and FICO score.  Typically, the maximum cash-out permitted is the greater of $200,000 or 50% of the new loan amount for LTVs above 50%.  Less than fully documented loans generally have loan-to-value and/or loan amount limits.

*   *   *

37

> Under the full/alternative documentation, the prospective borrower's employment, income and assets are verified through written and telephonic communications, covering a 2-year period for employment/income and a 2-month period for assets. Eligible loans may have been processed through Loan Prospector or Desktop Underwriter....

> Under stated income documentation, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.

98.     While the Offering Documents represented that National City's underwriting was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. National City's systematic practice of extending credit without regard to the income, assets, and employment status of borrowers cost the company over half a billion dollars.

99.     According to an article in the *Cleveland Plain Dealer*, National City lent money to people without regard to whether they could ultimately pay off the loan. *See How National City's Mortgage Division Lost Half A Billion Dollars, Cleveland Plain Dealer* (Feb. 12, 2008). They lent money to single people buying their first house, families making the move to a bigger house, people with lousy credit, and homeowners who needed extra money from an equity line. National City's home-equity division specialized in risky second mortgages known as piggyback loans.

100.    According to the *Cleveland Plain Dealer* article, by all accounts "National City got into one of the riskiest businesses way too deep." As of August 8, 2008, National City had

an estimated $19 billion in risky loans on its books that it was unable to sell to the secondary market, including $6 billion in subprime loans from First Franklin.

101.    In 1999, National City purchased First Franklin Financial Corporation ("First Franklin"), a now infamous subprime lender that consistently ignored underwriting guidelines, and used inflated appraisals to value the real estate underlying many of its loans.  By 2003, over half of National City's profits were from the mortgage business, and it ranked number 6 in the nation, with over $130 billion in mortgages.

102.    On June 30, 2008, National City was notified that the Chicago Regional Office of the SEC was conducting an informal investigation of National City and requested that it provide the SEC with certain documents concerning its loan underwriting experience, dividends, bank regulatory matters and the sale of First Franklin.

G.    GreenPoint Mortgage Funding, Inc.

103.    The GSAA 2006-3 Trust Prospectus Supplement listed GreenPoint Mortgage Funding, Inc. ("GreenPoint") as a loan originator accounting for 9.94% of the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> GreenPoint has originated residential mortgage loans of substantially the same type as the Mortgage Loans since October of 1999. . . .
>
> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the guidelines are permitted where compensating factors are present.  The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. . . .
>
> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally

considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. Each mortgage loan has a required amount of reserves, with the minimum being two months of principal, interest, taxes and insurance for full documentation loans. Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for additional risk. . . .

GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an ability to repay indebtedness in a timely fashion. . . .

\* \* \*

In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in good condition and verify that construction, if new, has been substantially completed.

104. While the Offering Documents represented that GreenPoint's underwriting was designed to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. GreenPoint's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of

40

the borrower to repay such mortgages. GreenPoint systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

105. GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated.[3] In *U.S. Bank v. GreenPoint*, a consultant reviewed the documentation for loans underlying a securitization transaction. The consultant concluded that 93% of the loans that GreenPoint sold contained errors, omissions, misrepresentations, negligence, fraud or similar occurrences in connection with the origination and underwriting of the loans. Just two years after the closing of the securitization transaction, approximately 29% of the loans in the original pool balance had either been written down completely or were severely delinquent.

106. The consultant found that loans which GreenPoint underwrote and originated suffered from serious defects including:

- pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated and fraudulent appraisal values; and

- pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

---

[3] *See, inter alia, U.S. Bank Nat'l Ass'n, et al., v. GreenPoint Mortgage Funding, Inc.*, New York Sup. Ct. 09-600352 (Feb. 5, 2009) ("U.S. Bank v. GreenPoint"); *Bank of America, N.A. v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:09-CV-71 (W. D. N.C. Feb. 26, 2009).

