## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS MORTGAGE COMPANY, GS MORTGAGE SECURITIES CORP., GOLDMAN, SACHS & CO., INC., MCGRAW-HILL COMPANIES, INC., MOODY'S INVESTORS SERVICE, INC., FITCH INC., DANIEL L. SPARKS, MARK WEISS, JONATHAN S. SOBEL, GSAA HOME EQUITY TRUST 2006-2, GSAA HOME EQUITY TRUST 2006-3, and GSAMP TRUST 2006-S2.<br><br>Defendants. | Civil Action No. 09-cv-1110-HB<br><br><br>LEAD PLAINTIFF'S OPPOSITION TO THE GOLDMAN SACHS DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................ii-vi

I.   INTRODUCTION ............................................................................... 1

II.  SUMMARY OF ALLEGATIONS.................................................... 2

III. LEGAL ARGUMENT ....................................................................... 4

A.   Lead Plaintiff Has Standing To Bring The Claims In
     The Complaint ........................................................................... 5

     1.   Claims On Behalf Of Absent Purchasers ........................... 6

     2.   All Class Members, Including Lead Plaintiff, Purchased
          Pursuant  To The Same Registration Statement ................ 8

     3.   Lead Plaintiff Has Individual Standing To Advance
          Section 12 Claims On Its Own Behalf ............................... 9

B.   The Complaint Alleges Untrue Statements And
     Omissions In The Offering Documents...................................... 9

     1.   Untrue Statements And Omissions Concerning
          Underwriting Guidelines ................................................. 10

          a.   The Offering Documents Did Not Disclose The
               Systemic Violations Of Underwriting Guidelines................................ 13

          b.   Lead Plaintiff Is Not Required To Allege Scienter ............................. 16

     2.   The Offering Documents Did Not Disclose The Actual
          Appraisal Practices ........................................................ 18

     3.   The Credit Ratings Were Unjustifiably High................... 19

C.   Lead Plaintiff's Claims Are Timely .......................................... 20

     1.   The Standard For Inquiry Notice.................................... 20

     2.   A Reasonable Investor Was Not On Inquiry Notice
          Until, At The Earliest, February 21, 2008 ...................... 21

     3.   Unrelated Lawsuits And General News Articles Do Not
          Establish Inquiry Notice ................................................. 22

IV.  CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
2009 U.S. Dist. LEXIS 79607 (S.D.N.Y. Sept. 2, 2009) ............................................................ 20

*AIG Global Sec. Lending Corp. v. Banc of Am. Secs., LLC*,
2005 U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005) .......................................................... 22

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 402 (S.D.N.Y. 2005) ........................................................................................ 24

*In re Ames Dep't Stores Inc. Note Litig.*,
991 F.2d 968 (2d Cir. 1993) ...................................................................................................... 24

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .......................................................................................................... 5, 12

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................................................................... 12

*Bano v. Union Carbide Corp.*,
361 F.3d 696 (2d Cir. 2004) ...................................................................................................... 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................... 5, 12

*In re Blech Sec. Litig.*,
2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) .............................................................................. 7

*Boykin v. KeyCorp*,
521 F.3d 202 (2d Cir. 2008) ...................................................................................................... 12

*Briarwood Invs., Inc. v. Care Inv. Trust, Inc.*,
2009 U.S. Dist. LEXIS 18963 (S.D.N.Y. Mar. 4, 2009) ............................................................ 14

*In re Brooks Automation Inc. Sec. Litig.*,
2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007) ............................................................... 9

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C*,
433 F.3d 181 (2d Cir. 2005) ........................................................................................................ 6

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007) ........................................................................................................ 6

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ...................................................................................................... 21

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................................... 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................................ 8

*DeMaria v. Andersen*,
    153 F. Supp. 2d 300 (S.D.N.Y. 2001) ........................................................................... 9

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) ........................................................................................... 7

*Dodds v. Cigna Sec. Inc.*,
    12 F.3d 346 (2d Cir. 1993) ........................................................................................... 21

*Dorchester Investors v. Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) ................................................................... 22, 25

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    2000 U.S. Dist. LEXIS 94 (S.D.N.Y. Jan. 6, 2000) .................................................... 22

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ............................................................... 7

*In re Dynex Capital, Inc. Sec. Litig.*,
    2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009)............................................. 12

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ......................................................................................... 15

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...................................................................................................... 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) ..................................................................... 13, 15

*Fogarazzo v. Lehman Bros., Inc.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004) ..................................................................... 22, 23

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) ........................................................................... 16

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ........................................................................... 15

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ....................................................................................... 13

*In re Grand Theft Auto Video Game Consumer Litig.*,
    2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006)................................................................. 7

*Grasty v. Amalgamated Clothing & Textile Workers Union,*
    828 F.2d 123 (3d Cir. 1987) ........................................................................... 6

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ................................................................................ 9, 13

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) ................................................................................. 2, 9

*Hevesi v. Citigroup, Inc.,*
    366 F.3d 70 (2d Cir. 2004) ........................................................................... 7

*Hicks v. Morgan Stanley & Co.,*
    2003 U.S. Dist. LEXIS 11972 (S.D.N.Y. July 16, 2003) ................................. 6

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) .......................................................... 7

*Hoxworth v. Blinder, Robinson & Co.,*
    980 F.2d 912 (3d Cir. 1992) ........................................................................ 7

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
    159 F.3d 723 (2d Cir. 1998) ...................................................................... 13

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,*
    936 F.2d 759 (2d Cir. 1991) ...................................................................... 13

*In re Initial Pub. Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................ 20

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n,*
    815 F.2d 240 (2d Cir. 1987) ................................................................ 18, 25

*Lapin v. Goldman Sachs Group, Inc.,*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................ 24

*LC Capital Partners, L.P. v. Frontier Ins. Group,*
    318 F.3d 148 (2d Cir. 2003) ...................................................................... 22

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ...................................................................... 22

*Levitt v. Bear Stearns & Co.,*
    340 F.3d 94 (2d Cir. 2003) ........................................................................ 21

*Miller v. Lazard, Ltd.,*
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) ........................................................ 15

*Milman v. Box Hill Sys. Corp.,*
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) ................................................... 13, 24

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................................................... 23, 24

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
   643 F. Supp. 2d 366 (S.D.N.Y. 2008) ................................................................ 17

*In re N2K Inc. Sec. Litig.*,
   82 F. Supp. 2d 204 (S.D.N.Y. 1999) ................................................................. 17

*Newman v. Warnaco Group, Inc.*,
   335 F.3d 187 (2d Cir. 2003) ............................................................................. 20

*In re NovaGold Res., Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................................................... 5

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
   51 F. Supp. 2d 1 (D. Mass. 1999) ..................................................................... 16

