## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 09-cv-1110-HB |
| Plaintiff, | |
| v. | LEAD PLAINTIFF'S OPPOSITION TO THE RATING AGENCIES' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT |
| GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS MORTGAGE COMPANY, GS MORTGAGE SECURITIES CORP., GOLDMAN, SACHS & CO., INC., MCGRAW-HILL COMPANIES, INC., MOODY'S INVESTORS SERVICE, INC., FITCH INC., DANIEL L. SPARKS, MARK WEISS, JONATHAN S. SOBEL, GSAA HOME EQUITY TRUST 2006-2, GSAA HOME EQUITY TRUST 2006-3, and GSAMP TRUST 2006-S2. | DEMAND FOR JURY TRIAL |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................ii-v

I.      INTRODUCTION ....................................................................................1

II.     SUMMARY OF ALLEGATIONS ...........................................................3

        A.      The Rating Agencies' Role In The Certificate
                Offerings ....................................................................................3

        B.      The Certificates' Ratings ..........................................................5

III.    ARGUMENT ...........................................................................................6

        A.      The Rating Agencies Are Liable As Underwriters ....................7

                1.      Underwriters Are Those Who Participate In
                        A Security's Distribution .................................................7

                2.      The Rating Agencies Acted As Underwriters .................9

                3.      SEC Rule 436(g)(1) Does Not Preclude
                        Lead Plaintiff's Claims .................................................12

        B.      The Rating Agencies Controlled The Depositor ....................13

        C.      The Offering Documents Contained Untrue
                Statements And Omissions .....................................................15

                1.      The Certificates' Ratings Were Unjustifiably
                        High .............................................................................16

                2.      Defendants Had A Duty To Disclose The
                        Omitted Information .....................................................18

                3.      Lead Plaintiff Is Not Required To Allege
                        Scienter .......................................................................19

                4.      The Bespeaks Caution Doctrine Is
                        Inapplicable .................................................................22

IV.     CONCLUSION .....................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  2009 U.S. Dist. LEXIS 79607 (S.D.N.Y. Sept. 2, 2009) ............................................... passim

*Ackerberg v. Johnson*,
  892 F.2d 1328 (8th Cir. 1989) ...........................................................................................9

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10, 2007)...................................................11

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993)......................................................................................20

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................................14

*In re AOL Time Warner Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)..................................................................................20

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...........................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................................3, 6, 7

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002)................................................................................................18

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) ....................................................................................................23

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ................................................................................13

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  2009 U.S. Dist. LEXIS 37090 (S.D.N.Y. Mar. 23, 2009) .................................................23

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992)................................................................................................18

*In re Global Crossing, Ltd. Sec. Litig.*,
  2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ......................................................................15

*In re Global Crossing Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)..................................................................................13

*Harden v. Raffensperger, Hughes & Co.*,
   65 F.3d 1392 (7th Cir. 1995) ........................................................................2, 8, 11

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..........................................................................................16, 19

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ....................................................................................22

*Ingenito v. Bermec Corp.*,
   441 F. Supp. 525 (S.D.N.Y. 1977)..........................................................................8, 9

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...................................................................14, 15

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004) .......................................................................23

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*,
   815 F.2d 240 (2d Cir. 1987)......................................................................................24

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
   496 F.3d 229 (2d Cir. 2007).........................................................................................7

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
   2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009)..........................................................21

*Lin v. Interactive Brokers Group, Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008).......................................................................21

*In the Matter of Lorsin, Inc.*,
   82 S.E.C. Docket 3044 (May 11, 2004)......................................................................9

*McFarland v. Memorex Corp.*,
   493 F. Supp. 631 (N.D. Cal. 1980) ...........................................................................11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003).......................................................................19

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999).........................................................................16

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
   2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ...............................................................19

*In re NovaGold Res., Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009).........................................................................6

*Olkey v. Hyperion 1999 Term Trust*,
    98 F.3d 2 (2d Cir. 1996)....................................................................................23

*Owens v. Gaffken & Barriger Fund, LLC*,
    2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009)........................................................15

*Pinter v. Dahl*,
    486 U.S. 622 (1988)...........................................................................................8

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    2009 WL 3149775 (D. Mass. Sept. 30, 2009) ................................................17, 18

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ................................................................................22

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................10, 11

*In re Refco, Inc. Sec. Litig.*,
    2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ................................................10, 11

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................19, 22

*SEC v. Allison*,
    1982 WL 1322 (N.D. Cal. Aug. 11, 1982) .........................................................9, 10

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ............................................................................14

*SEC v. Holschuh*,
    694 F.2d 130 (7th Cir. 1982) ..............................................................................9

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005)........................................................................2, 8, 11

*SEC v. Lybrand*,
    200 F. Supp. 2d 384 (S.D.N.Y. 2002)....................................................................9

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) .............................................................................10

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)................................................................8, 9

*SEC v. Van Horn*,
    371 F.2d 181 (7th Cir. 1966) ..............................................................................9

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000)..................................................................................................23

*Special Situations Fund, III, L.P. v. Cocchiola*,
   2007 WL 2261557 (D.N.J. Aug. 3, 2007) ...............................................................................8

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438 (1976)...............................................................................................................16, 19

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000). ...................................................................................16, 21

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................................................19, 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................................3, 13, 14, 15

*In re Wash. Mut. Sec. Deriv. & ERISA Litig.*,
   2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) ........................................................20, 21, 22

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)......................................................................................18

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77b(a)(11)..............................................................................................................7

15 U.S.C. § 77k(a) ..............................................................................................................7, 16, 21

15 U.S.C. § 77k(a)(4)..............................................................................................................12

15 U.S.C. § 77k(a)(5)..............................................................................................................7

15 U.S.C. § 77o.......................................................................................................................13

17 C.F.R. § 230.405 ..........................................................................................................3, 13, 14

17 C.F.R. § 230.408 ..............................................................................................................18, 21

17 C.F.R. § 230.436(g)(1)........................................................................................................12

Fed. R. Civ. P. 15(a) ..............................................................................................................24

The Public Employees' Retirement System of Mississippi ("Lead Plaintiff") respectfully submits this memorandum of law in support of its opposition to The Rating Agency Defendants' Motion To Dismiss The Second Amended Complaint ("RA Mot."). Dkt. No. 71.

