UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
PUBLIC EMPLOYEES' RETIREMENT                      :
SYSTEM OF MISSISSIPPI, Individually and           :
on Behalf of All Others Similarly Situated,       :
                                                  :
                          **Plaintiffs,**      :
                                                  :    **09 CV 1110 (HB)**
                - against -                    :
                                                  :    **OPINION & ORDER**
GOLDMAN SACHS GROUP, INC.,                        :
GOLDMAN SACHS MORTGAGE COMPANY,                   :
GS MORTGAGE SECURITIES CORP.,                     :
GOLDMAN, SACHS & CO., INC.                        :
MCGRAW-HILL COMPANIES, INC.                       :
MOODY's INVESTORS SERVICE, INC.,                  :
FITCH, INC., DANIEL L. SPARKS, MARK               :
WEISS, JONATHAN S. SOBEL, GSAA HOME               :
EQUITY TRUST 2006-2, GSAA HOME EQUITY             :
TRUST 2006-3, and GSAMP TRUST 2006-S2,            :
                                                  :
                          **Defendants.**      :
                                                  :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

       Lead Plaintiff Public Employees' Retirement System of Mississippi ("MISSPers" or "Plaintiff") brings claims charging the defendants with violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77*l*(a)(2), 77o (2010). These sections, the Plaintiff opines, were violated as a consequence of alleged omissions and misstatements in a registration statement, prospectuses, and prospectus supplements filed with the SEC in connection with three offerings of mortgage pass-through certificates. Pass-through certificates are securities that entitle the holder to income payments from pools of mortgage loans or mortgage backed-securities.

       Plaintiff brings suit against essentially two groups of defendants: First, the Goldman Sachs Defendants, who are alleged to have structured, issued, and sold the pass-through certificates challenged in this litigation (hereinafter, the "Certificates"); and second, the Rating Agency Defendants, who provided credit ratings for the Certificates and also allegedly acted as

1

underwriters based on their role in the structuring of the Certificates.  For the reasons that follow, the claims against the Rating Agency Defendants are dismissed because they cannot be held liable under this set of facts as "underwriters."  Claims against the Goldman Sachs Defendants related to offerings in which Plaintiff did not purchase are dismissed for lack of standing.  Plaintiff's section 11 and section 12(a)(2) claims related to misstatements and nondisclosure of mortgage originators' disregard of loan underwriting guidelines may proceed as to the GSAMP 2006-S2 certificates, which Plaintiff did purchase, as may Plaintiff's section 15 claims against certain of the Goldman Sachs Defendants.

## I.   FACTUAL BACKGROUND[1]

*Parties*

Lead Plaintiff MissPERS is a state government pension plan that serves nearly all non-federal public employees in the State of Mississippi.  It provides benefits to over 75,000 retirees and will provide future benefits to over 250,000 current and former public employees.  It purports to represent a class that "purchased or otherwise acquired mortgage pass-through certificates" which were registered or traceable to a single Registration Statement filed with the SEC.  Second Am. Class Action Compl. ("SAC") ¶ 1, 11.  Although the SAC alleges that the Registration Statement was filed on August 17, 2005, the Goldman Sachs Defendants assert that the challenged offerings were issued pursuant to Registration Statement filed on November 5, 2004 and amended on December 24, 2004, and a base prospectus dated November 17, 2005.  *See* SAC ¶ 39; Rouse Decl. Ex. D.   Between February 2, 2006 and March 28, 2006, Defendants filed prospectus supplements pursuant to which the challenged offerings were issued, each from a separate trust named in the SAC:  The GSAA Home Equity Trust 2006-2, the GSAA Home Equity Trust 2006-3, and the GSAMP Trust 2006-S2.

The various defendants (collectively "Defendants") can be grouped into two sets.  First, there are the "Goldman Sachs Defendants," made up of defendant corporate entities The Goldman Sachs Group, Inc. ("GS Group"), Goldman, Sachs & Co., ("Goldman Sachs"), Goldman Sachs Mortgage Company ("GSMC"), and GS Mortgage Securities Corp. ("GS

---

[1] The following facts are taken from the Second Amended Complaint, the factual allegations in which are accepted as true for purposes of Defendants' motion to dismiss, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.

