UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
PUBLIC EMPLOYEES' RETIREMENT             :
SYSTEM OF MISSISSIPPI, Individually and  :
on Behalf of All Others Similarly Situated, :
                                         :
          Plaintiff,                     :
                                         :    09 CV 1110 (HB)
     - against -                         :
                                         :    OPINION & ORDER
GOLDMAN SACHS GROUP, INC.,               :
GOLDMAN SACHS MORTGAGE COMPANY,          :
GS MORTGAGE SECURITIES CORP.,            :
GOLDMAN, SACHS & CO., INC.,              :
DANIEL L. SPARKS, MARK WEISS,            :
JONATHAN S. SOBEL, GSAA HOME             :
EQUITY TRUST 2006-2, GSAA HOME EQUITY    :
TRUST 2006-3, and GSAMP TRUST 2006-S2,   :
                                         :
          Defendants.                    :
                                         :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

       Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff" or "MissPERS") moves pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) to (1) certify a class of all persons and entities that purchased or acquired publicly offered certificates of GSAMP Trust 2006-S2 (the "Offering") and who were damaged thereby (the "Class"); and (2) appoint Plaintiff as Class Representative and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel. For the following reasons, the motion for class certification and appointment of class counsel is GRANTED.

       **I.    BACKGROUND**

       This securities class action arises out of a single offering, by Defendants The Goldman Sachs Group, Inc., Goldman Sachs Mortgage Co., GS Mortgage Securities Corp., Goldman, Sachs & Co., Daniel L. Sparks, Mark Weiss, and Jonathan S. Sobel ("Defendants"), in March 2006 of $698 million of certificates derived from a pool of securitized fixed-rate, second-lien home mortgages. All of the mortgage loans underlying the certificates were originated by New

1

Century Financial Corp. ("New Century") and purchased by Defendants in late 2005 to be securitized. The Second Amended Complaint ("Complaint") asserts that the Offering Documents for the Certificates contained untrue statements and omitted material facts in violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77*l*(a)(2), 77o. The background to this case is discussed in greater detail in an earlier opinion of this Court. *See Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, No. 09 CV 1110(HB), 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011).

Plaintiff contends that New Century failed to follow its own stated underwriting standards and used improper appraisals overstating the collateral value, and that Defendants failed to conduct adequate due diligence when acquiring the loans for securitization. Consequently, the statements in the Offering Documents concerning compliance with underwriting and appraisal standards were materially untrue when they were made, and as a result, Plaintiff and the Class purchased certificates that were far riskier than represented.

Plaintiff requests that the following Class be certified:

> All persons or entities who purchased or otherwise acquired publicly offered certificates of GSAMP Trust 2006-S2 and who were damaged thereby. Excluded from the Class are Defendants and their respective officers, affiliates, and directors at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

Pl.'s Mem. Supp. Class Certification ("Pl.'s Supp.") 1.

## II.   DISCUSSION

To qualify for class certification, Plaintiffs must prove that the putative class meets the four threshold requirements of Rule 23(a); if those requirements are satisfied, a district court may grant certification if the class is maintainable under at least one of the subsections of Rule 23(b). *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). The party seeking certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Courts must engage in a "rigorous analysis"[1] to determine whether

---

[1] The Second Circuit explained that "(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a

a plaintiff has met this burden. *In re Initial Pub. Offering Sec. Litig.* ("*In re IPO*"), 471 F.3d 24, 36 (2d Cir. 2006). The resolution of any factual dispute that is material to a Rule 23 requirement is made only for the purposes of the class certification phase "and is not binding on the trier of facts, even if that trier is the class certification judge." *Id.* at 41.

### A.     RULE 23(a) REQUIREMENTS

To qualify for class certification, Plaintiffs must prove four elements by a preponderance of the evidence: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. *See* Fed. R. Civ. P. 23(a). In addition to these elements, "Rule 23 contains an implicit requirement that the proposed class be precise, objective and presently ascertainable." *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006). Each of the elements that are at issue in this case will be addressed in turn.

