**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>GOLDMAN SACHS GROUP, INC., et al.,<br><br>    Defendants. | Civil Action No. 09-CV-1110-HB<br><br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES**
**<u>AND REIMBURSEMENT OF EXPENSES</u>**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
David Wales
Lauren McMillen
Stephen Brodsky
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
  -and-
David R. Stickney
Niki L. Mendoza
12481 High Bluff Drive, Ste. 300
San Diego, CA 92130
Telephone:  (858) 793-0070
Facsimile:   (858) 793-0323

*Class Counsel for Lead Plaintiff and Class*
*Representative Public Employees' Retirement*
*System of Mississippi*

Dated:  October 4, 2012

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES…………………………………………………………………..iii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 6

I.  PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE SETTLEMENT AMOUNT OBTAINED ................................................................................................ 6

II.  THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD .......................................................................... 7

A.  The Requested Attorneys' Fees Are Reasonable Under The Percentage-of-the-Fund Method ................................................ 7

B.  The Requested Attorneys' Fees Are Reasonable Under The Lodestar Method ............................................................................ 8

III.  OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE OF LESS THAN 17% IS FAIR AND REASONABLE ................................................. 10

A.  The Time And Labor Expended By Plaintiffs' Counsel Support The Requested Fee ........................................................................ 10

B.  The Magnitude And Complexity Of The Litigation Support The Requested Fee ............................................................................... 12

C.  The Risks Of The Litigation Support The Requested Fee ................. 14

D.  The Quality Of Lead Counsel's Representation Supports The Requested Fee ............................................................................... 15

E.  The Requested Fee In Relation To The Settlement Supports The Requested Fee ............................................................................... 17

F.  Public Policy Considerations Support The Requested Fee ................. 18

G.  The Approval Of Lead Plaintiff Supports The Requested Fee ........... 18

IV.  THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE ................................................................................ 19

A.  Lead Counsel's Litigation Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained ................. 19

B.  Lead Plaintiff Should Be Awarded Its Reasonable Costs And Expenses Under 15 U.S.C. § 77z-1(A)(4) ................................... 20

i

C.  Reimbursement Of Reasonable Claims Administration Fees And
    Expenses Should Be Confirmed .......................................................................... 22

V.  THE REACTION OF THE CLASS TO DATE SUPPORTS THE FEE
    AND EXPENSE REQUEST ................................................................................. 22

CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ............................17

*In re Am. Int'l Group, Inc. Sec. Litig.*,
No. 04 Civ. 8141 (DAB), 2010 WL 5060697 (S.D.N.Y. Dec. 2, 2010)................................21

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. Of Albany and Albany Cnty. Bd. of Elections,*
522 F.3d 182 (2d Cir. 2008)................................................................................................9

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
472 U.S. 299 (1985)............................................................................................................6

*In re Bisys Sec. Litig.*,
No. 04 Civ. 3840 (JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ..................................9

*Blum v. Stenson,*
465 U.S. 886 (1984)............................................................................................................7

*Boeing Co. v. Van Gemert,*
444 U.S. 472 (1980)............................................................................................................6

*In re Buspirone Antitrust Litig.*,
MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003)..................8

*In re Canadian Superior Sec. Litig.*,
No. 09 Civ. 10087 (SAS), 2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ............................20

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)................................19

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)................................................................................................14

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010).................8, 9, 14, 17

*D'Amato v. Deutsche Bank,*
236 F.3d 78 (2d Cir. 2001)..................................................................................................5

*Davis v. J.P. Morgan Chase & Co.*,
No. 01-CV-6492L, 2011 WL 4793835 (W.D.N.Y. Oct. 11, 2011)........................................9

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June 9, 2005)..............8, 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    02-CV-3400 (CM), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).................................. passim

*Fogarazzo v. Lehman Bros., Inc.*,
    No. 03 Civ. 5194 (SAS), 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ...............................10

*In re Generics Corp. Sec. Litig.*,
    No. 75 Civ. 6295, 1980 U.S. Dist. LEXIS 15730 (S.D.N.Y. Dec. 4, 1980)............................9

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ........................................................................6

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y 2004) ......................................................................15

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)..................................................................... passim

*Hicks v. Morgan Stanley*,
    No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)....................6, 18, 21

*In re IMAX Sec. Litig.*,
    06 Civ. 6128 (NRB), -- F.R.D. --, 2012 WL 2359653 (S.D.N.Y. June 20, 2012)...................5

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964)........................................................................................6

*Kurzweil v. Philip Morris Cos.*,
    No. 94 Civ. 2373 (MBM), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999)..............................8

*Lane v. Page*,
    -- F. Supp. 2d --, 2012 WL 1940574 (D.N.M. May 22, 2012) .................................5

*In re Lucent Techs., Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) .....................................................................19

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)..................................................................18

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ..................................................................15, 17

*McBean v. City of New York*,
    233 F.R.D. 377 (S.D.N.Y. 2006) .........................................................................5

*Missouri v. Jenkins*,
　491 U.S. 274 (1989)............................................................................................7, 9

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) ..................8

*Parker v. Time Warner Entm't Co.*,
　631 F. Supp. 2d 242 (E.D.N.Y. 2009) ......................................................................14

*In re Royal Dutch/Shell Transport Sec. Litig.*,
　Civ. No. 04-374 (JAP), 2008 WL 1787032 (D.N.J. Apr. 17, 2008)........................................5

*In re Sumitomo Copper Litig.*,
　189 F.R.D. 274 (S.D.N.Y. 1999) ..............................................................................12

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*,
　No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................................16