107. Similarly, numerous borrowers and former GreenPoint employees recently sued the company for fraud and other pervasive failures in its origination and underwriting practices. Such actions include a "whistleblower" action filed in June of last year by a former senior underwriter who GreenPoint forced to approve mortgage loan applications containing fraudulent information by approving applications after the underwriter had either denied such applications or made approval contingent upon obtaining additional borrower documentation. *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 12, 2008). [4]

H. The Offering Documents Contained Misleading Risk Factors

108. The Prospectus Supplements include fifteen pages of boilerplate risk disclosures that were false and misleading and failed to fully reveal the true risk in order to make the statements in the Prospectus Supplements not misleading. Specifically, the risk disclosures failed to disclose that, as detailed above, the originators had substantially deviated from their stated underwriting guidelines.

109. For example, the GSAMP Trust 2006-S2 Prospectus Supplement included the following risk disclosure:

> The mortgage loans were made, in part, to borrowers who, for one reason or another, are not able, or do not wish, to obtain financing from traditional sources. These mortgage loans may be considered to be of a riskier nature than mortgage loans made by traditional sources of

---

[4] Additionally, multiple individual borrowers and a class of borrowers also sued GreenPoint, alleging, among other things, fraudulent loan-origination practices based on misstated or overstated income and/or employment status. *See Ferguson v. GreenPoint Mortgage Funding, Inc., et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc., et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Perez v. GreenPoint Mortgage Funding, Inc., et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008).

financing, so that the holders of the certificates may be deemed to be at greater risk of loss than if the mortgage loans were made to other types of borrowers.

The underwriting standards used in the origination of the mortgage loans held by the trust are generally less stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and in certain other respects.  Borrowers on the mortgage loans may have an impaired or unsubstantiated credit history.  As a result of this less stringent approach to underwriting, the mortgage loans purchased by the trust may experience higher rates of delinquencies, defaults and foreclosures than mortgage loans underwritten in a manner which is more similar to the Fannie Mae and Freddie Mac guidelines.

110.    The GSAA 2006-2 Trust Prospectus Supplement and GSAA 2006-3 Trust Prospectus Supplements included virtually identical, boilerplate risk disclosures.

111.    The risk disclosures were themselves untrue and omitted material facts because they did not disclose that the originators, including Countrywide, New Century, Argent and the GS Conduit Program, had not followed their stated underwriting guidelines when issuing loans to borrowers.   Likewise, as detailed below, the risk disclosures did not disclose that the underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties nor that the ratings stated in the Prospectus Supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

## VII.    THE OFFERING DOCUMENTS MISSTATED THE TRUE LTV RATIOS ASSOCIATED WITH THE UNDERLYING MORTGAGES

112.    The Prospectus Supplements represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

113.    Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  As required by Fannie Mae and Freddie Mac, and as represented by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.  The Registration Statement explicitly noted that "All appraisals must conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation."

114.    With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

*   *   *

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favor the cause of the client;

3.    the amount of a value opinion;

4.    the attainment of a stipulated result; or

5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

44

115.    In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators required an appraisal report that included market data analysis based on recent sales of comparable homes in the area.  If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk, field review or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

116.    As represented in the Offering Documents, the "Loan-to-Value Ratio" or "LTV Ratio" of a mortgage loan at any time is the fraction, expressed as a percentage, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value of the related mortgaged property.  The collateral value of a mortgage property, other than with respect to housing contracts and certain mortgage loans the proceeds of which are used to refinance an existing loan, is the lesser of: (a) the appraised value determined in an appraisal obtained by the originator at origination of such loan, or (b) the sales price for such property.

117.    The Registration Statement stated that "the maximum loan-to-value ratio, including any second deeds of trust subordinate to [_____]'s first deed of trust, is 100%."