*Olkey v. Hyperion 1999 Term Trust*,
   98 F. 3d 2 (2d Cir. 1996) ................................................................................... 15

*Panther Partners, Inc. v. Ikanos Communc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................... 17

*Pinter v. Dahl*,
   486 U.S. 622 (1988) .......................................................................................... 13

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   2009 WL 3149775 (D. Mass. Sept. 30, 2009) ......................................... 14, 15, 19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................................... 7

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) .......................................................................... 14, 19

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986) ............................................................................................ 2

*See Rescuecom Corp. v. Google, Inc.*,
   562 F.3d 123 (2d Cir. 2009) ............................................................................ 4, 5

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................................. 16

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ............................................................................. 21

*Shah v. Meeker*,
   435 F.3d 244 (2d Cir. 2006) ............................................................................. 21

*Staehr v. Hartford Fin. Servs. Group,*
    547 F.3d 406 (2d Cir. 2008) ................................................................... 21, 23

*In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256 (3d Cir. 2006) ...................................................................... 6, 9

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) ...................................................................................... 5

*Thompson v. Metro. Life Ins. Co.,*
    149 F. Supp. 2d 38 (S.D.N.Y. 2001) ......................................................... 24

*In re Twinlab Corp. Sec. Litig.,*
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) .................................................. 10, 16

*In re Vivendi Universal, S.A. Sec. Litig.,*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................. 10, 15

*In re Wash. Mut. Sec., Deriv., & ERISA Litig.,*
    2009 U.S. Dist. LEXIS 99727 (W.D. Wash. Oct. 27, 2009) .................. 12, 18

*In re WorldCom, Inc. Sec. Litig.,*
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ....................................................... 10

*In re WorldCom, Inc. Sec. Litig.,*
    2003 WL 22790942 (S.D.N.Y. Nov. 25, 2003) .......................................... 24

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77k(a) ................................................................................. 9, 16

15 U.S.C. § 77k(b) ..................................................................................... 2

15 U.S.C. 77k(e) ........................................................................................ 8

15 U.S.C. § 77m ...................................................................................... 20

15 U.S.C. § 77o ....................................................................................... 10

17 C.F.R. § 229.1110 ............................................................................... 18

17 C.F.R. § 229.1111 ............................................................................... 17

Fed. R. Civ. P. 15(a) ............................................................................... 25

Fed. R. Evid. 201(b) ................................................................................ 21

The Public Employees' Retirement System of Mississippi ("Lead Plaintiff") submits this Memorandum of Law in Opposition to the Goldman Sachs Defendants' Motion To Dismiss The Second Amended Complaint.  Dkt. No. 68.

I.    INTRODUCTION

This securities class action arises from Defendants' sale of mortgage pass-through certificates ("Certificates") through offering documents that contained untrue statements and omitted material facts.  Lead Plaintiff asserts claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against Goldman Sachs Group, Inc. ("Goldman Sachs") and the entities that structured and sold the Certificates, the Underwriter, the Individual Defendants who signed the registration statements, and the Rating Agencies that controlled the structuring process and were necessary participants in distributing the Certificates.[1]

Between February 2, 2006 and March 28, 2006, Goldman Sachs sold over $2.6 billion in Certificates pursuant to a single Registration Statement.[2]   Goldman Sachs, through the Sponsor, created the Depositor, whose exclusive purpose was to securitize loans for sale through mortgage-backed certificates.   In coordination with the Underwriter, the Sponsor worked with the Rating Agencies in structuring the Certificates.   ¶13.  The Depositor then securitized the loans so that the rights to cash could be sold to investors after obtaining investment-grade ratings from the Rating

---

[1]  "Defendants" refers to Goldman Sachs; Goldman Sachs Mortgage Company (the "Sponsor"); GS Mortgage Securities Corp. (the "Depositor"); Goldman, Sachs & Co., Inc. ("Underwriter"); Daniel L. Sparks, Mark Weiss, and Jonathan S. Sobel ("Individual Defendants"); McGraw-Hill Companies, a division of which is Standard & Poor's ("S&P"), Moody's Investors Service, Inc. ("Moody's") and Fitch, Inc. ("Fitch") ("Rating Agencies").  Each of the Individual Defendants signed the Registration Statement.   The Rating Agencies filed a separate motion to dismiss ("RA Mot.").  Dkt. No. 71.  For facts and law opposing such motion, Lead Plaintiff respectfully refers the Court to its concurrently-filed opposition brief.

[2]  ¶¶3, 40, 176.   The Depositor filed the August 17, 2005, Registration Statement, as amended ("Registration Statement"), with the Securities and Exchange Commission ("SEC").   ¶1.   The Registration Statement, Prospectus and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

Agencies.  ¶¶25-27; 132-40.  The Certificates maintained investment-grade ratings until February 21, 2008, when Fitch alone downgraded the GSAMP Trust Series 2006-S2 to below investment-grade. ¶151.  Many of the Certificates have now been downgraded to below investment-grade.  ¶¶151, 172.

As set forth below, the Offering Documents emphasized the loan originator's underwriting standards.  Each originator purportedly evaluated the borrower's ability and willingness to repay the loan and the adequacy of the collateral.  *See*, *e.g.*, ¶¶30, 55, 59, 62, 68, 73, 79, 94, 97, 103.  In truth, however, these originators engaged in unsound lending practices and extended loans that did not comply with their underwriting standards in order to increase loan volume.  ¶¶52, 63, 69, 74, 80, 95, 98, 104.  The Offering Documents contained additional untrue statements and omissions regarding the value of the underlying real estate and the appraisal standards by which such real estate was valued, as well as the level of credit enhancement and the credit ratings.  ¶¶112-31.

The Complaint's allegations of falsity are well-supported by reliable, contemporaneous facts, including witness accounts and internal documents, the findings of government investigations and ensuing lawsuits, and the reported findings and conclusions from governmental hearings and investigations.  ¶¶64-66, 70-71, 75-77, 82-92, 102.  Nothing more is required at the pleading stage. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (liability under Sections 11 and 12 of the Securities Act is "virtually absolute, even for innocent misstatements") (citing 15 U.S.C. § 77k(b)).  *See also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (the 1933 Act aims "to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor").

## II.    SUMMARY OF ALLEGATIONS

The Depositor, acting in coordination with the Underwriter and the Rating Agencies, sold over $2.6 billion of Certificates in three different issuing trusts.  ¶¶3, 39-42, 176.  The Certificates

were sold primarily to conservative institutional investors, such as Lead Plaintiff, who purchased the Certificates as purportedly safe, investment-grade investments.  ¶38.