## I.    INTRODUCTION

Between 2005 and 2006, Moody's Investors Service, Inc. ("Moody's"), McGraw-Hill Companies, Inc., through its division Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") (collectively, "Rating Agencies") participated in the issuance of over $2.6 billion in mortgage-backed certificates ("Certificates") issued by GS Mortgage Securities Corp. (the "Depositor").[1] The registration statement, prospectuses and prospectus supplements ("Offering Documents") contained untrue statements and omissions for which the Rating Agencies are liable under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77 *et seq*. ("Securities Act").

The Rating Agencies played a significant and necessary role in the distribution of the Certificates. The Rating Agencies actively participated in structuring the Certificates, including evaluating default and delinquency rates of the underlying mortgages. ¶¶4, 46, 141. As a condition to the Certificates' issuance, they were assigned a specific set of pre-determined ratings. ¶¶44, 127, 132, 185. Through the Rating Agencies' control of the composition of the mortgage pools, they structured the Certificates to achieve the pre-determined ratings. ¶¶132, 185.

---

[1]  ¶¶3-7, 16-18. References to "¶__" are to the Second Amended Class Action Complaint for Violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Complaint"). Dkt. No. 65. "Defendants" refers collectively to (1) Goldman Sachs Group, Inc. ("Goldman Sachs"), Goldman Sachs Mortgage Company ("Sponsor"), the Depositor, and Goldman Sachs & Co. ("Underwriter") (together, the "Goldman Sachs Defendants"); (2) Daniel L. Sparks, Mark Weiss and Jonathan S. Sobel (the "Individual Defendants"); and (3) the Rating Agencies.

The ratings were integral to distributing the Certificates to investors because many banks, mutual funds and public pension funds are prohibited from buying securities that are not investment-grade.   ¶38.   Defendants marketed the Certificates "primarily to institutional investors."  *Id.*  Ultimately, the Rating Agencies assigned AAA ratings to over 85% of the Certificates.  ¶4.

The Certificates' ratings were based on insufficient information and faulty assumptions concerning the number of underlying mortgages that were likely to default.  ¶¶4, 141.  The credit rating models were not updated despite the existence of modern models that considered nearly 10 million loans and "covered the full spectrum of new mortgage products."  ¶148.  Likewise, the SEC found that the Rating Agencies, in rating mortgage-backed securities such as the Certificates: (1) had no specific written procedures; (2) failed to document or provide rationale for deviations from models; and (3) had no specific procedures to identify or address errors in their models or methodologies.  ¶143.  The Rating Agencies have now downgraded nearly all the Certificates, many to below investment-grade.  ¶¶7, 151.

Having engaged in activities necessary to the distribution of these Certificates, the Rating Agencies are liable as Section 11 "underwriters," as defined in Section 2(a)(11) of the Securities Act.  *See SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005); *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995).

In addition, the Rating Agencies controlled the structure and issuance of the Certificates and are liable as control persons under Section 15.  Their prominent role allowed them to control the Depositor – whose exclusive corporate purpose was to issue mortgage-backed securities.  The Rating Agencies clearly had the "power to direct or cause the direction of the

management and policies of" the Depositor.  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.

Supp. 2d 158, 187-88 (S.D.N.Y. 2003) (Baer, J.); 17 C.F.R. § 230.405.

The Rating Agencies, while acknowledging that the Complaint is subject to Rule 8's

notice pleading standard, contend that Lead Plaintiff's allegations should nevertheless be

dismissed.[2]   A complaint, however, can be dismissed only if the Complaint's allegations are

insufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  Here, the Rating Agencies were at the center of distributing billions

of dollars in supposedly AAA investments which have now been downgraded to below

investment-grade.  ¶¶7, 151-52.  Lead Plaintiff's claims are far more than "plausible," and the

Rating Agencies' motion to dismiss should be denied.  *Twombly*, 550 U.S. at 570.

II.     SUMMARY OF ALLEGATIONS

      A.     The Rating Agencies' Role
             In The Certificate Offerings

The Rating Agencies played a unique and vital role in over $2.6 billion in Certificate

offerings. The Sponsor originated and acquired large volumes of residential mortgage loans.

¶25.  The Sponsor then transferred a pool of these loans to the Depositor who "deposited" them

into an issuing trust and divided the cash flows into Certificates, or tranches.  ¶¶25-27.  Senior

tranches were purportedly more protected from loss, but offered lower returns, while junior

tranches offered higher risk, but greater returns.  ¶26.  The Offering Documents stated that

"[t]he depositor will not have any business operations other than securitizing mortgage assets

---

[2]  The Rating Agencies join the Goldman Sachs Defendants' contentions that Lead Plaintiff's claims are untimely and that Lead Plaintiff lacks standing. RA Mot. at 2 n.4. For law and facts opposing those arguments, Lead Plaintiff respectfully refers the Court to the concurrently-filed Lead Plaintiff's Opposition To The Goldman Sachs Defendants' Motion To Dismiss The Second Amended Complaint ("Goldman Opp."). "Goldman Mot." refers to the Goldman Sachs Defendants' Motion To Dismiss The Second Amended Complaint.  Dkt. No. 68.

and related activities." *See* Declaration Of Patrice A. Rouse in support of Goldman Mot. ("Rouse Decl."), Ex. D at S-45.  Dkt. No. 69.