Mortgage"), [2] who are alleged to have collectively securitized and issued the Certificates. The Goldman Sachs Defendants also include individual defendants ("Individual Defendants") Daniel L. Sparks, Mark Weiss, and Jonathan S. Sobel, who held senior positions at GS Mortgage and, simultaneously, at parent company Goldman Sachs. *See* SAC ¶¶ 20-23. The second group, the "Rating Agency Defendants," is made up of Moody's Investors Service, Inc. ("Moody's"), Fitch Inc. ("Fitch"), and McGraw-Hill Companies, Inc., of which Standard & Poor's Rating Service is a division (hereinafter "S&P") and, all of which are alleged to have acted as underwriters of the offerings. *See* SAC ¶¶ 16-18.

*Mortgage Backed Pass-Through Certificates*

Mortgage-backed pass through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans or, in certain cases, mortgage-backed securities ("MBS"). MBS are themselves created from mortgage loans, which are acquired, pooled together, and then sold to investors who acquire rights in the income flowing from the mortgage pools. *See New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F.Supp.2d 254, 258 (S.D.N.Y. 2010). Although the structure and underlying collateral of the mortgage and MBS underlying various pass-through certificates may vary, the concept is the same. *See* SAC ¶ 24.

In general, to create pass-through certificates, a "depositor" creates an inventory of loans from a sponsor, who originated the loans or bought them from other loan originators. The depositor then transfers the acquired pool of loans to the issuing trust entity. In addition, the depositor must securitize the pool of loans so that rights to the profits from the inventory of loans can be sold to investors. The certificates may be divided into different risk levels known as "tranches," such that the risk of default on the underlying loans corresponds to a lower "tranche" of pass-through certificates. Senior tranches of certificates are generally rated as the best quality, while junior tranches, which are less insulated from risk but offer greater rewards, receive lower ratings. *See* SAC ¶¶ 24-27.

---

[2]Defendants explain that certain Goldman Sachs entities were misnamed in the Second Amended Complaint. The names of the entities provided here accord with the corrected names of the Goldman Sachs Defendants as set forth in their Motion to Dismiss at 1, n.1.

During the securitization process, the depositor works with underwriters and rating agencies to ensure that each tranche receives an appropriate rating at the time of the offering. To sell the pass-through certificates to investors, the issuing trust must return the certificates to the depositor, who, in turn, passes the certificates to one or more underwriters. The underwriters offer the certificates to investors in exchange for cash that will be forwarded to the depositor, minus any underwriting fee. *Id.*

Each pass-through certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans. These payments are collected by the loan servicer and distributed, though the issuing trust, to investors at regular intervals throughout the life of the loans. Mortgage pass through certificates are offered to the public pursuant to a registration statement, in accordance with the provisions of the Securities Act of 1933. *See Id.* ¶ 28.

*The Goldman Sachs Securitizations*

Plaintiff alleges that GS Mortgage, acting as depositor, coordinated with the Rating Agencies and underwriter Goldman Sachs, to sell over $2.6 billion in Certificates from three issuing trusts between February 2, 2006 and March 28, 2006. The sales were pursuant to a single Registration Statement filed August 17, 2005. GSMC acted as sponsor for all three issuing trusts at issue in the litigation, the GSAA 2006-2 Trust, GSAA 2006-3 Trust, and GSAMP 2006-S2 Trust. GSMC but did not originate the underlying mortgage loans; rather, it purchased loans from other originators, and pooled and conveyed the loans to the depositor, GS Mortgage. *Id*. ¶¶ 3, 13, 25-26. GS Mortgage then conveyed a loan pool to each of the three issuing trusts. *Id.* ¶¶ 14, 25, 26, 29. In exchange for the loan pool, each trust transferred pass-through certificates to depositor GS Mortgage, which sold the certificates in separate offerings to investors through the underwriter, Goldman Sachs. *Id.* ¶¶ 15, 27, 29. Although the allegations in the SAC relate to sales of Certificates from all three trusts, the only trust from which Plaintiff is alleged to have purchased Certificates is GSAMP 2006-S2. *Id.* ¶¶ 3, 11, 39-42, 176.