####     i.     Numerosity

Rule 23 permits class certification if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Certification is appropriate when "the number of class members is sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient." *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir. 2007) ("The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate"). The Second Circuit has held that a proposed class of more than forty members presumptively satisfies the numerosity requirement. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Lead Plaintiff argues that numerosity is satisfied because there are more than 150 unique, geographically dispersed investors who purchased or otherwise acquired Certificates in the Offering. Pl.'s Supp. 9. Defendants argue that Plaintiff has not satisfied numerosity, when assessed on a certificate-by-certificate (or tranche) basis, because six of the eleven Certificates were purchased by fewer than five putative class members and two Certificates by fewer than

---

particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; [and] (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement . . . ." *In re IPO*, 471 F.3d at 41.

twenty putative class members. Defs.' Mem. Opp'n Class Certification ("Defs.' Opp'n") 25. The tranches may include certain differences in terms, such as repayment schedules and exposure to risk. However, there is no reason to assume that these differences create any intra-class conflict with respect to the alleged misstatements in the Offering Documents. Nor is there any obvious reason why the tranches should be counted separately. The invocation of tranches as a means to defeat class certification has failed in similar cases and fails here. *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.* ("*Merrill*"), 277 F.R.D. 97, 109 (S.D.N.Y. 2011) (Typicality); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897(HB), 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011) (Adequacy of Representation); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 166 (S.D.N.Y.2011) (Typicality).

    *ii. Commonality*

The commonality requirement of Fed. R. Civ. P. 23(a)(2) is satisfied if "plaintiffs' grievances share a common question of law or fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). A plaintiff must show that its claims rest upon a "common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "What matters to class certification . . . is not the raising of common questions . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks omitted). In securities actions, the commonality requirement is typically satisfied "where putative class members have been injured by similar material misrepresentations and omissions." *In re Initial Pub. Offerings Sec. Litig.*, 243 F.R.D. 79, 85 (S.D.N.Y. 2007).

Lead Plaintiff argues that there are several issues of law and fact common to the class because all the putative class members are alleged to have been impacted by the same misrepresentations and omissions about the collateral.[2] Defendants do not contest the existence

---

[2] The common questions raised by Plaintiff include:

    (1) Whether Defendants violated the Securities Act by the acts and conduct alleged in the Complaint;

    (2) Whether Defendants made materially false and misleading statements in the Offering Documents regarding New Century's underwriting and appraisal practices, Goldman's review of those practices, and the accuracy of the ratings for the certificates;

    (3) Whether Defendants omitted material information from the Offering Documents regarding New Century's underwriting and appraisal practices, Goldman's review of those practices, and the accuracy of the ratings for the certificates;

of commonality *per se* but focus their analysis on how the individual issues predominate. *See infra* (discussing the predominance requirement). Given that questions regarding the alleged misstatements in the Offering Documents and other issues articulated by Plaintiff are susceptible to common answers, Plaintiff has shown that commonality is satisfied. *See Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir.1972) ("[Commonality] is plainly satisfied since the alleged misrepresentations in the prospectus relate to all the investors, and the existence and materiality of such misrepresentations obviously present important common issues.").

     *iii.   Typicality*

To establish typicality, a plaintiff must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings Ltd Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted). "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84–85 (S.D.N.Y. 2007).

Plaintiff argues that its claims are typical of the claims of the Class because, like all other members of the Class, Plaintiff "purchased certificates issued pursuant to the Offering Documents that contained untrue representations and omissions concerning New Century's underwriting and appraisal practices." Pl.'s Supp. 12. Plaintiff explains that "all cash flows to the different tranches of the Offering are based on the performance of the same collateral," and, "to the extent there are untrue statements or material omissions in the Offering Documents, all securities in the Offering will be adversely affected." Pl.'s Supp. 13. Like their argument under numerosity, Defendants argue here that differences among the Certificates defeat typicality as well. Defs.' Opp'n 24–25. While Defendants mention typicality, their arguments focus on adequacy of representation and will be discussed further below. Because Plaintiff has shown that

---

    (4) Whether the Individual Defendants participated in the course of conduct alleged in the Complaint;

    (5) Whether the Class's claims are subject to any common affirmative defenses, including whether Goldman conducted a reasonable due diligence investigation (12th Affirmative Defense);

    (6) Whether Goldman Sachs Group, Goldman Sachs Mortgage Co., and the Individual Defendants controlled GS Mortgage Securities Corp.; and

    (7) The damages sustained by Class members and the appropriate measure of damages.

Pl.'s Supp. 11.

its claims based on misstatements and control-person liability are the same as those of absent Class members, Plaintiff has satisfied the typicality requirement.