*In re Telik, Inc. Sec. Litig.*,
　576 F. Supp. 2d 570 (S.D.N.Y. 2008).................................................................6, 9, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)................................................................................................6

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
　724 F. Supp. 160 (S.D.N.Y. 1989)..............................................................................9

*In re Veeco Instruments Inc. Sec. Litig.*,
　No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...................... passim

*In re Wachovia Equity Sec. Litig.*,
　08 Civ. 6171 (RJS), 2012 WL 2774969 (S.D.N.Y. June 12, 2012) ......................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
　396 F.3d 96 (2d Cir. 2006)........................................................................................9

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*,
　364 F. Supp. 2d 980 (D. Minn. 2005)........................................................................22

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 77z-1(a)(4)................................................................................... passim

Fed. R. Civ. P. 23 ..........................................................................................1, 2 11, 12

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730...............................18

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), having achieved a recovery of $26,612,500 in cash for the benefit of the Class, respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 23(h), for an award of attorneys' fees in an amount less than 17% of the Settlement Amount, or $4,488,972.68, and for reimbursement of Lead Counsel's litigation expenses, claims administrator fees and expenses, and the costs and expenses of Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") authorized pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1(a)(4), in the total amount of $811,027.32.[1]

## PRELIMINARY STATEMENT

The $26,612,500 in cash proposed Settlement of the Litigation represents an excellent recovery for the Class in connection with claims under the Securities Act of 1933 ("Securities Act") on a single offering of Residential Mortgage Backed Securities ("RMBS").[2]  This substantial monetary recovery was achieved through the skill, tenacity and effective advocacy of Lead Counsel, who litigated this Litigation on a purely contingent fee basis against highly skilled defense counsel.  The Settlement was achieved in the face of numerous hurdles and risks that, from the outset of the Litigation, threatened no recovery (or a substantially lesser recovery) for the Class.

As detailed in the accompanying Wales Declaration, Lead Counsel vigorously pursued this

---

[1]  The Declaration of David Wales in Support of (A) Lead Plaintiff's Motion for Approval of Class Action Settlement and Approval of Plan of Allocation, and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Wales Declaration" or "Wales Decl.") is being submitted simultaneously herewith.  Lead Counsel respectfully refers the Court to the Wales Declaration for a detailed description of the case and the Settlement.  Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated July 31, 2012 (the "Stipulation").

[2]  As explained in the Stipulation, the total settlement amount is $26,612,500, which consists of: (i) a fund of $21,312,500, subject to a $1,312,500 reduction if Stichting ABP, which has filed a private action against Goldman Sachs, elects to exclude itself from the Class; and (ii) a fund of $5,300,000 for attorneys' fees, litigation expenses, and claims administration expenses, subject to Court approval.

action for over three years, committed the extensive resources necessary to prosecute this complex action through extensive motion practice and discovery within the Court's accelerated pretrial schedule, and reached resolution just three months prior to the scheduled trial date.  From the outset of the case, Lead Counsel faced issues of first impression and complex factual and legal questions surrounding class action litigation over RMBS.   Among other things, Lead Counsel:  (i) researched and prepared three detailed complaints based on its extensive investigation; (ii) opposed and largely overcame motions to dismiss; (iii) conducted class certification and merits discovery, including obtaining over one million pages of documents from Defendants and third-parties in response to Lead Plaintiff's service of over thirty subpoenas and motions to compel, and completing eight depositions; (iv) successfully litigated a class certification motion and was preparing to brief Defendants' Rule 23(f) appeal before the Second Circuit; (v) consulted extensively with multiple experts to develop a strong record; and (vi) engaged in intense settlement negotiations overseen by the Honorable Daniel H. Weinstein (Ret.).

The Settlement achieved as a result of Lead Counsel's efforts is a very favorable outcome for the Class, especially when considered in light of the significant risks confronted in this case.  These risks were exacerbated by the relative lack of established precedent in class actions by purchasers of RMBS, which increased the level of uncertainty and the risks of appellate reversal.   Lead Counsel undertook this representation with no guarantee of payment and faced substantial risks with respect to establishing liability, defeating affirmative defenses, proving damages (and overcoming defenses to damages), and establishing (before both the district court and the Second Circuit) that a class action was appropriate.  Here, through the efforts of Lead Counsel, the Class's claims withstood Defendants' motions to dismiss substantially intact; a Class was certified; and Lead Counsel developed a strong record through discovery and, ultimately, negotiated the substantial Settlement.

The Settlement achieved by Lead Counsel is excellent when compared to settlements in other RMBS cases.  The settlement range of similar cases on a per offering basis is as follows:  Dynex - $7.5 million; Deutsche Bank - $16.25 million per offering; Lehman - $2.35 million per offering; and Merrill Lynch - $17.5 million per offering.[3]

Given the substantial recovery obtained for the benefit of the Class, the complexity and amount of work involved, the skill and expertise required, and the significant risks that counsel undertook, Lead Counsel submits that the requested fee award of less than 17% of the Settlement Fund is fair and reasonable.  Federal courts in this District and throughout the nation have awarded substantially greater fees in other similarly-complex class actions.  Moreover, the requested fee represents a *negative multiplier* on the total value of the time that Plaintiffs' Counsel have dedicated to the Litigation, meaning that the value of Plaintiffs' Counsel's time spent on this case is higher than the amount of the fee requested.  Lead Counsel also requests reimbursement of Lead Counsel's litigation expenses ($725,797.32), claims administrator fees and expenses ($60,000.00), and Lead Plaintiff's costs and expenses ($25,230.00) in the total amount of $811,027.32.