118.    The Registration Statement also stated that exceptions to the maximum loan-to-value ratio could be granted if the borrower's loan application reflected "compensating factors" such as "loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address." As detailed above, however, Defendants did not disclose that originators routinely violated the underwriting guidelines set forth in the Prospectus Supplements.  Accordingly, the standards for

making exceptions (*i.e.,* the application of legitimate compensating factors) were also routinely disregarded.

119.    The Prospectus Supplements also provided information regarding the weighted average combined original LTV Ratio of the loans underlying the Certificates. The Combined LTV Ratio is provided in each Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical location. Moreover, each Prospectus Supplement made representations regarding the Combined LTV Ratio. The GSAMP Trust 2006-S2 Prospectus Supplement stated that "[t]he weighted average original combined loan-to-value ratio of the mortgage loans is approximately 99.84% and approximately 99.93% of the mortgage loans have original combined loan to value ratios exceeding 80.00%." The GSAA 2006-2 Trust Prospectus Supplement stated that "[t]he weighted average loan-to-value ratio at origination of the mortgage loans is approximately 85.38% and approximately 53.18% of the mortgage loans have loan to value ratios at origination exceeding 80.00%." The GSAA 2006-3 Trust Prospectus Supplement stated that "[t]he weighted average loan-to-value ratio at origination of the mortgage loans is approximately 76.09% and approximately 4.09% of the mortgage loans have loan to value ratios at origination exceeding 80.00%."

120.    In retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again, resulting in

appraisals being done on a "drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.

121.    This lack of independence was noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking. Hummel noted this dynamic created a "terrible conflict of interest" where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or else they would never "see work from these parties again" and were "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

122.    A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio that publishes Valuation Review – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation." Adding to these problems was the fact that lenders, for originations completed by mortgage brokers, generally lacked knowledge of the accuracy of the appraisals since they were typically located far from the actual property and knew very little about the general area where the property was located.

123.    The Registration Statement and Prospectus included the Weighted Average Original Combined LTV Ratio, as well as tabular data reflecting the Weighted Average Original Combined LTV Ratios per a range of categorized loans. The GSAMP Trust Series 2006-S2 Prospectus Supplement indicated that 12,199 loans (out of 12,460 total loans) were within the

Loan-to-Value Ratio range of 95.01% to 100%. No loan was represented to have a Loan-to-Value Ratio of greater than 100%. The GSAA 2006-2 Trust Prospectus Supplement indicated that 1,664 loans (out of 3,473 total loans) were within the loan-to-value ratio of 70.01% to 80.00%. No loan was represented to have a loan-to-value ratio greater than 95%. The GSAA 2006-3 Trust Prospectus Supplement indicated that 3,094 (out of 3,910 total loans) were within the loan-to-value ratio range of 70.01% to 80.00%. Only one loan was represented to have a loan-to-value ratio of greater than 95%.

124. The above statements, including the tabular statistics in each Prospectus Supplement regarding the purported Loan-to-Value Ratios of the underlying mortgages, were untrue and omitted material facts because they failed to disclose that the Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures and in accordance with USPAP, as stated in the Prospectus Supplements. Due to the inflated appraisals, the LTV ratios listed in the Offering Documents were artificially low, making it appear that the loans underlying the trusts were safer and less risky than they really were.

## VIII. THE OFFERING DOCUMENTS MISREPRESENTED THE OVERCOLLATERALIZATION OF THE ISSUING TRUSTS

125. Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements. Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued. The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests, a yield maintenance agreement, overcollateralization and

excess interest. Each form of credit enhancement is necessarily dependent on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

126. Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization. In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust). Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

127. The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering. As stated in the Prospectus Supplements, the ratings assigned to mortgage pass-through certificates "address the likelihood of the receipt by certificateholders of distributions on mortgage loans. The ratings take into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the Certificates." As a condition to the issuance of the Certificates, each tranche in the series received respective ratings from the Rating Agency Defendants as set forth in the Prospectus Supplements.