Before the proliferation of mortgage-backed securities, loan originators had financial incentive to use prudent underwriting practices to ensure that the borrower had the ability to repay the note and that the underlying property was sufficiently valuable to serve as collateral.  ¶55.  With the proliferation of securitizations, however, this traditional model gave way to the "originate to distribute" model.  ¶¶56, 58.  Under this model, loans were pooled together, securitized and sold to investors in the form of mortgage-backed securities.  The originators were no longer required to hold them to maturity, and the credit risk was transferred to investors.  ¶56.

This model was highly lucrative for Wall Street banks, including Goldman Sachs.   Goldman Sachs established the Depositor, whose sole purpose was to securitize loans.   ¶¶57-58.   The Certificates were supported by pools of mortgage loans that the Sponsor purchased from various mortgage originators, including, among others, Countrywide Home Loans, Inc. ("Countrywide"), New Century Mortgage Corporation ("New Century"), and Argent Mortgage Company, L.L.C. ("Argent").  ¶3.

The Offering Documents set forth each originator's underwriting standards and stated that the originators were required to assess borrower creditworthiness through an examination and verification of borrower assets, credit history and employment.  ¶¶30, 55, 59, 62, 68, 73, 79, 94, 97, 103.   In truth, however, the originators systematically disregarded these standards.  ¶¶63, 69, 74, 80, 95, 98, 104.   The quality of the underlying loans and the value of the collateral was material information because the Certificates' value was dependent upon payments from borrowers.

Contrary to representations in the Offering Documents, loans were frequently based on inflated appraisals and understated LTV ratios.  ¶¶101, 106, 112-13, 115-19, 123-24.  Moreover, statements in the Offering Documents about "credit enhancement," including "overcollateralization"

(¶¶125-30), were materially false and omitted the true facts about the failure of originators to follow their underwriting and property appraisal standards.  ¶131.

To enable or facilitate the sale of the loans, the Rating Agencies branded the vast majority of the Certificates – 85% – with "AAA" ratings, categorizing them as the "best quality" of investment-grade securities.[3]  The Ratings, which are supposed to allow investors to compare the risk profiles of different investments in order to determine equivalent levels of risk, were vital to the distribution of the Certificates because many institutional investors, such as banks, mutual funds and public pension funds, are required to purchase and hold only "investment-grade" instruments.  ¶38.  In truth, the ratings were based on insufficient information and faulty assumptions concerning the number of underlying mortgages likely to default.  ¶141.  As a result, the Certificates were secured by assets that had a much greater risk profile than represented.  *Id.*

Until February 21, 2008, when Fitch alone downgraded the GSAMP Trust Series 2006-S2 to below investment-grade, the Rating Agencies maintained investment-grade ratings on all Certificates initially rated "AAA."  ¶151.  The ratings on virtually all of the Certificates have now been downgraded, reducing the value of the Certificates.  As stated in the GSAMP Trust 2006-S2 Prospectus Supplement, "[i]f a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and ***market value*** of the affected certificates is likely to be reduced."  *Id.* (emphasis added).

III.    LEGAL ARGUMENT

In assessing a motion to dismiss, the Court must accept the Complaint's factual allegations as true and draw all inferences in plaintiff's favor.  *See Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123,

---

[3]  ¶4.  The highest investment rating is "Aaa" and "AAA," respectively.  *Id.*  These ratings signify the highest investment-grade, are considered to be of the "best quality," and are supposed to carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  *Id.*  Any instrument rated lower than "BBB" or "Bbb" are considered below investment-grade.  *Id.*

127 (2d Cir. 2009).  The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002).

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a), requiring just a "short and plain statement of the claim showing that the pleader is entitled to relief."  *In re NovaGold Res., Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 276 (S.D.N.Y. 2009).  As the Supreme Court recently reaffirmed, "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("The plausibility standard is *not* akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  A complaint need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Complaint's allegations of falsity are supported by detailed factual allegations of systemic violations of the originators' stated underwriting standards, and are based upon, *inter alia*, statements by former employees of the originators, findings of government investigations, ensuing lawsuits, and the reported findings and conclusions from governmental hearings and investigations. The totality of these allegations makes it more than "plausible" that the Offering Documents contained untrue statements and omissions.  *Twombly*, 550 U.S. at 555, 570.  Nothing more is required under Rule 8(a), and Defendants' motion should therefore be denied.

A.   Lead Plaintiff Has Standing To
     Bring The Claims In The Complaint

Defendants do not challenge Lead Plaintiff's standing to represent absent purchasers in the GSAMP Trust 2006-S2.  Rather, Defendants attempt to challenge Lead Plaintiff's standing to represent absent purchasers in the other two trusts.

1.   <u>Claims On Behalf Of Absent Purchasers</u>

Defendants "confuse standing and the typicality requirement of Rule 23(a)(3)."  *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 n.8 (3d Cir. 1987).  Because Lead Plaintiff has standing to advance claims based on its *own* purchases, any challenge to its ability to bring claims on behalf of *absent* class members is not a question of "standing," but of its fitness to represent a defined class, and is therefore inappropriate for resolution on a motion to dismiss.  *See Hicks v. Morgan Stanley & Co.*, 2003 U.S. Dist. LEXIS 11972, at *19-20 (S.D.N.Y. July 16, 2003) (finding plaintiff rightfully in federal court for Section 11 claims could represent Section 12 class because the "claims arise out of the same conduct and involve the same legal theories").  As the Second Circuit explains:

> To establish Article III standing in a class action … for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.[4]

In this case, Lead Plaintiff purchased securities in one of the offerings and can assert a claim directly against each Defendant.  ¶¶11, 156.  Lead Plaintiff, therefore, has met the requirements of Article III and Securities Act standing.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C*, 433 F.3d 181, 198 (2d Cir. 2005); *In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 274 n.7 (3d Cir. 2006).

---

[4]  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("*Cent. States II*").  *See also* 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 2.7, at 2-40-41 (4th ed. 2009) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions."); 7AA CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed. 2005) ("Representative parties who have direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.").

Courts routinely employ this reasoning when dealing with cases involving securities.  For example, in *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) – approved in *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) – the court used an ordinary Rule 23 analysis to permit plaintiffs who had invested in a small subset of 700 partnerships to represent absent class members who had invested in the remaining partnerships.  *See Prudential*, 163 F.R.D. at 208.  *See also Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (investors in 15 securities permitted to advance Section 12 claims on behalf of purchasers of 21 securities); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("[C]lass representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern *vis a vis* the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").[5]

To support their argument that "standing" is lacking, Defendants cite cases holding that Section 11 requires the plaintiff to allege purchases traceable to the offering at issue.  *See, e.g.*, *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003).  But *DeMaria* only addresses the standing requirements for individual, or named, plaintiffs to advance claims on their ***own*** behalf.  It does not purport to address the conditions under which named plaintiffs who have standing to bring their own claims may then represent a class of absent purchasers.[6]

_____

[5]  *See also In re Grand Theft Auto Video Game Consumer Litig.*, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) (named plaintiffs individually have standing; the question "whether their injuries are sufficiently similar to those of the purported Class …. is, at least in the first instance, appropriately answered through the class certification process"); *In re Blech Sec. Litig.*, 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all securities because "[t]here need not be a class representative for every Blech security, as long as all the securities are part of a common fraudulent or manipulative scheme").