The Rating Agencies analyzed the "structural, legal and tax aspects associated with the Certificates" including "the nature of the underlying mortgage loans," "expected default rates" and the "credit enhancement provided for the benefit of the holders of the certificates."  ¶¶46, 127-28, 132-33.  The Rating Agencies also "participated in the drafting and dissemination of the Prospectus Supplements" and assigned pre-determined credit ratings to each tranche.  ¶¶16-18, 162.  These ratings were "a condition to the issuance of the Offered Certificates."  ¶¶44, 127, 132, 185.  Further, the ratings were essential to the Certificates' distribution as banks, mutual funds and public pension funds are required to hold only investment-grade securities.  ¶38.  The Rating Agencies assigned AAA ratings – the highest rating, denoting the smallest risk – to 85% of the Certificates.[3]

The Rating Agencies monitored the ratings throughout the life of the Certificates.  For example, the Depositor, the Master Servicer and the Trustee could amend the Pooling and Servicing Agreement with no opinion of counsel if "a letter from each rating agency confirm[s] that such amendment will not cause the reduction, qualification or withdrawal of the then-current ratings of the certificates."  ¶49.  Additionally, the Master Servicer could not resign unless each Rating Agency provided a letter stating that the resignation would not result in a downgrade of the Certificates.  ¶50.  Finally, the Supplemental Interest Trust's credit default swap counterparty could not be replaced before the Rating Agencies were given ten days' notice

_____

[3]  ¶4.  The highest ratings are "AAA" and "Aaa," respectively.  These ratings signify the highest investment-grade, are of the best quality, and carry the smallest risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  These ratings are considered "investment-grade ratings."  Any instrument rated lower than "BBB" or "Bbb" is considered below investment-grade.

and a letter from the Rating Agencies to the Trustee, the Master Servicer and the Depositor that the action would not result in a downgrade to the Certificates.  ¶51.

       B.    <u>The Certificates' Ratings</u>

The Certificates' ratings were based on outdated and insufficient data and assumptions about the delinquencies and defaults in the underlying mortgage pools.  ¶141.  Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, confirmed that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed a modern ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."  ¶148.  Mr. Raiter noted that because updated models were not used, "expected loss estimates no longer provided the equity necessary to support the AAA bonds."  *Id.*  Mr. Raiter continued:

> had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates…to increase and could have thus caused some of these products to be withdrawn from the market…

¶149.  Jerome Fons, a former Managing Director of Credit Policy at Moody's, confirmed that the Rating Agencies "did not update their models or their thinking."  ¶150.

On July 8, 2008, following its investigation into the Rating Agencies' role in rating mortgage-backed securities, the SEC issued *The Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* ("Summary Report").  The Summary Report found numerous flaws in the Rating Agencies' procedures, including:

- Relevant ratings criteria were not disclosed;
- None of the rating agencies examined had specific written procedures for rating RMBS;

- The rating agencies did not always document significant steps in the rating process – including the rationale for ***deviations from their models*** and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures ***to identify or address errors in their models or methodologies***;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records. As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

¶¶142-43 (emphasis added).

The outdated data, models and deviations from such models resulted in the ratings being unjustifiably high.  ¶¶4, 141.  Fitch, Moody's and S&P maintained investment-grade ratings on the Certificates originally rated "AAA" until February 21, 2008, when Fitch alone downgraded the GSAMP Trust Series 2006-S2 to below investment-grade.  ¶151.  The ratings on virtually all of the Certificates have now been downgraded, and the Certificates are no longer marketable at or near the prices paid by Lead Plaintiff and the Class.  ¶¶7, 151.

III.   ARGUMENT

Violations of Sections 11 and 15 of the Securities Act must be pled in accordance with Rule 8(a) of the Federal Rules of Civil Procedure.  *In re NovaGold Res., Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 283 (S.D.N.Y. 2009).  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" and does not require "detailed factual allegations."  *Twombly*, 550 U.S. at 555.  A complaint can only be dismissed if the plaintiff's factual allegations are insufficient "to state a claim to relief that is plausible on its face."  *Id.* at 570.  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).   At the pleading stage, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.   *Iqbal*, 129 S. Ct. at 1943; *Kassner v. 2nd Ave. Delicatessen, Inc*., 496 F.3d 229, 237 (2d Cir. 2007).

Here, the Complaint contains detailed factual allegations regarding, *inter alia*, the Rating Agencies' roles as underwriters and control persons and their resulting liability for the untrue statements and omissions in the Offering Documents.   Accordingly, the Complaint states a plausible claim.  *Twombly*, 550 U.S. at 570.

  A.  The Rating Agencies Are Liable As Underwriters

   1.  Underwriters Are Those Who
      Participate In A Security's Distribution

Section 11 provides a cause of action against every underwriter with respect to a security offered pursuant to a registration statement which contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); § 77k(a)(5).  The Securities Act defines "underwriter" to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, *or participates or has a direct or indirect participation in any such undertaking*. . ." 15 U.S.C. § 77b(a)(11) (emphasis added).   The legislative history of the Securities Act confirms the broad definition of "underwriter":

> Persons…who participate in any underwriting transaction or who have a direct or indirect participation on such a transaction…***The test is one of participation in the underwriting undertaking*** rather than that of a mere interest in it.

H.R. Conf. Rep. No. 73-152, at 24 (1933); *cf. Pinter v. Dahl*, 486 U.S. 622, 650 n.26 (1988) (liabilities and obligations expressly grounded in participation are found in numerous places in the Securities Act, including the provisions defining underwriter in Section 2(a)(11)).