The SAC alleges that the Registration Statement, along with the Prospectus and Prospectus Supplements filed with the SEC (together, the "Offering Documents") set forth the underwriting standards of each loan originator from which GSMC bought mortgages. Since pass-through certificates are valued based on the ability of borrowers to repay the principal and

4

interest on the underlying loans, information related to the underwriting standards is critical to the evaluation of whether to invest in certificates. *See id.* ¶ 32. According to the Offering Documents, the originators of the loans underlying the Certificates were required to assess borrower creditworthiness through an examination of borrower assets, credit history, and employment; however, Plaintiff contends that the originators systematically disregarded these standards, and as a consequence they misrepresented the value of the collateral underlying the Certificates and the potential returns on the Certificates themselves. *Id.* ¶¶ 30, 55, 59, 62, 68, 73, 79, 94, 97; 63, 69, 74, 80, 95, 98, 104. Plaintiff alleges that contrary to representations in the Offering Documents, the underlying loans were frequently based on inflated appraisals and understated loan-to-value ratios.[3] *Id.* ¶¶ 101, 106, 112-13, 115-19.

According to Plaintiff, the Rating Agency Defendants played a substantial role in the securitization process, by evaluating default and delinquency rates of the underlying mortgages. *Id.* ¶¶ 4, 46, 141. Furthermore, the SAC alleges that as a condition to the issuance of the Certificates, they were assigned a specific set of predetermined ratings, which were integral to the distribution of the certificates because it was only "investment-grade" securities that were sought by institutional investors. *Id.* ¶¶ 38, 44, 127, 132, 185. Plaintiff alleges that in order to facilitate the sale of the Certificates, the Ratings Agencies branded the vast majority of them with "AAA" ratings, categorizing them as "best quality" investment-grade securities. Plaintiff contends that these ratings were based on insufficient information and faulty assumptions concerning the number of underlying mortgages likely to default, and therefore, the Certificates were secured by assets that had a much greater risk profile than represented by the ratings.

*Causes of Action*

Plaintiff alleges that the Offering Documents for the Certificate offerings violated section 11 of the Securities Act, because GS Mortgage, Goldman Sachs, the Individual Defendants and the Rating Agency Defendants made misstatements and omissions in the Offering Documents. SAC ¶¶ 157-172. MissPERS further alleges that GS Mortgage and Goldman Sachs violated Section 12(a)(2) of the Securities Act because they "knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses."

---

[3] The loan-to-value ("LTV") ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. A high LTV ratio represents a greater risk of default on the loan.

SAC ¶¶ 173-181.  Finally, Plaintiff brings a cause of action pursuant to Section 15 of the Securities Act against GSMC, GS Group, the Individual Defendants, and the Rating Agency Defendants for "control person liability."  CAC ¶¶ 182-187.   As against GSMC, GS Group, and the Individual Defendants, Plaintiff alleges that their positions made them privy to the material facts concealed from Plaintiff and other class members.  With respect to the Rating Agencies, the SAC alleges that they wielded substantial control over many parties to the securitization of the Certificates, and also exercised control over GS Mortgage through pre-established ratings, a condition precedent to the issuance of the Certificates.