   *iv.* *Adequate Representation*

  Rule 23(a) requires parties seeking class certification to establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom*, 574 F.3d at 35 (internal quotation marks omitted). This requires a demonstration that "the proposed class representatives have no interests [that] are antagonistic to the interests of the other members of the class." *In re Vivendi*, 242 F.R.D. at 85 (citation and quotation marks omitted). "In order to defeat a motion for [class] certification, however, the conflict must be fundamental." *In re Flag Telecom*, 574 F.3d at 35 (internal quotation marks omitted).

  Plaintiff argues that its interests are aligned with other putative class members and its counsel has extensive experience in this area. Pl.'s Supp. 13–15. Plaintiff further argues that Plaintiff and its counsel were recently found to be adequate representatives in a similar action, and that there is no reason for a different result here. *See Merrill*, 277 F.R.D. at 110. Defendants argue that Plaintiff's interests are in conflict with other putative class members because (1) Plaintiff is particularly susceptible to a statute of limitations defense, and (2) Plaintiff purports to represent class members who purchased more senior and subordinate certificates, creating a conflict where, for example, a particular settlement structure might fully compensate Plaintiff but not other class members. Defs.' Opp'n 24–25. As discussed further below when evaluating the predominance of common issues, where Defendants' argue the statute of limitations question more strenuously, I find little evidence that the nature of Plaintiff's susceptibility to the affirmative defense is distinctly different from that of any other institutional investor. And, despite the differences among tranches, the conflict that Defendants propose is not "fundamental" because Plaintiff still has the incentive to negotiate a settlement for the highest amount of damages possible and any perverse incentives that may arise given the waterfall structure of the tranches are merely speculative at this stage. Plaintiff's counsel satisfies the adequacy requirement in light of the aligned interests between Plaintiff and absent class

members and of counsel's experience in similar actions. *See Merrill*, 277 F.R.D. at 110. This finding is subject to the caveat in footnote 6 at the conclusion of this Opinion.

**B.     RULE 23(b)(3) REQUIREMENTS**

Plaintiff, in seeking certification for a Rule 23(b)(3) class, are required "to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." *Myers*, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

    *i.     Predominance*

"The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted). In this way, "the main concern in the predominance inquiry" is "the balance between individual and common issues." *Myers*, 624 F.3d at 549 (internal quotation marks omitted). The requirement helps "achieve economies of time, effort, and expense, and promote uniformity of decisions as to person similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* at 547 (internal quotation marks omitted).

    a.  Liability Under §§ 11, 12(a)(2), and 15

To establish a prima facie case under §§ 11 and 12(a)(2), a plaintiff must prove that the defendant made untrue statements of material fact or omitted material facts from the Offering Documents. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Liability under § 15 is derivative of liability under §§ 11 and 12(a)(2), whereby a "control person" may be liable for an underlying primary violation of the securities laws by the "controlled person." A "control person" is one who has "the power, directly or indirectly, 'to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (quoting 17 C.F.R. § 230.405).

Plaintiff argues that these issues predominate in this case and can be established through common proof on a class-wide basis for the following reasons: (1) the Offering Documents contain the same untrue statements and omissions regardless of the class member; (2) the test for the materiality prong is under an objective standard; (3) control person liability is based on whether the Individual Defendants had certain authority within GS Mortgage Securities Corp.; (4) several of the Defendants' defenses are subject to generalized proof; and (5) the statute provides a damages formula that is common to the class. Pl.'s Supp. 17–20. Defendants do not deny much of Plaintiff's argument for predominance but do devote considerable attention to particular affirmative defenses and other specific issues. I address these concerns below.

      b. Individual Investor Knowledge

A defendant in a § 11 claim may raise an affirmative defense where "'the purchaser knew about the false statement at the time of acquisition.'" *Residential Capital*, 272 F.R.D. at 168 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003)) (internal quotation marks omitted). And should the affirmative defense "precipitate individual inquiries as to the knowledge of each member of the class," plaintiffs may be unable to demonstrate that common issues predominate. *In re IPO*, 471 F.3d at 44. While courts must consider affirmative defenses when balancing common and individual issues, "the existence of a defense potentially implicating different class members differently does not *necessarily* defeat class certification . . . ." *Myers*, 624 F.3d at 551. Certification was defeated in *In re IPO*, 471 F.3d at 43 ("The claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme."),[3] and in *Residential Capital*, 272 F.R.D. at 168–69 ("Defendants have mustered a good deal of documentary [and testimonial] evidence imputing knowledge to [Plaintiff's investment advisor.]"). However, common issues predominated in cases similar to the one now before the Court and in *Residential Capital* involving the sale of mortgage pass-through certificates. *See Merrill*, 277 F.R.D. 97; *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., et al.* ("*DLJ*"), No. 08 Civ. 5653(PAC), 2011 WL 3874821 (S.D.N.Y. Aug.16, 2011).