The Court-appointed Lead Plaintiff approves of the fee and expense request as fair and reasonable.  *See* Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to the Public Employees' Retirement System of Mississippi, in Support of (A) Lead Plaintiff's Motion for Approval of Settlement and Plan of Allocation (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiff's Request for Reimbursement of Costs and Expenses ("Neville Decl.") at ¶¶7-8, attached as Exhibit B to the Wales

---

[3] *See In re Dynex Capital Inc. Sec. Litig*., 05 *Civ. 1897 (S.D.N.Y.); Mass. Bricklayers and Masons Trust Funds, et al. v. Deutsche Alt-A Sec. Inc.,* 08-cv-03178-LDW (E.D.N.Y.); *In re Lehman Brothers Sec. & ERISA Litig*., 09-MD-2017-LAK (S.D.N.Y.); *In re Merrill Lynch Mortgage-Backed Sec. Litig*., 08-cv-10841-JSR (S.D.N.Y.).

Decl.  This endorsement is a significant factor in assessing fee and expense requests under the PSLRA.

In addition, pursuant to the Court's Administrative and Notice Order filed August 13, 2012 (ECF No. 141) (the "Notice Order"), copies of the Notice have been disseminated to more than 2,300 potential Class Members and a Summary Notice was published in the national edition of *The Wall Street Journal* and transmitted over the *PR Newswire*.  *See* Declaration of Jennifer M. Keough Re Notice Dissemination and Publication ("Keough Decl.") ¶¶9-10, attached as Exhibit C to the Wales Decl.  The Notice advised potential Class Members that Lead Counsel intended to apply to the Court for an award of attorneys' fees, reimbursement of litigation expenses (which may include the costs and expenses of Lead Plaintiff directly related to its representation of the Class), and claims administration expenses to be paid by Defendants in an amount not to exceed $5.3 million."  Notice ¶6 (Exhibit A to Keough Decl.); *see also* Notice ¶55.

While the deadline for Class Members to object to the requested attorneys' fees and expenses has not yet passed, to date no objection to Lead Counsel's application for fees and expenses has been received.  *See* Wales Decl. ¶121.[4]

Moreover, Judge Weinstein oversaw the joint mediation session and subsequent negotiations, and ultimately recommended the $26,612,500 Settlement Amount and the structure of the Settlement to the parties.  The structure of the Settlement, with the fund to pay fees and expenses up to $5,300,000, as awarded by the Court separate from the Class Settlement Fund, was included in the Mediator's Recommendation after Judge Weinstein's consultation with the Defendants and is designed to address matters raised by the Defendants.  Weinstein Decl. ¶13; Wales Decl. ¶75.  *See McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (Lynch, J.) (approving class action settlement

---

[4] The deadline for the submission of objections is October 18, 2012.  Should any objections be received, Lead Counsel will address them in reply papers.

and award of attorneys' fees where there was a separate fee fund, and stating where "money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").[5]

Judge Weinstein explains that the Settlement was reached only "at the end of an extended mediation process and hard-fought litigation" and "represents a well-reasoned and sound resolution of highly uncertain litigation." Weinstein Decl. ¶2. Judge Weinstein, therefore, "unreservedly recommend[s] the Settlement that has been reached as reasonable, arm's length, and accurately reflective of the risks and potential rewards of the claims being settled." Id. The active involvement of an experienced and independent mediator like Judge Weinstein in the negotiation of the Settlement is strong evidence of the absence of any collusion and further supports the presumption of fairness of the entire settlement.[6]

For the reasons set forth below, Lead Counsel respectfully requests that the Court approve its application for an award of attorneys' fees and reimbursement of expenses.

---

[5] The Stipulation provides that, in the event that the amount that Lead Counsel applies for as attorneys' fees, litigation expenses and claims administration expenses is less than $5.3 million, or the Court awards less than $5.3 million, the difference between $5.3 million and the amount awarded will be returned to Defendants from the Escrow Account. See also Lane v. Page, -- F. Supp. 2d --, 2012 WL 1940574, at *16, *66-68 (D.N.M. May 22, 2012); In re Royal Dutch/Shell Transport Sec. Litig., Civ. No. 04-374 (JAP), 2008 WL 1787032, at *3 (D.N.J. Apr. 17, 2008).

[6] See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); see also In re IMAX Sec. Litig., 06 Civ. 6128 (NRB), -- F.R.D. --, 2012 WL 2359653, at *3, *9 (S.D.N.Y. June 20, 2012) (approving a securities class action settlement previously mediated by Judge Weinstein; finding fact that mediation "took place before retired judges" buttresses presumption of fairness); In re Wachovia Equity Sec. Litig., 08 Civ. 6171 (RJS), 2012 WL 2774969, at *3 (S.D.N.Y. June 12, 2012) (finding procedural fairness supported by the fact that "The parties reached the settlement after arms'-length negotiations by experienced and competent counsel, with the involvement of a mediator, retired Judge Daniel Weinstein."); In re Flag Telecom Holdings, Ltd. Sec. Litig., 02-CV-3400 (CM), 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) (same).

## ARGUMENT

**I.    PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD
       OF ATTORNEYS' FEES FROM THE SETTLEMENT AMOUNT OBTAINED**

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  Courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore to discourage future alleged misconduct of a similar nature.[7]  Indeed, the Supreme Court has emphasized that private securities actions, such as the instant Litigation, are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC.[8]  Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class."  *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

---

[7] *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008*); see In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007) (same); *see also In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) (an award of appropriate attorneys' fees should "provid[e] lawyers with sufficient incentive to bring common fund cases that serve the public interest" and "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so") (citations omitted).