128. The Prospectus Supplements represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. The Prospectus Supplements represented that each Issuing Trust was structured with "credit enhancement provided for the benefit of the holders of the certificates,"

49

including the use of excess interest to cover losses on the mortgage loans and as distribution of principal to build or maintain overcollateralization.

129.   The Registration Statement explained the overcollateralization provisions in greater detail:

> The weighted average mortgage rate for the mortgage loans, adjusted to reflect the master servicing fee, the servicing fees and the Indenture Trustee fee payable from interest received or advanced on the mortgage loans, *is expected to be higher than the weighted average of the Note Interest Rates on the notes*, thus generating excess interest collections which, in the absence of Realized Losses, will not be necessary to fund interest payments on the notes.

130.   Each Prospectus Supplement stated a particular amount by which the aggregate stated principal balance of the mortgage loans was greater than the aggregate class principal of the Certificates at the time of the offering.  The GSAMP Trust 2006-S2 Prospectus Supplement stated that the overcollateralization amount with respect to the Series 2006-S2 Certificates was 2.40% of the aggregated outstanding principal balance of the mortgage loans on the cut-off date ($741,424,703), or approximately $1,779,419.  The GSAA 2006-2 Trust Prospectus Supplement stated that the overcollateralization amount with respect to the Certificates was 3.75% of the scheduled principal balance of the mortgage loans as of the cut-off date ($1,028,191,591), or approximately $3,855,718.  The GSAA 2006-3 Trust Prospectus Supplement stated that the overcollateralization amount with respect to the Series 2006-S2 Certificates was 0.50% of the aggregated outstanding principal balance of the mortgage loans on the cut-off date ($1,015,029,367), or approximately $507,514.

131.   The above statements were untrue and misleading because, as detailed above, they failed to disclose that many of the loan originators did not follow their underwriting and property appraisal standards.  Such failures increased the risk that many borrowers would not be able to repay their loans; foreclosure sales would not recoup the full value of the loans; and the

aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

IX.   THE RATINGS SET FORTH IN THE OFFERING DOCUMENTS
      MISSTATED THE QUALITY OF THE CERTIFICATES

132.   Each Prospectus Supplement stated that it was "a condition to the issuance of the Offered Certificates" that they receive certain, specified ratings from the Rating Agencies. The Prospectus Supplements also stated that these ratings addressed "the likelihood of the receipt by a certificateholder of distributions on the mortgage loans. The rating takes into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the certificates."

133.   The Prospectus Supplements contained representations regarding the nature of the ratings, and the role of the Rating Agencies in the ratings process:

> The ratings of Moody's on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled. Moody's rating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any.

*      *      *      *

> The ratings of S&P on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of timely payments of interest and the ultimate return of principal. S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make payments required under the certificates.

       *      *      *      *

> The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans.

134.    The Prospectus Supplements failed to disclose that the assigned ratings were not the result of the Ratings Agencies' independent analysis and conclusion. Rather, the ratings were pre-determined and, for virtually all tranches of the Certificates, were investment-grade. If the Rating Agencies did not assign the specific, pre-determined ratings, the Certificates would not have been distributed to investors.

135.    Each Prospectus Supplement listed the initial ratings of the Certificates being offered in each Issuing Trust. In each, the Certificates were rated as investment-grade, in accordance with the pre-established rating systems utilized by the Rating Agencies. The GSAA 2006-2 Trust Prospectus Supplement included the following chart identifying the initial ratings of each Series 2006-2 Certificate tranche:

| Class | S&P | Moody's |
|---|---|---|
| 1A1 | AAA | Aaa |
| 1A2 | AAA | Aaa |
| 2A1 | AAA | Aaa |
| 2A2 | AAA | Aaa |
| 2A3 | AAA | Aaa |
| 2A4 | AAA | Aaa |
| 2A5 | AAA | Aaa |
| M-1 | AAA | Aa1 |
| M-2 | AA+ | Aa2 |
| M-3 | AA | Aa3 |
| M-4 | AA | A1 |
| M-5 | AA- | A2 |
| M-6 | A+ | A3 |
| B-1 | A | Baa1 |
| B-2 | BBB+ | Baa2 |
| B-3 | BBB+ | Baa3 |
| R | AAA | NR |
| RC | AAA | NR |