[6]  Defendants also cite *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008), for the proposition that Lead Plaintiff cannot meet the injury requirement.  *See also* Goldman Mot. at 11-13 (arguing that Lead Plaintiff has not adequately alleged economic loss).  Damages in a Section 11 case

Finally, Defendants claim that because different prospectus supplements described different loan pools and underwriting standards, somehow standing is lacking. Goldman Mot. at 9 n.6. This argument concerns Rule 23 typicality and commonality, and therefore is more properly examined at class certification when a full factual record can be put before the Court. Given the common statements in the Offering Documents, there will be ample showing of typicality and commonality.

2. All Class Members, Including
Lead Plaintiff, Purchased Pursuant
To The Same Registration Statement

Here, all of the Offerings were issued pursuant to a ***single*** registration statement. ¶¶1, 39-40. In *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), the court held that purchasers of securities based on an initial shelf registration statement could serve as representatives for purchasers from other offerings, "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date."[7] Here, the prospectus supplements – which were incorporated by reference into the Registration Statement, and thus were common "parts" of the Registration Statement – contained common misrepresentations. ¶¶5-6, 43, 59. Therefore, Lead Plaintiff may represent absent purchasers.

---

are calculated as the difference between the amount paid for a security and: (1) the value of the security at the time the suit is filed; or (2) ***the price at which the security is sold before the suit is filed***; or (3) the price at which the security is sold after the suit is filed, if that amount is less than (1). *See* 15 U.S.C. 77k(e) (emphasis added). Here, Lead Plaintiff has clearly alleged an injury under Section 11. As detailed in its Certification, Lead Plaintiff purchased Certificates at a par value of $99.99, and later sold the Certificates prior to commencing this suit at a par value of $16.15, an 84% loss. *See* Declaration of Timothy A. DeLange In Support Of The Motion Of The Public Employees' Retirement System Of Mississippi For Appointment As Lead Plaintiff ("DeLange Decl."), Exhibit A. Dkt. No. 43. Neither Section 11, nor Defendants' authority, requires Lead Plaintiff to allege more.

[7] *Id.* at 1166. The court did not consider, nor was it apparently argued, that the ability of a named plaintiff to represent absent purchasers is governed by Rule 23, not the text of the statute.

     3.      Lead Plaintiff Has Individual Standing To
             Advance Section 12 Claims On Its Own Behalf

Defendants additionally contend that because the Complaint alleges "only" that Lead Plaintiff "purchased Series 2006-S2 Mortgage Pass-Through Certificates issued by the GSAMP Trust 2006-S2 directly from Goldman Sachs & Co., Inc., as reflected in its certification, filed February 6, 2009" (¶11), Lead Plaintiff has failed to properly plead that it has valid claims under Section 12. Defendants demand a level of particularity that goes far beyond the requirements of Rule 8(a).

Lead Plaintiff's certification specifies the exact security Lead Plaintiff bought and the date of the purchase. *See* DeLange Decl., Ex. A. Further, the Complaint alleges that the Underwriter sold the securities (¶¶15, 29, 43, 162) and that "Plaintiff and other Class members purchased their Certificates directly from GS&Co." ¶178. Countless courts have found lesser allegations to be sufficient. *See, e.g.*, *Suprema*, 438 F.3d at 274 at n.7; *In re Brooks Automation Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007). Defendants' citation to *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995), is not to the contrary – *Gustafson* did not address *pleading* requirements for a Section 12 cause of action. Likewise, *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307-08 (S.D.N.Y. 2001), is inapposite. There, plaintiffs admitted that they had not purchased from the defendants.

     B.     The Complaint Alleges Untrue Statements
          And Omissions In The Offering Documents

Section 11 liability exists when, as here, the registration statement "contained an untrue statement of a material fact *or* omitted to state a material fact required to be stated therein *or* necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 of the Securities Act imposes a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 381-82. The plaintiff need only "allege that he

purchased the security and that the registration statement contains false or misleading statements concerning a material fact."[8]

Here, the Complaint alleges that the Offering Documents contained untrue statements of material fact, omitted to state material facts required to be stated therein, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the true loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the true level of credit enhancement the Certificates provided; and (5) the ratings of the Certificates.[9]

### 1.   Untrue Statements And Omissions Concerning Underwriting Guidelines

The Offering Documents identified the various originators in each trust and emphasized the underwriting standards used to originate the underlying mortgage loans, each of which purportedly evaluated the applicant's ability to repay the loan and the adequacy of the collateral.  ¶¶30, 55, 59, 62, 68, 73, 79, 94, 97, 103.   In truth, these loan originators systematically disregarded their underwriting standards in order to increase loan volume.  ¶¶52, 63, 69, 74, 80, 95, 98, 104.  Far from evaluating the applicant's credit standing and ability to repay the loan, the loan originators actually

---

[8]  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (internal citation omitted); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 407-08 (S.D.N.Y. 2003) (finding it sufficient for purposes of pleading a Section 11 claim for plaintiff to allege that "'material facts have been omitted' from a registration statement or 'presented in such a way as to obscure or distort their significance'").

[9]  ¶¶5-6.  The Individual Defendants, Goldman Sachs, the Sponsor and the Rating Agencies are also liable as control persons pursuant to Section 15.  *See* 15 U.S.C. § 77o.  As this Court has found, "[S]ection 15 claims need only satisfy the minimal pleading standards of Rule 8."  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187-88 (S.D.N.Y. 2003) (Baer, J.) (adding that "'naked allegations of control will typically suffice' to plead an adequate § 15 claim to withstand a motion to dismiss") (citation omitted).  As set forth herein, the Complaint adequately alleges both primary violations under Sections 11 and 12(a)(2) and control under Section 15.

weakened their underwriting standards and increased their exceptions to those standards.  *Id.*  For example, New Century, the sole originator of loans in the GSAMP Trust 2006-S2, had "serious loan quality issues" and numerous "red flags" relating to loan quality.  ¶64.  New Century's problems began when it "engaged in a number of significant improper and imprudent practices related to its loan originations."  ¶66.