Courts in this Circuit and elsewhere have interpreted "underwriter" broadly.  *Kern*, 425 F.3d at 152 (underwriter includes every person who engages in "steps ***necessary*** to the distribution of security issues.") (citations omitted).  *See also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 431 (S.D.N.Y. 2007) (stating that "[t]he term [underwriter] should be 'broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public'") (citations omitted); *Special Situations Fund, III, L.P. v. Cocchiola*, 2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) ("To be an underwriter…it is not necessary for a person to undertake the risk that they will be left holding unsold shares…. Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, ***mere participation in an offering is enough***") (emphasis added).  Even *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977), on which the Rating Agencies rely, recognizes that an underwriter either performs the traditional underwriting function, "or he performs some act (or acts) that ***facilitates*** the issuer's distribution."  *Id.* (emphasis added).

In *Harden*, 65 F.3d at 1400, the defendant was retained to perform due diligence on a registration statement and to recommend a minimum yield.  The defendant did not "purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role."  *Id.* at 1396.  Nevertheless, the Seventh Circuit found that the defendant was an underwriter under Section 11 because "its role … was '***necessary*** to the distribution of [the] securities.'"  *Id.* at 1401 (quoting

*SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982) (emphasis added)); *accord SEC v. Van Horn*, 371 F.2d 181 (7th Cir. 1966).

2.    <u>The Rating Agencies Acted As Underwriters</u>

The Rating Agencies had direct involvement in multiple steps which facilitated, and were necessary to, the distribution of the Certificates.  In fact, as detailed above, the Rating Agencies analyzed the Certificates' structure, including the nature of the underlying mortgage loans, expected default and delinquency rates and any credit enhancement (¶¶46, 127-28, 132-33), participated in the drafting and dissemination of the Offering Documents and assigned pre-determined credit ratings to each tranche.   ¶¶16-18, 162.   Clearly, the Rating Agencies *facilitated*, and participated in **steps necessary to**, the Certificates' distribution.  *Ingenito*, 441 F. Supp. at 536*; Universal Express*, 475 F. Supp. 2d at 431.

The Rating Agencies contend that "underwriters" include only those entities that purchase securities from issuers and sell them to investors (*i.e.*, "conduits").   Attempting to support this notion, the Rating Agencies cite a series of cases which analyze the first clause of Section 2(a)(11) – *i.e.,* whether defendants purchased securities with a "view to distribution" – not, as alleged here, whether they indirectly or directly "participated" in the undertaking.  *See, e.g., Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989) (analyzing whether defendant acquired securities with a "view to distribution" or for an issuer "in connection with" a distribution); *In the Matter of Lorsin, Inc.*,  82 S.E.C. Docket 3044, at *7 (May 11, 2004) (analyzing whether defendant acquired stock with a "view towards distribution"); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002) (relying on *Ackerberg* and confining analysis to whether defendants acquired shares with view to distribution); *SEC v. Allison*, 1982 WL 1322, at *3 (N.D. Cal. Aug. 11, 1982) (finding that question of whether defendants acquired

shares with a "view to distribution" was immaterial  and that "[i]t is enough that the defendants

'participated' in these distributions.").[4]  The Rating Agencies cite no decision, and Lead Plaintiff

is unaware of any, holding that Rating Agencies can never be liable as underwriters.

      The Rating Agencies argue that their conduct here is comparable to the alleged

underwriters in *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) ("*Refco*

*I*"), and *In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008) ("*Refco*

*II*").  Not true.  RA Mot. at 7-11, 13-15.  In *Refco I*, defendants purchased unregistered bonds

and "immediately resold the bonds" to the plaintiffs.  503 F. Supp. 2d at 620.  Later, Refco

permitted the holders of the unregistered bonds to exchange them for registered bonds.  Plaintiffs

alleged that the purchasers of the unregistered bonds were "underwriters" of the registered

bonds.  *Id.* at 629.  The court dismissed plaintiffs' complaint as the basis for alleging liability as

an underwriter was a single-sentence "reproduction of the statutory requirement of 'direct or

indirect participation.'"  *Id.* at 629-30.  In their amended complaint, the *Refco* plaintiffs added

that the purchasers of the unregistered bonds and their lawyers were liable as underwriters

because they commented on draft registration statements for the registered offering.  *Refco II*,

2008 WL 3843343, at *4.  The Court concluded that the defendants were not liable as

underwriters, as "participation" under Section 2(a)(11) does not include those who "merely

comment[ed] on a draft of a registration statement...."  *Id.*  Here, unlike the defendants'

---

[4] *Allison* relies on the Ninth Circuit's decision in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980),
which found that "participation" includes those who fulfill ***steps necessary*** to the distribution and
play significant roles in devising and constructing the securities.  There, the alleged
"underwriter" devised the financing scheme for the securities, prepared, reviewed and edited the
offering memoranda, but never actually sold securities.  *Id.* at 637-38.  *Allison* extended *Murphy*
to the Section 2(a)(11) context, stating, "[w]hen...a defendant's actions [a]re necessary to and a
substantial factor in an illegal securities distribution, the defendant is a participant and thus an
underwriter..."  *Allison*, 1982 WL 1322, at *3.

attenuated role in *Refco I* and *Refco II*, the Rating Agencies actively and extensively participated in structuring the Certificates, drafting, editing and reviewing the Offering Documents, and assigning the necessary, pre-determined, investment-grade ratings.[5]

In fact, *Refco II* and *McFarland* actually support Lead Plaintiff's claims.  Both courts reasoned that Section 11 liability extends to those who "hold themselves out to the public as professionals," and the public has a reasonable expectation that they have "investigated the offering with which [they are] involved."  *McFarland*, 493 F. Supp. at 646.  Judge Lynch dismissed the lawyers in *Refco II* because they were "behind the scenes" and never held "themselves out in any respect."  *Refco II*, 2008 WL 3843343, at *4.  The court in *McFarland* dismissed the passive warrant holders because they had none of these "qualifying indicia of underwriters" 493 F. Supp. at 646.  Here, the Rating Agencies were prominently and repeatedly identified in the Offering Documents, including descriptions of their participation in structuring and rating the Certificates.  They held themselves out as participants in the offerings, and the public was unequivocally informed that the issuance of the Certificates was conditioned on their assignment of investment-grade ratings.  ¶¶3-7, 44-51.  Here, the Rating Agencies had all the qualifying indicia of underwriters.  *Harden*, 65 F.3d, at 1400; *Kern*, 425 F. 3d at 152.