## II.  DISCUSSION

### A.  Legal Standard

A complaint will be dismissed under Rule 12(b)(6) if there is a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F.Supp.2d 532, 538 (S.D.N.Y. 2009).  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief."  *Id.* at 1950.  "Bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat the motion."  *Garber*, 537 F.Supp.2d 597, 610 (S.D.N.Y. 2008).  In addition to well-pleaded factual allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Morgan Stanley Tech. Fund Secs. Litig.*, Nos. 02 Civ. 6153, 02 Civ. 8579 (BSJ), 2009 WL 256005

(S.D.N.Y. Feb. 2, 2009)(applying *ATSI* to Securities Act claims), *aff'd*, Nos. 09-0837-cv, 09-0858-cv, 2010 WL 252294 (2d Cir. Jan. 25, 2010).[4]

*          *          *

Defendants have raised a number of different arguments as to why Plaintiff's claims should be dismissed. The Rating Agency Defendants argue that claims against them should be dismissed because (1) SEC regulations preclude a section 11 claim against rating agencies; (2) they are not "underwriters" as defined by the Securities Act and do not fall within any of the other specifically enumerated categories of parties that may be liable under section 11; (3) Plaintiff fails to allege actionable omissions under section 11; and (4) control person liability under section 15 should be dismissed because they fail to allege a primary violation and because they are not a "control person."  The Goldman Sachs Defendants argue that (1) the Plaintiff lacks standing to assert Section 11 claims as to securities offered by trusts from which it did not purchase, and that it lacks standing to assert Section 12(a)(2) claims even as to the GSAMP 2006-S2 certificates that it did purchase; (2) Plaintiff does not plead any cognizable economic loss; (3) Plaintiff fails sufficiently to allege actionable omissions or misstatements under sections 11 or 12 of the Securities Act; and (4) the statute of limitations bars Plaintiff's claims.

**B.  The Rating Agency Defendants**

Plaintiff contends that the Rating Agency Defendants are liable for violations of sections 11 and 15 of the Securities Act due to actionable misstatements or omissions in the Offering Documents.  Based on the facts alleged in this case, however, Plaintiff simply cannot properly bring claims against the Rating Agency Defendants as "underwriters" as that term is understood in the Securities Act.

---

[4] Claims premised on fraud, including claims brought under the Securities Act, must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, whereas Securities Act claims that "sound in negligence" are governed by the standard notice pleading requirements of Rule 8.  *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  Defendants do not argue that Plaintiffs' claims sound in fraud, Plaintiffs expressly disclaim any allegations of fraud, and their allegations focus on the alleged negligent omission of information.  "Therefore, notice pleading supported by facially plausible factual allegations is all that is required – nothing more, nothing less."  *Id.*; *see also Landmen Partners*, 659 F.Supp.2d at 539, n.5 ("Plaintiff's allegations in this case clearly sound in negligence and not fraud.  Indeed, Blackstone does not argue to the contrary.").

1. **Section 11 and "Underwriter" Liability**

A cause of action may be brought under section 11 of the Securities Act where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). There are five categories of enumerated parties that may be sued under the statute, which, most importantly, includes "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(5). An "underwriter" is defined in the Securities Act as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." § 77b(a)(11).

As both the text of the statute and accompanying legislative history suggest[5], the definition revolves around the sale and distribution of securities. The Second Circuit determined that an underwriter includes persons "engaged in steps necessary to the distribution of security issues." *S.E.C. v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (quoting *S.E.C. v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)). An underwriter is one who "buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution." *In re Refco, Inc. Secs Litig.*, 503 F.Supp.2d 611, 629 (S.D.N.Y. 2007); (internal quotations omitted); *see In re Worldcom, Inc. Secs. Litig.*, 308 F. Supp. 2d 338, 343 (S.D.N.Y. 2004); *see also Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1400 (7th Cir. 1995)("necessary to the distribution of securities"); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989)("underwriter" is generally defined in close connection with the definition and meaning of "distribution."); *SEC v. Int'l Chem. Dev. Corp.*, 469 F.2d 20, 32-33 (10th Cir. 1972) (party was "unquestionably one who

---

[5] According to the House Report, "The term is defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also includes as an underwriter the person who purchases an issue outright with the idea of then selling that issue to the public. The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, in the distribution of a large issue. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter. The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein." H.R. Rep. No. 85, 73rd Cong., 1st Sess. 13 (1933) (emphasis added).

participated or had a direct or indirect participation in the undertaking" because he "served as a conduit for the distribution of these shares to numerous investors").