Defendants place considerable emphasis on the question of individual investor knowledge of the alleged misstatements and cite my opinion in *Residential Capital*. *See* Defs.'

---

[3] Plaintiffs in that case also brought a § 10(b) claim, whereby the "claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation.'" *In re IPO*, 471 F.3d at 43.

Opp'n 13–19 (citing *Residential Capital*, 272 F.R.D. 160). In *Residential Capital*, I determined that common issues did not predominate where different putative class members had different levels of knowledge regarding underwriting guidelines and practices. While *Residential Capital* refers to the sophistication of certain class members and their familiarity with the mortgage-backed securities market, 272 F.R.D. at 168, sophistication is not sufficient on its own to find that questions of individual investor knowledge predominate over common issues. *See Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007), *cited by DLJ*, 2011 WL 3874821, at *8–9 n. 1. Indeed, *Residential Capital* rested on a finding of individual investor knowledge that was informed not only by the sophistication of class members and differences in the availability of information over time, but other, more specific, evidence as well. *See, e.g.*, *Residential Capital*, 272 F.R.D. at 169 (finding that certain class members "were extensively involved in the structuring of the [offerings at issue], including in the review and selection of the loans that backed the certificates"). In distinguishing *Residential Capital*, the *DLJ* court found "no such explicit evidence" "directly suggesting that a potential plaintiff had knowledge of the misstatements or omission at issue." *DLJ*, 2011 WL 3874821, at *8–9 n.1. Similarly, in *Merrill*, there was "no allegation . . . that any class member actually participated in the [alleged conduct,]" and "the evidence in the record that any class member knew of false statements in the Offering before purchase [was] weak at best." *Merrill*, 277 F.R.D. at 118. For the reasons that follow, the individual questions of investor knowledge do not rise to a level sufficient to overcome the Plaintiff's showing of predominance.

Defendants argue that individual issues regarding investor knowledge predominate because (1) the securities "were tailored and sold to highly sophisticated investors in individually negotiated transactions"; (2) putative class members "had access to in-depth information about New Century's appraisal and underwriting practices"; (3) reliance by investors on asset managers "compounds the predominance of individualized questions"; and (4) "different levels of knowledge can be imputed to investors who purchased at different times" over the relevant period. Defs.' Opp'n 13–17 (internal quotation marks omitted).

With respect to individually negotiated transactions, Defendants state that the terms of some tranches "are *sui generis* and vary based on each investor's individualized information, appetite and assessments." Defs.' Opp'n 14; *see also id.* at 4–5. These negotiations, however, did not give investors access to information at a level beyond what was already made available in the

9

Offering Documents, where the alleged misrepresentations are found. Rather, the negotiations concerned "investors' desired interest rates, collateralization levels, ratings, and similar deal terms . . . ." Pl.'s Reply Supp. Class Certification ("Pl.'s Reply") 5; *see also* Walter Aff. ¶¶ 4–12 (noting tailored tranches based on interest rates, subordination, duration, and other factors). Common to each negotiation was the assumption that the underlying loans and the Defendants' due diligence were as described in the Offering Documents.

A potentially stronger claim by Defendants is that putative class members had access to information about the loan originator's appraisal and underwriting practices. Defs.' Opp'n 14–15. Defendants assert that investors, as part of their own due diligence and research, had direct interactions with originators at industry meetings, including the originator implicated in this suit. *Id*. Furthermore, investors had access to loan tapes containing "loan-level data that informed them about the loan pool and New Century's practices." *Id.* at 15. But again, without evidence implicating the misstatements at issue, I can't conclude that questions of individual knowledge will predominate on this basis alone. Defendants have shown that certain investors may have had reservations about New Century and a greater or lesser awareness of underwriting exceptions throughout the industry, and this, they opine, makes it more likely that an investor knew about the alleged misstatements in the Offering Documents. These amorphous generalizations hardly rise to the level of *In re IPO* and *Residential Capital*, where there was specific evidence that linked investor activity to the specific offerings at issue. Consequently, the showing here fails the "reasonably reliable inference" test. *See Residential Capital*, 272 F.R.D. at 169; *see also Merrill*, 277 F.R.D. at 118 ("[T]his broad indictment of the housing market as a whole does not suggest that [the investment advisor] had knowledge of the conduct alleged in this case.").