[8] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

## II.   THE REQUESTED ATTORNEYS' FEES ARE
### REASONABLE UNDER EITHER THE PERCENTAGE-
### OF-THE-FUND METHOD OR THE LODESTAR METHOD

### A.   The Requested Attorneys' Fees Are
### Reasonable Under The Percentage-of-the-Fund Method

The Supreme Court has recognized that an appropriate court-awarded fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *See Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989).  If this were a non-representative action, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 33% of the recovery.  *See Blum v. Stenson*, 465 U.S. 886, 903 (1984) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.") (Brennan, J., concurring).

The fee requested here of less than 17% is consistent with (or less than) the amount negotiated with Lead Plaintiff, and is endorsed by Lead Plaintiff.[9]  Notably, the requested award of less than 17% is less than fee awards in other asset-backed securities class action settlements.  *See In re Dynex Capital, Inc. Sec. Litig.,* Civ. No. 05-1897 (HB) (S.D.N.Y. Mar. 13, 2012), ECF No. 138 (awarding 32% of $7.5 million settlement fund); *see also In re Wells Fargo Mortgage-Backed Certificates Litig.*, Case No. 09-CV-1376-LHK (PSG) (N.D. Cal. Nov. 14, 2011), ECF No. 475 (awarding 19.75% of $125 million settlement fund); *Public Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.,* 08-cv-10841-JSR-JLC (S.D.N.Y. May 8, 2012), ECF No. 186 (awarding 17% of $315 million settlement

---

[9] See Neville Decl. ¶7.  The requested fee of $4,488,972.68 represents approximately 16.87% of the agreed upon Settlement Amount of $26,612,500.  Pursuant to the Stipulation, the total combined request for attorneys' fees, and reimbursement of Plaintiffs' Counsel's expenses, claims administration fees and costs, and Lead Plaintiff's costs and expenses is no more than $5,300,000 (the "Lead Counsel Fee and Expense Fund").  If legal fees of 17% and all expenses are awarded, it would total $35,152.32 more than the Lead Counsel Fee and Expense Fund.  As such, Lead Counsel is seeking all of the litigation expenses and is reducing its fee request by $35,152.32.  If, however, less than the all expenses are awarded, Lead Counsel seeks the full 17% fee award.

fund).

The requested percentage is also well within (or less than) the range of percentage fees awarded by this Court and other courts within the Second Circuit in other securities cases. *See, e.g., In re Gildan Activewear Inc. Sec. Litig.,* 08-cv-05048-HB, ECF No. 72 (S.D.N.Y. Mar. 2, 2011) (awarding 25% of $7,425,000 of the settlement fund); *In re Xethanol Corp. Sec. Litig.,* 06-cv-10234-HB, ECF No. 107 (S.D.N.Y. Oct. 6, 2008) (awarding 25% of $2.8 million settlement); *Montoya v. Mamma.Com Inc.*, 05-cv-02313-HB, ECF No. 85 (S.D.N.Y. July 13, 2007) (awarding 25% of $3.15 million settlement fund); *see also In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million settlement fund); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *12-*13 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement fund); *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement fund); *In re Buspirone Antitrust Litig.*, MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding 33⅓% of $220 million settlement fund); *Kurzweil v. Philip Morris Cos.*, No. 94 Civ. 2373 (MBM), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (awarding 30% of $123.8 million settlement fund).

### B.    The Requested Attorneys' Fees Are Reasonable Under The Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, the Second Circuit encourages district courts to cross-check the proposed award against counsel's lodestar. *See Goldberger*, 209 F.3d at 50. When doing so, however, the hours documented "need not be exhaustively scrutinized." *Id.* The lodestar/multiplier method involves calculating the product of the number of hours worked and counsel's respective hourly rates, *i.e.,* the "lodestar," and adjusting the lodestar for contingency, risk and other factors by applying a "multiplier" to the lodestar. *Id.* at 47.

Here, as set forth in the Declarations attached as Exhibits D and E to the Wales Declaration,

Plaintiffs' Counsel expended 14,534.30 hours for a total lodestar of $6,404,641.75 in the litigation of this case.[10]   The lodestar "multiplier" – the requested fee amount of $4,488,972.68 divided by the lodestar – is 0.70 in this case – a **_negative_** multiplier.  This means that, despite the extreme risk of this litigation, Plaintiffs' Counsel would receive only a portion of its standard fees if its full fee request were granted.

This negative multiplier is within the lowest range of lodestar multipliers approved by the courts in this Circuit (where awards of multipliers of lodestar are common) and further demonstrates the reasonableness of the requested fee. Indeed, in complex contingent litigation, lodestar multipliers between 2 and 5 are commonly awarded.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2006) (upholding multiplier of 3.5 as reasonable on appeal); *Davis v. J.P. Morgan Chase & Co.*, No. 01-CV-6492L, 2011 WL 4793835, at *11 (W.D.N.Y. Oct. 11, 2011) (awarding fee representing a multiplier of 5.3, which was "not atypical" in similar cases); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM) (S.D.N.Y. July 20, 2011), ECF No. 117 (awarding fee representing a multiplier of 4.7); *Comverse*, 2010 WL 2653354, at *5 (awarding fee representing a 2.8 multiplier); *Telik*, 576 F. Supp. 2d at 590 ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840 (JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (awarding 30% fee representing a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere"); *Deutsche*

---

[10] The Second Circuit has explained that the hourly rates to be applied in calculating the lodestar are "what a reasonable, paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. Of Albany and Albany Cnty. Bd. of Elections,* 522 F.3d 182, 184 (2d Cir. 2008).  Further, the Supreme Court and the Second Circuit have both approved the use of current rates in the lodestar calculation to "compensate for the delay in receiving compensation, inflationary losses, and the loss of interest." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989) (quoting *In re Generics Corp. Sec. Litig.,* No. 75 Civ. 6295, 1980 U.S. Dist. LEXIS 15730, at *6 (S.D.N.Y. Dec. 4, 1980)); *Jenkins,* 491 U.S. at 284 (1989).