136.   Certificates initially rated AAA were by far the largest component of the GSAA 2006-2 Trust, comprising approximately $799 million, or 83% of the total offering value.   All the Series 2006-2 Certificates that Moody's initially rated "AAA" continued to be rated as investment grade instruments by Moody's until March 13, 2009.   All the Series 2006-2 Certificates that S&P initially rated "AAA" continued to be rated as investment grade instruments by S&P until August 4, 2009.

137.   The GSAA 2006-3 Trust Prospectus Supplement included the following chart identifying the initial ratings of each Series 2006-3 Certificate tranche:

| Class | S&P | Moody's |
|-------|-----|---------|
| A-1 | AAA | Aaa |
| A-2 | AAA | Aaa |
| A-3 | AAA | Aaa |
| A-4 | AAA | Aaa |
| M-1 | AA+ | Aa1 |
| M-2 | AA | Aa2 |
| M-3 | AA- | Aa3 |
| M-4 | A | A1 |
| M-5 | A- | A2 |
| B-1 | BBB+ | A3 |
| B-2 | BBB | Baa1 |
| B-3 | BBB- | Baa3 |
| R | AAA | NR |
| RC | AAA | NR |

138.   Certificates initially rated AAA were by far the largest component in the GSAA 2006-3 Trust, comprising approximately $945 million, or 95% of the total offering value.   All the Series 2006-3 Certificates that Moody's initially rated "AAA" continued to be rated as investment grade instruments by Moody's until February 19, 2009.   All the Series 2006-3 Certificates that S&P initially rated "AAA" continued to be rated as investment grade instruments by S&P until September 22, 2008.

139.   The GSAMP Trust Series 2006-S2 Prospectus Supplement included the following chart identifying the initial ratings of each Series 2006-S2 Certificate tranche:

| Class | Fitch | Moody's | S&P |
|-------|-------|---------|-----|
| A-1A | AAA | Aaa | AAA |
| A-1B | AAA | Aaa | AAA |
| A-2 | AAA | Aaa | AAA |
| A-3 | AAA | Aaa | AAA |
| M-1 | AA | Aa2 | AA |
| M-2 | AA- | Aa3 | AA- |
| M-3 | A | A2 | A |
| M-4 | A- | A3 | A- |
| M-5 | BBB+ | Baa1 | BBB+ |
| M-6 | BBB | Baa2 | BBB |
| M-7 | BBB- | Baa3 | NR |

140.  Certificates initially rated AAA were by far the largest component in the GSAMP Trust Series 2006-S2, comprising approximately $505 million, or 72% of the total offering value. All the Series 2006-S2 Certificates that Fitch initially rated "AAA" continued to be rated as investment grade instruments by S&P until February 21, 2008. All the Series 2006-S2 Certificates that Moody's initially rated "AAA" continued to be rated as investment grade instruments by Moody's until April 15, 2008. All the Series 2006-S2 Certificates that S&P initially rated "AAA" continued to be rated as investment grade instruments by S&P until August 26, 2008.

141.  The ratings which the Rating Agencies assigned to the Certificates were unjustifiably high and did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning the number of underlying mortgages likely to default. As a result, the Certificates were secured by assets that had a much greater risk profile than represented – despite the fact that they were assigned investment-grade ratings – were far riskier than other investments with the same ratings.