Likewise, Argent, the sole originator of loans in the GSAA 2006-2 Trust, actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring . . . mortgage brokers in the art of fraud."  ¶70.  An examination of 129 Argent loans found that at least 103 "contained false and misleading information," such as "non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  *Id.*  Argent's lack of verification was so pervasive that a "borrower [who] claimed to work a job that didn't exist . . . got enough money to buy four houses."  *Id.*

Countrywide originated 29.86% of the loans in the GSAA 2006-3 Trust.  ¶78.  On June 4, 2009, the SEC filed a complaint against three Countrywide executives, alleging that a high percentage of loans violated Countrywide's own weak underwriting standards due to: (i) loans made as exceptions to guidelines; and (ii) the high percentage of  originations with a loan-to-value ratio of 100%.  ¶81.  Countrywide's underwriting standards are also the subject of numerous lawsuits and investigations by attorney generals in California, Connecticut, Florida, Indiana, Illinois, Washington, and West Virginia, as well as the Federal Bureau of Investigation ("FBI").  ¶¶82-90.  For example, on August 24, 2009, MBIA Insurance Corp. filed a complaint against Countrywide based on "an extraordinarily high incidence of material deviations from [Countrywide's] underwriting guidelines."  ¶92.

Faced with Lead Plaintiff's detailed allegations regarding the originators' systemic violations of underwriting standards, Defendants largely do not contest falsity.[10]  This Court recently found similar allegations sufficient on a motion to dismiss.  *See In re Dynex Capital, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 96527, at *24-27 (S.D.N.Y. Oct. 19, 2009) ("At some point, statements made by a defendant that it 'generally' adheres to a particular policy become misleading when in fact there is no such policy or the policy is something else altogether.").

Defendants contend that the Complaint contains no allegations about specific loans held by the trusts, and therefore, no allegations related to how the misrepresented underwriting practices affected the Certificates' value.  Goldman Mot. at 14.  This demand for loan-level particularity fails.  There is no dispute that Rule 8's "short and plain statement" standard for notice pleading governs the Complaint.  *See Iqbal*, 129 S. Ct. at 1949 ("the pleading standard Rule 8 announces does not require 'detailed factual allegations'"); *Boykin v. KeyCorp*, 521 F.3d 202, 213-14 (2d Cir. 2008) ("The [Supreme] Court reiterated that 'specific facts are not necessary,' and that the complainant 'need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'").  *Twombly* and *Iqbal* require allegations that suggest **plausibility**, but do not demand probability or increased particularity.   Here, the Complaint alleges ample, well-supported facts to show falsity, including corroboration by the Massachusetts AG, which settled claims against Goldman Sachs for

---

[10] Violations of underwriting standards undoubtedly constitute material information to investors.  *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (denying lending company's motion to dismiss and noting that "underwriting practices would be among the most important information looked to by investors"); *In re Wash. Mut. Inc. Sec., Deriv., & ERISA Litig.*, 2009 U.S. Dist. LEXIS 99727, at *25-27 (W.D. Wash. Oct. 27, 2009) (denying motion to dismiss where bank lowered its underwriting standards and pressured underwriters to approve loans outside the guidelines); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) (false statements included representations that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMs, and only retained high credit quality mortgages in its loan portfolio).   Indeed, the SEC specifically stated that "[i]nformation regarding characteristics and quality of the assets is important for investors in assessing how a pool will perform."  70 Fed. Reg. 1506-01, 1511 (Jan. 7, 2005).

its failure to verify that purchased loans complied with the originator's stated underwriting guidelines and took sufficient steps to avoid placing problem loans in securitization pools.  ¶¶75-77.

a. The Offering Documents Did Not Disclose The<br>Systemic Violations Of Underwriting Guidelines

The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Pinter v. Dahl*, 486 U.S. 622, 646 (1988) (the very purpose of the Securities Act is "to promote full and fair disclosure of information to the public in the sales of securities").  Indeed, "[t]he primary innovation of the 1933 Act was the creation of federal duties – for the most part, registration and disclosure obligations – in connection with public offerings."  *Gustafson*, 513 U.S. at 571.

Defendants contend that the Offering Documents disclosed "all material information about the certificates and ***the inherently risky loan pools that backed them***."[11]  It begs credulity for Defendants to now contend that the Offering Documents clearly disclosed the inherent risk of the loan pools when 85% of the Certificates were initially rated "AAA" – the "best quality" with the smallest degree of investment risk.  "[A] violation of Section 11 will be found when material facts have been omitted or presented in such a way as to 'obscure or distort' their significance."  *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009).  While the Offering Documents contained pages of boilerplate warnings about risk, ***none*** revealed the actual information Lead Plaintiff alleges was omitted and ***none*** put investors on notice of the actual risks of the Certificates. *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (cautionary

---

[11] Goldman Mot. at 15 (emphasis added).  A "complaint may not properly be dismissed pursuant to 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (internal quotations omitted; alterations in original).

language "must relate directly to that by which plaintiffs claim to have been misled"); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) (cautionary language must "warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").

Contrary to Defendants' mischaracterization, the Complaint does not allege that the Offering Documents merely omitted the fact that originators could issue loans pursuant to "exceptions." Goldman Mot. at 15.  Rather, the Complaint alleges that the Offering Documents falsely stated that the originators' underwriting standards were intended to evaluate the applicant's ability to repay the loan and the adequacy of the collateral, when in fact the originators extended loans to borrowers regardless of their ability to repay.  None of Defendants' purported disclosures disclosed this material fact.

Moreover, merely disclosing the authority to make an "exception" does not cure the alleged omissions because the standards for making exceptions (*i.e.*, legitimate **compensating factors**) were disregarded.  *See, e.g.*, ¶¶60, 63, 69, 74, 80, 95, 98, 104.  Defendants point to no disclosure revealing the fact that the originators routinely violated underwriting guidelines in an effort to increase loan volumes.  ¶¶108-11.  Under these circumstances, it is impossible for Defendants to establish, as they must, that the alleged disclosures "cured" a false statement or omission as a matter of law.  *See Briarwood Invs., Inc. v. Care Inv. Trust, Inc.*, 2009 U.S. Dist. LEXIS 18963, at *8-10 (S.D.N.Y. Mar. 4, 2009).

Defendants rely heavily on *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 2009 WL 3149775 (D. Mass. Sept. 30, 2009), which is currently being appealed. Notably, the court in *Nomura* did not hold that plaintiffs failed to plead falsity, but that the extensive risk disclosures sufficiently warned of the potential perils of subprime mortgage loans (*i.e.*, that the loans in the mortgage pools may experience significantly higher rates of delinquency, foreclosure and borrower bankruptcy compared to loans underwritten in strict compliance with Fannie Mae or

-14-

Freddie Mac).  *Id.* at \*5.  Here, the purported disclosures are far more general.  Therefore, the deviations from underwriting standards – which are detailed in the Complaint (¶¶63-66, 69-71, 74-77, 80-93, 95-96, 98-102, 104-07) – dramatically affected the total mix of information available to investors.  In short, the disclosures here are different from *Nomura*.