---

[5] ¶¶16-18, 44, 132-33, 137, 162.  *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980), and *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2007 U.S. Dist. LEXIS 66911, at *26 (S.D.N.Y. Sept. 10. 2007), are likewise inapposite.  In *McFarland*, plaintiffs alleged that warrant holders who sold warrants to investment banks (who in turn exercised the warrants and sold the stock through a public offering) were liable as underwriters.  493 F. Supp. at 644.  The court found that the warrant holders had "no interest, direct or indirect," and played an inactive role in the public offering.  *Id.* at 646.  In *Adelphia*, plaintiffs alleged that loaning money to an issuer constituted "direct and indirect participation" in an offering.  2007 U.S. Dist. LEXIS 66911, at *26.  The court disagreed and stated that plaintiffs' "bare pleading" did "not suffice to turn lenders into underwriters."  *Id.*  Here, in stark contrast to the passive warrant holders in *McFarland* and the lenders in *Adelphia*, the Rating Agencies structured the Certificates, participated in drafting the Offering Documents and assigned pre-determined ratings necessary to market and sell the Certificates.  ¶¶44, 46, 127-28, 132-33, 185.

3.      SEC Rule 436(g)(1) Does
        Not Preclude Lead Plaintiff's Claims

The Rating Agencies argue that SEC Rule 436(g) expressly exempts them from liability under Section 11.  RA Mot. at 3-4, 7.  Notably, the Rating Agencies' motion omits Rule 436's title – "Consents Required in Special Cases" – which makes clear that 436(g)'s application is limited to cases in which rating agencies would otherwise be liable as "experts" under Section 11(4), not to "underwriters" under Section 11(5).  The plain text of Rule 436(g) confirms its limitation to cases where the rating agency acts as an expert:

> Notwithstanding the provisions of paragraphs (a) and (b) of this section, the security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization [NRSRO] . . . shall not be considered *a part of the registration statement prepared or certified by a person* within the meaning of sections 7 and 11 of the Act.

SEC Regulation C, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1) (emphasis added).

The "prepared or certified" language refers to Section 11(a)(4), which identifies experts among the persons strictly liable for materially false statements or omissions in a registration statement.[6]  Further, Rule 436(g)'s legislative history confirms that it only exempts "the rating organization from liability *as an expert* under Section 11 of the Securities Act for security ratings included in registration statements."  *Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024 01, 42025 (Aug. 18, 1981) (emphasis added).  Rule 436(g) does not apply to underwriters strictly liable pursuant to Section 11(a)(5).  Here, the Complaint alleges claims against the Rating Agencies pursuant to

---

[6] Section 11(a)(4) states that the following persons can be sued for a materially false and misleading statement in a registration statement: "…(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having *prepared or certified* any part of the registration statement…" (emphasis added)  15 U.S.C. § 77k(a)(4).

Section 11(a)(5) ("underwriters").  Rule 436(g) does not insulate the Rating Agencies for their role as Section 11 underwriters.[7]

The Rating Agencies rely on *dicta* from *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 511 F. Supp. 2d 742, 817 n.77 (S.D. Tex. 2005), to support their argument.  RA Mot. at 4. There, however, plaintiffs did not allege violations of Section 11, nor did defendants invoke Rule 436(g).  *Id*. at 809.  In a footnote, the court cited Rule 436(g), but did not apply it to the facts or rely upon it in reaching its conclusions.  *Id*. at 817 n.77.

B.    The Rating Agencies Controlled The Depositor

Section 15 applies to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[s] [11 or 12]."  15 U.S.C. § 77o.  To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator."[8]  Rule 405 defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, ***whether through ownership of voting securities, by contract, or otherwise.***"  17 C.F.R. § 230.405 (emphasis added).  "[S]ection 15 claims need only satisfy the minimal pleading standards of Rule 8."  *Vivendi Universal*, 381 F. Supp. 2d 187-88 (adding that "'naked allegations of control will typically suffice' to plead an adequate Section 15

---

[7] Likewise, the Rating Agencies' argument that Lead Plaintiff is attempting "to erase the consent requirements of § 11(a)(4)" should be ignored.  RA Mot. at 5.  The requirement that experts consent to being named to investors as having prepared and certified a portion of the registration statement is a requirement unique to Section 11(a)(4).  Section 11(a)(5) has no similar consent requirement.

[8] *See, e.g., In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004).  As detailed in the Goldman Sachs Opp., the Depositor committed primary violations of Sections 11 and 12(a)(2).

claim to withstand a motion to dismiss") (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003)).

The Rating Agencies contend that Lead Plaintiff's allegations "lack any of the hallmarks generally considered adequate to plead 'control.'"  RA Mot. at 15.  The purported "hallmarks" of control – such as stock ownership in the controlled entity – are not, however, the exclusive means to plead control.  *See* 17 C.F.R. § 230.405 (control can be shown "through ownership of voting securities, by contract, *or otherwise*" (emphasis added)).  Here, the Rating Agencies had the power to – and did – "cause the direction of the management and policies" of the Depositor "**by contract or otherwise.**"  17 C.F.R. § 230.405 (emphasis added); *Vivendi Universal*, 381 F. Supp. 2d 187-88.  Specifically, the Offering Documents stated that the Depositor was forbidden from engaging in any business activities "other than securitizing mortgage assets and related activities."  *See* Rouse Decl., Ex. D at S-45.  The Rating Agencies controlled every stage of the securitization process from structuring through servicing, including whether to assign the necessary and pre-determined ratings.  If the Rating Agencies did not assign the ratings, the Depositor could not legally issue, market or sell the Certificates.  After issuance, the Rating Agencies continued to exercise control over the Depositor.  ¶¶48-51.  For example, the Rating Agencies – by issuing a letter stating that the Certificates' ratings would not be downgraded – could dispose of the requirement that the Depositor obtain an opinion of counsel prior to amending the Pooling and Servicing Agreement.  ¶49.