While the Rating Agency Defendants may have played a significant role in the ability of other defendants to market the securities at issue, and if we were writing on a clean slate, their liability might be presumed, the fact is we are not writing on a clean slate and, for the moment at least, the law insulates them from exposure under section 11 and they must be dismissed.

   2. **Control Person Liability**

Plaintiff also brings a cause of action against the Rating Agency Defendants for "control person liability" under section 15 of the Securities Act. "[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see also Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004). Since Plaintiff has failed to allege primary liability against the Ratings Agency Defendants, their claims under section 15 must also be dismissed.

C. **The Goldman Sachs Defendants**
   1. **Standing**

   *Section 11*

The Certificates at issue were filed pursuant to a single registration statement, but were issued in three distinct offerings by three trusts. Named plaintiff MissPERS allegedly purchased Certificates issued by one of the trusts, GSAMP 2006-S2. SAC ¶ 11. Given that Plaintiff did not purchase certificates from the other two trusts, GSAA Home Equity Trust 2006-2 and GSAA Home Equity Trust 2006-3, the Goldman Sachs Defendants argue that Plaintiff lacks standing as to offerings of certificates from those trusts.

Standing is challenged on the basis of the pleadings, and a district court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). In a putative class action setting, "named plaintiffs…must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* at 106 n.5

(internal quotations omitted, emphasis in original). Plaintiff's argument that this should be held in abeyance until class certification has been accomplished is not persuasive. *See* Pl.'s Mem. Opp. 8. "That a suit may be a class action…adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

To demonstrate Article III standing, Plaintiff must allege (1) injury in fact, a "concrete and particularized harm to a legally protected interest;" (2) causation, a "fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendants," and; (3) redressability, "a nonspeculative likelihood that the injury can be remedied by the requested relief." *See Huff*, 549 F.3d at 106-07 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Section 11 does not create any obligation to allege damages but a plaintiff "must nevertheless satisfy the court that she has suffered a cognizable injury under the statute." *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F.Supp.2d 192, 246 (S.D.N.Y. 2004) (internal citations omitted).

Plaintiff argues that it may represent absent purchasers because the prospectus supplements accompanying each offering were incorporated by reference into a common Registration Statement, and therefore were "parts" of the Registration Statement. Pl.'s Mem. Opp. 8. But the Registration Statement and related base prospectuses are general in content and point investors to specific details contained in the supplements to the individual and distinct prospectus for each offering. *See, e.g.*, SAC ¶¶ 39-42. Most of Plaintiff's factual allegations focus on the underlying details contained in the prospectus supplements and are unique to each of the offerings: the downgrade in credit ratings, the particular guidelines used by the mortgage originator for that pool of loans, and the default and delinquency rates all differ based on the particular offering. Although the makeup of each offering in this case was alleged to be relatively similar, even Plaintiff admits that the percentage of loans from each originator varied among the three issuing trusts that issued the Certificates challenged in the SAC—while the GSAA 2006 Trust contained only loans acquired from Ameriquest Mortgage Company, which themselves may have originated elsewhere, the GSAA 2006-3 Trust contained loans from four major originators and numerous smaller ones. SAC ¶ 53. Furthermore, the trust that issued the Certificates Plaintiff purchased, the GSAMP Trust 2006-S2, is alleged to have contained only loans that were originated by New Century Mortgage Corporation. *Id.* Put another way, the

10

harm Plaintiff may have suffered based on misstatements in the Offering Documents for the Certificates it purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiff did not purchase.