For example, Defendants rely heavily on the deposition of Mr. Clarkson from UBS Global Asset Management—the asset manager to Plaintiff and certain other putative class members—to demonstrate the sophistication and depth of knowledge of institutional investors. *See* Defs.' Opp'n 7. Mr. Clarkson explicitly avoids making any statement about the Certificates here and even suggests that it would be "counter-productive for a dealer to bring loans that they felt weren't written well enough in the context of the structure and pricing [of the Certificates]." Clarkson Dep. 211:9–216:3, July 29, 2011. The loan tapes do provide information about the loans that comprise the Offering, such as interest rates, zip codes, credit scores of borrowers, and loan-to-value ratios. Defs.' Opp'n 7. While Defendants suggest that this data would allow an

investor, during a reverse inquiry, to essentially reverse engineer the standards by which loans were underwritten, the Defendants' expert never reaches that conclusion. Torous Dep. 97:13–105:5, Sept. 16, 2011. This is similar to the Defendants' arguments that with later purchasers, retrospective analyses of loan performance could allow an investor to infer that misstatements were made. Defs.' Opp'n 10. Instead, analyses such as these might allow for inferences to be made regarding the value of the securities offered or to conduct risk assessments based on larger market assumptions.[4] There is no indication, however, that there was sampling of specific loan files or that the level of detail (such as property age, condition, or address) that an underwriter would use to decide whether to grant a loan was available—information that goes to the core of the misstatements alleged here to the effect that underwriting guidelines were actually followed or that the due diligence conducted by the Defendants was adequate. It also shouldn't be ignored that issues like these are largely subject to generalized proof. *See Merrill*, 277 F.R.D. at 119.

Turning finally to investors' reliance on asset managers and the differences in publicly available information over time, Defendants' argue that these factors "cast increasing levels of doubt on whether the loans comprising mortgage backed securities were originated in conformity with appropriate guidelines and risk analyses." Defs.' Opp'n 16 (quoting *Residential Capital*, 272 F.R.D. at 169–70). These arguments carry the same defect as the previous two just discussed. The predominance requirement tests whether proposed classes are "sufficiently cohesive," *Amchem*, 521 U.S. at 623, a test that focuses on the "balance between individual and common issues." *Myers*, 624 F.3d at 549. Casting increasing levels of doubt on whether investors knew of the alleged misstatements is certainly relevant to the balance of common and individual issues. As discussed above, however, in those cases where common issues failed to predominate because of individual investor knowledge, certain putative class members either participated in or had knowledge of the alleged conduct. The balance in those cases was not struck on the *likelihood* of knowledge alone, and I am not persuaded that the potential varying

---

[4] The Defendants' expert provides an example of using the loan-to-value ratio to calculate the value of the property and then, using the zip codes, to determine where these properties fall within the distribution of property values in that community. Torous Dep. 103:12–24. While this may raise suspicions if the loan values are "all falling within the 99th percentile", *id.* at 100:21–22, any inferences made from this data are still at an aggregate level. This type of analysis fails to approach the specificity of the random and adverse sampling of loan files used by Defendants to "[r]e-underwrite loans to ensure they meet the underwriting guidelines." Wales Decl., Sept. 27, 2011, Ex. 2, GSAMP Primer (Mar. 14, 2006), at 48156–57.

11

degrees of investor knowledge here will create issues subject to individual proof sufficient to overwhelm common issues.

        c. Materiality and Loss Causation

Defendants argue that differences in risk among the various Certificates prevent the question of materiality from being common across all Certificates. Defs.' Opp'n 19–20. For instance, Defendants note that the Certificates vary in the ways that the tranche structures shield investors from the risk of defaults. This in turn affects the materiality of the representations made in the Offering Documents because it may change how significant those representations are to the reasonable investor. *Id*. Furthermore, because some Certificates were paid off in full, the alleged misrepresentations did not necessarily cause a loss for some of those more senior Certificates. *Id.* at 20 (citing 15 U.S.C. §§ 77k(e), 77*l*(b)). Plaintiffs respond that "the undisclosed violations of underwriting standards harmed all Certificates by making the underlying loans riskier than disclosed and leading to higher than expected losses." Pl.'s Reply 6.