*Telekom*, 2005 U.S. Dist. LEXIS 45798, at *13-*14 (awarding fee representing a 3.96 multiplier).

Where, as here, there is a negative lodestar, that weighs heavily in favor of the requested fee award.  *See Fogarazzo v. Lehman Bros., Inc.,* No. 03 Civ. 5194 (SAS), 2011 WL 671745 at *4 (S.D.N.Y. Feb. 23, 2011) ("Not only is Class Counsel not receiving a multiplier of their lodestar to compensate them for the contingent risk factor, their fee request amounts to a deep discount from their lodestar.  Thus, the lodestar 'cross-check' unquestionably supports a percentage fee award of one-third."); *FLAG Telecom,* 2010 WL 4537550, at *26 ("Lead Counsel's request for a percentage fee representing a significant discount from their lodestar provides additional support for the reasonableness of the fee request.").

### III. OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE OF LESS THAN 17% IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (internal quotes and citation omitted).  Consideration of these factors, together with the analyses above, demonstrates that the fee requested by Lead Counsel is reasonable.

### A. The Time And Labor Expended By Plaintiffs' Counsel Support The Requested Fee

Lead Counsel respectfully submits that achieving the successful resolution of this case has been challenging and required a substantial commitment of resources.  Wales Decl. ¶¶12-78. As noted above, Plaintiffs' Counsel expended 14,534.30 hours prosecuting this Litigation.  Lead Counsel committed substantial resources that included devoting a team of attorneys to prepare the case for trial in accordance with the Court's accelerated pretrial schedule, and succeeded in obtaining an exceptional recovery for the Class after prosecuting the case for years.  *Id*. ¶97.

Lead Counsel's efforts began with a substantial investigation of the facts underlying the Class's claims, including a comprehensive review of publicly available information about the Certificates at issue and the underlying mortgage pools, and the preparation of three detailed consolidated complaints.  Wales Decl. ¶¶12-18.  Lead Counsel also opposed motions to dismiss by Defendants, which required substantial briefing on a number of complex issues (*id.* ¶¶19-21).  Thereafter, Lead Counsel litigated the class certification motion, which required deposing Defendants' expert, examining two Goldman Sachs witnesses (only after Lead Plaintiff was forced to file a successful motion to compel), examining a third-party witness, and preparing for and defending the depositions of Lead Plaintiff's expert witness and two Lead Plaintiff representatives.  Although Lead Plaintiff successfully defeated Defendants' arguments on class certification before this Court, Lead Counsel was forced to continue litigating class certification pursuant to Defendants' Rule 23(f) petition for appellate review of the class certification order.  *Id.* ¶¶28-33, 46-65.

Lead Counsel also conducted extensive fact discovery, which efforts were crucial to developing a strong record and, ultimately, to the Settlement achieved.  As detailed in the Wales Declaration, the parties heavily negotiated almost every aspect of discovery in this Litigation.  *Id.* ¶26.  Ultimately, Lead Counsel obtained evidence from multiple sources and through different discovery procedures during both the class certification and merits phases of discovery.  Overall, Lead Counsel prepared and propounded 63 document requests, 7 interrogatories (each with multiple subparts per local rules), and 14 requests for admission.  In addition, Lead Counsel propounded subpoenas to over 30 non-parties for documents and testimony.  As a result, Lead Counsel obtained over one million pages of documents from Defendants and non-parties for analysis and to support the Class' claims.  *Id.* ¶¶26-60.

Lead Counsel also consulted extensively with experts in specialized areas, including in the

11

areas of RMBS, statistics and economics. *Id.* ¶¶66-69. Finally, Lead Counsel engaged in intense settlement negotiations overseen by Judge Weinstein in order to bring the Litigation to a successful resolution. *Id.* ¶¶70-78. As detailed in the Wales Declaration, the discovery and pretrial process was far advanced, with a trial scheduled for October 2012, at the time Lead Plaintiff reached an agreement to settle. The significant amount of time and effort devoted to this case by Plaintiffs' Counsel, and the efficient and effective management of the litigation, confirm that the fee request here is reasonable.

**B.      The Magnitude And Complexity Of The Litigation Support The Requested Fee**

The magnitude and complexity of the Litigation also support the requested fee. Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). This case raised novel and complex issues surrounding structured securities and the nationwide economic downturn.

As discussed in the Wales Declaration, the Litigation raised a number of complex questions that required extensive efforts by Lead Counsel and consultation with experts. To build the case, Lead Counsel conducted an extensive factual investigation, engaged in substantial document discovery, and obtained testimony from key witnesses. In discovery, Lead Counsel obtained one million pages of documents that required analysis within the accelerated pretrial schedule. Given the subject matter of the Litigation, the documents presented complex material. Lead Counsel assured that a team of lawyers was appropriately staffed and guided to effectively manage the documents for use at depositions and to prepare for trial.