142.  The Rating Agencies had a financial stake in the issuance of the Certificates. First, the Rating Agencies compensation was a direct result of the assignment of the pre-determined ratings.  Second, because there were a limited number of additional firms conducting the underwriting function, failure to assign the pre-determined ratings could affect

the Rating Agencies' highly-profitable RMBS business.  On July 8, 2008, the SEC issued its *Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* ("Summary Report") which noted that there were only a limited number of investment banks who performed the underwriting function in many of the MBS which the Rating Agencies rated:

> there is a high concentration in the firms conducting the underwriting function. Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals.  While 22 different arrangers underwrote subprime RMBS deals, *12 arrangers accounted for 80% of the deals, in both number and dollar volume*...In addition, 12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters, further concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

The Summary Report concluded that "[h]igh profit margins from rating RMBS and CDOs may have provided an incentive for a rating agency to encourage the arrangers to route future business its way."

143.   The SEC's Summary Report found flaws in the Rating Agencies' procedures with respect to rating MBS products, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;

- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records.  As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

144.   Further, the SEC concluded that the conflicts of interest created from the issuer pays model -- that rating agencies "have an interest in generating business from the firms that seek the rating, which could conflict with providing ratings of integrity" – *"may be exacerbated for a number of reasons"* with structured finance products, particularly RMBS and CDOs.  For example, the SEC noted that:

> the arranger is often the primary designer of the deal and as such, has more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes. As well, arrangers that underwrite RMBS and CDO offerings have substantial influence over the choice of rating agencies hired to rate the deals.

145.   The SEC found that the Rating Agencies failed to frequently update their models with new data.  "Based on discussions with the rating agencies examined and documents provided by them, it appears that the parameters of the models were re-estimated by executing the model with new data *infrequently.*"

146.   Furthermore, with respect to the Rating Agencies' lack of established procedures, including documentation for particular ratings, the SEC's Summary Report stated that the Rating Agencies' actions "make it difficult for the rating agencies' internal compliance staff or internal audit staff to assess compliance with the firms' policies and procedures when conducting reviews of rating agency activities."

147.   On June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

148.    Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, stated that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed, but never implemented, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories." According to Mr. Raiter, a "consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products.  As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds.  This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

149.    Mr. Raiter stated that "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market . . . ."

150.    October 22, 2008, in testimony before the United States House of Representatives, Committee on Oversight and Government Reform in October 2008, Jerome Fons, a former Managing Director of Credit Policy at Moody's, stated that the rating agencies "did not update their models or their thinking" during the period of deterioration in credit standards.  Before the same Committee, Deven Sharma, the President of S&P, stated that "many of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out."

## X.    THE PERFORMANCE AND VALUE OF THE CERTIFICATES

151.    As described above, Fitch, Moody's and S&P maintained investment-grade ratings on the Certificates originally rated as "AAA" until February 21, 2008, when Fitch alone downgraded GSAMP Trust Series 2006-S2 to below investment grade.  The ratings on virtually all of the Certificates within each of the Issuing Trust have now been downgraded, reducing the value of the Certificates.  As stated in the GSAMP Trust 2006-S2 Prospectus Supplement, "[i]f a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced."

152.    Further, the delinquency, foreclosure and bank ownership rates on the underlying mortgages have soared since issuance.  As reflected in the chart below, more than half of the underlying loans in the GSAA 2006-2 Trust are either 60 days or more delinquent, in foreclosure, or bank owned.  In the GSAA 2006-3 Trust, almost 30% of the underlying loans are either 60 days or more delinquent, in foreclosure, or bank-owned.  In the GSAMP 2006-S2 Trust, which contains only second lien mortgage loans, more than 12% of the underlying loans were delinquent as of May 2009.