Defendants' reliance on a hearing transcript from *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 08-CV-10783, is also misplaced.  Although Judge Cedarbaum granted the motion to dismiss with leave to file a clearer complaint, she did not find that the complaint did not state a claim and explained that "[i]t is very important that these suits be brought if they are well-founded," as is the case here.[12]

Likewise, boilerplate risk disclosures cannot inoculate Defendants from liability for the untrue statements in the Offering Documents.  *See* Goldman Mot. at 13-18.  As Judge Conner recently wrote, it is because "risk factors" have become ubiquitous in securities offering documents that:

> The cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed.  (Citation omitted).  ***The requirement that the cautionary language match the specific risk is particularly important***, considering that most, if not all, security offerings, contain cautionary language.

*In re Flag Telecom*, 618 F. Supp. 2d 311, 322 (citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5-6 (2d Cir. 1996), and *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007)).  *See also Vivendi*, 381 F. Supp. 2d at 183 ("boilerplate warnings will not suffice . . . .  The cautionary

---

[12]  *See* Rouse Decl., Ex. B at 38.  None of Defendants' remaining authorities resemble the facts of this case.  For example, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), arose from Legg Mason's "swap" of certain assets with Citigroup.  The plaintiffs alleged the failure to disclose (1) the planned departure of an asset manager, (2) a "dramatic increase" in integration-related expenses, and (3) owed distribution fees, amounting to only .4% of Legg Mason's budget.  The court explained that "by their very nature, swap transactions . . . will generate changes in personnel and increases in expenses," and the "owed distribution" fees of .4% were too small to be material.  *Id.* at 612.  That is not the case here.  Likewise, in *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), shareholders of JP Morgan Chase & Co. ("JPMC") alleged that they were defrauded by JPMC's complicity in Enron's financial scandals.  On the unique facts of that case, the court found that alleged misrepresentations relating to less than two percent of defendant's assets were immaterial.  Again, that is not the case here.

statements must convey substantive information . . . .").  Here, as explained above, Defendants' risk disclosures are too general and do not directly address the omitted information.

Moreover, risk disclosures only apply to ***future events***.  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[13]  Here, the statements concern the underwriting standards for loans in existing pools and are clearly historical.  Defendants, therefore, cannot evade liability by relying on risk disclosures for future events.

b.     Lead Plaintiff Is Not
Required To Allege Scienter

"Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."  *Rombach*, 355 F.3d at 169 n.4.  *See also Twinlab*, 103 F. Supp. 2d at 202-05 ("the defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement").

Despite these well-established principles, Defendants assert that "under the SEC regulations applicable to mortgage-backed securities," Defendants were obligated to disclose "only *known* exceptions to an originator's underwriting guidelines."  Goldman Mot. at 20-21.  Focusing exclusively on their omissions, however, Defendants ignore that Section 11 first and foremost imposes strict liability for any material "untrue statement" in a registration statement.  *See* 15 U.S.C. 77k(a).  Here, the Complaint alleges such untrue statements – including that the loans were originated

---

[13]  *See also, In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 442-43 (S.D.N.Y. 2009); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 23 (D. Mass. 1999) ("bespeaks caution" doctrine may not be invoked to protect defendants' misrepresentations regarding present facts).

by evaluating the borrower's ability and willingness to repay the loan and the adequacy of the collateral.  ¶¶52, 63, 69, 74, 80, 95, 98, 104.

Defendants' motion is devoid of a single decision holding that untrue statements about underwriting standards in offering documents for an asset-backed security cannot form the basis of a Section 11 claim, absent allegations of knowledge.[14]  Indeed, Defendants' own authority recognizes that SEC regulations, such as Regulation AB, are in addition to, not in place of, a defendant's general duty to disclose information necessary to make other statements not misleading.  *See N2K Inc.*, 82 F. Supp. 2d at 207 ("a material omission from a registration statement is actionable if the omitted facts (1) were required by SEC regulations to be stated therein, *or* (2) were necessary to make the disclosures in the registration statement not misleading"); *Morgan Stanley*, 643 F. Supp. 2d at 373 (same).

Against this backdrop, Defendants urge the Court to focus narrowly on just Item 1111(a)(3) of Regulation AB.  Goldman Mot. at 20-22.  Item 1111 sets forth "[g]eneral information regarding pool asset types and selection criteria" that must be disclosed to allow investors to make a "material evaluation of the pool data."  17 C.F.R. § 229.1111.  In that context, Item 1111 imposes a duty to disclose changes to the underwriting criteria "used to originate or purchase the pool assets," to the "extent known."  Here, however, Lead Plaintiff does not allege changes to the underwriting criteria or the extent to which policies are or could be overridden.  Rather, Lead Plaintiff alleges that the Offering Documents failed to disclose that originators systematically disregarded their stated (i.e., unchanged) underwriting standards.

---

[14] Defendants' decisions stand for the unremarkable proposition that SEC Regulations describe the contents of registration statements and prospectuses.  *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999); *see also In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2008); *Panther Partners, Inc. v. Ikanos Communc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).

Defendants conveniently fail to acknowledge others Items, such as Items 1104 and 1110, when purporting to describe the "relevant" disclosure requirements of Regulation AB.  *See* Goldman Mot. at 21.  In particular, Item 1110 requires, for each originator that originated 20% or more of the pool assets, "a description of the originator's origination program," including "***information material to an analysis of the performance of the pool assets, such as the originator's credit-granting or underwriting criteria for the asset types being securitized***."  17 C.F.R. § 229.1110 (emphasis added).  Nothing in Item 1110 limits disclosure of such information "to the extent known."[15]

### 2. The Offering Documents Did Not Disclose The Actual Appraisal Practices

It is undisputed that the fundamental basis upon which the Certificates are valued is the ability of borrowers to repay the loans *and the adequacy of the collateral for those loans*.  ¶¶3, 30, 55, 59.  Here, the Complaint details that appraisers "experience[d] systemic problems of coercion" and further details the inflated valuations and appraisals at the various originators.  *See, e.g.,* ¶¶6, 92, 101, 106, 111, 120-24.  Defendants do not contest that the Offering Documents contained untrue statements regarding the appraisals.  *See Wash. Mut.*, 2009 U.S. Dist. LEXIS 99727, at *23-24.