The Rating Agencies' cases are either easily distinguished or support Lead Plaintiff's position.  For example, both *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996), and *In re Alstom SA Sec. Litig.*, 406 F. Supp. 433, 486 (S.D.N.Y. 2005), stand for the proposition that the control person inquiry revolves around "direction of the management and

policies of the primary violator.'"   RA Mot. at 13.   Here, as described above, the Rating Agencies **_did_** control the Depositor's policies and corporate purpose.

The Rating Agencies also attempt to rely on _In re Global Crossing, Ltd. Sec. Litig._, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005), and _Owens v. Gaffken & Barriger Fund, LLC_, 2009 WL 3073338, at *12 (S.D.N.Y. Sept. 21, 2009), for the proposition that "[c]onclusory allegations of control are insufficient as a matter of law." RA Mot. at 13.   While this Circuit and others have disagreed – _see e.g., Vivendi Universal_, 381 F. Supp. 2d 187-88 (naked control person allegations will typically suffice); _Initial Pub. Offering_, 241 F. Supp. 2d at 352 – Lead Plaintiff's allegations are far more than conclusory.   The Rating Agencies controlled the Depositor's ability to legally issue, market and sell the Certificates – its sole corporate purpose. This is the essence of control and the Rating Agencies' motion should be denied.

    C.    The Offering Documents Contained
          Untrue Statements And Omissions

As underwriters and control persons, the Rating Agencies are strictly liable under the Securities Act for the untrue statements and omissions in the Offering Documents, not just the unjustifiably high ratings.   The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein, or omitted to state material facts regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the true loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the true level of credit enhancement levels the Certificates provided; and (5) the ratings of the Certificates.   ¶¶5-6.   Lead Plaintiff respectfully refers the Court to Section III.B of the Goldman Sachs Opp. for facts and law establishing these untrue statements and omissions.

1.   The Certificates' Ratings Were Unjustifiably High

Section 11 liability exists where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  This represents a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  The plaintiff need only "allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact."  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).  A misstated or omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Materiality is a mixed question of law and fact which is typically left for the jury to decide.  *Id.* at 449.  A "complaint may not properly be dismissed pursuant to 12(b)(6). . .on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (citation omitted).

Here, the Certificates' ratings constituted an affirmative misrepresentation of the character and investment risk of the Certificates.  Defendants failed to disclose that the ratings were based on "outdated assumptions, relaxed ratings criteria, and inaccurate loan information."  Moreover, updated models were developed, but not implemented.  ¶¶6, 111, 148-49.  In fact, the SEC found that the Rating Agencies updated their models "infrequently," and a former Managing Director of Credit Policy at Moody's admitted that the Rating Agencies "did not

update their models or their thinking." ¶¶145-50.  The SEC also found that the Rating Agencies

failed to document or provide rationale for **deviations from models** or out-of-model adjustments

and had no specific procedures to identify or address errors in their models.  ¶143.  In addition,

Defendants failed to disclose that the Rating Agencies' compensation created conflicts of interest

that were exacerbated when they rated structured products, and could interfere with assigning

"ratings of integrity."[9]  As a result, the Certificates were "far riskier than represented," and were

not equivalent to other investments with the same ratings.  ¶141.  In a similar context, credit

ratings were recently held to be actionable misstatements.  *See Abu Dhabi Commercial Bank v.*

*Morgan Stanley & Co.*, 2009 U.S. Dist. LEXIS 79607, at *35-36 (S.D.N.Y. Sept. 2, 2009)

(finding inflated ratings to be actionable misstatements).

The Rating Agencies rely on *Plumbers' Union Local No. 12 Pension Fund v. Nomura*

*Asset Acceptance Corp.*, 2009 WL 3149775, at *8 (D. Mass. Sept. 30, 2009) – an out-of-circuit

district court decision which is currently on appeal – to support their argument that the Offering

Documents contained no false statements or omissions related to the Certificates' ratings.  RA

Mot. at 11.  In *Nomura*, plaintiffs alleged that Moody's and S&P's used outdated models, but

failed to corroborate these allegations with the SEC's determination that there were deviations

from the models and that the Rating Agencies did not have policies and procedures to identify or

address errors in the models.  2009 WL 3149775, at *8.  The court noted that while it "may be

true" that the ratings were "meaningless," "plaintiffs do not allege that defendants inaccurately

reported the actual ratings awarded by Moody's and S&P."  *Id.* at *28.  Here, Lead Plaintiff's

---

[9]  ¶144.  The fact that investors were unaware of these facts defeats the Rating Agencies' claim
that the issuer-pay compensation model was "publicly known."  As detailed in the Complaint,
the degree to which the MBS compensation model "exacerbated" the conflicts of interest
inherent in the issuer-pay model was unknown until the SEC published the Summary Report in
July 2008.  ¶¶143-47.

allegations are not centered on the accurate reporting of the ratings.  Rather, Lead Plaintiff alleges that outdated models, deviations from those models and conflicts of interest interfered with "ratings of integrity" and caused the credit ratings to be "far riskier than other investments with the same ratings."   ¶¶7, 141.   Given these omissions, the Certificates' ratings were "meaningless" to investors.  2009 WL 3149775, at *8.