Courts in this circuit and elsewhere have come to similar conclusions on this question. In *In re Salomon Smith Barney Mutual Fund Fees Litigation*, Judge Crotty determined that named plaintiffs in a putative class action "who own shares in twenty of the eighty-eight mutual funds offered" at issue in the case lacked standing to bring suit based on the defendant's other sixty-eight mutual fund offerings. 441 F. Supp. 2d 579, 582-83 (S.D.N.Y. 2006). Judge Kaplan likewise found no standing in a factually similar Securities Act case based on alleged omissions and misstatements in MBS offering documents. *In re Lehman Brothers Secs. and ERISA Litig.*, 684 F.Supp.2d 485 (S.D.N.Y. 2010) ("Named plaintiffs have purchased in nine of the ninety-four offerings. They have not alleged any personal injury stemming from the other eighty-five. They therefore have no standing to assert those claims."); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 08 Civ. 10783 (MGC), Hr'g Tr. at 40:5-41:20 (S.D.N.Y. Jan. 28, 2010) (Denying standing because "plaintiff has not shown that the injuries it alleges based upon purchases of those two trusts are the same injury as those allegedly suffered by purchasers of outlying trusts backed by distinct sets of loans."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F.Supp.2d 299, 303 (D.Mass. 2009) ("[T]he named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they themselves never purchased."). I concur with these well reasoned and common-sense opinions that Plaintiff needs to show an injury connected to the offerings it challenges as misleading, and therefore Plaintiff's claims with regard to Certificates they did not purchase—*e.g.* those issued by the GSAA 2006-2 and GSAA 2006-3 Trusts—are dismissed for lack of standing.

*Section 12(a)(2)*

Defendants next argue that the section 12(a)(2) claims must be dismissed as to those Certificates that Plaintiff actually purchased, because of Plaintiff's failure to plead that the purchases were made directly from Goldman Sachs or GS Mortgage or in a public offering, rather than in the aftermarket. See *Gustafson v. Alloyd Co.*, Inc., 513 U.S. 561, 578 (limiting section 12 liability to "public offerings"). A plaintiff has standing to bring a section 12(a)(2)

claim only against the person or entity from whom he directly purchased a security, including one who engaged in "active solicitation of an offer to buy." *Pinter v. Dahl,* 486 U.S. 622, 645, (1988).

Here, MissPERS' certification specifies the exact security that it bought, and the date of purchase. DeLange Decl. Ex. A. Furthermore, the Complaint alleges that "Plaintiff and other Class members purchased their Certificates directly from GS&Co." SAC ¶ 178. Unlike in *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F.Supp.2d 299 (D. Mass 2009), Plaintiff here does not allege simply that the Certificates were "issued pursuant to, or traceable to the [Offering Documents]," but rather, provides information which, at the pleading stage, is sufficient to find standing for Plaintiff's section 12(a)(2) claims as to the GSAMP Trust 2006-S2 Certificates.

### 2. Statute of Limitations

The Goldman Sachs Defendants also argue that Plaintiff's claims should be dismissed because they are time-barred. The statute of limitations for both section 11 and 12(a)(2) under the Securities Act is one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" and in no event greater than three years after the public offering or sale of the security. 15 U.S.C. § 77m; *see also Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). Circumstances that suggest the existence of these misstatements or omissions, typically known as "storm warnings," create a duty to inquire. *Id.* at 350. Plaintiff filed this action on February 6, 2009, and Defendants argue that Plaintiff's claims must be dismissed because it was on inquiry notice—at a minimum—of the alleged misrepresentations well before February 6, 2008.

Defendants base their argument on the fact that Fitch, Moody's, and S&P placed all classes of the GSAMP 2006-S2 Certificates on "negative watch" and downgraded their ratings of the Certificates by December 2007. While this may have been an indication that the Certificates were performing badly, it does not constitute "triggering information [that] relate[s] directly to the misrepresentations and omissions" that the Plaintiff alleges in the SAC. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008); *New Jersey Carpenters,* 720 F.Supp.2d 254, 267 (S.D.N.Y. 2010). Furthermore, as Plaintiff argues, it was not until February

12

21, 2008 that Fitch—alone among the Ratings Agencies—downgraded the GSAMP Trust Series 2006-S2 Certificates to below investment grade.