Defendants overstate the significance of the differences in risk and performance among various Certificates. The questions of materiality and loss causation are subject to objective standards and generalized proof; they are more common than individual issues. *See Merrill*, 277 F.R.D. at 114 (discussing materiality and citing *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y. 1981)); *see also id.* at 119–20 (discussing loss causation). Additionally, negative loss causation is an affirmative defense and does not upset the "common nucleus of facts" that comprise Plaintiff's claims. *DLJ*, 2011 WL 3874821, at *8 (quoting *In re Oxford Health Plans, Inc.,* 191 F.R.D. 369, 377 (S.D.N.Y.2000)). For these reasons, I reject the Defendants' argument that questions of materiality and loss causation are significant individual issues.

        d. Statute of Limitations

Section 11 claims are barred if made more than a year after the "discovery of the untrue statement" or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. "An investor does not have to have notice of the entire [alleged] fraud being perpetrated to be on inquiry notice." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005). Instead, inquiry notice arises from "'notice of . . . facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *LC Capital Partners, LP v. Frontier Ins. Grp.,*

*Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992)). Such notice is "[o]ften referred to as 'storm warnings,'" *Freidus v. ING Groep N. V.*, 736 F. Supp. 2d 816, 827 (S.D.N.Y. 2010), and is assessed objectively under a totality-of-the-circumstances test. *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).

Defendants argue that individual issues as to whether at least some putative class members' claims are time-barred predominate because questions of what knowledge individual investors had at what times are not subject only to generalized proof in this case. Defs.' Opp'n 21–22. In an earlier opinion, I rejected Defendants' motion to dismiss on this ground as it related to public documents, such as ratings downgrades, because the information there did not directly relate to the alleged misstatements in the Offering Documents. *See Goldman Sachs Group, Inc.*, 2011 WL 135821, at *8–9 (S.D.N.Y. Jan. 12, 2011). Defendants seek to provide additional evidence demonstrating the statute of limitations issue will turn on facts that vary among investors, using the Lead Plaintiff as an example.

First, Defendants cite to the deposition of the representative of Plaintiff's counsel, the Mississippi Attorney General:

> MissPERS admitted that it received in 2007 "storm warnings" of its claims, including [law firm] reports to the AG about how "appraisals weren't really . . . done well," borrowers being "put into loans they would not have normally qualified for," and how this affected MissPERS' "securities that were backed by mortgages."

Defs.' Opp'n 21–22 (internal citation omitted) (quoting Neville Dep. 27:17–23, 152:21–22 155:8–11, 217:2, July 12, 2011). Through creative cutting and pasting of this over-200 page deposition, Defendants contend to say that MissPERS' counsel knew or should have known as early as 2007 that the Certificates contained misleading information regarding New Century's underwriting guidelines. Put in context, this evidence differs only marginally from other publicly available information. Rather than being presented with information about the alleged misstatements in this matter, the Mississippi Attorney General's representative was speaking of disclosures regarding the larger issues in the market and in mortgage-backed securities generally.[5] This suggests to me that the supposed individual issues relating to the statute of

---

[5] Mr. Neville stated that the Attorney General's Office was provided "general concerns about holdings that [MissPERS] had in securities that were backed by mortgages." Neville Dep. 27:21–23. The advising firm "came to

13

limitations are still capable of being resolved under objective criteria and are largely driven by generalized proof.

Second, Defendants point to actions taken by BLB&G while under its "monitoring agreement" with Plaintiff. Defs.' Opp'n 22 (noting a 2007 complaint filed against New Century and a press release announcing misconduct relating to New Century's underwriting practices). Plaintiffs respond that there is no evidence suggesting BLB&G was on notice of misstatements in the Offering Documents before February 6, 2008, that the monitoring agreement did not cause BLB&G's knowledge to be imputed to Plaintiff, and that BLB&G advised Plaintiff of potential claims against Defendants only in late 2008 or early 2009. Pl.'s Reply 8–9. I agree with Plaintiffs that the monitoring agreement, which does not retain BLB&G as its representative, is insufficient to impute BLB&G's knowledge to Lead Plaintiff. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("[W]hen an agent is employed *to represent a principal with respect to a given matter* and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal." (emphasis added)). Because of this, the activities of BLB&G prior to its advising Plaintiff of the claim for which it was ultimately retained are part of the larger pool of publicly available information. Regardless of the specificity contained, or not, within the press release, the statute of limitations issues do not predominate.