Throughout the Litigation, Lead Plaintiff consulted extensively with experts in specialized areas, including in the areas of RMBS, statistics, and economics. First, during the class certification phase of the case, Lead Plaintiff retained an economist who issued an expert report in support of class certification, detailing a financial analysis of the offering, the interrelatedness of the tranches in the

offering and set out a methodology for calculating damages on a class-wide basis.  In the merits phase of the Litigation, Lead Plaintiff retained an expert in mortgage underwriting, who was re-underwriting samples of loans supporting the offering, and a statistician who was analyzing the data of the underlying mortgages and re-underwriting, in order to quantify the misstatements in the Offering Materials.  Lead Plaintiff had consulted with experts on due diligence, to evaluate Goldman Sach's due diligence processes, and their expected due diligence defense.  Further, Lead Plaintiff's economist expert from class certification was preparing a damages report.  These experts all assisted Lead Plaintiff with the analysis of the various issues in the case.  Wales Decl. ¶¶66-69.

Many of the arguments raised in Defendants' motions to dismiss, their opposition to class certification and their Answer raised complex and novel legal issues, including issues of Article III standing, cognizable damages, rating agency liability under the Securities Act, the statute-of-limitations and due diligence defenses, and others.  Wales Decl. ¶¶19-21.  The scope of these arguments was also indicative of the many complex issues that the Litigation continued to present as the Litigation proceeded and of the vigorous defense that Defendants' Counsel had mounted and would continue to pursue throughout the course of the Litigation.

If the Litigation had not been settled, there would have been further fact discovery (Lead Plaintiff had issued notices of six fact depositions of relevant Goldman Sachs and non-party witnesses, which depositions were scheduled at the time the agreement-in-principle to settle was reached); expert discovery that would have been critical to the case, including on the issues of due diligence and damages; contested motions for summary judgment; a trial that would certainly require substantial factual and expert testimony; and inevitable appeals, including the appeal that was already pending at the time the Settlement was reached.  Accordingly, the magnitude and complexity of this Litigation support the conclusion that the requested fee is reasonable and fair.

**C.**      **The Risks Of The Litigation Support The Requested Fee**

The risk of the litigation is often considered the most important *Goldberger* factor.  *See Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at \*5; *Telik*, 576 F. Supp. 2d at 592.  The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted), *abrogated on other grounds by Goldberger*, 209 F.3d 43.  When considering the reasonableness of attorneys' fees in a contingency action, the Court should consider the risks of the litigation at the time the suit was brought.  *See Goldberger*, 209 F.3d at 55; *Parker v. Time Warner Entm't Co.,* 631 F. Supp. 2d 242, 261 (E.D.N.Y. 2009) (the court should consider "the contingent nature of the expected compensation" and the "risk of non-payment viewed as of the time of the filing of the suit").  The Court should bear in mind that "[l]ittle about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."  *Comverse*, 2010 WL 2653354, at \*5.

While Lead Counsel believes that the claims of Lead Plaintiff and the Class have merit, it recognized that there were significant uncertainties and risks from the outset as to whether Lead Plaintiff would ultimately be able to prove liability and establish damages, as well as with respect to the amount of damages that Lead Plaintiff could establish.  As discussed in the Wales Declaration and in the memorandum of law in support of the Settlement, there were substantial risks here with respect to Lead Plaintiff's ability to sustain the action, continue to maintain it as a class action, and prove that Defendants had made material misstatements or omissions and to establish that the alleged misstatements, rather than other factors (such as the overall economic downturn, housing price declines or reduced liquidity in the market for mortgaged-backed securities), were the cause of the

14

Class's losses.  Wales Decl. ¶82.  If Defendants were to prevail, the Class – and therefore counsel – would receive nothing.

These risks were enhanced in this Litigation because many of the legal and factual issues were issues of first impression, or for which there was little or no favorable authority, in the context of RMBS litigation.  *Id*. ¶98.  Accordingly, the risks faced by Lead Counsel from the outset of the Litigation were very real.

In the face of these uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of attorney time and a significant expenditure of litigation expenses with no guarantee of compensation.  Wales Decl. ¶103.  "There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise."  *Veeco*, 2007 WL 4115808, at *6.  Lead Counsel's assumption of this contingency fee risk strongly supports the reasonableness of the requested fee.  *See FLAG Telecom*, 2010 WL 4537550, at *27 ("the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

## D.     The Quality Of Lead Counsel's Representation Supports The Requested Fee

The quality of the representation is another important factor that supports the reasonableness of the requested fee.  The quality of the representation here is best evidenced by the quality of the result achieved.  *See Goldberger*, 209 F.3d at 55; *Veeco*, 2007 WL 4115808, at *7; *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y 2004).  Lead Counsel here developed a strong record over the course of years in this highly contested litigation.  Based on that work, Lead Counsel

was able to obtain the Settlement for $26,612,500, for a single RMBS offering.  This offering was for an original principal amount of $698 million in Certificates and was backed by fixed second lien loans from New Century.  As of the date this lawsuit was commenced, investors in the offering had received principal and interest payments of more than $396 million, based on the loans remaining in the trust there was still outstanding balance of more than $177 million, and the remainder had been written off.[11]   As noted above, the settlement range of similar cases on a per offering basis is as follows: Dynex - $7.5 million; Deutsche Bank - $16.25 million per offering; Lehman - $2.35 million per offering; and Merrill Lynch - $17.5 million per offering.