### As of May 2009

|  | Delinq. 60 days | Delinq. 90 days | Foreclosure | REO | Total |
|---|---|---|---|---|---|
| GSAA 2006-2 Trust[1] | - | - | 38.79% | 12.72% | 51.51% |
| GSAA 2006-2 Trust[1] | 3.04% | 8.87% | 13.78% | 3.88% | 29.57% |
| GSAMP 2006-S2[2] | 3.33% | 8.92% | n/a | n/a | 12.25% |

[1] Trusts are comprised of First Lien Loans only

[2] Trusts are comprised of Second Lien Loans only

## XI.    CLASS ACTION ALLEGATIONS

153.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of itself and all persons or entities ( the

"Class") who purchased or otherwise acquired mortgage pass-through certificates pursuant or traceable to GS Mortgage Securities Corp.'s November 5, 2004 Registration Statement, as amended, and the accompanying Prospectus and Prospectus Supplements.

154.   This action is properly maintainable as a class action for the following reasons:

a)   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b)   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.   Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)   A class action is superior to all other methods for a fair and efficient adjudication of this controversy.   There will be no difficulty in the management of this action as a class

action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

155.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a)  Whether Defendants violated the Securities Act;

b)  Whether statements made by Defendants to the investing public in the Registration Statement, Prospectus and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c)  The extent and proper measure of the damages sustained by the members of the Class.

## XII.    PLAINTIFF HAS STANDING TO PURSUE THE CLAIMS ALLEGED

156.    Plaintiff has constitutional standing to advance the claims alleged herein.  As set forth in Plaintiff's certification, Plaintiff purchased Certificates alleged to have been damaged by Defendants, and can assert a claim directly against each Defendant.  Accordingly, Plaintiff has alleged concrete and particularized invasions of legally protected interests for all of the claims alleged under the Securities Act.

## FIRST CAUSE OF ACTION

### For Violation Of Section 11 Of The Securities Act
#### (Against The Depositor, the Individual Defendants, GS&Co. and the Rating Agency Defendants)

157.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

158.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants.  This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Offering Documents.

159.    The Registration Statement for the Certificate offerings was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

160.    The Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

161.    The Individual Defendants each signed the Registration Statement.

162.    GS&Co. and the Rating Agency Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

163.    The Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

164.    The Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

165.    Each of the Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

166.    The Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Registration Statement, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

167.    By reason of the conduct alleged herein, each of the Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

168.    Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements.   At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

169.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants.

170.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, the Depositor, GS&Co. and the Rating Agency Defendants, as set forth in Section 11 of the Securities Act.

171.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

172.    As detailed above, the Certificates that were initially rated AAA were not downgraded to below investment-grade until Fitch downgraded GSAMP Trust Series 2006-S2 to below investment-grade on February 21, 2008. Moody's and S&P did not downgrade any tranches originally rated AAA until April 15, 2008 and August 26, 2008, respectively. The additional tranches in 2006-S2 that were initially rated AAA were not downgraded to below investment-grade until August 4, 2009. Additionally, the Rating Agencies and Goldman Sachs issued statements of comfort to the market and throughout 2007. For example:

- On December 5, 2006, the *Wall Street Journal* noted that "[b]ecause the underlying loans have gotten riskier, credit-rating agencies are telling issuers of mortgage-backed bonds to set aside more money to cover losses than they did three years ago in order to get an AAA rating for their bonds." The head of RMBS Surveillance at S&P is quoted as stating, "*we are really monitoring very, very closely the portfolios of all the subprime issuers.*" Here, the Rating Agency Defendants maintained investment-grade ratings for Certificates initially rated "AAA" as alleged above.

- On October 1, 2007, Michael Kanef, group managing director at Moody's, stated that Moody's has "successfully managed related conflicts of interest

and provided the market with objective, independent, and unbiased credit opinions."

- On October 11, 2007, Ms. Tillman submitted a letter to the editor of the *Washington Post* in response to a column entitled "Markets' World of Worry," that questioned whether, in pursuit of fees, rating agencies gave higher ratings than they otherwise would. In the letter, Ms. Tillman reiterated that "[t]here is no evidence – none at all – to support this contention with respect to S&P."