Rather, Defendants claim that the Offering Documents adequately disclosed that third-party appraisers might deviate from standard guidelines.  Goldman Mot. at 16.  Contrary to Defendants' mischaracterization, the Complaint alleges that the Offering Documents did not disclose that originators "routinely violated the underwriting guidelines" (¶118), or that the originators

---

[15]  If the Court determines that Lead Plaintiff is required to plead facts showing Defendants' knowledge, Lead Plaintiff respectfully requests leave to amend.  Such leave is freely granted when justice requires.  *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987).  Leave to amend would be particularly appropriate here because Lead Plaintiff is unaware of any decision construing Regulation AB as Defendants do here, and Defendants have not identified any.

"pressure[d] appraisers to appraise properties at artificially high levels" (¶120).[16]  This information was **not** disclosed in the Offering Documents.

Defendants attempt to rely on the following purported disclosure: "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers." Goldman Mot. at 16.  Defendants somehow conclude that "[a] reasonable investor would have understood this to indicate that neither [Defendants] nor any originator (like New Century) controlled the appraisal process and that third-party appraisers might deviate from the standard guidelines." *Id.* Defendants do not – and cannot – argue that the excerpted passage disclosed that the appraisals were not being performed in accordance with USPAP and were in fact systemically inflated as a result of the pressure lenders, including the originators here, were placing on the appraisers.[17]  Defendants' so-called disclosure did not reveal the omitted information.  *Daum*, 355 F.3d at 97 ("the cautionary language must. . . warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").

### 3.      The Credit Ratings Were Unjustifiably High

The Goldman Sachs Defendants incorporate the arguments concerning the ratings set forth in the Rating Agency Defendants' Motion To Dismiss.  Goldman Mot. at 18-19, n.11.  For facts and law opposing the Goldman Mot., Lead Plaintiff respectfully refers the Court to the arguments in Lead Plaintiff's Opposition To The Rating Agency Defendants' Motion To Dismiss ("RA Opp.").  As

---

[16] Defendants' contention that the Offering Documents sufficiently disclosed the calculation of loan-to-value ratios, debt-to-income ratios and credit enhancement features also fails.  The inflated appraisals caused the LTV ratios listed in the Offering Documents to be artificially low, and the level of credit enhancement and overcollateralization to be overstated, making it appear that the loans underlying the trusts were safer and less risky than they really were.  ¶¶123-24, 125-31.

[17]  ¶¶113-14, 120-22, 124.  Defendants again attempt to rely on the out-of-circuit district court opinion in *Nomura*, 2009 WL 3149775, at *6.  In *Nomura*, unlike here (*see, e.g.*, ¶¶6, 92, 101, 106, 120-24), there were no allegations regarding inflated appraisals at Nomura or any of the underlying originators in those loan pools.

detailed therein, the Certificates' credit ratings misrepresented the character and investment risk of the Certificates as they were based on "outdated assumptions, relaxed ratings criteria, and inaccurate loan information." ¶¶6, 111. Accordingly, the Certificates were, in truth, "far riskier than represented," and were not equivalent to other investments with the same ratings. ¶¶7, 141. In similar context, credit ratings have been held to be actionable misstatements. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 2009 U.S. Dist. LEXIS 79607, at *35-36 (S.D.N.Y. Sept. 2, 2009) (finding high ratings and the information they conveyed to be actionable misstatements).

      C.    <u>Lead Plaintiff's Claims Are Timely</u>

      Defendants contend that their wrongdoing was so obvious, investors should have known of the probability of a claim over one year before this litigation was commenced.

      1.    <u>The Standard For Inquiry Notice</u>

      Section 13 of the Securities Act provides, in part, that "[n]o action shall be maintained to enforce any liability created under [Section 11] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The statute of limitations is "an affirmative defense on which the defendant has the burden of proof." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004). "The defendant's normal burden includes showing when the cause of action accrued." *Id.* The Second Circuit has set forth a particularly stringent standard. "Inquiry notice exists only when ***uncontroverted*** evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Newman v. Warnaco Group, Inc*., 335 F.3d 187, 194-95 (2d Cir. 2003) (emphasis added) (citations omitted). *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003) (defendants must produce ***uncontroverted*** evidence that irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent

scheme).   To demonstrate that Lead Plaintiff had such inquiry notice, Defendants must present evidence of "storm warnings" relating "directly" to the misrepresentations and omissions on which Lead Plaintiff bases its claims.   *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008).

In attempting to establish that Lead Plaintiff was on inquiry notice, Defendants rely upon matters outside of the Complaint and on unwarranted factual inferences and assertions that are not subject to judicial notice.[18]   Absent a valid request for judicial notice, matters extraneous to the Complaint cannot be considered.[19]   When a court considers extrinsic documents that are not proper for judicial notice, it must convert the motion to a motion for summary judgment and provide plaintiffs with an opportunity to conduct discovery and submit additional supporting materials. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 154-55 (2d Cir. 2002).

> ## 2.    A Reasonable Investor Was Not On Inquiry
> ## <u>Notice Until, At The Earliest, February 21, 2008</u>

A plaintiff is on inquiry notice only "when the circumstances would suggest to ***an investor of ordinary intelligence*** the probability" that he or she has a claim.   *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (quoting *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) (emphasis added)). *See also Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003).   It is axiomatic that "whether

---

[18]  For a court to take judicial notice of an adjudicative fact, it must be "one not subject to dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  *See, e.g., Staehr*, 547 F.3d at 424-25 (court must not judicially notice extraneous materials for "the truth of their contents").

[19]  Goldman Mot. at 2 n.2, 7.  Lead Plaintiff objects to Defendants' submission of Appendix 1, which purports to be a chronology of selected (by defense counsel) public reports concerning subprime mortgage matters from May 2005 through February 2008.  *Staehr,* 547 F.3d at 509 (court cannot take judicial notice of an extrinsic document for the truth of the matter asserted).  Lead Plaintiff does not object to the Court's consideration of documents that are referenced in or integral to the Complaint or that are properly the subject of judicial notice.  *See id.* at 425; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'"  *LC Capital Partners, L.P. v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003).  *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (citations omitted).  Federal courts have repeatedly held that the question of when the statute of limitations begins to run on federal securities law claims is inherently fact-specific.[20]

Securities Act claims on behalf of Goldman Sachs Certificate purchasers were not "probable" until February 21, 2008, when Fitch alone downgraded the GSAMP Trust Series 2006-S2 to below investment-grade.  This action was filed on February 6, 2009.  Accordingly, Lead Plaintiff's claims are timely.