2.      Defendants Had A Duty To
<u>Disclose The Omitted Information</u>

The Rating Agencies contend that Lead Plaintiff can cite no authority for the proposition that they had a duty to disclose the truth about the information omitted from the Offering Documents.  RA Mot. at 11-12.  That is simply untrue.  The Offering Documents included select information regarding the structure and ratings of the Certificates.  Defendants, therefore, had a duty to disclose all information necessary to make the statements about those structures and ratings not misleading.  *See* 17 C.F.R. § 230.408 ("[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.").  *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (noting that once a party chooses to discuss material issues, he or she "ha[s] a duty to be both accurate and complete"); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004).  Despite this duty, the Offering Documents failed to disclose specific information – the use of outdated and unreliable models, deviations from such models and the Rating Agencies' compensation – which directly affected whether the Certificates' ratings accurately represented the investment risk of the Certificates.

-18-

The Rating Agencies' cases do not support the contention that they had no duty to disclose the truth.  In *In re Morgan Stanley Tech. Fund Sec. Litig.*, 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009), plaintiffs alleged that the defendant (an investment bank and a series of its mutual funds) had a duty to disclose: (1) conflicts of interest between analysts and investment banking business; and (2) select business practices that might inflate share price.  The court, however, found that the defendant had no duty to disclose because (1) the regulations on which plaintiffs relied were inapplicable to the defendant, *id*. at *7-11; and (2) plaintiffs did not allege "any facts" that any business practice caused share inflation.[10]  Here, the omitted information was directly relevant to the Certificates' value.  Cleary, the disclosure of this information would have "been viewed by the reasonable investor as significantly altering the total mix of information made available.  *TSC Indus.*, 426 U.S. at 449.

3.   Lead Plaintiff Is Not
      Required To Allege Scienter

Undoubtedly, Section 11 does not require investors to allege scienter.  *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (citing *Herman & MacLean*, 459 U.S. at 382).  Attempting to import a scienter requirement, the Rating Agencies contend that their ratings are opinions and, therefore, Lead Plaintiff must plead subjective falsity.  RA Mot. at 1-2, 4-5, 11.  In support, they cite *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991), which

---

[10] *Id.* at *12.  The facts in *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), are akin to those in *Morgan Stanley*.  There, the court held that the defendant mutual fund had no duty to disclose that (1) its broker-dealer affiliate provided investment banking services to companies in which it invested; and (2) the affiliate issued purportedly misleading research reports.  *Id.* at 250-52.  The court concluded that the SEC regulations were inapplicable and the information regarding the purported conflicts of interest was public knowledge.  *Id.*  Here, as explained above, Section 11 and Rule 408 required Defendants to disclose all information necessary to make the statements regarding the ratings not misleading.

held that plaintiffs must show subjective falsity of statements of opinion, specifically, a "fairness opinion." The "subjective falsity standard" articulated in *Virginia Bankshares* does not, however, apply to statements of fact. *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 589 (S.D.N.Y. 1993) ("To extend…*Virginia Bankshares* beyond statements of opinion and belief and apply it to…statements of fact would be tantamount to reading a scienter requirement into Sections 11 and 12(2) which is contrary to the text of these statutes."). In *In re Wash. Mut. Sec. Deriv. & ERISA Litig.*, 2009 WL 3517630, at *21-22 (W.D. Wash. Oct. 27, 2009), the defendant argued that its statements that internal control reports were audited "in accordance with the PCAOB's standards," and that financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" were opinions. *Id.* The court disagreed, finding that each statement was a "verifiable factual statement" and plaintiffs were not required to plead subjective falsity. *Id.* (relying on *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 241-243 (S.D.N.Y. 2004) (finding that fairness opinion was subject to subjective falsity standard, but auditor's certification was not)).

Similarly, the ratings here were comprised of verifiable factual statements which addressed: (1) "the likelihood of the receipt by certificateholders of all distributions of principal and interest;" and (2) "…the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any." ¶¶127, 133. Unlike the opinions in *Virginia Bankshares* (501 U.S. at 1095) and *AOL Time Warner* (381 F. Supp. 2d at 242) that a particular transaction was "fair" from a financial point of view, the assertions related to the ratings represented that the underlying mortgage pools had been evaluated, and – in the case of 85% of the Certificates – designated as the "best quality." ¶¶4, 7, 26. Whether these analyses of the underlying mortgages took place is a verifiable factual statement. *AOL Time Warner*, 381 F. Supp. 2d at 241-43; *Wash.*

*Mut.*, 2009 WL 3517630, at *21-22.  In reality, Defendants failed to disclose that the ratings were based on outdated models, deviations from those models and "inaccurate loan information." ¶¶6, 111, 143, 148-49.  Further, Defendants failed to disclose that the Rating Agencies "did not update their models or their thinking."   ¶¶145-50.  Lead Plaintiff is not required to plead Defendants' subjective belief that these factual statements were false.[11]

In *Abu Dhabi*, 2009 U.S. Dist. LEXIS 79607, at *35-37, Moody's and S&P argued, as they do here, that their ratings were merely non-actionable opinions.  *Id.* at *37.  The court disagreed, finding that the credit ratings were actionable misstatements because "plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned…were accurate and had a basis in fact."[12]  Here, the ratings were "unjustifiably high" because the Rating Agencies deviated from their models, did not update their thinking and were aware of, but failed to implement, newer models and data.   ¶¶6, 111, 143, 145-50.  Finally,

---

[11]  The Rating Agencies' contention that Lead Plaintiff must plead that the omitted facts were "known or knowable, at the time of the offering" is similarly misguided.  RA Mot. at 11.  The Securities Act does not require Lead Plaintiff to allege Defendants' knowledge of misrepresentations or omissions.  "Lack of knowledge of misleading statements in a prospectus is an affirmative defense to a claim . . . for which the defendant bears the burden of proof."  *Twinlab Corp.*, 103 F. Supp. 2d, at 203-05 ("the defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement.").