Although Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not "relate directly" to the misrepresentations and omissions alleged in the SAC. None of the articles are directly related to the Goldman Sachs issuing trusts; rather, they related to the mortgage originators whose loans comprised the pools out of which the Certificates at issue were created. A plaintiff is on inquiry notice "when the circumstances would suggest to an investor of ordinary intelligence the probability" that he or she has a claim. *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006). Defendants have not demonstrated, at this stage of the proceedings, that Plaintiff should have been on notice as of February 6, 2008 of the alleged misstatement or omissions; thus, Plaintiff's claims will not be dismissed as untimely.

### 3. Failure to Plead Any Cognizable Economic Loss

The Goldman Sachs Defendants next allege that the SAC should be dismissed because Plaintiff does not plead that it, or the class of investors who purchased the Certificates, suffered any cognizable economic loss. They argue that Plaintiff cannot base its assertion of damages upon its sale of its Certificates in a privately negotiated transaction, because the value of the Certificates was not based on their price in a sale in an illiquid market, but rather, the entitlement to receive pass-through payments.

If a plaintiff has no conceivable damages under Section 11, its claim under that section must, as a matter of law, be dismissed. *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 299 (S.D.N.Y. 2008). However, damages in a section 11 case are calculated as the difference between the amount paid for a security and (1) the value of the security at the time the case was filed; *or* (2) the *price at which the security is sold before the suit is filed* or (3) the price at which the security is sold after the suit is filed, if that price is less than (1). Here, Plaintiff alleges that it purchased Certificates at a par value of $99.99, and later sold the Certificates, before it filed this action, at a par value of $16.15. Section 11 does not require Plaintiff to allege more.

### 4. Failure to Allege Actionable Misrepresentations

13

The Goldman Sachs Defendants next argue that Plaintiff has failed to state actionable omissions or misstatements under sections 11 or 12(a)(2). The arguments are specific to each and boil down to claims that (1) the allegedly omitted risks were in fact disclosed; (2) to the extent omitted material was left out of the offering documents, they were under no duty to disclose that information; and (3) the alleged omissions were otherwise insufficiently pled or immaterial as a matter of law.

To state a claim under section 11, Plaintiff must allege that it (1) purchased a registered security either from the issuer or in the aftermarket; (2) defendants participated in the offering in a manner sufficient to give rise to liability under section 11 and; (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *Morgan Stanley*, 592 F.3d at 358-59. Section 12(a)(2) "provides similar redress" to section 11 claims, "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." 15 U.S.C. § 77*l*(a)(2); *Morgan Stanley*, 592 F.3d at 359. "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *Morgan Stanley*, 592 F.3d at 359 (quoting *Huddleston,* 459 U.S. at 382). The analysis of claims made pursuant to section 11 and section 12(a)(2) is essentially the same. *See, e.g., Landmen Partners*, 659 F.Supp.2d at 539 n.6; *Rubin v. MF Global, Ltd.*, 634 F.Supp.2d 459, 466 (S.D.N.Y. 2009).

For misstatement or omission to be actionable under sections 11 or 12(a)(2), a defendant must have a duty to disclose the information, and the omitted or misstated information must be material to the investor. In terms of a duty to disclose, these sections "create[] three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *Morgan Stanley*, 592 F.3d at 360; *see* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). If Plaintiff demonstrates that Defendants bears some duty of disclosure, they must still demonstrate that the alleged omission or misstatement is material, or "whether the defendants representations, taken together and in context, would have misled a reasonable investor." *Morgan Stanley*, 592 F.3d at 360; *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

14

According to Plaintiff, the descriptions of the underwriting guidelines in the Offering Documents contained material misstatements and omissions, because the loan originators systematically disregarded their underwriting standards in order to increase loan volume. *See*, *e.g.*, SAC ¶¶ 52, 63, 69, 74, 80. Defendants assert that it was clear to investors that the loan originators would deviate from their underwriting guidelines.