In sum, Plaintiffs have met their burden to show that common issues predominate. The potential individual issues raised by Defendants do not undermine this finding.

*ii.   Superiority*

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule provides four factors pertinent to the superiority requirement:

(A) The class members' interests in individually controlling the prosecution or defense of separate actions;

---

[the Attorney General's Office] and said based on what they understood, the market conditions and what they thought might happen because of their bankruptcy practice, they asked us to consider looking into this area of investment." *Id.* at 151:19–24. The more specific quotes concerning appraisals and the qualifications of borrowers were based on market conditions and experience with the mortgage industry generally and were not in reference to a specific investment. *See id.* at 152:19–156:25.The rating downgrades were "the kind of, again, significant issues that I felt like up to that point hadn't happened yet in a lot—a lot of the storm warnings that we were—for a better term—that we were getting from [the advising firm]." *Id.* at 217:23–218:4.

>    (B) The extent and nature of any litigation concerning the controversy already brought by or against class members;
>
>    (C) The desirability of concentrating the litigation of the claims in the particular forum; and
>
>    (D) The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). In light of these considerations, I find that Plaintiff has satisfied the superiority requirement.

There is little indication that absent class members have expressed interest in controlling the prosecution of their claim. At the time Plaintiff's motion was fully briefed, none had filed suit. Shortly before this Opinion was published, Defendants brought to my attention that a second individual action was filed by another investor. Given that it has been close to three years since Plaintiff filed this action and that the second action was brought by one of the largest investors in the Certificates, this fact does not change my finding. *Cf. Merrill*, 277 F.R.D. at 120–21. It is unlikely that other actions will be filed, given that many (if not most) investors here lack sufficient resources or economic incentives to do so. *Cf. Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010). The putative class members' investments fall within a broad range, as low as ten thousand dollars, Pl.'s Reply 9, and with a median that may be as low as $1 million, Defs.' Opp'n 23 ("Most investors purchased more than $1 million of Certificates . . . ."). Collective action can be expected to bring advantages in terms of bargaining and efficiency. *AFTRA Ret. Fund*, 269 F.R.D. at 355. In their Opposition Memorandum, Defendants provide examples of some putative class members having filed individual suits in similar matters elsewhere or of other institutional investors bringing individual actions against Defendants in other contexts. It is unclear how this informs the superiority analysis for the proposed class action here other than to suggest that large institutional investors often sue each other. What is missing from Defendants' objection is how these suits implicate the controversy now before the Court.

Concentrating litigation in this forum is desirable because the Court is familiar with the history of this case, having ruled on earlier motions and discovery disputes. Additionally, there are several other benefits, for example, the elimination of the risk of inconsistent judgments, benefits in terms of judicial resources, and the familiarity of the Southern District of New York with securities law.

Defendants argue that the class action is not the superior method because the Court would have to endure significant evidence on the individual issues described above. Defs.' Opp'n 24. In light of my finding that the common issues predominate, it does not seem likely questions regarding individual investor knowledge, statutes of limitation, or any other issue will become unmanageable. This is especially true in light of the numerous case management tools that are available under Rule 23. *See In re Flag Telecom*, 574 F.3d at 37 (noting the Court's ability to alter or amend the class certification order, to certify subclasses, and to issue orders to protect class members and fairly conduct the action).

### III.   CONCLUSION

The Court has considered Defendants' additional arguments and finds them without merit. The motion for class certification is GRANTED. Plaintiff is appointed Class Representative, and Bernstein Litowitz Berger & Grossmann LLP is appointed Class Counsel, subject to its submission of an additional memorandum.[6] Merit discovery will commence in accordance with the pre-trial scheduling order. The Clerk of the Court is instructed to close the motion.

SO ORDERED:

_____
Harold Baer, Jr., U.S.D.J.

Date: 02/2/12

---

[6] These conclusions are subject to the Court being satisfied with Class Counsel's memorandum to be submitted within five days from the date of this Order with information respecting diversity in the class, so far as it is known, and in the trial team. *Cf. Blessing v. Sirius XM Radio Inc.*, No. 09 CV 10035(HB), 2011 WL 1194707, at *12 (S.D.N.Y. Mar. 29, 2011); *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007).