Lead Counsel respectfully submits that the quality of Lead Counsel's efforts in the Litigation to date, together with its substantial experience in securities class actions and commitment to the Litigation, provided Lead Counsel with the leverage necessary to negotiate the significant $26,612,500 Settlement.  In fact, Judge Weinstein noted the high quality of the advocacy of all the attorneys in this case.  Weinstein Decl. ¶5.  The skill and substantial experience of counsel in the specialized field of shareholder securities litigation also support the reasonableness of the requested fee.  *See Teachers' Ret. Sys. v. A.C.L.N., Ltd.,* No. 01-CV-11814 (MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) (the skill and prior experience of counsel in the field is relevant to determining fair compensation).  Lead Counsel specializes in complex securities litigation, including litigation involving mortgage-backed securities, and is highly-experienced in such litigation, with a successful track record in securities cases throughout the country.  *See* Wales Decl. ¶79 and Lead Counsel's firm resume attached thereto as Exhibit D3, and Plaintiffs' Counsel's biography attached thereto as Exhibit

---

[11]  Wales Decl. ¶80.  *See* Trustee Report dated February 25, 2009.  As explained in the Wales Declaration, Lead Plaintiff estimated that recoverable damages could range from approximately $320 million, assuming no negative causation, to near zero, assuming Defendants' position on negative causation.  Wales Decl. ¶81.

E2.

Courts have also repeatedly recognized that the quality of the opposition faced by plaintiffs' counsel should also be taken into consideration in assessing the quality of counsel's performance. *See, e.g., Marsh*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *Veeco*, 2007 WL 4115808, at *7 (among the factors supporting a 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."). Here, Defendants were represented by Sullivan and Cromwell LLP, and Cohen and Gresser, LLP, who spared no effort in the defense of their clients. *See* Wales Decl. ¶105. Notwithstanding this formidable opposition, Lead Counsel's ability to present a strong case and to demonstrate its willingness to continue to vigorously prosecute the Litigation enabled Lead Counsel to achieve a favorable settlement for the benefit of the Class.

### E.     The Requested Fee In Relation To The Settlement Supports The Requested Fee

Courts have interpreted this factor as requiring the review of the fee requested in terms of the percentage it represents of the total recovery. "When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *Comverse*, 2010 WL 2653354, at *3. As discussed in detail in Section II above, the requested fee of less than 17% is well within the range of percentage fees that this Court and other courts within the Second Circuit and around the country have awarded in securities cases, including in other asset-backed securities cases. Accordingly, the

17

requested fee is reasonable in relation to the size of the Settlement.

**F.      Public Policy Considerations Support The Requested Fee**

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding."). Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

**G.      The Approval Of Lead Plaintiff Supports The Requested Fee**

Lead Plaintiff was actively involved in the settlement negotiations, directly participating in class certification discovery, including sitting for depositions; and has approved the requested fee. *See* Neville Decl., attached as Exhibit B to the Wales Decl., at ¶¶2, 4-5, 7, 10.  MissPERS is precisely the type of sophisticated and financially interested investor that Congress envisioned serving as a fiduciary for the class when it enacted the PSLRA.   The PSLRA was intended to encourage institutional investors like MissPERS to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at *27 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731.  Congress believed that these institutions would be in the best position to monitor the prosecution and to assess the reasonableness of counsel's fee requests.  Accordingly, Lead

Plaintiff's endorsement of the fee request supports its approval as fair and reasonable. *See, e.g., Veeco,* 2007 WL 4115808, at *8 ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request"); *In re Lucent Techs., Inc. Sec. Litig.,* 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("[s]ignificantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request") (approving fee of 17% of $517 million recovery).

## IV.     THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE

Pursuant to the Stipulation, Lead Counsel's application includes a request for reimbursement of litigation expenses that Lead Counsel reasonably incurred in the successful prosecution of this Litigation ($725,797.32), reimbursement of Lead Plaintiff's costs and expenses pursuant to the PSLRA ($25,230.00), and reimbursement of claims administration fees and expenses ($60,000.00), in the total amount of $811,027.32. *See* Wales Decl. ¶93.

### A.     Lead Counsel's Litigation Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained

As set forth in detail in the Wales Declaration, Lead Counsel incurred $725,797.32 in litigation expenses on behalf of the Class in the prosecution of the Litigation. *See* Exhibit D to Wales Decl. These expenses are properly recovered by counsel. *See, e.g., In re China Sunergy Sec. Litig.,* No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *3 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'"); *FLAG Telecom,* 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class.").

The expenses for which Lead Counsel seeks reimbursement are the types of expenses that are

necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, expert fees, computerized research, mediation costs, travel expenses, photocopying, long distance telephone and facsimile charges, postage and delivery expenses, and filing fees. *See* Exhibit D2 to Wales Decl.  The foregoing expense items are billed separately by Lead Counsel, and such charges are not duplicated in the firm's hourly billing rates.

Indeed, included in the amount of expenses is $435,905.88 paid or payable to Lead Plaintiff's experts and consultants.  This encompasses over 60% of Lead Counsel's total expenses.  *Id.*  As detailed in the Wales Declaration, Lead Counsel worked extensively with experts and consultants at the different stages of the Litigation.  Experts were utilized to prepare the complaints, craft discovery requests, analyze documents, draft the mediation briefs, prepare for trial, and to examine the Plan of Allocation.  Experts were retained in the complex and specialized areas of residential mortgage loan underwriting, due diligence, the mortgage-backed securities industry, statistical sampling, and securities law damages.  Wales Decl. ¶¶66-69, 114.

Without the tremendous work conducted by Lead Plaintiff's experts and consultants, who are at the top of their respective fields, there is a good chance that Lead Plaintiff would not have succeeded in achieving a settlement of this magnitude.  *See In re Canadian Superior Sec. Litig.,* No. 09 Civ. 10087 (SAS), 2011 WL 5830110 at *3 (S.D.N.Y. Nov. 16, 2011) (approving expenses and noting that the expenses, "particularly those attributable to professional services, were a contributing factor to achieving the settlement").