- On November 13, 2007, Lloyd C. Blankfein, Goldman Sachs' CEO stated that the company was "confident" in the valuations for its $50 billion of risky and illiquid assets and that Goldman Sachs would not take more write-downs on mortgage-backed securities.

## SECOND CAUSE OF ACTION

### For Violation Of Section 12(a)(2) Of The Securities Act
(Against the Depositor and GS&Co.)

173.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

174.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Depositor and GS&Co.

175.    The Depositor promoted and sold Certificates pursuant to the defective Prospectuses for its own financial gain.  The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

176.    By means of the Prospectuses, the Depositor sold the Certificates to Plaintiff and the Class in return for proceeds in excess of $2.6 billion.  The Depositor's actions of solicitation consisted primarily of the preparation and dissemination of the Prospectuses.

177.    The Depositor and GS&Co. owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  The Depositor and GS&Co. knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

178.    Plaintiff and other Class members purchased Certificates pursuant to the defective Prospectuses.  Plaintiff and other Class members purchased their Certificates directly from GS&Co.  Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

179.    By reason of the conduct alleged herein, the Depositor and GS&Co. violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to the Prospectuses.

180.    Plaintiff and other Class members were damaged by the Depositor and GS&Co.'s wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

181.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses and within three years of when the Certificates were sold to the public.  As detailed above, despite the exercise of reasonable

diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

THIRD CAUSE OF ACTION

For Violation Of Section 15 Of The Securities Act<br>(Against Goldman Sachs, the Sponsor, the Individual Defendants and the Rating Agency Defendants)

182.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein. For purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct. This Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

183.    This Cause of Action is brought against Goldman Sachs, the Sponsor, the Individual Defendants, and the Rating Agency Defendants as controlling persons, pursuant to Section 15 of the Securities Act. Each of the Individual Defendants, Goldman Sachs and the Sponsor, by virtue of his or its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Depositor within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants, Goldman Sachs and the Sponsor had the power and influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act, as described herein. The Individual Defendants', Goldman Sachs' and the Sponsor's control, ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

184.    In addition to participating in a necessary role in the Certificates' distribution, the Prospectus Supplements make clear that the Rating Agencies played other important and vital roles regarding the structuring and administration of the Certificates. These roles allowed

66

them to exercise substantial control over many parties to the securitization transaction, including the Depositor.

185.    The Rating Agencies also had the ability to exercise, and did exercise, significant control in causing the Depositor to engage in violations of the Securities Act, as described herein. In particular, the Rating Agency Defendants controlled the issuance of the Certificates through their pre-established ratings the assignment of which was a condition precedent for the issuance of the Certificates. The Offering Documents expressly stated that: "In order to be issued, the offered certificates must be assigned ratings not lower than the following by [Rating Agency], and Rating Agency" and "[I]t is a condition to the issuance of the securities of each series offered by this prospectus and by the related prospectus supplement that the nationally recognized statistical rating agency or agencies specified in the prospectus supplement shall have rated the securities in one of the four highest rating categories."

186.    Additionally, the Rating Agencies also had the ability to exercise, and did exercise, significant control over the Master Servicer's rights and obligations, the interest rate swap agreements entered into by the Supplemental Interest Trust and whether the Pooling and Servicing Agreements could be amended.

187.    By virtue of the wrongful conduct alleged herein, Goldman Sachs, the Sponsor, the Individual Defendants, and the Rating Agency Defendants are liable to Plaintiff and other Class members for their sustained damages.

RELIEF REQUESTED

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)     Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

(b)     Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other relief as the Court may deem just and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 18, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DeLANGE
ELIZABETH LIN
MATTHEW P. JUBENVILLE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
elizabethl@blbglaw.com
matthewj@blbglaw.com

-and-

68

BRUCE D. BERNSTEIN
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
bruce@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead
Plaintiff Public Employees' Retirement System of
Mississippi*


POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Additional Counsel for Lead Plaintiff Public
Employees' Retirement System of Mississippi*

69