       3.     Unrelated Lawsuits And General News
                  Articles Do Not Establish Inquiry Notice

Defendants apparently scoured the country for pending subprime litigation, articles and transcripts relating to subprime lending to contend that Lead Plaintiff was on inquiry notice at some (unspecified) date prior to February 6, 2008.  *See* Goldman Mot. at 23; Appendix 1.  Even if appropriate for review on a motion to dismiss, the lawsuits and articles do nothing more than generically report on the loosening of underwriting standards in the mortgage lending industry.  None of the plethora of lawsuits, general news articles or transcripts identifies Goldman Sachs, the Certificates at issue in this litigation, or that such Certificates were toxic or less than AAA-related securities.  The standard articulated in *Lentell* requires that storm warnings be "company-specific" and that "the triggering . . . data must be such that it relates directly to the misrepresentations and

---

[20]  *See, e.g., Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 577 (S.D.N.Y. 2001) (issue of whether plaintiffs were on inquiry notice is a factual one to be resolved by the trier of fact); *AIG Global Sec. Lending Corp. v. Banc of Am. Secs., LLC*, 2005 U.S. Dist. LEXIS 21605, at *46 (S.D.N.Y. Sept. 26, 2005) (question of constructive knowledge and inquiry notice may be "one for the trier of fact and therefore ill-suited for determination on a motion to dismiss"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 U.S. Dist. LEXIS 94, at *10-11 (S.D.N.Y. Jan. 6, 2000) ("[T]he issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage in this litigation.").

omissions" plaintiffs allege in the complaint.  396 F.3d at 168, 171.  *See also Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 299-300 (S.D.N.Y. 2004) (media reports of industry-wide fraud did not trigger inquiry notice because the reports did not specifically mention defendants).

Each of the lawsuits and articles involves claims against various originators of mortgage loans throughout the country for those originators' statements regarding their own financial condition and underwriting guidelines in their SEC filings and press releases.  What was unknown to Lead Plaintiff and the Class – until February 21, 2008 – was that the underlying loans in the Certificates suffered from this same disregard for underwriting standards.  The downgrades revealed for the first time that the underlying mortgage pools contained loans originated in violation of the stated underwriting guidelines.  Clearly, the information and allegations in the various lawsuits and articles were insufficient to disclose the probability of Lead Plaintiff's claims here and, therefore, cannot constitute "storm warnings."  *Staehr*, 547 F.3d at 428 ("Because nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute 'storm warnings' is far from compelling.").

In *Staehr*, defendants indentified four lawsuits, various articles from news sources and industry newsletters, portions of defendants' regulatory filings with the SEC, and samples of annual insurance filings.  547 F.3d at 416.  The Second Circuit found that "the publicly available information in the record before us consists almost exclusively of generic articles on conflicts of interest for insurance brokers, not insurers" and that "there is no mention of [the defendant] at all except in one *National Underwriter* article."  *Id.* at 429.  The Second Circuit concluded that because the lawsuits did not name the defendant, or accuse the defendant of similar wrongdoing, they were insufficient to place a reasonable investor on inquiry notice.  *Id.* at 434.  Similarly, in *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506-507 (S.D.N.Y. 2009), the defendants submitted a voluminous record of media reports and statements concerning potential conflicts of interest in the credit-ratings

industry.  The court held that these statements, which referred to the ratings industry generally, rather than Moody's specifically, were insufficient to trigger inquiry notice.[21]

Moreover, where defendants offer reassurances, reasonable words of comfort or otherwise controvert the basis for any claim, the storm warnings are "controverted" and inquiry notice cannot exist.  *Milman*, 72 F. Supp. 2d at 229 (citing *In re Ames Dep't Stores Inc. Note Litig.*, 991 F.2d 968 (2d Cir. 1993); *see also Moody's Corp.*, 599 F. Supp. 2d at 506 (plaintiffs not on inquiry notice when they "reasonably rely" on the "reliable words of comfort from management").

Here, Defendants offered the market reassurances and reasonable words of comfort which "controverted" facts establishing any basis for a claim.  *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) (plaintiff not on inquiry notice, "'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of comfort from management.'") (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)). For example, Defendants argue that a May 16, 2007 *Financial Times* article disclosed that because the Rating Agencies helped to structure mortgage-backed securities, there might be "a significant incentive to look kindly on the products they are rating."  Appendix 1 at 6.  Defendants fail to include, however, the reassuring statement from S&P's head of European structured finance which concludes the same article:

> Banks come to us with a proposed transaction and we explain how it might be rated under our criteria.  In many cases, the transaction is then restructured by the bank in order to meet our criteria. ***There's nothing sinister about this process – we don't advise on how deals should be structured or arbitrate on which deals can proceed or not.***

---

[21] *Id.* at 506.  *See also Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 51 (S.D.N.Y. 2001) (two dozen articles reflecting "general public awareness" of industry wrongdoing insufficient to put plaintiffs on inquiry notice); *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22790942, at *5 (S.D.N.Y. Nov. 25, 2003) (press reports regarding conflicts between research departments and investment banking departments at large financial institutions did not constitute "storm warnings" where press reports were vague and did not discuss corporation in particular).

The Complaint details Defendants' numerous additional reassuring statements throughout 2006 and 2007.  ¶172.  In sum, at the same time Defendants claim that investors had sufficient information for inquiry notice, they were reassuring the market that no wrongdoing existed.  At best, Defendants have created a factual issue inappropriate for determination on a motion to dismiss.  *See Dorchester*, 134 F. Supp. 2d at 577.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiff respectfully submits that the Goldman Sachs Defendants' motion should be denied.  In the event the Court dismisses all or part of Lead Plaintiff's allegations, Lead Plaintiff respectfully requests leave to replead.  Lead Plaintiff is aware of this Court's Individual Practices regarding amendments to Complaints.  While Lead Plaintiff is unaware of any defects in the Complaint, its investigation of Goldman Sachs and the Certificates has continued and Lead Plaintiff could allege additional events to further support its claims.  Fed. R. Civ. P. 15(a) sets forth a policy in favor of granting leave to amend, stating that "[t]he court should freely give leave when justice so requires."  *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987) (reversing denial of request for leave to amend pursuant to "liberal policy").

Dated: December 21, 2009

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP


_____*/s/ David R. Stickney*_____
DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DeLANGE
ELIZABETH LIN
MATTHEW P. JUBENVILLE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
elizabethl@blbglaw.com
matthewj@blbglaw.com
            -and-

BRUCE D. BERNSTEIN
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
bruce@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead
Plaintiff Public Employees' Retirement System of
Mississippi*


POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Additional Counsel for Lead Plaintiff Public Employees'
Retirement System of Mississippi*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2009, I caused a copy of the foregoing

LEAD PLAINTIFFS' OPPOSITION TO THE GOLDMAN SACHS
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter who are registered on the CM/ECF system.

                 */s/ David R. Stickney*
                 DAVID R. STICKNEY