[12]  *Id.* at 38.  In *Landmen Partners Inc. v. Blackstone Group, L.P.*, 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009) (Baer, J.), this Court recognized that Section 11 imposes strict liability on defendants who fail to include "the information 'required to be stated' in the registration statement."  *Id.* at *9 n.14.  Here, Defendants were required to, but did not, include information necessary to make the information about the Certificates' structure and ratings not misleading.  15 U.S.C. § 77k(a); 17 C.F.R. § 230.408; ¶¶5, 159, 163, 165, 175, 177.  Additionally, *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008), supports Lead Plaintiff's position.  There, defendants moved to dismiss plaintiffs' complaint, arguing that they had no duty to disclose the alleged misstatements as they had no knowledge of the misstatements at the time investors purchased in the initial public offering.  *Id.* at 421-22.  The court recognized that whether the defendants had knowledge was a factual inquiry, and ordered discovery on the issue. *Id.* at 422-23.

the Rating Agencies had no specific procedures to identify or address errors in their models or methodologies and had no specific written procedures for rating mortgage-backed securities. *Id.* These allegations establish that, if the Certificates' ratings were opinions, the Rating Agencies could not have genuinely believed – nor was there any reasonable basis to believe – that they accurately reflected the true risk of the Certificates. *Abu Dhabi*, 2009 U.S. Dist. LEXIS 79607, at *35-37; *Wash. Mut.*, 2009 WL 3517630, at *21-22 (relying on *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) ("an opinion may still be actionable if the speaker does not genuinely believe it or if it is without basis in fact.").

### 4.   The Bespeaks Caution Doctrine Is Inapplicable

The Rating Agencies contend that statements in the Offering Documents regarding the unjustifiably high ratings insulate them from liability under the "bespeaks caution" doctrine. RA Mot. at 12. The statements – which generally assert that (1) the ratings are not recommendations to buy, sell or hold the Certificates; and (2) the ratings do not guarantee payment – are boilerplate, and not precise enough for Defendants to evade liability.

The "bespeaks caution doctrine" has no application to statements of present or historical fact. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). As explained by the Second Circuit:

> The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass in dealing with the contingent or unforeseen future. Historical or present fact – knowledge within the grasp of the offeror – is a different matter. Such facts exist and are known; they are not unforeseen or contingent.

*Id.* at 97. *See also Rombach*, 355 F.3d at 173 ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Here, the untrue

statements and omissions are misrepresentations of present or historical fact.  Specifically, the ratings purported to accurately reflect the ***present*** risk of the Certificates based on ***historical*** facts such as the borrower's credit, employment and payment history, and ***historical*** delinquency and default statistics.  Likewise, the existence of, but failure to implement, updated models and data and the Rating Agencies' compensation arrangement were facts in existence – but not disclosed – at the time the Certificates were issued.  ¶¶143-45.

Even if the misstatements and omissions regarding the ratings were forward-looking – and they were not – the boilerplate disclosures accompanying them do not represent ***meaningful*** cautionary language.   *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000). "[C]autionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed."   *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 2009 U.S. Dist. LEXIS 37090, at *28-29 (S.D.N.Y. Mar. 23, 2009) (citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5-6 (2d Cir. 1996) (emphasis added)). "The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all, security offerings contain cautionary language."   *Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at *28-29.   *See also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (generalized disclosures will not shield defendants as cautionary language must 'warn investors of exactly the risk that plaintiffs' claim was not disclosed.'").

Here, the disclosures are far from sufficiently specific to qualify as "meaningful."  The Ratings Agencies do not – and cannot – cite any disclosure warning that the risk profile of the Certificates is far greater than the ratings represented.  Further, Defendants cannot point to any statement disclosing that the Rating Agencies had access to, but failed to implement, models

which used updated assumptions or that the Rating Agencies deviated from such models. Indeed, the court in *Abu Dhabi* found that the exact disclosures at issue here were "insufficient to protect the Rating Agencies from liability for promulgating misleading ratings."  2009 U.S. Dist. LEXIS 79607, at \*39 (disclaimer that "a credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities" was insufficient).

IV.     CONCLUSION

        For the foregoing reasons, Lead Plaintiff respectfully requests that the Court deny the Rating Agency Defendants' Motion To Dismiss The Second Amended Complaint.  In the event the Court dismisses all or part of Lead Plaintiff's allegations, Lead Plaintiff respectfully requests leave to replead.   Lead Plaintiff is aware of this Court's Individual Practices regarding amendments to Complaints.  While Lead Plaintiff is unaware of any defects in the Complaint, its investigation of Goldman Sachs, the Rating Agencies and the Certificates has continued and Lead Plaintiff could allege additional events to further support its claims.  Fed. R. Civ. P. 15(a) sets forth a policy in favor of granting leave to amend, stating that "[t]he court should freely give leave when justice so requires."  *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987) (reversing denial of request for leave to amend pursuant to "liberal policy").

Dated: December 21, 2009                   BERNSTEIN LITOWITZ BERGER
                                                          & GROSSMANN LLP


                                                  */s/ David R. Stickney*
                                                 DAVID R. STICKNEY

                                           DAVID R. STICKNEY
                                           TIMOTHY A. DeLANGE
                                           ELIZABETH LIN
                                           MATTHEW P. JUBENVILLE
                                           12481 High Bluff Drive, Suite 300
                                           San Diego, CA 92130
                                           Tel:    (858) 793-0070

Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
elizabethl@blbglaw.com
matthewj@blbglaw.com
            -and-
BRUCE D. BERNSTEIN
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
bruce@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead
Plaintiff Public Employees' Retirement System of
Mississippi*


POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Additional Counsel for Lead Plaintiff Public
Employees' Retirement System of Mississippi*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2009, I caused a copy of the foregoing

LEAD PLAINTIFF'S OPPOSITION TO THE RATING AGENCIES' MOTION
TO DISMISS THE SECOND AMENDED COMPLAINT

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter who are registered on the CM/ECF system.

_____*/s/ David R. Stickney*_____
DAVID R. STICKNEY