But "a violation of section 11 will be found when material facts have been omitted or presented in such a way as to '*obscure or distort*' their significance. *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer Co.*, 936 F.2d 759, 761 (2d Cir. 1991); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F.Supp.2d 311, 320 (S.D.N.Y. 2009). The SAC alleges not simply that the Offering Documents omitted the fact that originators could issue loans pursuant to "exceptions," but rather, alleges that the Offering Documents contained material misstatements as to whether the originators applied underwriting standards that took into account each loan applicant's ability to repay. The generalized language in the Offering Documents did not put investors on notice as to the underwriting practices that the loan originators were using, and therefore obscured the actual level of risk faced by investors who purchased the Certificates.

*Section 1111 of Regulation AB*

The Goldman Sachs Defendants further contend that they have sufficiently discharged their duty to disclose, based on Section 1111 of SEC Regulation AB, which provides disclosure requirements for "asset-backed securities," and requires "[a] description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden." 17 C.F.R. § 229.1111(a)(3) (2010). Because of the phrase "to the extent known" in the regulation, the Goldman Sachs Defendants argue that Plaintiff's allegations are insufficient because they fail to allege that Defendants knew of the problems associated with the underwriting guidelines beyond what they disclosed.

Plaintiff's allegations about the loan underwriting guidelines are not precluded by this regulation. Although Plaintiff focuses largely on omissions in the Offering Documents, the SAC can be fairly read to include allegations of affirmative misstatements with regard to the underwriting guidelines. *See In re Lehman Brothers Secs. and ERISA Litig.*, No. 09 MD 2017 (LAK), slip op. at 13. (S.D.N.Y. Feb. 17, 2010) (noting in case with similar claims about

15

underwriting guidelines that, "[i]f the plaintiffs' claims were based on omissions only, this theory might have some merit"). Plaintiff alleges not only that Goldman Sachs Defendants failed to disclose information about the underwriting guidelines, but that the statements about the guidelines were themselves incorrect because the originators failed to disclose that originators disregarded their stated underwriting standards. In other words, Plaintiff alleges that the Goldman Sachs Defendants failed to live up to their additional duty not to make misrepresentations because they affirmatively misstated the guidelines used – or rather, disregarded – by the mortgage originators of the underlying loans. *See Morgan Stanley*, 592 F.3d at 360 (duty to disclose misstatements). "As this claim relies on Section 11 of the Securities Act, and not Section 10(b) of the Securities Exchange Act or Rule 10b-5, the [Goldman Sachs Defendants'] knowledge is immaterial." *Lehman*, 684 F.Supp. at 492.

Plaintiff has pled sufficient factual allegations to plausibly infer that the underwriting guidelines were disregarded by mortgage originators, and in conflict with the disclosures made in the Offering Documents. These allegations are "sufficient at this stage to support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading." *In re Lehman Bros. Securities and ERISA Litig.,* 684 F.Supp.2d 485, 492 (S.D.N.Y. 2010).

5. <u>Control Person Liability</u>

To state a cause of action for control person liability under section 15, 15 U.S.C. § 77*o*, a plaintiff must allege (1) a primary violation of the Securities Act and (2) "control" by the defendant. *See Rombach*, 355 F.3d at 178. The Goldman Sachs Defendants' only argument for dismissal of this claim is that Plaintiff failed to allege a primary violation under section 11 or 12(a)(2). As described above, Plaintiff has sufficiently alleged a primary violation with regard to their allegations about the loan underwriting guidelines. Plaintiff has also sufficiently alleged control by GSMC, GS Group and the Individual Defendants; therefore, Plaintiff's cause of action under section 15 is sufficient to survive a motion to dismiss.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's causes of action against the Ratings Agency Defendants are dismissed. Plaintiff's claims against the Goldman Sachs Defendants with regard

to the offerings they did not purchase are dismissed for lack of standing. Plaintiff's claims related to the disregard of underwriting guidelines may proceed, as may the control person liability claims against GSMC, GS Group and the Individual Defendants. The Clerk of Court is instructed close these motions (No. 67, No. 70) and remove them from my docket.

**SO ORDERED**
January 12, 2011
New York, New York

　　　　　　　　　　　　　　　　　　　　　　　　　　Hon. Harold Baer, Jr.
　　　　　　　　　　　　　　　　　　　　　　　　　　U.S.D.J.

17