**B.      Lead Plaintiff Should Be Awarded Its Reasonable
          Costs And Expenses Under 15 U.S.C. § 77z-1(A)(4)**

As part of the request for reimbursement of litigation expenses, Lead Counsel also seeks reimbursement of $25,230 in costs and expenses incurred by Lead Plaintiff directly relating to its representation of the Class.  The PSLRA specifically provides that an "award of reasonable costs and

expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 77z-1(a)(4).  Numerous courts have approved such awards under the PSLRA to compensate class representatives for the time and effort they spent on behalf of the class.  *See Hicks*, 2005 WL 2757792, at *10 ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."); *In re Monster Worldwide, Inc. Sec. Litig.*, 07-cv-02237, ECF No. 139 (S.D.N.Y. Nov. 25, 2008); *see also In re Xethanol Corp. Sec. Litig.*, 06-cv-10234-HB, ECF No. 107 (S.D.N.Y. Oct. 6, 2008).

As set forth in the Neville Declaration, Lead Plaintiff MissPERS took an active role in the prosecution of the Litigation through its own employees and those of the Office of the Attorney General of Mississippi ("OAG"), including communicating extensively with Lead Counsel regarding strategy and developments in the Litigation, reviewing all significant pleadings and briefs filed in the Litigation, consulting with Lead Counsel regarding the retention of experts and consultants, supervising the production of discovery by MissPERS, preparing and sitting for depositions, and consulting with Lead Counsel concerning the settlement negotiations as they progressed.  Neville Decl. ¶4.  Pursuant to the PSLRA, MissPERS requests reimbursement totaling $25,230 based on the value of the 152.5 hours that MissPERS and OAG employees expended participating in and managing this Litigation on behalf of the Class.  *Id.* ¶11.

These are precisely the types of activities that courts have found to support reimbursement to class representatives.  *See, e.g., In re Am. Int'l Group, Inc. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010) (granting PSLRA award of $30,000 to institutional lead plaintiffs "to compensate them for the time and effort they devoted on behalf of a class"); *FLAG*

*Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *Veeco*, 2007 WL 4115808, at *12 (characterizing such awards as "routine" in this Circuit); *see also In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 collectively to lead plaintiffs who "fully discharged their PSLRA obligations and have been actively involved throughout the litigation [including] . . . communicat[ing] with counsel . . . [and] review[ing] counsels' submissions."). The award sought by Lead Plaintiff is reasonable and fully justified under the PSLRA and should be granted.

### C.   Reimbursement Of Reasonable Claims Administration Fees And Expenses Should Be Confirmed

Also included in the requested total fee and expense award is a request to pay the Court-approved Claims Administrator, GCG, in the total amount up to $60,000. When the agreement in principle to settle the case was reached, Lead Counsel negotiated a maximum "cap" on claims administration with GCG, in which it agreed to cap the fees for the administration of the project at $60,000, inclusive of expenses, unless there are materially more than 150 claims submitted. *See* Keough Decl. ¶12.

Consistent with the Stipulation and the Court's Notice Order authorize Lead Counsel to pay up to $60,000 from the Escrow Account for all reasonable Notice and Administration Expenses actually incurred, Lead Counsel seeks confirmation of approval to pay GCG $60,000 for the claims administration fees and expenses. Keough Decl. ¶14. *See, e.g., In re Dynex Capital, Inc. Sec. Litig.,* 05-cv-1897-HB, ECF No. 138, ¶8 (S.D.N.Y. Mar. 3, 2012) (approving claims administrator fees and expenses); *In re Xethanol Corp. Sec. Litig.,* 06-cv-10234-HB, ECF No. 107, ¶19 (S.D.N.Y. Oct. 6, 2008) (approving claims administration fees and expenses in the amount of $90,000).

## V.   THE REACTION OF THE CLASS TO DATE SUPPORTS THE FEE AND EXPENSE REQUEST

The reaction of the Class to date supports the fee and expense request. As of September 25, 2012, the Claims Administrator disseminated the Notice to more than 2,300 potential Class Members (Keough Decl. ¶¶7-9), which informed them, among other things, that Lead Counsel

intended to apply to the Court for an award of attorneys' fees, reimbursement of litigation expenses (which, may include the costs and expenses of Lead Plaintiff directly related to its representation of the Class), and claims administration expenses to be paid by Defendants in an amount not to exceed $5.3 million, plus interest earned at the same rate and for the same period as earned by the Settlement Amount.  Notice ¶6 (Exhibit A to Keough Decl.); *see also* Notice ¶55.  While the time to object to the fee and expenses application does not expire until October 18, 2012, to date, not a single objection has been received.  Wales Decl. ¶121.  Should any objections be received, Lead Counsel will address them in its reply papers.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees of less than 17% of the Settlement Amount, or $4,488,972.68, plus interest; reimbursement of Lead Counsel's reasonable litigation expenses incurred in connection with the prosecution of this Litigation in the amount of $725,797.32, plus interest; reimbursement of claims administrator fees and expenses in the amount of $60,000.00; and Lead Plaintiff's costs and expenses in the amount of $25,230.00.

Dated:  October 4, 2012

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


        */s/ David Wales*
        DAVID WALES

David Wales
Lauren A. McMillen
Stephen L. Brodsky
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

        -and-

David R. Stickney
Niki Mendoza
12481 High Bluff Drive, Ste. 300
San Diego, CA 92130
Telephone:  (858) 793-0070
Facsimile:   (858) 793-0323

*Class Counsel and Counsel for Lead Plaintiff and Class Representative Public Employees' Retirement System of Mississippi*